ACCEPTED
13-15-00174-CV
THIRTEENTH COURT OF APPEALS
CORPUS CHRISTI, TEXAS
7/22/2015 8:09:32 PM
CECILE FOY GSANGER
CLERK

No. 13-15-00174-CV

I n The
## Thirteenth Court of Appeals
Corpus Christi, Texas

FILED IN
13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS
7/22/2015 8:09:32 PM
CECILE FOY GSANGER
Clerk

HALE-MILLS CONSTRUCTION, LTD., HALE-MILLS CONSTRUCTION,
INC., and HMC CONTRACTING SOUTH TEXAS, LLC
*Appellants*,

v.

WILLACY COUNTY,
*Appellee*.

On Interlocutory Appeal from the 197th District Court of Willacy County Texas
(Cause No. 2014-CV-0103-A)

---

## APPELLEE'S BRIEF

---

Mazin Sbaiti
State Bar No. 24058096
Bruce Steckler
State Bar No. 00785039
Steckler, LLP
12720 Hillcrest Road, Ste. 1045
Dallas, TX 75230
Telephone: (972) 387-4040
Fax: (972) 387-4041
mazin@stecklerlaw.com
bruce@stecklerlaw.com

Manuel Solis
State Bar No. 18826790
Law Office of Manuel Solis
6657 Navigation Boulevard
Houston, TX 77011
Telephone: (713) 844-2700
Fax: (281) 754-4681
msolis1882@yahoo.com

Ramon Garcia
State Bar No. 07641800
Emerson E. Arellano
State Bar No. 24067490
Law Office of Ramon Garcia, P.C.
222 West University Drive
Edinburg, Texas 78539
Telephone: (956) 383-7441
Facsimile: (956) 381-0825
rgarcia@ramongarcia-law.com
earellano@ramongarcia-law.com

Daniel G. Rios
State Bar No. 00784844
Law Office of Daniel G. Rios, PC
323 W. Nolana Avenue
McAllen, TX  78504
Telephone: (956) 630-9401
Facsimile: (956) 682-0566
dan@danrioslaw.com

**Counsel for Appellee**
**ORAL ARGUMENT REQUESTED**

The following is a complete list of all parties to the trial court's order and the names and addresses of all trial and appellate counsel.

## APPELLANTS HALE-MILLS CONSTRUCTION, LTD., HALE-MILLS CONSTRUCTION, INC., and HMC CONTRACTING SOUTH TEXAS, LLC

Represented in the trial court and in this appeal by:

William B. Westcott
Robert A. Plessala
Andrews Myers, P.C.
3900 Essex Lane, Suite 800
Houston, TX 77027-5109

## APPELLEE WILLACY COUNTY

Represented in the trial court and in this appeal by:

Mazin Sbaiti
State Bar No. 24058096
Bruce Steckler
State Bar No. 00785039
Steckler, LLP
12720 Hillcrest Road, Ste. 1045
Dallas, TX 75230
Telephone: (972) 387-4040
Fax: (972) 387-4041
mazin@stecklerlaw.com
bruce@stecklerlaw.com

Ramon Garcia
State Bar No. 07641800
Emerson E. Arellano
State Bar No. 24067490
Law Office of Ramon Garcia, P.C.
222 West University Drive
Edinburg, Texas 78539
Telephone: (956) 383-7441
Facsimile: (956) 381-0825
rgarcia@ramongarcia-law.com
earellano@ramongarcia-law.com

Manuel Solis
State Bar No. 18826790
Law Office of Manuel Solis
6657 Navigation Boulevard
Houston, TX 77011
Telephone: (713) 844-2700
Fax: (281) 754-4681
msolis1882@yahoo.com

Daniel G. Rios
State Bar No. 00784844
Law Office of Daniel G. Rios, PC
323 W. Nolana Avenue
McAllen, TX 78504
Telephone: (956) 630-9401
Facsimile: (956) 682-0566
dan@danrioslaw.com

# TABLE OF CONTENTS

REQUEST FOR ORAL ARGUMENT ........................................................ …..cover

IDENTITIES OF PARTIES AND COUNSEL…………………………………............i

TABLE OF CONTENTS…………………………………………………………….ii

TABLE OF AUTHORITIES…………………………………………….............v

STATEMENT REGARDING ORAL ARGUMENT..............................................ix

RESPONSE ISSUES PRESENTED.......................................................................x

SUMMARY OF THE ARGUMENT…………………………………………………xi

STATEMENT OF FACTS ...................................................................................1

I.      Defendants/Appellants Propose to Build Three Facilities Using Taxpayer Dollars…………………………………………………………………….......1

II.     The Scandal………………………………………………………………2

III.    The State of the Facilities………………………………………………….4

STANDARD OF REVIEW ..................................................................................6

ARGUMENTS AND AUTHORITIES……………………………………..……6

I.      The District Court did not Abuse Its Discretion in Denying Arbitration as to Any of the Three Facilities at Issue…………………………………………………6

      A. Appellant has Waived any Argument Challenging the District Court's Finding that the Contracts were Unconscionable when Made…………………………..8

      B. Appellant has Waived any Argument Challenging the District Court's Finding that Compelling Arbitration Would be Substantively Unconscionable………..10

C.Appellants have Waived any Challenge to the District Court's Finding of Insufficient of Evidence to Support the Existence of a Valid Agreement……..14

II.  The District Court did not Abuse Its Discretion in Denying Arbitration on the Basis of Sovereign Immunity…………………………………………………..15

A.The District Court Properly Found that there had been no Waiver of Sovereign Immunity…………………………………………………………...15

B.Willacy County Has Not Waived Its Sovereign Immunity Because It Has Not Signed the Agreements…………………………………………………………...16

C.  Texas Local Government Code Does Not Waive Sovereign Immunity...18

1.  Local Government Code Section 271 Does Not Waive the County's Sovereign Immunity…………………………………….18

2.  Appellant's Contentions Regarding the Local Government Corporations' Agency are Inapt and Irrelevant………………..19

3.  Local Government Code Section 262.007 Also Establishes Why the County has Not Waived Sovereign Immunity………………21

III.  Willacy County has Not Filed Suit to Enforce the Agreements, Nor Does It Seek a "Direct Benefit" From Them, Therefore It Is Not Bound By the Arbitration Clause……………………………………………………………………….22

A.  Texas Supreme Court Precedent and Persuasive Authority Support the District Court's Discretionary Finding…………………………………….24

B.  Under KBR, The Court at most Would Reverse as to the Warranty Claims……………………………………………………………………….29

IV.  This Court Should Affirm on Contractual Grounds………………………...30

A.  The Sheriff's Office Agreement Does not Provide for Mandatory Arbitration by the County Because it Was Not a Party and the Provision is Patently Ambiguous………………………………………………31

B.  The County is Expressly Excluded from Mandatory Arbitration Regarding

the Marshall's Office……………………………………34

C.      The Agreements' Clauses are Limited to Disputes that Arise During Construction and Pendency of the Contracts- Not After………………35

D.      Appellant Has Not Proven that All Pre-Requisites to Compelling Arbitration on the Detention Facility Have Been Met…………………38

CONCLUSION AND PRAYER……………………………………..………39

CERTIFICATE OF SERVICE…………………………………………………41

CERTIFICATE OF COMPLIANCE…………………………………………...41

# TABLE OF AUTHORITIES

*Aldridge v. Thrift Fin. Mktg., LLC*,
376 S.W.3d 877 (Tex. App.–Fort Worth 2012, no pet.)………………..…..30, 36

*Amir v. Int'l Bank of Commerce*,
419 S.W.3d 687 (Tex. App.–Houston [1st Dist.] 2013, no pet.)………...……..38

*Bankhead v. Maddox,*
135 S.W.3d 162 (Tex. App –Tyler- 2004, no pet.) …………………………8, 15

*Bridas S.A.P.I.C. v. Turkmenistan,*
345 F.3d 347 (5th Cir. 2003)……………………………………………….....23

*Britton v. Texas Dep't of Criminal Justice*,
95 S.W.3d 676 (Tex. App. - Houston [1st Dist.] 2002, *no pet.*)………….7, 8, 13

*Carr v. Main Carr Dev., LLC*,
337 S.W.3d 489 (Tex. App. Dallas 2011)……………………………….25, 27

*Cruikshank v. Consumer Direct Mortgage, Inc.*,
138 S.W.3d 497 (Tex. App. - Houston [14th Dist.] 2004, pet. den). 9, 10, 13, 15

*First Option of Chicago, Inc. v. Kaplan*,
514 U.S. 938 (1995)…………………………………………………..…..30, 36

*Fluor Daniel, Inc. v. Travis County*,
2003 U.S. App. LEXIS 8138, *4 (5th Cir. Tex., Apr. 30, 2003)………....…….17

*Freis v. Canales*,
877 S.W.2d 283 (Tex. 1994) (orig. proceeding)……………………………14

*Gonzalez v. Mission Am. Ins. Co.*,
795 S.W.2d 734 (Tex. 1990)…………………………………………31, 33, 37

*Green Tree Find. Corp. v. Randolph*,
531 U.S. 79 (2000)………………………………………………………...12

*Hill v. G.E. Power Sys, Inc.*,

v

282 F.3d 343 (5th Cir. 2002)……………………………………………..25

*In re Choice Homes, Inc.*,
174 S.W.3d 408 (Tex. App.–Houston [14th Dist.] 2005, no pet.)…………35, 37

*In re First Merit Bank N.A.,*
52 S.W.3d 749 (Tex. 2001)…………………………………………………11

*In re Halliburton Co.*,
80 S.W.3d 566 (Tex. 2002)……………………………….…………11, 13

*In re Kellogg Brown & Root, Inc.*,
166 S.W.3d 732 (Tex. 2005) (orig. proceeding)…14, 24, 25, 26, 27, 28, 29, 30

*In re Luna*,
175 S.W.3d 315 (Tex. App. Houston 1st Dist. 2004)………………………….12

*In re Pisces Foods, L.L.C.*,
228 S.W.3d 349 (Tex. App–Austin 2007, orig. proceeding)…………………..38

*In re Poly-America, L.P.*,
262 S.W.3d 337 (Tex. 2008)…………………………………….9, 10, 11, 12, 13

*In re Serv. Corp. Intern.*,
355 S.W.3d 655 (Tex. 2011)…………………………………………….31, 37

*In re Weekley Homes, L.P.,*
180 S.W.3d 127 (Tex. 2005)……………………………………………..23, 24

*Intergen N.V. v. Grina,*
344 F.3d 134 (1st Cir. 2003)………………………………20, 26, 27, 32

*Int'l Paper Co. v. Schwabedissen Maschinen Anlagen GMBH*
206 F.3d 411 (11th Cir. 2000)……………………………………………..23

*Jack B. Anglin Co., Inc. v. Tipps*,
842 S.W.2d 266 (Tex. 1992) (orig. proceeding)………………………………6

*J.M. Davidson Inc. et al. v. Webster, 128 S.W.3d 228 (Tex. 2003)*

128 S.W.3d at 227…………………………………………………………....14

*Landmark Org., L.P. v. Tremco Inc.*,
2010 Tex. App. LEXIS 5052, *29 (Tex. App. Austin 2010)…………………..29

*Morrison v. Circuit City Stores, Inc.*,
317 F.3d 646 (6th Cir. 2003)…………………………………………………....12

*Okorafor v. Uncle Sam & Assocs., Inc.*,
295 S.W.3d 27 (Tex. App.–Houston [1st Dist.] 2009, *pet. denied*)…………..6

*Olshan Found. Repair Co. v. Ayala*,
180 S.W.3d 212 (Tex. App.-San Antonio 2005, pet. denied)…………………..10

*R.J. Griffin & Co. v. Beach Club II Homeowners Ass'n,*
384 F.3d 157 (4th Cir. 2004)……………………………………………………25

*Schlumberger Technology Corp. v. Baker Hughes Inc.,*
355 S.W.3d 791 (Tex. App.–Houston [1st Dist.] 2011)……………..............6

*Schwartz v. Forest Pharmaceuticals, Inc.,*
127 S.W.3d 118 (Tex. App. - Houston [1st Dist.] 2003, *pet. den*)……9, 10, 13

*Seagull Energy E & P, Inc. v. Eland Energy, Inc.*,
207 S.W.3d 342 (Tex.2006)………………………………………………….31, 37

*Town of Highland Park v. Iron Crow Construction Incorporated*,
168 S.W.3d 313 (Tex. App. Dallas 2005)…………………………16, 17, 18, 22

*Texas Natural Resource Conservation Commission v. IT-Davy,*
74 S.W.3d 849 (Tex. 2002)……………………………….…………………17, 18

*Venture Cotton Coop. v. Freeman*
395 S.W.3d 272 (Tex. App. Eastland 2013)…………………………………...13

*Webb County v. Khaledi Props.*,
2013 Tex. App. LEXIS 9063, *3 (Tex. App. San Antonio, July 24, 2013)……18

*Wortham v. Otis Elevator Co.,*

2000 Tex. App. LEXIS 3443, *8 (Tex. App. Dallas May 25, 2000)…………...14

**Secondary Authorities**

Tex. Civ. Prac. Rem. Code § 171.001……………………………………………14

Tex. Loc. Gov. Code § 262.001……………………………………………….20

Tex. Loc. Gov. Code § 262.007……………………………………………….21, 22

Tex. Loc. Gov. Code § 262.011………………………………………………..21

Tex. Loc. Gov. Code § 271.151…………………………………………………18, 19

Tex. Loc. Gov. Code § 271.152………………………………………………..18

Tex. Loc. Gov. Code § 271.154………………………………………………..19

Tex. Loc. Gov. Code § 271.160………………………………………………..20

W. Wendall Hall et al., *Hall's Standards of Review in Texas*,
     42 St. Mary's L.J. 1, 78 (2010)…………………………………………….6

## STATEMENT REGARDING ORAL ARGUMENT

Appellee respectfully requests that this Court grant oral argument. Due to the novelty of the arguments raised by Appellants, Appellee believes oral argument will be of assistance in this matter.

# RESPONSE ISSUES PRESENTED

1.    Texas law states that a party who does not raise evidentiary objections before the district court waives them on appeal. Here, Appellants failed to raise any evidentiary objections before the district court seeking to strike Willacy County's evidence supporting the district court's finding of unconscionability. ***Did Appellants waive these objections on appeal?***

2.    Texas law states that an appellant's failure to raise points of error in an opening brief waives them for the appeal. Texas law also requires proof of a valid agreement before ordering arbitration. Here, Appellants' opening brief fails to challenge the district court's adopted finding that Appellants' motion was unsupported by competent evidence of a valid agreement. ***Have the Appellants waived any right to argue against this finding?***

3.    Texas law states that a County has sovereign immunity from enforcing an arbitration clause, and that only the legislature may waive sovereign immunity. Texas statutes have only waived sovereign immunity for a county with regards to specific contracts to which the County is a party, and even then immunity is waived only to the extent suit is brought in a district court in that county. Here it is undisputed that Willacy County is not a signatory to any of the Agreements. ***Was the district court correct in finding that sovereign immunity applied and had not been statutorily waived for Willacy County?***

4.    Texas law states that the doctrine of "direct benefits estoppel" may apply to a third party to a contract where that party's claims seek a direct benefit from enforcement of the contract. Texas courts review such determination for abuse of discretion. Here, the district court found that the County's claims for fraud, unjust enrichment, warranty and negligence did not seek derive a direct benefit from the Agreements. ***Did the district court abuse its discretion in finding that direct benefits estoppel did not apply to one or more of the County's claims?***

5.    This court may affirm on any basis in the record. Texas law requires that arbitration agreements be construed by their terms. Here, two of the Agreements are limited by their terms to the signatories to the contracts, and the others are limited to claims arising during the time period during which the work was in progress. ***Do these support the district court's denial of the motion to compel arbitration on a harmless error standard?***

x

## SUMMARY OF THE ARGUMENT

This appeal arises from the improvident motion by Appellants to compel Willacy County to arbitration. The record is clear that Willacy County is not a signatory to any of the Agreements. The Agreements are project specific, and therefore, must be evaluated on their own terms.

However, Appellants' motion to compel arbitration, and this Appeal, suffer from four common flaws:

*First*, the district court's adopted finding on unsconscioability was predicated on evidence that Appellants never challenged below—therefore, Appellants have waived their appeal on this issue which is sufficient to affirm in full.

*Second*, the district court's conclusion is supported by its adopted finding that Appellants' motion was not supported by competent evidence of a valid agreement to arbitrate—Appellants fail to address this issue in their opening brief and therefore, have waived their appeal on this issue which is sufficient to affirm in full.

*Third*, it is well established that only the Texas legislature can waive immunity. Here, the district court's conclusion is supported by the fact that the County is immune from suit to compel arbitration, and its immunity has not been waived by the Texas legislature for suits brought on contracts to which the county is not a signatory. The only statute that remotely speaks to the issue only applies to signatories, and even then

only waives immunity from suits brought in district court.

**_Fourth_**, the Texas Supreme Court in *KBR* said that "direct benefits estoppel" only applies to a non-signatory who "seeks, through the claim, to derive a direct benefit from the contract." The Court very clearly excluded any non-contractual claims from arbitration. Courts have consistently held that extra-contractual warranty claims are not the types of claims that invoke the estoppel doctrine. Here, Appellants have failed to demonstrate how the district court abused its discretion in concluding that the county's claims for fraud, unjust enrichment, negligence and implied warranty did not seek to derive a direct benefit from the Agreements. Under *KBR*, even if this Court thinks that the warranty claim triggers estoppel, it should only reverse as to the warranty claim and affirm on the other claims.

The foregoing demonstrate four independent and sufficient reasons to affirm.

But before this Court must also consider the individual Agreements' terms. There are three facilities and each is governed by its own arbitration provision. However, (i) Two of the arbitration clauses by their terms are limited to the parties to the respective agreements unless otherwise stated in writing. Binding authority holds that arbitration *cannot* be compelled under those circumstances. (ii) The other arbitration clause is by its terms, limited to the pre-dispute resolution provisions, which itself only applies to disputes that arise during the pendency of the construction project. It lacks any language taking it beyond to any and claims arising under the agreement before or after

the contract terminates.

## STATEMENT OF FACTS

**I.  DEFENDANTS/APPELLANTS PROPOSE TO BUILD THREE FACILITIES USING TAXPAYER DOLLARS**

Defendants Hale Mills Construction, Ltd., Hale-Mills Construction, Inc., and HMC Contracting South Texas, LLC ("Appellants") approached members of Willacy County's board of commissioners proposing to build a detention center for the U.S. Marshall's Office, a detention center for pre-deportation inmates of the Immigration and Customs Enforcement agency (aka "ICE"), and a new jail for the Willacy County Sherriff's office in Raymondville (altogether, the "Facilities").

To that end, over the course of years, four principal agreements were entered into between one or more of the Defendants/Appellants and one of the County's local government entities (altogether, the "Agreements")[1].

- For the Marshall's Office, Willacy County Public Facility Corporation contracted with Hale Mills Construction, Ltd., and Hale-Mills Construction, Inc. (CR 106 - 130). Attached hereto as Exhibit A (the "Marshall's Office Agreement").

- For the Willacy County Sherriff's office, Hale-Mills Construction Ltd. contracted with the County Jail Public Facility Corporation of Willacy County,

---

[1] Below, Appellee moved to strike any such evidence as not properly for the district court. See Exhibit F; CR 90-91). The district court adopted this finding in its Order. Appellee's citation to the agreements in the record is without waiving their contention that such evidence was not properly before the district court or the contention that Appellants have waived the challenge on appeal since they did not raise it in their opening brief. See Section I(c) supra.

1

Texas, on June 29, 2004 (CR 132 - 158). Attached hereto as Exhibit B (the "Jail Agreement").

- For the Detention Center for ICE, the ICE Facility was constructed under an agreement between the Willacy County Local Government Corporation and HMC Contracting South Texas, LLC, and was executed on July 19, 2006 (CR 160-196). Attached hereto as Exhibit C. An addition was constructed pursuant to an agreement executed on August 2, 2007 between The Willacy County Local Government Corporation and HMC Contracting South Texas, LLC. (CR 198-239). Attached hereto as Exhibit D (Exhibits C and D together, the "ICE Facility Agreements").

There is no dispute that the Facilities were substantially completed by January 2008, (CR 130, 158, 196, 239) 2 and that the completion of the facilities terminated the contractual relationships cited above.

## II. THE SCANDAL

The Agreements were neither negotiated, nor made without substantial controversy. (CR 92). They were procured through a system of bribery that ultimately saw two Willacy County officials get indicted and plead guilty with a third official to criminal charges. (CR 92).3 Jose Jimenez and Israel Tamez were

---

2 Appellants admit as much in the brief. See Appellant's Opening Br. at 1).

3 *Citing* http://www.myplainview.com/article_439ed742-bbc0-51de-8368-26bf030b4c35.htm ("Two former Willacy County commissioners pleaded guilty Tuesday to accepting bribes for their votes on federal

sentenced to six months in prison each for their roles in voting in favor of the Facilities projects. (*Id.*)

Yet, these men's names are all over the Local Government Entities' paperwork that Appellants attach to their opening briefs. For example, in Appellants' Opening Brief, Appendix 2, the *Articles of Incorporation of Willacy County Public Facility Corporation*, Israel Tamez is named on the Board of Directors (pg 2) and Jose Jimenez is additional board member (pg 2(A)). In Appellants' Opening Brief, Appendix 3, the *Articles of Incorporation of County Jail Public Facility Corporation*, Israel Tamez is the "Incorporator" (Art. IX) and is named to the Board of Directors (Art. VIII).

What makes the scandal so insidious is that the Facilities were financed through public bond issuances that the Taxpayers undertook to bear and repay in reliance on the representations that the Facilities would not only perform a function, but also on the basis that the Marshall's Office and the ICE Facility would generate revenue and jobs to the County. (CR 92; *see also* Willacy County Commissioner Bd.

---

prison contracts. Jose Jimenez, 67, of Sebastian, and Israel Tamez, 58, of Raymondville, waived indictment and admitted accepting more than $10,000 each from companies competing for work on the Willacy County Adult Correctional Center. The $14.5 million prison was being built to house federal inmates."); *and see* http://www.myplainview.com/article_92fb86e1-aa11-504a-94cf-49820f746300.html ("The last of three county commissioners to plead guilty in a bribery scandal involving a Rio Grande Valley federal detention facility has been sentenced…Webb County Commissioner David Cortez, 72, of Laredo was given three months in prison Tuesday in federal court for his role in funneling $39,000 in bribes to former Willacy County Commissioners Jose Jimenez and Israel Tamez in 2002. The money was given in exchange for favorable votes on contracts to design, build or manage a 500-bed facility in Raymondville that opened in 2003.").

3

Resolutions attached to Appellant's Brief).4 This is reflected in the various board resolutions attached to Appellants' Opening Brief. *See also* Appellants' Br. app'x 3, Art. XIII.

## III.   THE STATE OF THE FACILITIES

While what was promised by Appellants was state-of-the-art facilities, what was delivered was substandard. After only a few years of use, the facilities are in complete disrepair, revealing the fraud and slipshod workmanship done by the Defendants. (CR 06 *et. seq*.)

The Facilities are in no shape to last their useful lives. As revealed in the Original Petition (CR 06 *et. seq*.), poor materials were used in place of proper construction materials, thus requiring constant repairs (*Id*. at ¶ 17). The site preparation was irremediably flawed, with building sitting below grade, subjecting them to shifting, flooding and improper drainage (*Id*. at ¶ 18). Whereas the typical home houses 3 to 4 people, and has 8 to 12 inches of foundation, the buildings are based on less than that (*Id*. at ¶ 19). Moreover, the quality of the concrete is substandard. The concrete throughout reveals flaking, chipping, and spalding—all of which should not happen had minimally appropriate concrete and cement been used. (*Id*. at ¶ 21) There are structural defects in load-bearing walls—these are

---

4 Appellants have attached several appendices to the Opening Brief that are not part of the record. These should be stricken to the extent Appellants have not made them a part of the record, but also serve as admissions.

cracking and showing signs of failure. Walls without sufficient internal structure are bearing heavy steel beams that cause a danger of failure. (*Id*. at ¶ 22). There are cracks and chipping in all walls and ceilings that continually have to be repaired. This is cumulatively worse in quarantine and isolation rooms, since cracks in interior walls allow contamination to pass through the walls that are supposed to prevent that from happening. (*Id*. at ¶ 23). There are have been hundreds of roof leaks due to poor roofing installation techniques. (*Id*. at ¶ 24). There is evidence of serious water penetration and leakage into the Centers. These are dangerous and cause electrical wiring failures, and have caused shorting wiring and otherwise damage conduits and electrical appliances and equipment (HVACs, grid ceiling, etc.). (*Id*. at ¶ 26) The sewage and drainage system is demonstrably deficient and exhibits signs of improper construction and building techniques. The sewage line is (singular) far too small for the Centers and the number of people in them—causing constant grotesque backup of sewage and human waste into the dormitories and cafeterias. (*Id*. at ¶ 27)

The list is endless.

The County in filing the instant suit, presciently observed in its Original Petition:

> Make no mistake: What is at stake here is the potential loss of the contracts and eventually closure of the Centers (all of them) because they fail to meet even the most basic requirements of suitable construction. Such a cataclysmic event would cost jobs

5

in addition to County revenue. (CR 07)

Thus, it surprised absolutely no one at the County when a riot broke out at the ICE Facility in February 2015 precipitating its closure and the dismissal of all but a skeleton crew of employees.5 Appellants' misconduct has contributed to the loss of the government contract with the Bureau of Prisons for the ICE Facility, costing over 400 Willacy County residents their livelihood, and costing the County fiscally as well. (*Id.*) That is just one building; the rest are soon to fall.

## STANDARD OF REVIEW

This Court reviews the trial court's denial of a motion to compel arbitration for abuse of discretion. *See Schlumberger Technology Corp. v. Baker Hughes Inc.*, 355 S.W.3d 791, 800 (Tex. App.–Houston [1st Dist.] 2011); *Okorafor v. Uncle Sam & Assocs., Inc.*, 295 S.W.3d 27, 38 (Tex. App.–Houston [1st Dist.] 2009, *pet. denied*); *see also* W. Wendall Hall et al., *Hall's Standards of Review in Texas*, 42 St. Mary's L.J. 1, 78 (2010) (citing *Jack B. Anglin Co., Inc. v. Tipps*, 842 S.W.2d 266, 271–72 (Tex. 1992) (orig. proceeding).

## ARGUMENTS AND AUTHORITIES

**I.** **THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING ARBITRATION AS TO ANY OF THE THREE FACILITIES AT ISSUE**

The District Court denied arbitration on several independent grounds. (CR

---

5 *See* http://www.valleymorningstar.com/news/local_news/article_bf112990-cc4a-11e4-ba2f-e3c024760e63.html.

418) (the "Order"). The Order is attached hereto as Exhibit E. The district court ruled that the County had sovereign immunity because it was not a signatory to the agreements and was not seeking to enforce the Agreements; that Defendants' had failed to properly authenticate their evidence to establish their contractual right to arbitrate; and that the arbitration clauses were unconscionable.6

Appellants expends the entirety of their Appellate briefing on the first of these arguments. But they never address the other independent grounds for the denial of their motion to compel arbitration. For that reason, Appellants have *waived* them and this Court need not wade into the mire of sovereign immunity.

An appellant "must attack all independent bases or grounds that fully support a complained-of ruling or judgment*." Britton v. Texas Dep't of Criminal Justice*, 95 S.W.3d 676, 681 (Tex. App. - Houston [1st Dist.] 2002, *no pet.*). If the appellant fails to do so, the court of appeals "*must* affirm the ruling or judgment." *Id.* The reason is that:

> If an independent ground fully supports the complained-of ruling or judgment, but the appellant assigns no error to that independent ground, then (1) [the appellate court] must accept the validity of that unchallenged independent ground, … and thus (2) any error in the grounds challenged on appeal is harmless

---

6 The District Court's Order cited sovereign immunity, and incorporated as independent grounds the balance of the issues raised in Willacy County's Response below (*Willacy County's Plea to the Jurisdiction and Response to Plea in Abatement and Opposition to Arbitration Before AAA* (CR 84 et seq.) is attached hereto as Exhibit F). This Court thus must treat the Willacy County Response below as incorporated by reference into the Court's Order.

because the unchallenged independent ground fully supports the complained-of ruling or judgment.

*Id.* at 681-682. It is not enough for the Appellants to try and cure this waiver in their reply brief. That would sandbag the Appellee and be patently unfair. The failure to address these issues in the opening brief constitutes an irrevocable waiver. *See Bankhead v. Maddox,* 135 S.W.3d 162, 164-65 (Tex. App –Tyler- 2004, no pet.) (holding issues not raised in appellant's initial brief are deemed waived on appeal).

Accordingly, the waiver of the issues provides ample ground for affirmance.

## A. Appellant Has Waived any Argument Challenging the District Court's Finding that the Contracts Were Unconscionable When Made

The District Court adopted the argument set forth in Willacy County's opposition to arbitration. (CR 418, 84; see Exhibits E and F). Below, the County contended that the Contracts were contracts of adhesion, procured in the midst of a criminal bribery scandal during which two of Appellant's affiliates (former county commissioners) were tried, convicted, and sent to prison. (CR 92) The District Court adopted this argument in its Order, thus holding that the Agreements were unconscionable when made. (CR 418).

These facts were never controverted nor even addressed by Appellant before the district court. They never objected to the evidence, and never obtained a ruling on their objections. Appellants have thus failed to preserve the alleged evidentiary error for this Appeal.

8

In *Cruikshank v. Consumer Direct Mortgage, Inc.*, 138 S.W.3d 497 (Tex. App. - Houston [14th Dist.] 2004, pet. denied), appellant argued that the trial court had erroneously sustained objections to the appellant's summary judgment affidavit. The court of appeals held that the appellant had not preserved error because he had not filed a response to the objecting party's motion to strike, he did not object to the trial court's ruling, and he did not request the court to reconsider its ruling. *Id.* at 499.

Also, the fact that Appellants did not specifically object to the evidence anywhere, and failed to obtain a ruling means they have irrevocably preserved the error. *Accord Schwartz v. Forest Pharmaceuticals, Inc.,* 127 S.W.3d 118, 120 (Tex. App.- Houston [1st Dist.] 2003, *pet. den*) (holding that failure to specifically raise relevance or sufficiency objection before trial court and obtain a ruling failed to preserve the objection for appeal even though same evidence had been objected to on other grounds).

The failure to preserve error on appeal deprives the appellate court of any jurisdiction to reverse on that basis. *Id.* That is true even if the Appellate court believes it might have otherwise ruled in the appellant's favor.

Furthermore, Texas law applies to determine the validity or revocability of the arbitration clause. *See In re Poly-America, L.P.*, 262 S.W.3d 337, 348 (Tex. 2008). There is no presumption favoring arbitration when it comes to determining whether there is a valid and enforceable agreement to arbitrate. *Id.* "Unconscionable

9

contracts, however – whether relating to arbitration or not – are unenforceable under Texas law." *Id.* at 348.

Here, Appellant neither raised Willacy County's support of unconscionability as a matter of factual or legal error before the district court. Therefore, Appellant cannot argue that the District Court abused its discretion or applied the wrong law, and has thus waived any contention to that effect in this appeal. *Schwartz,* 127 S.W.3d at 120; *Cruikshank*, 138 S.W.3d at 499. Moreover, this Court would be duty-bound to defer to the district court's findings even without a finding waiver. *See Olshan Found. Repair Co. v. Ayala,* 180 S.W.3d 212, 214 (Tex. App.-San Antonio 2005, pet. denied) (when reviewing "the trial court's decision concerning the unconscionability of an arbitration agreement . . . we defer to the trial court's factual determinations"). Appellants' waiver of their challenges thus conclusively requires affirmance.

Therefore, it is undeniable that Appellant has waived any point of error on the District Court's finding that the agreements are unconscionable. *See id.* Its waiver provides *prima facie*, independent and uncontroverted grounds for affirming the District Court's Order.

**B. Appellant Has Waived any Argument Challenging the District Court's Finding that Compelling Arbitration Would be Substantively Unconscionable**

Below, the County contended that the arbitration clauses were unconscionable

because they imposed on Willacy County and the county taxpayers an insupportable burden and expense in filing and litigating before the Arbitral panel. (CR 92). The District Court adopted this position in its Order, thus holding that the Agreements were unconscionable when made. (CR at 418).

Contrary to Appellants' position that, under *In re In re First Merit Bank N.A.,* 52 S.W.3d 749 (Tex. 2001)*,* substantive unconscionability lies within the exclusive realm of the arbitrator, the Texas Supreme Court overruled that opinion and held that a court may find that procedural *or* substantive unconscionability is sufficient to invalidate an arbitration clause. *See In re Halliburton Co.*, 80 S.W.3d 566, 572 (Tex. 2002) ("We therefore clarify that courts may consider both procedural and substantive unconscionability of an arbitration clause in evaluating the validity of an arbitration provision.").

The case law is littered with courts invalidating arbitration clauses for being substantively unconscionable. The Texas Supreme Court specifically held that an arbitration provision is unconscionable if it imposes on the party raising the claim the obligation to pay the costs of arbitration which render access to the forum unaffordable. *See In re Poly-America, L.P.,* 262 S.W.3d at 355. There, the Supreme Court agreed that:

> [I]n some cases, the potential of incurring large arbitration costs and fees will deter potential litigants from seeking to vindicate their rights in the arbitral forum . . . . [I]f the fees and costs of the

11

arbitral forum deter potential litigants, then that forum is clearly not an effective, or even adequate, substitute for the judicial forum . . . [T]he burden of demonstrating that incurring such costs is likely under a given set of circumstances rests, at least initially, with the party opposing arbitration.

*Id.* (quoting *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 659-60 (6th Cir. 2003) (invalidating arbitration provision that imposed excessive fees on litigant)). While the Supreme Court held that there was no "per se" rule, it ruled that such a determination would be a question of fact. *Id.* The lower court had found that there was sufficient evidence of the litigants inability to afford access to the arbitral forum. *In re Luna*, 175 S.W.3d 315, 322 (Tex. App. Houston 1st Dist. 2004). The Supreme Court disagreed, noting that the fee provisions were not unconscionable because the arbitrator was permitted to adjust any unconscionable terms including the fee split between the parties, and therefore, he had a remedy. *In re Poly-America, L.P.,* 262 S.W.3d at 355. Here, the District Court implicitly found that the County is required to foot the entire cost of filing arbitration which is substantial, and the Agreements afford no discretion to the arbitrator to reduce the amount(s).

Similarly, under *Green Tree Find. Corp. v. Randolph*, 531 U.S. 79, 90 (2000), the U.S. Supreme Court held that prohibitively high arbitration costs that would "preclude a litigant...from effectively vindicating [her] rights in the arbitral forum" are unsconsionable, and held that it raised a question of evidentiary fact, not law. Following these precedent, Texas courts have invalidated arbitration clauses that

12

substantively deny a litigant the right of redress. *See, e.g., Venture Cotton Coop. v. Freeman*, 395 S.W.3d 272, 276 (Tex. App. Eastland 2013),

Applying these precedents, it is clear that Appellant has waived any challenge to the district court's factual finding of unconscionability due to the expense and cost to be imposed on the County.

While Appellants contend that there was insufficient evidence to support this finding, Appellants never specifically raised that objection before the district court. Appellants thus fail to preserve the factual and legal error for appeal. *See Cruikshank*, 138 S.W.3d at 499 (failure to raise matters before trial court does not preserve error on appeal and waives such issues); *Schwartz,* 127 S.W.3d at 120 (holding that objection to ruling on one issue—in that case, Rule 401 prejudice, does not preserve objections on relevance of evidence).

Accordingly, Appellants have waived any challenge to the District Court's finding of substantive unconscionability. The finding of unconscionability is sufficient in and of itself to vitiate the arbitration clause and its enforcement. *See In re Poly-America, L.P.*, 262 S.W.3d 337, 348; *In re Halliburton Co.*, 80 S.W.3d at 572. This Court need not address the other issues as they are rendered moot. *See Freeman,* 395 S.W.3d at 277 ("Because we have held that the arbitration agreement is substantively unconscionable…we need not consider appellants' remaining arguments attacking appellees' other substantive unconscionability and procedural

13

unconscionability defenses."); *Britton*, 95 S.W.3d at 681 (failure to attack all independent grounds requires affirmance).

Therefore, the district court's order may be summarily affirmed.

## C. Appellants Have Waived Any Challenge to the District Court's Finding of Insufficient of Evidence to Support the Existence of a Valid Agreement

To compel arbitration, a party must show that there is a valid arbitration agreement and that the claims raised fall within the agreement's scope. *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 737 (Tex. 2005) (orig. proceeding); *see also* Tex. Civ. Prac. Rem. Code § 171.001(a). Without an agreement to arbitrate, arbitration cannot be compelled. J.*M. Davidson*, 128 S.W.3d at 227 (citing *Freis v. Canales*, 877 S.W.2d 283, 284 (Tex. 1994) (orig. proceeding)).

Below, Willacy County attacked the insufficiency of Defendants' evidence in their motion to compel arbitration, and moved to strike the supporting evidence as being unsubstantiated, inauthentic, and incomplete. (CR 91-92). This objection was sustained by the district court (*see* Order, CR 418), despite Appellants' last-ditch effort to supplement their motion papers with the agreements. (CR 103 et seq.). Appellants never obtained a ruling overruling the objection, meanwhile, the Order plainly adopts it as independent grounds to deny arbitration and is correct. *See Wortham v. Otis Elevator Co.*, 2000 Tex. App. LEXIS 3443, *8 (Tex. App. Dallas May 25, 2000) (sustaining trial court striking of evidence where "documents

14

constituted hearsay and were not properly authenticated").

However, Appellants also fail to raise the issue in the opening brief before this Court. This waives the issue on appeal. In *Cruikshank*, the court held that raising a general point of error only preserves such errors if the errors are expressly and specifically addressed in the briefing. 138 S.W.3d at 502. The court of appeals concluded that, because the appellant only generally addressed the issue in its brief, those issues and the error had been waived. *Id.* at 503. Furthermore, such waiver cannot be cured in an Appellant's reply brief. *See Bankhead,* 135 S.W.3d at 164-65 (holding issues not raised in appellant's initial brief are deemed waived).

Accordingly, Appellants have likewise waived yet another independent grounds for affirming the district court's Order denying arbitration against Willacy County.

## II.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING ARBITRATION ON THE BASIS OF SOVEREIGN IMMUNITY

### A. The District Court Properly Found That There Had Been No Waiver of Sovereign Immunity

The district court, after considering the parties' motion papers and hosting a lengthy hearing, found that the County was protected by sovereign immunity from a suit to compel arbitration because it was not a signatory to the Agreements, found that the County's factual allegations at best merely *touched upon* the Agreements, but that the County was not seeking to *enforce* the Agreements. *See* Order.

15

The fault in this appeal lies in the fact that Appellant side-steps the salient argument. Rather than address the district court's finding head-on, Appellant hangs its hat on the premise that the County as a third-party beneficiary of the Agreements is attempting to enforce the Agreements, and therefore, is bound by the Arbitration clauses. These premises rest on a faulty and simplistic construction of the allegations and the law. We address the issues one by one.

## B. Willacy County Has Not Waived Its Sovereign Immunity Because It Has Not Signed the Agreements

Appellant does not dispute that Willacy County is a sovereign cloaked in sovereign immunity from suits to compel arbitration. This was clarified by the Supreme Court initially in *Town of Highland Park v. Iron Crow Construction Incorporated*, 168 S.W.3d 313, 319 (Tex. App. Dallas 2005) ("Because its contract with Highland Park provided for binding arbitration in the event of a dispute between the parties, Iron Crow was seeking to enforce Highland Park's performance under that contract. Therefore, sovereign immunity was indeed implicated here.").

In *Town of Highland Park*, the town was a signatory to the contract and the Supreme Court refused to allow it to be compelled to arbitration because merely signing the agreement did not waive sovereign immunity. 168 S.W.3d at 319. The Court held that a motion or action to enforce an Arbitration clause is essentially a suit to enforce the terms of a contract, a suit against which the County has sovereign

16

immunity. *Id.* The Court noted that only the legislature can waive immunity which it did not do in this case. *Id.* The court of appeals also held that the Federal Arbitration Act did not apply because both the plaintiff and the defendant were Texas residents (as is the case here: Willacy and Hale-Mills are Texas residents); and even if the FAA did apply, it could not preempt the sovereign rights of the County. *Id.* at 317-318. *Town of Highland Park* thus stands for the proposition that a sovereign is generally immune from suit to compel arbitration, even if it is a counterclaim to a suit brought by the sovereign.

In another case analogous to this one, in *Texas Natural Resource Conservation Commission v. IT-Davy*, 74 S.W.3d 849 (Tex. 2002), the Texas Supreme Court rejected the argument that a contractual provision providing that disputes could be decided by arbitration could be enforced against a County. *Id.* at 857-58. The court held that since only the Legislature could waive sovereign immunity, "administrative agents," even those with authority to enter into contracts such as the County Judge, had no authority to bind the County. *Id.*

Likewise, in *Fluor Daniel, Inc. v. Travis County*, 2003 U.S. App. LEXIS 8138, *4 (5th Cir., Apr. 30, 2003), the Fifth Circuit held that Travis County had not waived its rights as a sovereign in a contract with Fluor, despite the fact that the County Judge had signed the contract. The Court held that only "the legislative body of the county—the commissioner's court—can waive sovereign immunity." *Id.* at

17

*5. And moreover, even then it must be "clear and unambiguous." *Id*. In that case, the Court held that Travis County—even though it arguably invoked the jurisdiction of the court by filing counterclaims—had not waived any of its sovereign rights not to be brought into court without its express consent. It is also well-established that these rights cannot be waived through the conduct of the county. *See Webb County v. Khaledi Props.*, 2013 Tex. App. LEXIS 9063, *3 (Tex. App. San Antonio, July 24, 2013).

The Texas legislature amended the statutes after *Town of Highland Park* and *It-Davy* to provide that sovereign immunity could be waived in the limited circumstances. *See* Tex. Loc. Gov. Code § 271.151 et seq. However, outside of these amendments, *Town of Highland Park* is still good law.

Appellant apparently does not disagree that Willacy County is not a signatory to the Agreements. And it cannot show how Section 271 of the Texas Local Government Code applies to Willacy County as a non-signatory to the agreements.

## C. Texas Local Government Code Does Not Waive Sovereign Immunity

### 1. Local Government Code Section 271 Does Not Waive the County's Sovereign Immunity

Appellant attempts to expand the reach of the waiver of sovereign immunity by invoking Local Government Code section 271.

However, Local Government Code section 271.152 states that "A local governmental entity that is authorized by statute or the constitution to enter into a

18

contract *and that enters into a contract* subject to this subchapter waives sovereign immunity to suit for the purpose of adjudicating a claim for breach of the contract, subject to the terms and conditions of this subchapter."

And Texas Local Government Code 271.154 states that "Adjudication procedures, including requirements for …engaging in alternative dispute resolution proceedings before bringing a suit or an arbitration proceeding, that are stated in the contract subject to this subchapter or that are established by the local governmental entity and expressly incorporated into the contract or incorporated by reference are enforceable except to the extent those procedures conflict with the terms of this subchapter."

The definition of a "contract" includes the fact that the contract "is properly executed on behalf of the local governmental entity." See Tex. Loc. Gov. Code § 271.151(2)(A). And the definition of "Local Government Entity" excludes a County. *See id.* at § 271.151(3).

Therefore, even if the local government entities' execution of the Agreements waives sovereign immunity, it does not extend to the County as a non-signatory. Nothing in Section 271 extends the waiver of sovereign immunity for signing the Agreements to the County.

**2. Appellant's Contentions Regarding the Local Government Corporations' Agency Are Inapt and Irrelevant**

Appellants take the position that the founding and structure of the various

local government corporations and their signatory authority creates an agency relationship with the County. Appellants ask this Court to conclude that the agency relationship binds the County to the Arbitration clause.

This argument is inapt and irrelevant.

*First*, if there is there is no agency, then there can be no binding authority. *Intergen N.V. v. Grina*, 344 F.3d 134, 148 (1st Cir. 2003). Here, the local government entities were not serving as agents of the County. If they were, they would have been signing the Agreements on behalf of the County as a party. The Agreements expressly disclaim such a relationship, relegating the County to anything from complete stranger (Exhibit A, at CR 106-130) to assignee (Exhibit B, at CR 132-158) to third party beneficiary (Exhibits C, at CR 160-196 and D at CR 198-239).

*Second*, Texas Local Government Code section 271.160 expressly precludes Appellants' argument. That provision states that "A contract entered into by a local government entity is not a joint enterprise [with the county] for liability purposes." In other words, where a local government entity signs an agreement, under Chapter 271 it would waive immunity. This provision states that it only waives immunity as to itself—not as to the local governing body (e.g., here, the County).

This stands in distinction to Appellants' invocation of Local Government Code section 262.001(b). That states that "A contract or other act of an agent ***appointed under this section*** that is properly executed on behalf of the county and

20

is within the agent's authority binds the county to the contract for all purposes." However, Willacy County did not *appoint* any of the local government entities as its agents—the documents attached to Appellants' brief clearly show the decision to *create* the local government entities to do the work themselves. Moreover, nothing says that creating local government entities is the same as "appointing" an agent under section 262 as agents of the County. *See* Tex. Loc. Gov. Code § 262.011 or 0115 (purchasing agents). Appellants also never demonstrate how the local government entities were appointed as agents under the section.

Therefore, Willacy County is not liable for any contractual liabilities—including liability for the contract's arbitration provision—entered into by one or more of the local government entities.

**3. Local Government Code Section 262.007 Also Establishes Why the County Has Not Waived Sovereign Immunity**

Section 262.007 only applies to contracts and waives sovereign immunity for a County that is a signatory to the contract. *See* Tex. Loc. Gov. Code § 262.007(a) ("***A county that is a party to a written contract*** for engineering, architectural, or construction services or for goods related to engineering, architectural, or construction services may sue or be sued, plead or be impleaded, or defend or be defended on a claim arising under the contract.") (emphasis added). Therefore, this section only applies to contracts where the County is a signatory.

Consequently, the section specifically requires all suits to be brought in court.

It provides that even where the county is a signatory to the contract, "a suit on the contract brought against a county shall identify the county by name **_and must be brought in a state court in that county_**." *Id*. (emphasis added). No exception is made for a contract that contains an arbitration clause.

It is now well established that only the Texas legislature can waive sovereign immunity, or delegate the specific power to do so to subordinate entities, such as the County or municipal entity. *See Town of Highland Park v. Iron Crow Constr., Inc*., 168 S.W.3d 313, 319 (Tex. App. Dallas 2005).

The Texas legislature has spoken and stated that where the County is a signatory to a contract for specified goods, it may only be sued in the state court of that county. *See* Tex. Loc. Gov. Code § 262.007(a). Nowhere has the Texas legislature stated that a County may be compelled to arbitration on a contract, much less on a contract to which it is not a signatory. The inclusion of only a means to sue a county in state court (e.g., irrespective of an arbitration agreement), necessarily implies the exclusion of the right to impose arbitration on a signatory, much less to do so on a county that is not even a signatory to an arbitration agreement.

III.    **WILLACY COUNTY HAS NOT FILED SUIT TO *ENFORCE* THE AGREEMENTS, NOR DOES IT SEEK A "DIRECT BENEFIT" FROM THEM, THEREFORE IT IS NOT BOUND BY THE ARBITRATION CLAUSE**

Finding no statutory grounds for the premise that the Texas legislature has

waived sovereign immunity to compel the County into arbitration, Appellants' primary argument is the equitable contention that the County cannot bring suit to enforce the Agreements, but evade the Agreements' arbitration provisions. They cite the "direct benefits estoppel" argument for this position.

The district court has substantial discretion in deciding whether the equitable doctrine applies. See In re Weekley Homes, L.P., 180 S.W.3d 127, 135 (Tex. 2005) ("the equitable nature of the [direct benefits estoppel] doctrine may render firm standards inappropriate, requiring trial courts to exercise some discretion based on the facts of each case.") (citing Bridas S.A.P.I.C. v. Turkmenistan, 345 F.3d 347, 360 (5th Cir. 2003) ("The use of equitable estoppel is within a district court's discretion.")).

Appellants rely exclusively the contention that the district court committed legal error. Appellants conveniently gloss over the fact that in its cited cases, the sovereign at issue had brought to suit to enforce a contract's specific provisions, or the record had evidence that the plaintiff had specifically adopted the contract as its own prior to instituting suit. *See Weekley*, 180 S.W.3d at 131 (also discussing *lnt'l Paper Co. v. Schwabedissen Maschinen Anlagen GMBH*, 206 F.3d 411 (11th Cir. 2000) (estopping non-signatory from denying agreement to arbitrate "when he has consistently maintained that other provisions of the same contract should be enforced to benefit him.")).

## A. Texas Supreme Court Precedent and Persuasive Authority Support the District Court's Discretionary Finding

In *Weekely*, the Supreme Court reiterated that "a nonparty may be compelled to arbitrate 'if it seeks, through the claim, to derive a *direct benefit* from the contract containing the arbitration provisions.' On the other hand, claims can be brought in tort (and in court) if liability arises from general obligations imposed by law." *Id.* (citing *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 741 (Tex. 2005)). The Supreme Court created a two part test: "Claims must be brought on the contract (and arbitrated) if liability arises *solely* from the contract" and if the claims "*must* be determined by reference to [the contract]." *Weekley,* 180 S.W.3d at 132.

The narrowness of *Weekely's* adoption of the direct benefits estoppel doctrine was clarified by the Texas Supreme Court in *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 741 (Tex. 2005) ("KBR"). There, the Supreme Court addressed whether by alleging damages due to non-payment under color of a claim for unjust enrichment or declaratory relief of valid liens, KBR has in effect sought to enforce a contract and could be subject to arbitration as a non-litigant. The Supreme Court said no. The Supreme Court agreed that KBR was seeking to enforce a right that was "based on the fabrication subcontract in the sense that KBRs labor and services were linked inextricably to that subcontract." *Id.* at 739-740. But it held that it was not enough. "[U]nder 'direct benefits estoppel,' a non-signatory plaintiff cannot be compelled to arbitrate on the sole ground that, but for the contract containing the

24

arbitration provision, it would have no basis to sue." *Id*. at 740.

The KBR court further elucidated: "We conclude that, under 'direct benefits estoppel,' although a non-signatory's claim may relate to a contract containing an arbitration provision, that relationship does not, in itself, bind the non-signatory to the arbitration provision. Instead, a non-signatory should be compelled to arbitrate a claim only if it seeks, through the claim, to derive a direct benefit from the contract containing the arbitration provision." Id. (emphasis added). The Supreme Court held that "we conclude that the court of appeals abused its discretion to the extent it compelled KBR to arbitrate its quantum meruit claim[.]" *Id*. at 741.

As a Texas Court of Appeals likewise explained, "a non-signatory cannot be compelled to arbitrate when claims merely 'touch matters' covered by a contract or 'are dependent upon' a contract; instead, the claims must rely on the terms of the contract." Carr v. Main Carr Dev., LLC, 337 S.W.3d 489, 498 (Tex. App. Dallas 2011) (citing Hill v. G.E. Power Sys, Inc., 282 F.3d 343, 348-49 (5th Cir. 2002). "Where the obligations arise under general law"—e.g., here, the law of negligence, anti-fraud and implied warranty—then a non-signatory to the agreement cannot be compelled to arbitrate. *Id*.

Furthermore, it is well-established that a warranty and defect claims can be brought by third parties to the contract without enforcing any specific terms of the contract. Highly instructive is *R.J. Griffin & Co. v. Beach Club II Homeowners*

25

*Ass'n,* 384 F.3d 157 (4th Cir. 2004), on which the Texas Supreme Court heavily relied on in *KBR*, 166 S.W.3d at 740. There, the Fourth Circuit denied application of "direct benefits estoppel" to compel homeowners association who were non-signatories to a development contract, even though they sued on the basis of breach of contract/breach of warranty. *Id.* at 164. The circuit court recognized that the claim did arise from the construction agreement—but they were not seeking to enforce particular terms of the agreement; e.g., they were suing "to enforce extra-contractual common law rights created by South Carolina to protect homeowners from shoddy construction practices." *Id.* Moreover, the circuit court noted that the doctrine did not apply because "equitable estoppel operates to prevent one party from holding another to the terms of an agreement while simultaneously avoiding the same agreement's arbitration clause. Here, the Association is not attempting to hold [defendant] to any term of" the agreement in question." *Id.* at 165.

Similarly, in *Intergen N.V. v. Grina*, 344 F.3d 134, 145 (1st Mass. 2003), the court of appeals refused to apply the direct benefits estoppel to force a plaintiff to arbitration even though the plaintiff alleged breach of contract to which it was not a signatory. The plaintiff had alleged that it was the "the successor to all rights of predecessor entities related to the actions and omissions alleged." *Id.* The court of appeals noted that the plaintiff was not seeking to enforce the contract in its breach of warranty claims because, inter alia, the "claimed damages are not contract

26

damages *per se*." *Id.* The court further noted that the damages were instead a series of "extra contractual" acts and representations. *Id.* at 145-146. Moreover, the court held that where a non-signatory has been forced to arbitrate, it is only where the non-signatory "during the life of the contract, have embraced the contract despite their non-signatory status but then, during litigation, attempt to repudiate the arbitration clause in the contract." *Id.* at 146. The court saw no evidence before it of the plaintiff attempting, during the life of the contract, to enforce the terms of the agreement to its benefit. *Id.*

Here, the district court's Order is fully consistent with binding precedent. Appellants identify no grounds for finding that the district court abused its discretion in holding that the claims in the case did not seek to enforce the terms of the Agreements. Indeed, Appellants have identified no terms or provisions of the Agreements that are being enforced. The Agreements contain no warranty language being enforced, nor fraud nor unjust enrichment language. This is all a red herring.

Willacy County's claims for breach of implied warranty, negligence, unjust enrichment and fraud may "relate" to the Agreements to the extent they relate to the Facilities, but they do not actually depend upon them or enforce them. *See KBR*, 166 S.W.3d at 740 ("under 'direct benefits estoppel,' a non-signatory plaintiff cannot be compelled to arbitrate on the sole ground that, but for the contract containing the arbitration provision, it would have no basis to sue"); *Carr*, 337 S.W.3d 489, 498

27

(contracts that merely "relate" or "touch upon" an agreement insufficient to impose arbitration obligation). Nor do Appellants identify how the County seeks to obtain "through the claim, to derive a direct benefit from the [Agreement]," *KBR*, 166 S.W.3d a 741.

There is no evidence in the record of any direct benefit obtained by the County from the Agreements. The specific evidence in the Appendices shows that the County got no direct benefit because the local government entities were handling the work load and raised the funds to build the Facilities. Moreover, those Agreements terminated a long, long time ago (CR 130, 158, 196, 239). Therefore, any alleged benefit to the County from this lawsuit is incidental.

For these reasons, Appellants' continual recitation of the fact that the County is a named third-party beneficiary in two of the three Agreements is a non-starter. Being named a third party beneficiary does not change the fact that Willacy is a stranger to the Agreements. No case has held that a sovereign entity can be bound to the breadth of fundamental waivers of sovereign immunity even when it has not signed the Agreement. Not a single case has held that.

To the extent that Appellants admit that in one of the Agreements—the Sheriff's Office Agreement—the County is NOT a third party beneficiary—that justifies affirming prima facie. Thus, if as Appellants' own contorted logic demands, being a named third-party beneficiary is outcome determinative, this Court cannot

28

reverse the district court as to the Sherriff's Office Agreement.

## B. Under KBR, The Court At Most Would Reverse as to the Warranty Claims

Under *KBR*, the Texas Supreme Court has recognized that a non-signatory cannot be compelled to arbitrate claims lying outside of the contract, even if it can be compelled to arbitrate claims within the contract.

The *KBR* Court recognized the general rule that arbitration clauses can be read expansively for signatory parties to include all claims arising between them; the same is not true for non-signatories. The Court expalained:

> A party to a contract may, however, seek alternative relief under both contract and quasi-contract theories. Pleading in the alternative does not defeat the effect of an arbitration clause that broadly covers all disputes between signatories that arise out of the underlying agreement. But in this case, KBR is not a signatory to the fabrication subcontract between MacGregor and Unidynamics; therefore, the scope of that subcontract's arbitration clause does not answer whether KBR must arbitrate.

*KBR*, 166 S.W.3d at 740. Thus, the KBR ultimately reversed as to the quantum meruit claim because it was definitely not under the contract, and remanded for further determination by the district court of whether the other claims could be arbitrated. *Id.* at 742.

Therefore, at best, Appellants' estoppel theory would place the warranty claims in arbitration. Seeking restitution for negligence or unjust enrichment and fraud in the inducement does not invoke any terms of the agreement. *Landmark Org.,*

*L.P. v. Tremco Inc.*, 2010 Tex. App. LEXIS 5052, *29. These arise independent of any contract. *KBR*, 166 S.W.3d at 740. Therefore, the claims for negligence, fraud and unjust enrichment must be allowed to remain in district court.

## IV.  THIS COURT SHOULD AFFIRM ON CONTRACTUAL GROUNDS

An appellate court may affirm a trial court's determination on any sufficient ground in the record. Here, in the event this Court overrules the district court's sustaining of Willacy County's objection to the lack of evidence and admits the Agreements as evidence, the Agreements themselves provide textual grounds to affirm.7

It is important to note that the three facilities were subject to independent contracts, none of which had the same arbitration clause or arbitration language. A close reading of these Agreement shows that they do not compel arbitration under these circumstances and that the trial court did not abuse her discretion – or said differently, any error was ultimately harmless.

Arbitration agreements are creatures of contract and are construed under the same rules of construction as applied to other contracts. *See Aldridge v. Thrift Fin. Mktg., LLC*, 376 S.W.3d 877, 882 (Tex. App.–Fort Worth 2012, no pet.); *First Option of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). When interpreting a

---

7 Because they were never provided in full, Appellee did not have the opportunity to raise the textual arguments herein except where noted. Thus, to the extent this court overrules the district court's implicit evidentiary ruling, it should permit these arguments to be raised and find sufficient grounds to affirm the district court's order.

contract, the primary concern is "to ascertain and give effect to the intent of the parties as expressed in the contract." *In re Serv. Corp. Intern.*, 355 S.W.3d 655, 661 (Tex. 2011). "To discern this intent, we 'examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument.'" *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex.2006) (citations omitted).

Furthermore, all of these agreements were presented and drafted by the Defendants. And "[i]t is well-established law that where an ambiguity exists in a contract, the contract language will be construed strictly against the party who drafted it since the drafter is responsible for the language used." *Gonzalez v. Mission Am. Ins. Co.*, 795 S.W.2d 734, 737 (Tex. 1990).

## A. The Sherriff's Office Agreement Does not Provide for Mandatory Arbitration by the County Because it Was Not a Party and the Provision is Patently Ambiguous

In addition to not naming the County as a third party beneficiary, the Sherriff's Office Agreement does not provide for mandatory arbitration involving the County. That agreement only provides for arbitration or mediation of "Claims, disputes, or other matters in question *between the parties* to this Agreement arising out of or relating to this Agreement or breach thereof[.]" (see Exhibit B, at CR 132-158)

31

(emphasis added).

As revealed in the Record before this Court, the County is not a Party and is not a named third party beneficiary to the Sherriff's Office Agreement. (see Exhibit B, at CR 132-158). In fact, that agreement specifically provides that "Nothing contained in this Agreement shall create a contractual relationship between the Owner [County Jail Public Facility Corporation] and any person or entity other than the Design/Builder [Hale-Mills]." (see Exhibit B at § 1.2.3, at CR 132-158).

Thus, the express inclusion of the limitation of "parties" as persons bound by the arbitration provision to the Agreement cannot be overridden by an equitable catch-all. None of the cases cited by the Appellants addressed an arbitration provision that was, by its terms, limited to the "parties" of that contract. To the contrary, at least one appellate court has held that even a third party beneficiary to a contract who brings suit cannot be compelled to arbitrate when the contract specifically delineates who must arbitrate, and does not specifically identify the third party. *See Intergen,* 344 F.3d at 146 ("Each purchase order's arbitration clause applies to "any and all controversies, disputes or claims between Buyer and Seller." The words "Buyer" and "Seller" are explicitly defined.").

Additionally, the contract provision is ambiguous. It does not provide that arbitration is the exclusive or mandatory means to settling disputes. Indeed, Section 10.1 specifically states that "Claims, disputes or other matters in question between

32

the parties to this Agreement arising out of or relating to this Agreement or breach thereof shall be subject to and decided by *mediation or arbitration*." (see Exhibit B, at CR 132-158).

Section 10.2 then clarifies that if a party selects arbitration under Section 10.1, it must be preceded by a demand for mediation. (*See id*.). But the opposite is plainly not true. A party who elects mediation—as the County did—which then turns out to be unsuccessful is nowhere required to then also seek arbitration. The "or" in "mediation or arbitration" is disjunctive. Either the mediation, or the arbitration is mandatory. Both are not.

Because neither Section 10.1 nor Section 10.2 states that once a demand for mediation is made then a party must then also file for arbitration, arbitration is not mandatory under the Sheriff's Office Agreement. Indeed, Section 10.2, by its own terms, only applies to mandatory mediation preceding arbitration.

This language can be juxtaposed to the ICE Agreements (*see* Exhibits C, at CR 160-196 and D, at CR 198-239) which specifically states that if mediation is unsuccessful, then the complaining party must move for arbitration. (See § 10.2 and 10.3).8 Thus, to the extent that the provision allows the party to select between mandatory mediation or arbitration, it is patently ambiguous and must be construed

---

8 The Arbitration provision in the Ice Agreements do not compel arbitration for other reasons, however, as we spell out below.

33

against the Appellant. *Gonzalez*, 795 S.W.2d at 737.

Because the County is not a named third party beneficiary, is not a party to the agreement required to bring an arbitration, and arbitration is not clearly mandatory under the provision, this Court must affirm the district court's denial of arbitration as to the Sherriff's Office Agreement.

## B. The County is Expressly Excluded from Mandatory Arbitration Regarding the Marshall's Office9

Appellants' own arbitration clause in the Marshall's Office Agreement expressly excludes arbitration with non-signatories to the Agreement. (*See* Exhibit A, at CR 106-130). Specifically, the agreement provides, for example, that:

> No other arbitration arising out of or relating to this Part 2 Agreement shall include by consolidation, joinder, or in any other manner, an additional person or entity not a party to this Part 2 Agreement or not a party to an Agreement with [Hale-Mills], except by written consent[.]

*See* Exhibit B, at CR 132-158.

Thus, by the plain language in the Marshall's Office Contract, Willacy County cannot be compelled to arbitration over the marshal's office facility because Willacy County is not a signatory to any of the arbitration agreements with Hale-Mills, and Willacy County has not otherwise agreed in writing to be bound.

Thus, the County is expressly excluded from being required to bring

---

9 This argument was raised and upheld by the district court.

arbitration under Marshall's Office Agreement, and could not otherwise join the non-signatory defendants.

## C. The Agreements' Clauses are Limited to Disputes that Arise During Construction and Pendency of the Contracts—Not After

In *In re Choice Homes, Inc.*, 174 S.W.3d 408 (Tex. App.–Houston [14th Dist.] 2005, no pet.), the appeals court acknowledged that generally, events that occur after a contract lapses or has terminated, they are not governed by the contract or its arbitration provision unless expressly provided for. That is true even between the same parties to the contract. *Id*. But, because the arbitration provision in that case "encompassed claims that arose 'during or after'" the contract period (there, the period of employment), they were "thus subject to arbitration regardless of whether the [events occurred] before or after [the contract] was terminated." *Id*. at 413-14. Under this language, the *In re Choice Homes* court held that the plaintiff's defamation claim was within the scope of the arbitration provision. *Id*.

While the court's opinion in *In re Choice Homes, Inc.*, turned on the "during or after" language contained in the arbitration provision, no such language appears in any of the Agreements at issue in this case. Appellants do not deny that the period governed by the Agreements ended years ago, but that the latent infirmities and cover-ups have only metastasized in recent years. Nonetheless, the disputes at issue did not arise during the pendency of the Agreements—those contracts have long lapsed, and therefore arguably, so have the Arbitration clauses. There is no dispute

35

that the Facilities were substantially completed by January 2008, (CR 130, 158, 196, 239)10 and that the completion of the facilities terminated the contractual relationships.

This reading is consistent with the language in the Agreements. For example, the ICE Agreements' dispute resolution provisions address the parties relationship "throughout the project." *See, e.g.,* Exhibit D, at CR 198-239 § 10.2 (§ 10.2.1). That same provision then provides that "if disputes or disagreements do arise," e.g., "throughout the project," then the parties "commit to resolving such disputes or disagreements in an amicable, professional, and expeditious manner so as to avoid unnecessary losses, delays and disruptions to the Work." *Id*. The balance of Section 10.2 describes the procedures for resolution thereof. *Id*. § 10.3.2-4.

Section 10.3 governs "Arbitration," but by its own terms specifically and only applies to disputes that arise and cannot be resolved under Section 10.2. *See* Exhibit D, CR at 198-239 at § 10.3 (§§ 10.3.1). In other words, if the dispute arose under Section 10.2 and was not resolved, only then would it be subject to Section 10.3. Nothing in Section 10.2 suggests that it would apply to disputes that arose after the completion of the "Project,"

It is black letter law that the provisions of contracts, especially those containing an arbitration clause must be read to give each term its meaning, and to

---

10 Appellants admit as much in the brief. See Appellant's Opening Br. at 1.

harmonize the terms thereof. *See Aldridge*, 376 S.W.3d at 882; *Kaplan*, 514 U.S. at 944. When interpreting a contract, the primary concern is "to ascertain and give effect to the intent of the parties as expressed in the contract." *In re Serv. Corp. Intern.*, 355 S.W.3d at 661. "To discern this intent, we 'examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument.'" *Seagull Energy*, 207 S.W.3d at 345.

Here, the plain reading of Section 10.3 of the ICE Agreement renders it limited in scope to the "disputes or disagreements" that arise under Section 10.2, which is limited to disputes and disagreements that arise "throughout the project"—e.g., while the construction project is still underway. Any other reading would expand the scope of Section 10.3 beyond its textual moorings, and would render the reference to Section 10.2 meaningless. *Id.*

Had the drafters intended for Arbitration to be mandatory regardless of when the dispute arose—e.g., before or after, it would have expressly stated as much, and it would not have referred to the limited scope of Section 10.2. *Accord In re Choice Homes, Inc.*, 174 S.W.3d at 413-14. Moreover, to the extent these provisions are ambiguous, the ambiguity should be construed against Appellee as the drafter. *Gonzalez*, 795 S.W.2d 734, 737.

37

Because there is no dispute in the record that the construct project is no longer "underway," and there is no risk of "unnecessary losses delays or disruptions to the work" that could be avoided by mediation under Section 10.2, the plain language of Section 10.3 renders the mandatory arbitration provision therein inapplicable to the current litigation.

## D. Appellant Has Not Proven that All Pre-Requisites to Compelling Arbitration on the Detention Facility Have Been Met

The Appellant has not proven that the pre-requisites to invoking arbitration have been met. Where there are contractual prerequisites to invoking an arbitration agreement, the party seeking an order compelling arbitration is not entitled to relief if it cannot demonstrate that those pre-requisites were met. *See In re Pisces Foods, L.L.C.*, 228 S.W.3d 349, 353 (Tex. App–Austin 2007, orig. proceeding) (holding trial court did not abuse its discretion by refusing to compel arbitration, and noting that many courts have held "arbitration could not be compelled when parties who were contractually required to mediate or follow other grievance procedures as a precondition to arbitration had failed to do so."); *Amir v. Int'l Bank of Commerce*, 419 S.W.3d 687, 692 (Tex. App.–Houston [1st Dist.] 2013, no pet.). (holding that where it is clearly established that a strictly procedural requirement has not been met and that procedural requirement precludes arbitration, a court can deny a motion to compel arbitration).

38

Here, the ICE Agreement Section 10.1 requires that the Parties mediate in good faith to resolve *any* dispute that arises during the project. Therefore, if the scope of that clause is broadened, then Appellant as the movant bears the burden of proving that all pre-requisites were met. The record is barren of any evidence that such a prerequisite has been met.

## CONCLUSION AND PRAYER

Therefore, for the foregoing reasons, any one of which is sufficient, Appellee, Willacy County respectfully requests this Court affirm the Order of the Trial Court denying Appellant's motions to compel arbitration.

Respectfully submitted,

By_____*/s/Mazin Sbaiti*_____
    Bruce W. Steckler
    State Bar No. 00785039
    Mazin Sbaiti
    State Bar No. 24058096
    STECKLER, LLP
    12720 Hillcrest Road, Ste. 1045
    Dallas, TX 75230
    Telephone: (972) 387-4040
    Fax: (972) 387-4041
    bruce@stecklerlaw.com
    mazin@stecklerlaw.com

    Ramon Garcia
    State Bar No. 07641800
    Emerson E. Arellano
    State Bar No. 00785039
    LAW OFFICE OF RAMON GARCIA, P.C.
    222 West University Drive
    Edinburg, TX  78539
    T:  956-383-7441
    F:  956-381-0825

    Manuel Solis
    State Bar No. 18826790
    LAW OFFICE OF MANUEL SOLIS
    6657 Navigation Boulevard
    Houston, TX  77011
    T:  713-844-2700
    F:  281-754-4681
    msolis1882@yahoo.com

    Daniel G. Rios
    State Bar No. 00784844
    LAW OFFICE OF DANIEL G. RIOS, PC
    323 W. Nolana Avenue
    McAllen, TX  78504
    T:  956-630-9401

40

F: 956-682-0566
dan@danrioslaw.com

**ATTORNEYS FOR APPELLEE**

**<u>CERTIFICATE OF SERVICE</u>**

This is to certify that on July 22, 2015, a true and correct copy of the foregoing Appellee's Brief was served via U.S. Mail, Fax and/or Electronic Service, upon the following counsel of record in accordance with the Texas Rules of Appellate Procedure:

William B. Westcott
Robert A. Plessala
Andrews Myers, P.C.
3900 Essex Lane, Suite 800
Houston, TX 77027-5109
(713) 850-4211 (facsimile)

*/s/Mazin Sbaiti*
Mazin Sbaiti

**CERTIFICATE OF COMPLIANCE**

Based on a word count run in Microsoft Word 2010, this *Appellant's Brief* contains 9,415 words, excluding the portions of the document exempt from the word count under Texas Rule of Appellate Procedure 9.4(i)(1).

*/s/ Mazin A. Sbaiti*
Mazin Sbaiti

# EXHIBIT A

*AIA Document A191*

# Standard Form of Agreement Between Owner and Design/Builder

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES: CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS USE, COMPLETION OR MODIFICATION.*

*This document comprises two separate Agreements: Part 1 Agreement and Part 2 Agreement. To the extent referenced in these Agreements, subordinate parallel agreements to A191 consist of AIA Document A491, Standard Form of Agreements Between Design/Builder and Contractor, and AIA Document B901, Standard Form of Agreements Between Design/Builder and Architect.*

## PART 2 AGREEMENT

### 1996 EDITION

## AGREEMENT

made as of the    **Tenth**                day of    **June**              in the year of **two  thousand**
*(In words, indicate day, month and year.)*                                                            **two**

**BETWEEN** the Owner:
*(Name and address)*

> Armando Rubalcaba-President
> Willacy County Public Facility Corporation
> 546 W. Hidalgo Street
> Raymondville, Texas  78580

and the Design/Builder:
*(Name and address)*

> Hale-Mills Construction, Ltd.
> Hale-Mills Construction, Inc.
> 4130 Bellaire Blvd, Ste 210
> Houston, Texas  77025



EXHIBIT

1

Copyright 1985, ©1996 The American Institute of Architects, 1735 New York Avenue, NW, Washington, DC 20006-5292. Reproduction of the material herein or substantial quotation of its provisions without the written permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution.

For the following Project:
*(Include Project name, location and a summary description.)*

### See Paragraph 1 of Appendix "A".

T architectural services described in Article 3 will be provided by the following person or entity who is lawfully licensed
 .ctice architecture:

*(N.  and address)*                    *(Registration Number)*           *(Relationship to Design/Builder)*

### Aguirre Corporation

Normal structural, mechanical and electrical engineering services will be provided contractually through the Architect
except as indicated below:

*(Name, address and discipline)*                *(Registration Number)*           *(Relationship to Design/Builder)*

The Owner and the Design/Builder agree as set forth below.

## TERMS AND CONDITIONS—PART 2 AGREEMENT

## ARTICLE 1

## GENERAL PROVISIONS

### 1.1    BASIC DEFINITIONS

1.1.1 The Contract Documents consist of the Part 1 Agreement to the extent not modified by this Part 2 Agreement, this Part 2 Agreement, the Design/Builder's Proposal and written addenda to the Proposal identified in Article 14, the Construction Documents approved by the Owner in accordance with Subparagraph 3.2.3 and Modifications issued after execution of this Part 2 Agreement. A Modification is a Change Order or a written amendment to this Part 2 Agreement signed by both parties, or a Construction Change Directive issued by the Owner in accordance with Paragraph 8.3.

1.1.2 The term "Work" means the construction and services provided by the Design/Builder to fulfill the Design/Builder's obligations.

### 1.2    EXECUTION, CORRELATION AND INTENT

2.1 It is the intent of the Owner and Design/Builder at the Contract Documents include all items necessary for proper execution and completion of the Work. The Contract Documents are complementary, and what is required by one shall be as binding as if required by all; performance by the Design/Builder shall be required only to the extent consistent with and reasonably inferable from the Contract Documents as being necessary to produce the intended results. Words that have well-known technical or construction industry meanings are used in the Contract Documents in accordance with such recognized meanings.

1.2.2 If the Design/Builder believes or is advised by the Architect or by another design professional retained to provide services on the Project that implementation of any instruction received from the Owner would cause a violation of any applicable law, the Design/Builder shall notify the Owner in writing. Neither the Design/Builder nor the Architect shall be obligated to perform any act which either believes will violate any applicable law.

1.2.3 Nothing contained in this Part 2 Agreement shall create a contractual relationship between the Owner and any person or entity other than the Design/Builder.

### 1.3    OWNERSHIP AND USE OF DOCUMENTS

1.3.1 Drawings, specifications, and other documents and electronic data furnished by the Design/Builder are instruments of service. The Design/Builder's Architect and other providers of professional services shall retain all common law, statutory and other reserved rights, including copyright in those instruments of service furnished by them. Drawings, specifications, and other documents and electronic data are furnished for use solely with respect to this Part 2 Agreement. The Owner shall be permitted to retain copies, including reproducible copies, of the drawings, specifications, and other documents and electronic data furnished by the

Design/Builder for information and reference in connection with the Project except as provided in Subparagraphs 1.3.2 and 1.3.3.

1.3.2 Drawings, specifications, and other documents and electronic data furnished by the Design/Builder shall not be used by the Owner or others on other projects, for additions to this Project or for completion of this Project by others, except by agreement in writing and with appropriate compensation to the Design/Builder, unless the Design/Builder is adjudged to be in default under this Part 2 Agreement or under any other subsequently executed agreement.

1.3.3 If the Design/Builder defaults in the Design/Builder's obligations to the Owner, the Architect shall grant a license to the Owner to use the drawings, specifications, and other documents and electronic data furnished by the Architect to the Design/Builder for the completion of the Project, conditioned upon the Owner's execution of an agreement to cure the Design/Builder's default in payment to the Architect for services previously performed and to indemnify the Architect with regard to claims arising from such reuse without the Architect's professional involvement.

1.3.4 Submission or distribution of the Design/Builder's documents to meet official regulatory requirements or for similar purposes in connection with the Project is not to be construed as publication in derogation of the rights reserved in Subparagraph 1.3.1.

## ARTICLE 2

## OWNER

2.1 The Owner shall designate a representative authorized to act on the Owner's behalf with respect to the Project. The Owner or such authorized representative shall examine documents submitted by the Design/Builder and shall render decisions in a timely manner and in accordance with the schedule accepted by the Owner. The Owner may obtain independent review of the Contract Documents by a separate architect, engineer, contractor, or cost estimator under contract to or employed by the Owner. Such independent review shall be undertaken at the Owner's expense in a timely manner and shall not delay the orderly progress of the Work.

2.2 The Owner may appoint an on-site project representative to observe the Work and to have such other responsibilities as the Owner and Design/Builder agree in writing.

2.3 The Owner shall cooperate with the Design/Builder in securing building and other permits, licenses and inspections. The Owner shall not be required to pay the fees for such permits, licenses and inspections unless the cost of such fees is excluded from the Design/Builder's Proposal.

2.4 The Owner shall furnish services of land surveyors.

geotechnical engineers, and other consultants for subsoil, air and water conditions, in addition to those provided under the Part 1 Agreement, when such services are deemed necessary by the Design Builder to properly carry out the design services required by this Part 2 Agreement.

2.5 The Owner shall disclose, to the extent known to the Owner, the results and reports of prior tests, inspections or investigations conducted for the Project involving: structural or mechanical systems; chemical, air and water pollution; hazardous materials; or other environmental and subsurface conditions. The Owner shall disclose all information known to the Owner regarding the presence of pollutants at the Project's site.

2.6 The Owner shall furnish all legal, accounting and insurance counseling services as may be necessary at any time for the Project, including such auditing services as the Owner may require to verify the Design/Builder's Applications for Payment.

2.7 ~~Those services, information, surveys and reports required by Paragraphs 2.4 through 2.6 which are within the Owner's control shall be furnished at the Owner's expense, and the Design/Builder shall be entitled to rely upon the accuracy and completeness thereof, except to the extent the Owner advises the Design/Builder to the contrary in writing.~~

2.8 If the Owner requires the Design/Builder to maintain any special insurance coverage, policy, amendment, or rider, the Owner shall pay the additional cost thereof, except as otherwise stipulated in this Part 2 Agreement.

2.9 If the Owner observes or otherwise becomes aware of a fault or defect in the Work or nonconformity with the Design/Builder's Proposal or the Construction Documents, the Owner shall give prompt written notice thereof to the Design/Builder.

2.10 The Owner shall, at the request of the Design/Builder, prior to execution of this Part 2 Agreement and promptly upon request thereafter, furnish to the Design/Builder reasonable evidence that financial arrangements have been made to fulfill the Owner's obligations under the Contract.

2.11 The Owner shall communicate with persons or entities employed or retained by the Design/Builder through the Design/Builder, unless otherwise directed by the Design/Builder.

## ARTICLE 3

### DESIGN/BUILDER

**3.1    SERVICES AND RESPONSIBILITIES**

3.1.1 Design services required by this Part 2 Agreement be performed by qualified architects and other design professionals. The contractual obligations of such professional persons or entities are undertaken and performed in the interest of the Design/Builder.

3.1.2 The agreements between the Design/Builder and

the persons or entities identified in this Part 2 Agreement, and any subsequent modifications, shall be in writing. These agreements, including financial arrangements with respect to this Project, shall be promptly and fully disclosed to the Owner upon request.

3.1.3 The Design/Builder shall be responsible to the Owner for acts and omissions of the Design/Builder's employees, subcontractors and their agents and employees, and other persons, including the Architect and other design professionals, performing any portion of the Design/Builder's obligations under this Part 2 Agreement.

**3.2    BASIC SERVICES**

3.2.1 The Design/Builder's Basic Services are described below and in Article 14.

3.2.2 The Design/Builder shall designate a representative authorized to act on the Design/Builder's behalf with respect to the Project.

3.2.3 The Design/Builder shall submit Construction Documents for review and approval by the Owner. Construction Documents may include drawings, specifications, and other documents and electronic data setting forth in detail the requirements for construction of the Work, and shall:

.1 be consistent with the intent of the Design/Builder's Proposal;

.2 provide information for the use of those in the building trades; and

.3 include documents customarily required for regulatory agency approvals.

3.2.4 The Design/Builder, with the assistance of the Owner, shall file documents required to obtain necessary approvals of governmental authorities having jurisdiction over the Project.

3.2.5 Unless otherwise provided in the Contract Documents, the Design/Builder shall provide or cause to be provided and shall pay for design services, labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation and other facilities and services necessary for proper execution and completion of the Work, whether temporary or permanent and whether or not incorporated or to be incorporated in the Work.

3.2.6 The Design/Builder shall be responsible for all construction means, methods, techniques, sequences and procedures, and for coordinating all portions of the Work under this Part 2 Agreement.

3.2.7 The Design/Builder shall keep the Owner informed of the progress and quality of the Work.

3.2.8 The Design/Builder shall be responsible for correcting Work which does not conform to the Contract Documents.

3.2.9 The Design/Builder warrants to the Owner that materials and equipment furnished under the Contract will be of good quality and new unless otherwise required or permitted by the Contract Documents, that the construction will be free from faults and defects, and that the construction will conform with the requirements of the

Contract Documents. Construction not conforming to these requirements, including substitutions not properly approved by the Owner, shall be corrected in accordance with Article 9.

3.2.10 The Design/Builder shall pay all sales. consumer, use and similar taxes which had been legally enacted at the time the Design/Builder's Proposal was first submitted to the Owner. and shall secure and pay for building and other permits and governmental fees, licenses and inspections necessary for the proper execution and completion of the Work which are either customarily secured after execution of a contract for construction or are legally required at the time the Design/Builder's Proposal was first submitted to the Owner.

3.2.11 The Design/Builder shall comply with and give notices required by laws. ordinances, rules. regulations and lawful orders of public authorities relating to the Project.

3.2.12 The Design/Builder shall pay royalties and license fees for patented designs, processes or products. The Design/Builder shall defend suits or claims for infringement of patent rights and shall hold the Owner harmless from loss on account thereof, but shall not be responsible for such defense or loss when a particular design, process or product of a particular manufacturer is required by the Owner. However, if the Design/Builder has reason to ' "ieve the use of a required design, process or product  infringement of a patent, the Design/Builder shall be  ...ponsible for such loss unless such information is promptly furnished to the Owner.

3.2.13 The Design/Builder shall keep the premises and surrounding area free from accumulation of waste materials or rubbish caused by operations under this Part 2 Agreement. At the completion of the Work. the Design/Builder shall remove from the site waste materials, rubbish, the Design/Builder's tools, construction equipment, machinery, and surplus materials.

3.2.14 The Design/Builder shall notify the Owner when the Design/Builder believes that the Work or an agreed upon portion thereof is substantially completed. If the Owner concurs, the Design/Builder shall issue a Certificate of Substantial Completion which shall establish the Date of Substantial Completion. shall state the responsibility of each party for security. maintenance, heat. utilities, damage to the Work and insurance. shall include a list of items to be completed or corrected and shall fix the time within which the Design/Builder shall complete items listed therein. Disputes between the Owner and Design/Builder regarding the Certificate of Substantial Completion shall be resolved in accordance with provisions of Article 10.

3.2.15 The Design/Builder shall maintain at the site for the Owner one record copy of the drawings. specifications, product data, samples. shop drawings. Change Orders and other modifications. in good order and regularly updated to record the completed construction. ve shall be delivered to the Owner upon completion instruction and prior to final payment.

## 3.3    ADDITIONAL SERVICES

3.3.1 The services described in this Paragraph 3.3 are not included in Basic Services unless so identified in Article 14. and they shall be paid for by the Owner as provided in this Part 2 Agreement, in addition to the compensation for Basic Services. The services described in this Paragraph 3.3 shall be provided only if authorized or confirmed in writing by the Owner.

3.3.2 Making revisions in drawings, specifications. and other documents or electronic data when such revisions are required by the enactment or revision of codes, laws or regulations subsequent to the preparation of such documents or electronic data.

3.3.3 Providing consultation concerning replacement of Work damaged by fire or other cause during construction, and furnishing services required in connection with the replacement of such Work.

3.3.4 Providing services in connection with a public hearing, arbitration proceeding or legal proceeding, except where the Design/Builder is a party thereto.

3.3.5 Providing coordination of construction performed by the Owner's own forces or separate contractors employed by the Owner. and coordination of services required in connection with construction performed and equipment supplied by the Owner.

3.3.6 Preparing a set of reproducible record documents or electronic data showing significant changes in the Work made during construction.

3.3.7 Providing assistance in the utilization of equipment or systems such as preparation of operation and maintenance manuals, training personnel for operation and maintenance, and consultation during operation.

## ARTICLE 4

### TIME

4.1 Unless otherwise indicated, the Owner and the Design/Builder shall perform their respective obligations as expeditiously as is consistent with reasonable skill and care and the orderly progress of the Project.

4.2 Time limits stated in the Contract Documents are of the essence. The Work to be performed under this Part 2 Agreement shall commence upon receipt of a notice to proceed unless otherwise agreed and, subject to authorized Modifications. Substantial Completion shall be achieved on or before the date established in Article 14.

4.3 Substantial Completion is the stage in the progress of the Work when the Work or designated portion thereof is sufficiently complete in accordance with the Contract Documents so the Owner can occupy or utilize the Work for its intended use.

4.4 Based on the Design/Builder's Proposal, a construction schedule shall be provided consistent with Paragraph 4.2 above.

4.5 If the Design/Builder is delayed at any time in the progress of the Work by an act or neglect of the Owner. Owner's employees, or separate contractors employed by the Owner. or by changes ordered in the Work. or by

labor disputes. fire, unusual delay in deliveries. adverse weather conditions not reasonably anticipatable. unavoidable casualties or other causes beyond the Design/Builder's control. or by delay authorized by the Owner pending arbitration. or by other causes which the Owner and Design/Builder agree may justify delay, then the Contract Time shall be reasonably extended by Change Order.

# ARTICLE 5
## PAYMENTS

### 5.1    PROGRESS PAYMENTS

5.1.1 The Design/Builder shall deliver to the Owner .itemized Applications for Payment in such detail as indicated in Article 14.

5.1.2 Within ten (10) days of the Owner's receipt of a properly submitted and correct Application for Payment, the Owner shall make payment to the Design/Builder.

5.1.3 The Application for Payment shall constitute a representation by the Design/Builder to the Owner that the design and construction have progressed to the point indicated; the quality of the Work covered by the "plication is in accordance with the Contract xuments: and the Design/Builder is entitled to payment in the amount requested.

5.1.4 Upon receipt of payment from the Owner, the Design/Builder shall promptly pay the Architect, other design professionals and each contractor the amount to which each is entitled in accordance with the terms of their respective contracts.

5.1.5 The Owner shall have no obligation under this Part 2 Agreement to pay or to be responsible in any way for payment to the Architect, another design professional, or a contractor performing portions of the Work.

5.1.6 Neither progress payment nor partial or entire use or occupancy of the Project by the Owner shall constitute an acceptance of Work not in accordance with the Contract Documents.

5.1.7 The Design/Builder warrants that title to all construction covered by an Application for Payment will pass to the Owner no later than the time of payment. The Design/Builder further warrants that upon submittal of an Application for Payment all construction for which payments have been received from the Owner shall be free and clear of liens, claims, security interests or encumbrances in favor of the Design/Builder or any other person or entity performing construction at the site or furnishing materials or equipment relating to the construction.

5.1.8 At the time of Substantial Completion, the Owner shall pay the Design/Builder the retainage, if any, less the "asonable cost to correct or complete incorrect or incomte Work. Final payment of such withheld sum shall be .ade upon correction or completion of such Work.

### 5.2    FINAL PAYMENT

5.2.1 Neither final payment nor amounts retained, if any,

shall become due until the Design/Builder submits to the Owner (1) an affidavit that payrolls. bills for materials and equipment. and other indebtedness connected with the Work for which the Owner or Owner's property might be responsible or encumbered (less amounts withheld by the Owner) have been paid or otherwise satisfied; (2) a certificate evidencing that insurance required by the Contract Documents to remain in force after final payment is currently in effect and will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Owner; (3) a written statement that the Design/Builder knows of no substantial reason that the insurance will not be renewable to cover the period required by the Contract Documents; (4) consent of surety, if any, to final payment; and (5) if required by the Owner, other data establishing payment or satisfaction of obligations, such as receipts, releases and waivers of liens, claims, security interests or encumbrances arising out of the Contract, to the extent and in such form as may be designated by the Owner. ·If a contractor or other person or entity entitled to assert a lien against the Owner's property refuses to furnish a release or waiver required by the Owner, the Design/Builder may furnish a bond satisfactory to the Owner to indemnify the Owner against such lien. If such lien remains unsatisfied after payments are made, the Design/Builder shall indemnify the Owner for all loss and cost, including reasonable attorneys' fees incurred as a result of such lien.

5.2.2 When the Work has been completed and the contract fully performed, the Design/Builder shall submit a final application for payment to the Owner, who shall make final payment within 30 days of receipt.

5.2.3 The making of final payment shall constitute a waiver of claims by the Owner except those arising from:

.1 liens, claims, security interests or encumbrances arising out of the Contract and unsettled;

.2 failure of the Work to comply with the requirements of the Contract Documents; or

.3 terms of special warranties required by the Contract Documents.

5.2.4 Acceptance of final payment shall constitute a waiver of all claims by the Design/Builder except those previously made in writing and identified by the Design/Builder as unsettled at the time of final Application for Payment.

### 5.3    INTEREST PAYMENTS

5.3.1 Payments due the Design/Builder under this Part 2 Agreement which are not paid when due shall bear interest from the date due at the rate specified in Article 13, or in the absence of a specified rate, at the legal rate prevailing where the Project is located.

# ARTICLE 6
## PROTECTION OF PERSONS AND PROPERTY

6.1 The Design/Builder shall be responsible for initiating, maintaining and providing supervision of all safety precautions and programs in connection with the performance of this Part 2 Agreement.

6.2 The Design/Builder shall take reasonable precautions for the safety of, and shall provide reasonable protection to prevent damage, injury or loss to: (1) employees on the Work and other persons who may be affected thereby; (2) the Work and materials and equipment to be incorporated therein, whether in storage on or off the site, under care, custody, or control of the Design/Builder or the Design/Builder's contractors: and (3) other property at or adjacent thereto, such as trees, shrubs, lawns, walks, pavements, roadways, structures and utilities not designated for removal, relocation, or replacement in the course of construction.

6.3 The Design/Builder shall give notices and comply with applicable laws, ordinances, rules, regulations and lawful orders of public authorities bearing on the safety of persons or property or their protection from damage, injury or loss.

6.4 The Design/Builder shall promptly remedy damage and loss (other than damage or loss insured under property insurance provided or required by the Contract Documents) to property at the site caused in whole or in part by the Design/Builder, a contractor of the Design/Builder or anyone directly or indirectly employed by any of them, or by anyone for whose acts they may be liable.

## ARTICLE 7

## INSURANCE AND BONDS

### 7.1    DESIGN/BUILDER'S LIABILITY INSURANCE

7.1.1 The Design/Builder shall purchase from and maintain, in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located, such insurance as will protect the Design/Builder from claims set forth below which may arise out of or result from operations under this Part 2 Agreement by the Design/Builder or by a contractor of the Design/Builder, or by anyone directly or indirectly employed by any of them, or by anyone for whose acts any of them may be liable:

.1 claims under workers' compensation, disability benefit and other similar employee benefit laws that are applicable to the Work to be performed;

.2 claims for damages because of bodily injury, occupational sickness or disease, or death of the Design/Builder's employees;

.3 claims for damages because of bodily injury, sickness or disease, or death of persons other than the Design/Builder's employees;

.4 claims for damages covered by usual personal injury liability coverage which are sustained (1) by a person as a result of an offense directly or indirectly related to employment of such person by the Design/Builder or (2) by another person;

.7 claims for damages, other than to the Work itself, because of injury to or destruction of tangible property, including loss of use resulting therefrom;

.6 claims for damages because of bodily injury, death of a person or property damage arising out

of ownership, maintenance or use of a motor vehicle; and

.7 claims involving contractual liability insurance applicable to the Design/Builder's obligations under Paragraph 11.5.

7.1.2 The insurance required by Subparagraph 7.1.1 shall be written for not less than limits of liability specified in this Part 2 Agreement or required by law, whichever coverage is greater. Coverages, whether written on an occurrence or claims-made basis, shall be maintained without interruption from date of commencement of the Work until date of final payment and termination of any coverage required to be maintained after final payment.

7.1.3 Certificates of Insurance acceptable to the Owner shall be delivered to the Owner immediately after execution of this Part 2 Agreement. These Certificates and the insurance policies required by this Paragraph 7.1 shall contain a provision that coverages afforded under the policies will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Owner. If any of the foregoing insurance coverages are required to remain in force after final payment, an additional certificate evidencing continuation of such coverage shall be submitted with the application for final payment. Information concerning reduction of coverage shall be furnished by the Design/Builder with reasonable promptness in accordance with the Design/Builder's information and belief.

### 7.2    OWNER'S LIABILITY INSURANCE

7.2.1 The Owner shall be responsible for purchasing and maintaining the Owner's usual liability insurance. Optionally, the Owner may purchase and maintain other insurance for self-protection against claims which may arise from operations under this Part 2 Agreement. The Design/Builder shall not be responsible for purchasing and maintaining this optional Owner's liability insurance unless specifically required by the Contract Documents.

### 7.3    PROPERTY INSURANCE

7.3.1 Unless otherwise provided under this Part 2 Agreement, the Owner shall purchase and maintain, in a company or companies authorized to do business in the jurisdiction in which the principal improvements are to be located, property insurance upon the Work to the full insurable value thereof on a replacement cost basis without optional deductibles. Such property insurance shall be maintained, unless otherwise provided in the Contract Documents or otherwise agreed in writing by all persons and entities who are beneficiaries of such insurance, until final payment has been made or until no person or entity other than the Owner has an insurable interest in the property required by this Paragraph 7.3 to be insured, whichever is earlier. This insurance shall include interests of the Owner, the Design/Builder, and their respective contractors and subcontractors in the Work.

7.3.2 Property insurance shall be on an all-risk policy form and shall insure against the perils of fire and extended coverage and physical loss or damage including, without duplication of coverage, theft, vandalism, malicious mischief, collapse, falsework, temporary buildings and

debris removal including demolition occasioned by enforcement of any applicable legal requirements and shall cover reasonable compensation for the services and expenses of the Design/Builder's Architect and other professionals required as a result of such insured loss. Coverage for other perils shall not be required unless otherwise provided in the Contract Documents.

7.3.3 If the Owner does not intend to purchase such property insurance required by this Part 2 Agreement and with all of the coverages in the amount described above, the Owner shall so inform the Design/Builder prior to commencement of the construction. The Design/Builder may then effect insurance which will protect the interests of the Design/Builder and the Design/Builder's contractors in the construction, and by appropriate Change Order the cost thereof shall be charged to the Owner. If the Design/Builder is damaged by the failure or neglect of the Owner to purchase or maintain insurance as described above, then the Owner shall bear all reasonable costs properly attributable thereto.

**7.3.4** Unless otherwise provided, the Owner shall purchase and maintain such boiler and machinery insurance required by this Part 2 Agreement or by law, which shall specifically cover such insured objects during installation and until final acceptance by the Owner. This insurance shall include interests of the Owner, the Design/Builder, Design/Builder's contractors and subcontractors in the Work, and the Design/Builder's Architect and other design professionals. The Owner and the Design/Builder shall be named insureds.

**7.3.5** A loss insured under Owner's property insurance shall be adjusted by the Owner as fiduciary and made payable to the Owner as fiduciary for the insureds, as their interests may appear, subject to requirements of any applicable mortgagee clause and of Subparagraph 7.3.10. The Design/Builder shall pay contractors their shares of insurance proceeds received by the Design/Builder, and by appropriate agreement, written where legally required for validity, shall require contractors to make payments to their subcontractors in similar manner.

**7.3.6** Before an exposure to loss may occur, the Owner shall file with the Design/Builder a copy of each policy that includes insurance coverages required by this Paragraph 7.3. Each policy shall contain all generally applicable conditions, definitions, exclusions and endorsements related to this Project. Each policy shall contain a provision that the policy will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Design/Builder.

**7.3.7** If the Design/Builder requests in writing that insurance for risks other than those described herein or for other special hazards be included in the property insurance policy, the Owner shall, if possible, obtain such insurance, and the cost thereof shall be charged to the Design/Builder by appropriate Change Order.

**7.3.8** The Owner and Design/Builder waive all rights against each other and the Architect and other design professionals, contractors, subcontractors, agents and employees, each of the other, for damages caused by fire or other perils to the extent covered by property insurance obtained pursuant to this Paragraph 7.3 or other property insurance applicable to the Work, except such rights as they may have to proceeds of such insurance held by the Owner as trustee. The Owner or Design/Builder, as appropriate, shall require from contractors and subcontractors by appropriate agreements, written where legally required for validity, similar waivers each in favor of other parties enumerated in this Paragraph 7.3. The policies shall provide such waivers of subrogation by endorsement or otherwise. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

**7.3.9** If required in writing by a party in interest, the Owner as trustee shall, upon occurrence of an insured loss, give bond for proper performance of the Owner's duties. The cost of required bonds shall be charged against proceeds received as fiduciary. The Owner shall deposit in a separate account proceeds so received, which the Owner shall distribute in accordance with such agreement as the parties in interest may reach, or in accordance with an arbitration award in which case the procedure shall be as provided in Article 10. If after such loss no other special agreement is made, replacement of damaged Work shall be covered by appropriate Change Order.

**7.3.10** The Owner as trustee shall have power to adjust and settle a loss with insurers unless one of the parties in interest shall object in writing, within five (5) days after occurrence of loss to the Owner's exercise of this power; if such objection be made, the parties shall enter into dispute resolution under procedures provided in Article 10. If distribution of insurance proceeds by arbitration is required, the arbitrators will direct such distribution.

**7.3.11** Partial occupancy or use prior to Substantial Completion shall not commence until the insurance company or companies providing property insurance have consented to such partial occupancy or use by endorsement or otherwise. The Owner and the Design/Builder shall take reasonable steps to obtain consent of the insurance company or companies and shall not, without mutual written consent, take any action with respect to partial occupancy or use that would cause cancellation, lapse or reduction of coverage.

**7.4    LOSS OF USE INSURANCE**

**7.4.1** The Owner, at the Owner's option, may purchase and maintain such insurance as will insure the Owner against loss of use of the Owner's property due to fire or other hazards, however caused. The Owner waives all rights of action against the Design/Builder for loss of use of the Owner's property, including consequential losses due to fire or other hazards, however caused.

## ARTICLE 8

## CHANGES IN THE WORK

### 8.1    CHANGES

8.1.1 Changes in the Work may be accomplished after execution of this Part 2 Agreement, without invalidating this Part 2 Agreement, by Change Order, Construction Change Directive, or order for a minor change in the Work, subject to the limitations stated in the Contract Documents.

8.1.2 A Change Order shall be based upon agreement between the Owner and the Design/Builder; a Construction Change Directive may be issued by the Owner without the agreement of the Design/Builder; an order for a minor change in the Work may be issued by the Design/Builder alone.

8.1.3 Changes in the Work shall be performed under applicable provisions of the Contract Documents, and the Design/Builder shall proceed promptly, unless otherwise provided in the Change Order, Construction Change Directive, or order for a minor change in the Work.

8.1.4 If unit prices are stated in the Contract Documents or subsequently agreed upon, and if quantities originally contemplated are so changed in a proposed Change Order or Construction Change Directive that application of such unit prices to quantities of Work proposed will cause substantial inequity to the Owner or the Design/Builder, the applicable unit prices shall be equitably adjusted.

### 8.2    CHANGE ORDERS

8.2.1 A Change Order is a written instrument prepared by the Design/Builder and signed by the Owner and the Design/Builder, stating their agreement upon all of the following:

.1 a change in the Work;

.2 the amount of the adjustment, if any, in the Contract Sum; and

.3 the extent of the adjustment, if any, in the Contract Time.

8.2.2 If the Owner requests a proposal for a change in the Work from the Design/Builder and subsequently elects not to proceed with the change, a Change Order shall be issued to reimburse the Design/Builder for any costs incurred for estimating services, design services or preparation of proposed revisions to the Contract Documents.

### 8.3    CONSTRUCTION CHANGE DIRECTIVES

8.3.1 A Construction Change Directive is a written order prepared and signed by the Owner, directing a change in the Work prior to agreement on adjustment, if any, in the Contract Sum or Contract Time, or both.

8.3.2 Except as otherwise agreed by the Owner and the Design/Builder, the adjustment to the Contract Sum shall be determined on the basis of reasonable expenditures and savings of those performing the Work attributable to the change, including the expenditures for

design services and revisions to the Contract Documents. In case of an increase in the Contract Sum, the cost shall include a reasonable allowance for overhead and profit. In such case, the Design/Builder shall keep and present an itemized accounting together with appropriate supporting data for inclusion in a Change Order. Unless otherwise provided in the Contract Documents, costs for these purposes shall be limited to the following:

.1 costs of labor, including social security, old age and unemployment insurance, fringe benefits required by agreement or custom, and workers' compensation insurance;

.2 costs of materials, supplies and equipment, including cost of transportation, whether incorporated or consumed;

.3 rental costs of machinery and equipment exclusive of hand tools, whether rented from the Design/Builder or others;

.4 costs of premiums for all bonds and insurance permit fees, and sales, use or similar taxes;

.5 additional costs of supervision and field office personnel directly attributable to the change; and fees paid to the Architect, engineers and other professionals.

8.3.3 Pending final determination of cost to the Owner, amounts not in dispute may be included in Applications for Payment. The amount of credit to be allowed by the Design/Builder to the Owner for deletion or change which results in a net decrease in the Contract Sum will be actual net cost. When both additions and credits covering related Work or substitutions are involved in a change, the allowance for overhead and profit shall be figured on the basis of the net increase, if any, with respect to that change.

8.3.4 When the Owner and the Design/Builder agree upon the adjustments in the Contract Sum and Contract Time, such agreement shall be effective immediately and shall be recorded by preparation and execution of an appropriate Change Order.

### 8.4    MINOR CHANGES IN THE WORK

8.4.1 The Design/Builder shall have authority to make minor changes in the Construction Documents and construction consistent with the intent of the Contract Documents when such minor changes do not involve adjustment in the Contract Sum or extension of the Contract Time. The Design/Builder shall promptly inform the Owner, in writing, of minor changes in the Construction Documents and construction.

### 8.5    CONCEALED CONDITIONS

8.5.1 If conditions are encountered at the site which are (1) subsurface or otherwise concealed physical conditions which differ materially from those indicated in the Contract Documents or (2) unknown physical conditions of an unusual nature, which differ materially from those ordinarily found to exist and generally recognized as inherent in construction activities of the character provided for in the Contract Documents, then notice by the observing party shall be given to the other party promptly before conditions are disturbed and in no

AIA DOCUMENT A191, Part 2 • OWNER-DESIGN/BUILDER AGREEMENT • SECOND EDITION • AIA® • ©1996
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, NW, WASHINGTON, DC 20006-5292 •
WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.

A191—1996
Part 2—Page 9

114

event later than 21 days after first observance of the conditions. The Contract Sum shall be equitably adjusted for such concealed or unknown conditions by Change Order upon claim by either party made within 21 days after the claimant becomes aware of the conditions.

## 8.6   REGULATORY CHANGES

8.6.1 The Design/Builder shall be compensated for changes in the construction necessitated by the enactment or revisions of codes, laws or regulations subsequent to the submission of the Design/Builder's Proposal.

## ARTICLE 9

## CORRECTION OF WORK

9.1 The Design/Builder shall promptly correct Work rejected by the Owner or known by the Design/Builder to be defective or failing to conform to the requirements of the Contract Documents, whether observed before or after Substantial Completion and whether or not fabricated, installed or completed. The Design/Builder shall bear costs of correcting such rejected Work, including additional testing and inspections.

9.2 If, within one (1) year after the date of Substantial Completion of the Work or, after the date for commencement of warranties established in a written agreement between the Owner and the Design/Builder, or by terms of an applicable special warranty required by the Contract Documents, any of the Work is found to be not in accordance with the requirements of the Contract Documents, the Design/Builder shall correct it promptly after receipt of a written notice from the Owner to do so unless the Owner has previously given the Design/Builder a written acceptance of such condition.

9.3 Nothing contained in this Article 9 shall be construed to establish a period of limitation with respect to other obligations which the Design/Builder might have under the Contract Documents. Establishment of the time period of one (1) year as described in Subparagraph 9.2 relates only to the specific obligation of the Design/Builder to correct the Work, and has no relationship to the time within which the obligation to comply with the Contract Documents may be sought to be enforced, nor to the time within which proceedings may be commenced to establish the Design/Builder's liability with respect to the Design/Builder's obligations other than specifically to correct the Work.

9.4 If the Design/Builder fails to correct nonconforming Work as required or fails to carry out Work in accordance with the Contract Documents, the Owner, by written order signed personally or by an agent specifically so empowered by the Owner in writing, may order the Design/Builder to stop the Work, or any portion thereof, until the cause for such order has been eliminated; however, the Owner's right to stop the Work shall not give rise a duty on the part of the Owner to exercise the right for benefit of the Design/Builder or other persons or entities.

9.5 If the Design/Builder defaults or neglects to carry out the Work in accordance with the Contract Documents and fails within seven (7) days after receipt of written notice from the Owner to commence and continue correction of such default or neglect with diligence and promptness, the Owner may give a second written notice to the Design/Builder and, seven (7) days following receipt by the Design/Builder of that second written notice and without prejudice to other remedies the Owner may have, correct such deficiencies. In such case an appropriate Change Order shall be issued deducting from payments then or thereafter due the Design/Builder costs of correcting such deficiencies. If the payments then or thereafter due the Design/Builder are not sufficient to cover the amount of the deduction, the Design/Builder shall pay the difference to the Owner. Such action by the Owner shall be subject to dispute resolution procedures as provided in Article 10.

## ARTICLE 10

## DISPUTE RESOLUTION— MEDIATION AND ARBITRATION

10.1 Claims, disputes or other matters in question between the parties to this Part 2 Agreement arising out of or relating to this Part 2 Agreement or breach thereof shall be subject to and decided by mediation or arbitration. Such mediation or arbitration shall be conducted in accordance with the Construction Industry Mediation or Arbitration Rules of the American Arbitration Association currently in effect.

10.2 In addition to and prior to arbitration, the parties shall endeavor to settle disputes by mediation. Demand for mediation shall be filed in writing with the other party to this Part 2 Agreement and with the American Arbitration Association. A demand for mediation shall be made within a reasonable time after the claim, dispute, or other matter in question has arisen. In no event shall the demand for mediation be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statute of repose or limitations.

10.3 Demand for arbitration shall be filed in writing with the other party to this Part 2 Agreement and with the American Arbitration Association. A demand for arbitration shall be made within a reasonable time after the claim, dispute or other matter in question has arisen. In no event shall the demand for arbitration be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statutes of repose or limitations.

10.4 An arbitration pursuant to this Paragraph may be joined with an arbitration involving common issues of law or fact between the Design/Builder and any person or entity with whom the Design/Builder has a contractual obligation to arbitrate disputes. No other arbitration arising out of or relating to this Part 2 Agreement shall include, by consolidation, joinder or in any other manner, an additional person or entity not a party to this Part 2 Agreement or not a party to an agreement with the Design/Builder, except by written consent containing a

**115**

* The indemnification of this Article 11.5 shall be limited to the extent or the insurance provided by Des   i/Builder pursuant to Article 7   are of and the payment and performance bonds required therein.

specific reference to this Part 2 Agreement signed by the Owner, the Design/Builder and any other person or entities sought to be joined. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of any claim, dispute or other matter in question not described in the written consent or with a person or entity not named or described therein. The foregoing agreement to arbitrate and other agreements to arbitrate with an additional person or entity duly consented to by the parties to this Part 2 Agreement shall be , specifically enforceable in accordance with applicable law in any court having jurisdiction thereof.

10.5  The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

## ARTICLE 11
## MISCELLANEOUS PROVISIONS

11.1  Unless otherwise provided, this Part 2 Agreement shall be governed by the law of the place where the Project is located.

### 11.2   SUBCONTRACTS

11.2.1  The Design/Builder, as soon as practicable after ecution of this Part 2 Agreement, shall furnish to the ner in writing the names of the persons or entities ...e Design/Builder will engage as contractors for the Project.

### 11.3  WORK BY OWNER OR OWNER'S CONTRACTORS

11.3.1  The Owner reserves the right to perform construction or operations related to the Project with the Owner's own forces, and to award separate contracts in connection with other portions of the Project or other construction or operations on the site under conditions of insurance and waiver of subrogation identical to the provisions of this Part 2 Agreement. If the Design/Builder claims that delay or additional cost is involved because of such action by the Owner, the Design/Builder shall assert such claims as provided in Subparagraph 11.4.

11.3.2  The Design/Builder shall afford the Owner's separate contractors reasonable opportunity for introduction and storage of their materials and equipment and performance of their activities and shall connect and coordinate the Design/Builder's construction and operations with theirs as required by the Contract Documents.

11.3.3  Costs caused by delays or by improperly timed activities or defective construction shall be borne by the party responsible therefor.

### 11.4   CLAIMS FOR DAMAGES

11.4.1  If either party to this Part 2 Agreement suffers injury or damage to person or property because of an act or omission of the other party, of any of the other party's employees or agents, or of others for whose acts such is legally liable, written notice of such injury or age, whether or not insured, shall be given to the

other party within a reasonable time not exceeding 21 days after first observance. The notice shall provide sufficient detail to enable the other party to investigate the matter. If a claim of additional cost or time related to this claim is to be asserted, it shall be filed in writing.

### 11.5   INDEMNIFICATION

11.5.1  To the fullest extent permitted by law, the Design/Builder shall indemnify and hold harmless the Owner. Owner's consultants, and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) including loss of use resulting therefrom, but only to the extent caused in whole or in part by negligent acts or omissions of the Design/Builder, anyone directly or indirectly employed by the Design/Builder or anyone for whose acts the Design/Builder may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder. Such obligation shall not be construed to negate, abridge, or reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Paragraph 11.5.

11.5.2  In claims against any person or entity indemnified under this Paragraph 11.5 by an employee of the Design/Builder, anyone directly or indirectly employed by the Design/Builder or anyone for whose acts the Design/Builder may be liable, the indemnification obligation under this Paragraph 11.5 shall not be limited by a limitation on amount or type of damages, compensation or benefits payable by or for the Design/Builder under workers' compensation acts, disability benefit acts or other employee benefit acts.

### 11.6   SUCCESSORS AND ASSIGNS

11.6.1  The Owner and Design/Builder, respectively, bind themselves, their partners, successors, assigns and legal representatives to the other party to this Part 2 Agreement and to the partners, successors and assigns of such other party with respect to all covenants of this Part 2 Agreement. Neither the Owner nor the Design/Builder shall assign this Part 2 Agreement without the written consent of the other. The Owner may assign this Part 2 Agreement to any institutional lender providing construction financing, and the Design/Builder agrees to execute all consents reasonably required to facilitate such an assignment. If either party makes such an assignment, that party shall nevertheless remain legally responsible for all obligations under this Part 2 Agreement, unless otherwise agreed by the other party.

### 11.7   TERMINATION OF PROFESSIONAL DESIGN SERVICES by the Design/Builder

11.7.1  Prior to termination of the services of the Architect or any other design professional designated in this Part 2 Agreement, the Design/Builder shall identify to the Owner in writing another architect or other design professional with respect to whom the Owner has no reasonable objection, who will provide the services

AIA DOCUMENT A191, Part 2 • OWNER-DESIGN BUILDER AGREEMENT • SECOND EDITION • AIA® • ©1996
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, NW WASHINGTON, DC 20006-5292 •
WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.

originally to have been provided by the Architect or other design professional whose services are being terminated.

## 11.8   EXTENT OF AGREEMENT

**11.8.1** This Part 2 Agreement represents the entire agreement between the Owner and the Design/Builder and supersedes prior negotiations, representations or agreements, either written or oral. This Part 2 Agreement may be amended only by written instrument and signed by both the Owner and the Design/Builder.

## ARTICLE 12

## TERMINATION OF THE AGREEMENT

### 12.1   TERMINATION BY THE OWNER

**12.1.1** This Part 2 Agreement may be terminated by the Owner upon 14 days' written notice to the Design/Builder in the event that the Project is abandoned. If such termination occurs, the Owner shall pay the Design/Builder for Work completed and for proven loss sustained upon materials, equipment, tools, and construction equipment and machinery, including reasonable profit and applicable damages.

2 If the Design/Builder defaults or persistently fails or neglects to carry out the Work in accordance with the Contract Documents or fails to perform the provisions of this Part 2 Agreement, the Owner may give written

notice that the Owner intends to terminate this Part 2 Agreement. If the Design/Builder fails to correct the defaults, failure or neglect within seven (7) days after being given notice, the Owner may then give a second written notice and, after an additional seven (7) days, the Owner may without prejudice to any other remedy terminate the employment of the Design/Builder and take possession of the site and of all materials. equipment. tools and construction equipment and machinery thereon owned by the Design/Builder and finish the Work by whatever method the Owner may deem expedient. If the unpaid balance of the Contract Sum exceeds the expense of finishing the Work and all damages incurred by the Owner, such excess shall be paid to the Design/Builder. If the expense of completing the Work and all damages incurred by the Owner exceeds the unpaid balance, the Design/Builder shall pay the difference to the Owner. This obligation for payment shall survive termination of this Part 2 Agreement.

### 12.2   TERMINATION BY THE DESIGN/BUILDER

**12.2.1** If the Owner fails to make payment when due, the Design/Builder may give written notice of the Design/Builder's intention to terminate this Part 2 Agreement. If the Design/Builder fails to receive payment within seven (7) days after receipt of such notice by the Owner, the Design/Builder may give a second written notice and, seven (7) days after receipt of such second written notice by the Owner, may terminate this Part 2 Agreement and recover from the Owner payment for Work executed and for proven losses sustained upon materials, equipment, tools, and construction equipment and machinery, including reasonable profit and applicable damages.

## ARTICLE 13

## BASIS OF COMPENSATION

The Owner shall compensate the Design/Builder in accordance with Article 5, Payments, and the other provisions of this Part 2 Agreement as described below.

### 13.1   COMPENSATION

~~13.1.1 For the Design/Builder's performance of the Work, as described in Paragraph 3.2 and including any other services listed in Article 14 as part of Basic Services, the Owner shall pay the Design/Builder in current funds the Contract Sum as follows.~~

Compensation provisions are set forth in Appendix "A".

Total contract amount is $ 14,279,000 ( Fourteen million two hundred seventy nine thousand dollars).

See Appendix B "the Schedule of Values."

13.1.2 For Additional Services, as described in Paragraph 3.3 and including any other services listed in Article 14 as Additional Services, compensation shall be as follows:

13.2 REIMBURSABLE EXPENSES

13.2.1 Reimbursable Expenses are in addition to the compensation for Basic and Additional Services, and include actual expenditures made by the Design/Builder and the Design/Builder's employees and contractors in the interest of the Project, as follows:

13.2.2 FOR REIMBURSABLE EXPENSES, compensation shall be a multiple of
(                ) times the amounts expended.

13.3  INTEREST PAYMENTS

13.3.1 The rate of interest for past due payments shall be as follows:   Lesser of 1-1/2% per month or
the highest interest allowed
by law.

*(Usury laws and requirements under the Federal Truth in Lending Act, similar state and local consumer credit laws and other regulations at the Owner's and Design/Builder's principal places of business, at the location of the Project and elsewhere may affect the validity of this provision. Specific legal advice should be obtained with respect to deletion, modification or other requirements, such as written disclosures or waivers.)*

**118**

## ARTICLE 14

### OTHER CONDITIONS AND SERVICES

following

14.1   The Basic Services to be performed shall be commenced on the date 5 days after all of the and, subject to authorized adjustments and to delays not caused by the Design/Builder, Substantial Completion shall be achieved in the Contract Time of three hundred ninety( 399   ) calendar days.

nine

~~14.2   The Basic Services beyond those described in Article 3 are as follows:~~

Defined as:

1.  Receipt of building permit

2.  Receipt of confirmation of financial funding and first payment.

3.  Receipt of approval to begin construction from the Texas Commission of Jail Standards.

4.  Approval of design documents by county representative and operator.

14.2

The Owners Representative will be James Parkey-Corplan Corrections The Representative for Hale-Mills Construction will be Kendall Phinney

~~14.3   Additional Services beyond those described in Article 3 are as follows:~~

14.4   The Design/Builder shall submit an Application for Payment ~~on the~~ by the (  5th  ) day of each month.

**14.5**   The Design/Builder's Proposal includes the following documents:
*(List the documents by specific title and date; include any required performance and payment bonds.)*

Title                                                    Date


        Appendix A


This Agreement entered into as of the day and year first written above.

OWNER                                                   DESIGN/BUILDER

_____          _____
*(Signature)*                                            *(Signature)*


_____          Kendall Phinney, President
*(Printed name and title)*                          *(Printed name and title)*


u should sign an original AIA document which has this caution printed in red.
sures that changes will not be obscured as may occur when documents are reproduced.

_____

APPENDIX "A"

1.   A minimum and medium security correctional facility to house 500 inmates, to be located on the real property described in Exhibit "A" attached hereto, located in the Town of Raymondville, Willacy County, Texas, design to be approved by the Texas Commission on Jail Standards.

2.   Design/Builder acknowledges the funds for the construction of the Project are to be provided through the issuance of Lease Certificates of Participation by Willacy County (the "County"), the disbursement of which will be governed by a certain Trust Indenture between Municipal Capital Markets Corporation ("Owner") and U.S. Bank National Association ("Trustee"). Design/Builder had reviewed the Trust Indenture and hereby agrees to be bound by the terms thereof. Further, Design/Builder acknowledges and understands the Owner, immediately upon execution hereof, will assign to the County this agreement and Design/Builder agrees that Owner should have no personal liability whatsoever for any payments due to Design/Builder hereunder and that Design/Builder shall look solely to the Construction Fund established pursuant to the Trust Indenture by the Trustee for any and all payments due to Design/Builder hereunder. Notwithstanding the foregoing, Owner shall be liable to Design/Builder for any act or omissions of Owner which are negligent, grossly negligent or willful and which are directly related to the obligations of Owner hereunder.

3.   This agreement is make and intended for the benefit of Owner and Design/Builder only, and is not made or intended for the benefit of any third party, except the County and the Trustee. Design/Builder makes no representations as to the commerciality or profitability of the Project, and does not guarantee or warrant any representations or statements made by any other party in connection with the Project.

4.   If the Design/Builder is delayed in the progress of the Project by acts of neglect of Owner, Owner's employees, separate contractors employed by the Owner, changes ordered in the Work except as provided in Paragraph 7 below, labor disputes, fire not caused by Design/Builder, unusual delay in transportation, unavoidable casualties, or another cause which the Owner and Design/Builder agree is justifiable, the contract time shall be reasonably extended by Change Order.

5.   Should Design/Builder fail to substantially complete the Project within thirteen (13) months from the date of funding, subject to any extensions pursuant to this Agreement ("Time of Completion of Work"), the Design/Builder agrees to pay the Owner as liquidated damages for each and every day of delay beyond the Time of Completion of Work the sum of $6,475 per day, which sum is hereby, in view of the difficulty of estimating such damages, agreed upon, fixed, and

**121**

per day, which sum is hereby, in view of the difficulty of estimating such damages, agreed upon, fixed, and determined by the parties hereto, as the liquidated damages that the Owner will suffer by such default and not by way of penalty, and shall be deducted as such from the "Balance Due Design/Builder." The facility will be considered substantially complete upon inspection and approval by the Texas Jail Standards Commission.

6.   Design/Builder's liability for damage or loss shall be limited to the amount of insurance coverage and payment and performance bonds required by the terms of this Agreement. In no event shall Design/Builder by liable for any damages or losses, no matter how described, for amounts in excess of that covered by the insurance required hereby.

7.   Design/Builder shall receive a total of thirteen million eight hundred thousand and no/100 dollars ($ 14,279,000) as compensation for services provided under this Agreement, subject to the time and provisions hereof. The parties hereto agree that the Project, as constructed in accordance with this Contract, will not be subject to state and local sales taxes. Owner will provide Design/Builder an exemption certificate for exemption from payment of state and local sales and use taxes in order to comply with applicable sales tax laws of the State of Texas, this Agreement shall be separated contract, with the amount for, materials and services specified separately:

Materials - $ 7,350,000  Services - $ 6,979,000

Application for payment will be for 100% of work completed, less 10% retainage, which retainage shall be paid upon completion of the Project. The retainage is not applicable to development insurance and bond costs. The price is subject to change only pursuant to the provisions contained in this Agreement.

8.   Design/Builder and Owner agree that Design/Builder need not present a complete set of documents for Owner to approve prior to the beginning of construction. Design/Builder will present for approval such documents as are reasonably available at the time Design/Builder is ready to commence construction of the Project and Design/Builder shall be entitled to commence construction based on partial documents. Notwithstanding the foregoing, Design/Builder represents and warrants that the Project will be designed and constructed to house 500 inmates, to be located on the real property described in Exhibit "A" attached hereto, and to be approved by the Texas Commission on Jail Standards.

**122**

9.  Weather/Time Extensions

The time quoted in this contract includes -0- days for weather related delays on the project and the contractor has made no allowance for time or cost above this number for delays caused by weather.  Any delay or work stoppage due to any weather above the stated allowance will necessitate a change order to address this change to the contract.  The time quoted in the contract is in calendar days and the schedule of the project recognizes a 5 day work week, therefore, the loss of part or all of a day will need to be converted to calendar days.

10.  Warranty

Hale-Mills Construction, Inc. warrants our finished product to be the project as defined on the plans and specifications. Contractor warrants all work for one year after substantial completion.  Contractor agrees to provide the Owner with all warranties as required by the specifications.  Some systems and/or products have been selected by the Design Professionals on this project for their value to the project and an extended warranty by the vendor is required by the contract documents.  For any extended warranties required in any contract documents, the Contractor will provide and the Owner will rely solely on the Product or Manufacturer or Subcontractor providing the system, for the extended warranty.

11.  Design Liability

Hale-Mills Construction, Inc. has no licensed professional design or engineering personnel nor do we engage in professional design work.  Hale-Mills Construction, Inc. does not represent that we have the capability or expertise to evaluate such services or product.  The Architect is the design professional on this project and is qualified to make these evaluations and judgments.  In the event design or engineering work is required under the contract, Hale-Mills Construction, Inc. will provide and pay for the professional design work required but, Hale-Mills Construction, Inc. and the Owner are relying on the Architect and his project design professionals in evaluating and approving this design work.  Hale-Mills Construction, Inc. will assist the Owner and Architect in any way, necessary and will, if requested, assign any rights Hale-Mills Construction, Inc. might have, to the Owner regarding this professional design and engineering work and the entity or person providing the professional design or engineering services under this contract.

12.  Change Order Cost

Any increased cost to the project will increase the cost of the insurance and if applicable the cost of any bonds.  The cost on any change order will carry a added burden of 1.97% for insurance cost and 1.15% for bonds where applicable.

# Willacy 500 Bed Detention Center
# 08/05/2002

Cash Flow analysis of a 500 bed Detention center
Based on a total cost of:                    $14,279,000

Many things effect the timing of draws and determine
progresss on a particular project.   Some of these are:
rain, approvals/inspections, changes, delivery, schedules,
etc.   This is only a projection of work on the project
and does not convey or guarantee the resorces needed
for any particular month.

| | | | | |
|---|---|---|---|---|
| 3,656,352 | 26% | | 1 | At Closing |
| 1,285,110 | 9% | | 2 | September |
| 1,142,320 | 8% | | 3 | October |
| 999,530 | 7% | | 4 | November |
| 999,530 | 7% | | 5 | December |
| 1,142,320 | 8% | | 6 | January |
| 999,530 | 7% | | 7 | February |
| 713,950 | 5% | | 8 | March |
| 713,950 | 5% | | 9 | April |
| 579,460 | 4% | | 10 | May |
| 571,160 | 4% | | 11 | June |
| 428,370 | 3% | | 12 | July |
| 1,047,418 | 7% | | 13 | August |
| 14,279,000 | 100% | | | |

**124**

# APPLICATION AND CERTIFICATE FOR PAYMENT

| TO (Owner): **Willacy County Public Facility Corp.**<br>546 West Hidalgo Street<br>Raymondville, Texas 78580 | PROJECT:<br>**Willacy County**<br>**Detention Center** | APPLICATION NO: **1** | Distribution to:<br>☐ OWNER<br>☐ ARCHITECT<br>☐ CONTRACTOR<br>☐ INSPECTOR |
|---|---|---|---|
| FROM (G/C): **Hale-Mills Construction, Inc.**<br>4130 Bellaire Blvd. #210<br>Houston, Texas 77025 | VIA ARCHITECT:<br>**Aguirre, Inc.**<br>12700 Park Central Drive #1508 | PERIOD TO: **Start** | |
| Attention:<br>**James Parkey** | Dallas, Texas 75251 | PROJECT NO: **09-016**<br>CONTRACT DATE: **08/14/2002** | |

## CONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for Payment, as shown below, in connection with the Contract.
Continuation Sheet is attached.

1. ORIGINAL CONTRACT SUM. . . . . . . . . . . . . . $    14,279,000.00

2. Net change by Change Orders . . . . . . . . . . . . . . . $    0.00

3. CONTRACT SUM TO DATE. . . . . . . . . . . . . . . $    14,279,000.00

4. TOTAL COMPLETED & STORED TO DATE . . . . . . . . . . $    3,904,110.00
   (Column G on Continuation Sheet)

5. RETAINAGE . . . . . . .        10%    . . . . . . . . . . . $    247,758.00
   (Column I on Continuation Sheet)

6. TOTAL EARNED LESS RETAINAGE . . . . . . . . . . . . . . $    3,656,352.00

7. LESS PREVIOUS CERTIFICATES FOR PAYMENT . . . . . . . $    0.00

8. CURRENT PAYMENT DUE . . . . . . . . . . . . . . . $    3,656,352.00

9. BALANCE TO FINISH (INCLUDING RETAINAGE
   (Line 3 less Line 6)    $    10,622,648.00

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Change Orders approved<br>in previous months by Owner | | |
| Total approved this Month | | |
| TOTALS | 0.00 | 0.00 |
| Net changed by Change Orders | | 0.00 |

The undersigned Contractor certifies that to the best of his knowledge, information and belief the Work covered by this APPLICATION FOR PAYMENT has been completed in accordance with the Contract Documents, that all amounts have been paid by him for Work for which previous CERTIFICATES for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

CONTRACTOR: HALE-MILLS CONSTRUCTION, INC.

BY: _____ DATE: 08/06/2002

Phil Pack, Vice-President

State of TEXAS    County of _____

SUBSCRIBED AND SWORN TO before me this

6 DAY OF August 2002

NOTARY PUBLIC: _____

PENNY GUTIERREZ<br>NOTARY PUBLIC, STATE OF TEXAS<br>MY COMMISSION EXPIRES<br>DEC. 31, 2005

## AGENT'S CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the data comprising the above application, the AGENT certifies to the Owner that the work has progressed to the point indicated; that to the best of his knowledge, information and belief, the quantity of the work is in accordance with the Contract documents; and that the Contractor is entitled to payment of the AMOUNT CERTIFIED.

AMOUNT CERTIFIED . . . . . . .    $ _____
COR-PLAN CORRECTIONS

BY: _____ DATE: _____

This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.

CONTINUATION SHEET
APPLICATION AND CERTIFICATE FOR PAYMENT, containing
Contractor's signed Certification is attached.
In tabulations below, amounts are stated to the nearest dollar.

APPLICATION NO:                    1
APPLICATION DATE:         Funding
PERIOD TO:               August 14, 2002
Willacy County Detention Center
PROJECT NUMBER:           09-016

| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED | | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G÷C) | BALANCE TO FINISH (C-G) | RETAINAGE 10% |
| | | | FROM PREVIOUS APPLICATION (D+E) | THIS PERIOD | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 102 | SITE PREPARATION | 518,743 | | 440,932 | | 440,932 | 85% | 77,811 | 44,09: |
| 109 | SANITARY SEWER | 180,805 | | 153,684 | | 153,684 | 85% | 27,121 | 15,36: |
| 110 | MISCELLANEOUS SITE WORK | 131,932 | | 39,058 | | 39,058 | 30% | 92,874 | 3,90( |
| 111 | WATER MAINS | 115,620 | | 49,765 | | 49,765 | 43% | 65,855 | 4,97: |
| 116 | SITE LIGHTING | 95,912 | | 0 | | 0 | | 95,912 | ( |
| 121 | ASPHALT PAVING | 301,065 | | 0 | | 0 | | 301,065 | ( |
| 124 | PARKING MARKERS/STRIPING | 2,476 | | 0 | | 0 | | 2,476 | ( |
| 128 | FENCING | 464,145 | | 0 | | 0 | | 464,145 | ( |
| ALL100 | SERIES TOTALS | 1,810,698 | 0 | 683,439 | 0 | 683,439 | 38% | 1,127,259 | 68,34< |
| 201 | LAY-OUT ENGINEERING | 11,570 | | 11,570 | | 11,570 | 100% | 0 | 1,15: |
| 219 | TURN-KEY CONCRETE FOUNDATIO | 296,308 | | 103,708 | | 103,708 | 35% | 192,600 | 10,37: |
| 220 | TURN-KEY CONCRETE PAVING | 76,415 | | 0 | | 0 | | 76,415 | ( |
| 221 | TURN-KEY CONCRETE FLATWK | 684,315 | | 218,981 | | 218,981 | 32% | 465,334 | 21,89( |
| 222 | TURN-KEY CONCRETE WALLS | 238,201 | | 71,687 | | 71,687 | 30% | 166,514 | 7,16( |
| 223 | TURN-KEY CONCRETE SITE-WK | 68,117 | | 0 | | 0 | | 68,117 | ( |
| 234 | WATERPROOFING | 33,717 | | 0 | | 0 | | 33,717 | ( |
| 235 | TESTING ALLOWANCE | 17,449 | | 10,385 | | 10,385 | 60% | 7,064 | 1,03( |
| ALL200 | SERIES TOTALS | 1,426,092 | 0 | 416,331 | 0 | 416,331 | 29% | 1,009,761 | 41,63: |
| 301 | STRUCTURAL STEEL | 316,270 | | 56,467 | | 56,467 | 18% | 259,803 | 5,64: |
| 302 | STRUCTURAL ERECTION | 69,418 | | 3,443 | | 3,443 | 5% | 65,975 | 34< |
| 303 | MISCELLANEOUS STEEL | 74,643 | | 0 | | 0 | | 74,643 | ( |
| 304 | ROOFING | 362,345 | | 0 | | 0 | | 362,345 | ( |
| 305 | MASONRY | 1,090,052 | | 0 | | 0 | | 1,090,052 | ( |
| 309 | BUILDING MISCELLANEOUS | 25,727 | | 0 | | 0 | | 25,727 | ( |
| ALL300 | SERIES TOTALS | 1,938,455 | 0 | 59,910 | 0 | 59,910 | 3% | 1,878,545 | 5,89: |
| 501 | INSULATION | 52,349 | | 0 | | 0 | | 52,349 | ( |
| 502 | HOLLOW-CORE METAL DOORS | 51,103 | | 10,138 | | 10,138 | 20% | 40,965 | 1,01< |
| 507 | GLASS AND GLAZING | 24,701 | | 0 | | 0 | | 24,701 | ( |
| 509 | CARPENTRY | 48,795 | | 0 | | 0 | | 48,795 | ( |
| 510 | HARDWARE | 37,601 | | 0 | | 0 | | 37,601 | ( |
| 514 | DRYWALL | 150,917 | | 0 | | 0 | | 150,917 | ( |
| 515 | CEILINGS | 12,408 | | 0 | | 0 | | 12,408 | ( |
| 51? | PAINTING | 288,257 | | 0 | | 0 | | 288, | ( |

CONTINUATION SHEET
APPLICATION AND CERTIFICATE FOR PAYMENT, containing
Contractor's signed Certification is attached.
In tabulations below, amounts are stated to the nearest dollar.

APPLICATION NO: 1
APPLICATION DATE: Funding
PERIOD TO: August 14, 2002
Willacy County Detention Center
PROJECT NUMBER: 09-016

127

| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED | | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G+C) | BALANCE TO FINISH (C-G) | RETAINAGE 10% |
|---|---|---|---|---|---|---|---|---|---|
| | | | FROM PREVIOUS APPLICATION (D+E) | THIS PERIOD | | | | | |
| 519 | TILE AND MARBLE | 26,610 | | 0 | | 0 | | 26,610 | |
| 521 | RESILIENT FLOORING | 45,321 | | 0 | | 0 | | 45,321 | |
| 522 | SPECIAL FLOORS | 37,037 | | 0 | | 0 | | 37,037 | |
| 523 | METAL PARTITIONS | 5,901 | | 0 | | 0 | | 5,901 | |
| 525 | PLUMBING | 1,101,421 | | 399,820 | | 399,820 | 36% | 701,601 | 39,98: |
| 529 | EQUIPMENT | 496,000 | | 0 | | 0 | | 496,000 | |
| 530 | HVAC | 968,315 | | 48,418 | | 48,418 | 5% | 919,899 | 4,84: |
| 535 | ELECTRICAL | 1,122,135 | | 112,214 | | 112,214 | 10% | 1,009,921 | 11,22· |
| 540 | FIRE SPRINKLER SYSTEM | 174,352 | | 8,718 | | 8,718 | 5% | 165,634 | 87: |
| 545 | MISCELLANEOUS SPECIALTIES | 31,819 | | 0 | | 0 | | 31,819 | |
| 566 | SECURITY MISCELLANEOUS | 1,916,784 | | 57,504 | | 57,504 | 3% | 1,859,280 | 5,75( |
| ALL500 | SERIES TOTALS | 6,591,826 | 0 | 636,810 | 0 | 636,810 | 10% | 5,955,016 | 63,68· |
| 401 | PROJECT SUPERVISION | 326,000 | | 74,980 | | 74,980 | 23% | 251,020 | 7,49( |
| 402 | JOB MOBILIZATION | 43,176 | | 17,270 | | 17,270 | 40% | 25,906 | 1,72; |
| 403 | GENERAL CONDITIONS | 60,225 | | 13,852 | | 13,852 | 23% | 46,373 | 1,38! |
| 404 | PROJECT UTILITIES | 12,000 | | 1,800 | | 1,800 | 15% | 10,200 | 18( |
| 405 | PLANS & PERMITS | 10,000 | | 10,000 | | 10,000 | 100% | 0 | 1,00( |
| 406 | CLEAN-UP | 30,000 | | 0 | | 0 | | 30,000 | ( |
| 407 | TRAVEL/PER DIEM EXPENSE | 53,000 | | 12,190 | | 12,190 | 23% | 40,810 | 1,21! |
| 409 | DEVELOPMENT/DESIGN COST | 1,102,000 | | 1,102,000 | | 1,102,000 | 100% | 0 | 55,10( |
| 410 | PRECONSTRUCTION EXPENSE | 460,000 | | 460,000 | | 460,000 | 100% | 0 | ( |
| 420 | INSURANCE | 247,308 | | 247,308 | | 247,308 | 100% | 0 | ( |
| 421 | PMT/PERF. BOND | 168,220 | | 168,220 | | 168,220 | 100% | 0 | ( |
| ALL400 | SERIES TOTAL | 2,511,929 | 0 | 2,107,620 | 0 | 2,107,620 | 84% | 404,309 | 68,10! |
| ALL | TOTAL CONTRACT COST | 14,279,000 | 0 | 3,904,110 | 0 | 3,904,110 | 27% | 10,374,890 | 247,75! |

# ACORD. CERTIFICATE OF LIABILITY INSURANCE

CSR JN 3-HALEM

| DATE (MM/DD/YY) |
| --- |
| 08/06/02 |

| PRODUCER | |
| --- | --- |
| Howse, Inc.<br>11 Wilcrest Green #106<br>Houston TX 77042-4739<br>Phone: 713-785-6785  Fax:713-785-8785 | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. |

| INSURED | INSURERS AFFORDING COVERAGE |
| --- | --- |
| Hale-Mills Construction, Inc.<br>Phil Packer<br>4130 Bellaire Blvd. #210<br>Houston TX 77025 | INSURER A: Scottsdale Ins. Co.*<br>INSURER B: Fireman's Fund<br>INSURER C: Colonial County Mutual<br>INSURER D: The Texas W/C Fund<br>INSURER E: Liberty Insurance Underwriters |

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
| --- | --- | --- | --- | --- | --- | --- |
| A | GENERAL LIABILITY<br>X COMMERCIAL GENERAL LIABILITY<br>☐ CLAIMS MADE X OCCUR<br>X Owner/Cont Prot.<br>GEN'L AGGREGATE LIMIT APPLIES PER:<br>☐ POLICY ☐ PRO-JECT ☐ LOC | BCS0002141 | 09/30/01 | 09/30/02 | EACH OCCURRENCE<br>FIRE DAMAGE (Any one fire)<br>MED EXP (Any one person)<br>PERSONAL & ADV INJURY<br>GENERAL AGGREGATE<br>PRODUCTS - COMP/OP AGG | $1,000,000<br>$50,000<br>$5,000<br>$1,000,000<br>$2,000,000<br>$1,000,000 |
| C | AUTOMOBILE LIABILITY<br>X ANY AUTO<br>☐ ALL OWNED AUTOS<br>☐ SCHEDULED AUTOS<br>X HIRED AUTOS<br>X NON-OWNED AUTOS | CAG0012339 | 09/30/01 | 09/30/02 | COMBINED SINGLE LIMIT (Ea accident)<br>BODILY INJURY (Per person)<br>BODILY INJURY (Per accident)<br>PROPERTY DAMAGE (Per accident) | $1,000,000<br>$<br>$<br>$. |
| | GARAGE LIABILITY<br>☐ ANY AUTO | | | | AUTO ONLY - EA ACCIDENT<br>OTHER THAN   EA ACC<br>AUTO ONLY:   AGG | $<br>$<br>$ |
| B | EXCESS LIABILITY<br>X OCCUR ☐ CLAIMS MADE<br>☐ DEDUCTIBLE<br>☐ RETENTION $ | XYZ00084560085 | 03/30/01 | 09/30/02 | EACH OCCURRENCE<br>AGGREGATE | $10,000,000<br>$10,000,000<br>$<br>$<br>$ |
| D | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY | SBP0001041044 | 10/28/01 | 10/28/02 | WC STATU- TORY LIMITS  OTHER<br>E.L. EACH ACCIDENT<br>E.L. DISEASE - EA EMPLOYEE<br>E.L. DISEASE - POLICY LIMIT | $1000000<br>$1000000<br>$1000000 |
| E | OTHER<br>Builders Risk | DA007001003 | 03/30/02 | 03/30/03 | TOTAL<br>PROJECT | $10,000,000 |

DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES/EXCLUSIONS ADDED BY ENDORSEMENT/SPECIAL PROVISIONS
Certificate Holder is included as an Additional Insured as respects General Liability and Waiver of Subrogation applies. Workers' Compensation Policy provides coverage for class code 8809 - Executive Officers.

| CERTIFICATE HOLDER | Y ADDITIONAL INSURED; INSURER LETTER: ___ | CANCELLATION |
| --- | --- | --- |
| | USBADEN | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL 30 DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES. |
| U.S. Bank National Association<br>As Trustee<br>Attn: Linda Johnson<br>950 17th Street, Suite 650<br>Denver, CO 80202 | | AUTHORIZED REPRESENTATIVE<br>*Jodi Neal* |

ACORD 25-S (7/97)

© ACORD CORPORATION 1988

128

# ACORD. CERTIFICATE OF LIABILITY INSURANCE

|  | DATE (MM/DD/YY) |
| --- | --- |
| CSR JM | 09/06/02 |

**PRODUCER**

Howze, Inc.
11111 Wilcrest Green #106
Houston TX 77042-4739
Phone:713-785-6785  Fax:713-785-8785

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.

**INSURED**

Hale-Mills Construction, Inc.
Phil Packer
4130 Bellaire Blvd. #210
Houston TX 77025

**INSURERS AFFORDING COVERAGE**

| | |
| --- | --- |
| INSURER A: | Scottsdale Ins. Co.* |
| INSURER B: | Fireman's Fund |
| INSURER C: | Colonial County Mutual |
| INSURER D: | The Texas W/C Fund |
| INSURER E: | Liberty Insurance Underwriters |

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
| --- | --- | --- | --- | --- | --- | --- |
| A | **GENERAL LIABILITY** [X] COMMERCIAL GENERAL LIABILITY [ ] CLAIMS MADE [X] OCCUR [X] Owner/Cont Prot. GEN'L AGGREGATE LIMIT APPLIES PER: [ ] POLICY [ ] PROJECT [ ] LOC | BCS0002141 | 09/30/01 | 09/30/02 | EACH OCCURRENCE FIRE DAMAGE (Any one fire) MED EXP (Any one person) PERSONAL & ADV INJURY GENERAL AGGREGATE PRODUCTS - COMP/OP AGG | $1,000,000 $50,000 $5,000 $1,000,000 $2,000,000 $1,000,000 |
| C | **AUTOMOBILE LIABILITY** [X] ANY AUTO [ ] ALL OWNED AUTOS [ ] SCHEDULED AUTOS [X] HIRED AUTOS [X] NON-OWNED AUTOS | CA000012339 | 09/30/01 | 09/30/02 | COMBINED SINGLE LIMIT (Ea accident) BODILY INJURY (Per person) BODILY INJURY (Per accident) PROPERTY DAMAGE (Per accident) | $1,000,000 $ $ $ |
| | **GARAGE LIABILITY** [ ] ANY AUTO | | | | AUTO ONLY - EA ACCIDENT OTHER THAN EA ACC AUTO ONLY: AGG | $ $ $ |
| B | **EXCESS LIABILITY** [X] OCCUR [ ] CLAIMS MADE [ ] DEDUCTIBLE [ ] RETENTION $ | XYZ00084560085 | 03/30/01 | 09/30/02 | EACH OCCURRENCE AGGREGATE | $10,000,000 $10,000,000 $ $ $ |
| D | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** | SBP0001041044 | 10/28/01 | 10/28/02 | [ ] WC STATU- TORY LIMITS [ ] OTHER E.L. EACH ACCIDENT E.L. DISEASE - EA EMPLOYEE E.L. DISEASE - POLICY LIMIT | $1000000 $1000000 $1000000 |
| E | **OTHER** Builders Risk | DA007001003 | 03/30/02 | 03/30/03 | TOTAL PROJECT | $10,000,000 |

**DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES/EXCLUSIONS ADDED BY ENDORSEMENT/SPECIAL PROVISIONS**

Re:  Willacy County Detention Facility.  Certificate holder is included as
an Additional Insured as respects General Liability.  Waiver of subrogation
applies.  Workers' Compensation Policy provides coverage for class code
8809 (Executive Officers) only.

| CERTIFICATE HOLDER | [Y] ADDITIONAL INSURED; INSURER LETTER: ____ | CANCELLATION |
| --- | --- | --- |
| | WILCRAX | |

Willacy County Public Facility
Corporation
546 W. Hidalgo Street
Raymondville, TX 78580

SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL __30__ DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES.

AUTHORIZED REPRESENTATIVE
*Jodi Neal*

ACORD 25-S (7/97)

© ACORD CORPORATION 1988

**129**

# CERTIFICATE OF SUBSTANTIAL COMPLETION

*AIA DOCUMENT G704*

Distribution to:
NER ☐
ARCHITECT ☐
CONTRACTOR ☐
FIELD ☐
OTHER ☐

PROJECT: Willacy County Detention
(name address) Facility
1601 Buffalo Drive
Raymondville, Texas 78580

TO (Owner):

⌐Willacy County Public ¬
Facility Corporation
546 W. Hidalgo Street
Raymondville, Texas 78580
∟ ⌋

DATE OF ISSUANCE: October 6, 2003

ARCHITECT: Aguirre Corporation

ARCHITECT'S PROJECT NUMBER:

CONTRACTOR: Hale-Mills Construction, Lt

CONTRACT FOR: Willacy County Detention
Facility

CONTRACT DATE: June 10, 2002

PROJECT OR DESIGNATED PORTION SHALL INCLUDE:

The Work performed under this Contract has been reviewed and found to be substantially complete. The Date of Substantial Completion of the Project or portion thereof designated above is hereby established as **July 29, 2003**

which is also the date of commencement of applicable warranties required by the Contract Documents, except as stated below.

## DEFINITION OF DATE OF SUBSTANTIAL·COMPLETION

The Date of Substantial Completion of the Work or designated portion thereof is the Date certified by the Architect when construction is sufficiently complete, in accordance with the Contract Documents, so the Owner can occupy or utilize the Work or designated portion thereof for the use for which it is intended, as expressed in the Contract Documents.

A list of items to be completed or corrected, prepared by the Contractor and verified and amended by the Architect, is attached hereto. The failure to include any items on such list does not alter the responsibility of the Contractor to complete all Work in accordance with the Contract Documents. The date of commencement of warranties for items on the attached list will be the date of final payment unless otherwise agreed to in writing.

| Aguirre Corporation | | 10/7/03 |
|---|---|---|
| ARCHITECT | BY | DATE |

The Contractor will complete or correct the Work on the list of items attached hereto within _____ days from the above Date of Substantial Completion.

| Hale-Mills Construction, Ltd. | | 10/6/0? |
|---|---|---|
| CONTRACTOR | BY | DATE |

The Owner accepts the Work or designated portion thereof as substantially complete and will assume full possession thereof at _____ (time) on _____, (date).

| Willacy County Public Facility | | 11 6/0? |
|---|---|---|
| OWNER Corporation | BY | DATE |

The responsibilities of the Owner and the Contractor for security, maintenance, heat, utilities, damage to the Work and insurance shall be as follows:
*(Note—Owner's and Contractor's legal and insurance counsel should determine and review insurance requirements and coverage; Contractor shall secure consent of surety company, if any.)*

wner assumes all responsibility for security, maintenance, utilites and insurance.

AIA DOCUMENT G704 • CERTIFICATE OF SUBSTANTIAL COMPLETION • APRIL 1978 EDITION • AIA®
© 1978 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVE., N.W., WASHINGTON, D.C. 20006
G704 — 1978

# EXHIBIT B

# Agreement Between Owner and Design/Builder

**AGREEMENT**

Made as of the twenty-ninth day of June in the year of 2004.

**BETWEEN** the owner:

County Jail Public Facility Corporation of Willacy County, Texas
546 West Hidalgo Street

Raymondville, Texas 78580

and the Design/Builder:

Hale-Mills Construction, Ltd.
4130 Bellaire Boulevard, Suite 210
Houston, Texas 77025

For the following Project:

The design and construction of the will consist of a one story, 96 bed, secure adult detention facility, expandable by 96 beds, with an area of approximately 26,000 square feet. The facility will be designed to meet the requirements of the Texas Commission on Jail Standards and will comply with applicable local, state and national codes. The facility will be monitored through closed circuit television and operable remotely through the use of a central control panel located in the central Control Room.

The Sheriff's administrative offices will contain all functional spaces necessary to support the sheriff's office and his staff, including a sheriff's lobby with public restrooms, clerical office, multi-agency office, chief's offices, Sheriff's office, dispatch room, 911 room, communications sergeants office, investigators offices, civil process office, deputies office, patrol sergeants office evidence storage, arsenal and kennel for the drug dogs. On the opposite side of the sheriff's lobby will be a squad room/conference room, break room and multi-purpose room. A separate Department of Public Safety ("DPS") room will be located in the administrative area and will have a private entrance. The jail lobby will have a separate entrance for the public, adjacent to the DPS. The ceiling in these areas will be acoustical ceiling tile. The floors in these areas will be carpet or vinyl composition tile. The walls will be metal studs with gypsum wall board or concrete masonry unit.

The Intake Area will contain an intake/booking counter, female holding, male holding, violent cell, shakedown, female detox, male detox, inmate property storage, and inmate clothing issue. The ceiling in the Intake Area will be composed of hollow core concrete planks. The floors will be sealed concrete and the walls will be grouted, reinforced concrete masonry units.



**EXHIBIT**

**2**

**132**

The Secure Area (inmate housing area) will contain (12) separation cells, (10) 8-person multi-occupancy cells, and (1) 4-person multi-occupancy cell. Inmate Visitation and Public/Attorney Visitation rooms will be located near the Jail Lobby. The Line-Up room will be located across from the Viewing/Statement room. The Medical Room will be located adjacent to the Kitchen and the Laundry will be adjacent to Intake. There is a Multi-purpose Room, Commissary, ample Storage and Janitor's Closets. The inmate outdoor recreation area will be configured as an interior courtyard and will be visible from Central Control. The Jail Administrator's office will be located next to Central Control. All passage from the secure area to non-secure area will be through security vestibules with interlocking doors. The ceiling in the Secure Area will be composed of hollow core concrete planks. The floors will be sealed concrete and the walls will be grouted, reinforced concrete masonry units. All inmate plumbing fixtures will be security-type stainless steel fixtures. The doors in the secure area will be security hollow metal and the door hardware will be detention hardware.

The kitchen will be designed to accommodate food preparation for 100-200 inmates. It will be fully equipped with the appropriate kitchen equipment and food storage areas. The ceiling in the kitchen will be security gypsum board and /or hollow core concrete planks. The floors will be sealed, non-porous concrete and the walls will be reinforced concrete masonry units.

The vehicular sallyport will be fully secured and will accommodate a full size inter-city bus.

The facility will be constructed of tilt-up concrete panel exterior walls. The building structure will be steel framed with a metal roof.
The architectural services described in Article 3 will be provided by:

F. C. Cuny Corporation
4222 Rosehill Rd., Suite 7
Garland, Texas 75043


who is lawfully licensed to practice architecture in the State of Texas.


## ARTICLE 1

## GENERAL PROVISIONS

### 1.1    BASIC DEFINITIONS

1.1.1    The Contract Documents consist of this Agreement; the Design/Builder's Proposal and written addenda to the Proposal identified in Article 14, the Construction Documents approved by the Owner in accordance with Subparagraph 3.2.3 and Modifications issued after execution of this Agreement. A Modification is a Change Order or a written amendment to this Agreement signed by both parties, or a Construction Change Directive issued by the Owner in accordance with Paragraph 8.3.

1.1.2   The term "Work" means the planning, design,, construction, financing, operation and management services provided (or caused to be provided) by the Design/Builder to fulfill the Design/Builder's obligations.

## 1.2   EXECUTION, CORRELATION AND INTENT

1.2.1   It is the intent of the Owner and the Design/Builder that the Contract Documents include all items necessary for proper execution and completion of the Work.   The Contract Documents are complementary, and what is required by one shall be as binding as if required by all; performance by the Design/Builder shall be required only to the extent consistent with and reasonably inferable from the Contract Documents as being necessary to produce the intended results.   Words that have well known technical or construction industry meanings are used in the Contract Documents in accordance with such recognized meanings.

1.2.2   If the Design/Builder believes or is advised by the Architect or by another design professional retained to provide services on the Project that implementation of any instruction received from the Owner would cause a violation of any applicable law, the Design/Builder shall notify the Owner in writing.   Neither the Design/Builder nor the Architect shall be obligated to perform any act which either believes will violate any applicable law.

1.2.3   Nothing contained in this Agreement shall create a contractual relationship between the Owner and any person or entity other than the Design/Builder.

## 1.3   OWNERSHIP AND USE OF DOCUMENTS

1.3.1   Drawings, specifications, and other documents and electronic data furnished by the Design/Builder are instruments of service.   The Design/Builder's Architect and other providers of professional services shall retain all common law, statutory and other reserved rights, including copyright in those instruments of service furnished by them. Drawings, specifications, and other documents and electronic data are furnished for use solely with respect to this Agreement.   The Owner shall be permitted to retain copies, including reproducible copies, of the drawings, specifications, and other documents and electronic data furnished by the

Design/Builder for information and reference in connection with the Project except as provided in Subparagraphs 1.3.2 and 1.3.3.

1.3.2   Drawings, specifications, and other documents and electronic data furnished by the Design/Builder shall not be used by the Owner or others on other projects, for additions to this Project or for completion of this Project by others, except by agreement in writing and with appropriate compensation to the Design/Builder, unless the Design/Builder is adjudged to be in default under this Agreement or under any other subsequently executed agreement.

1.3.3   If the Design/Builder defaults in the Design/ Builder's obligations to the Owner, the Architect shall grant a license to the Owner to use the drawings, specifications, and other documents and electronic data furnished by the Architect to the Design/Builder for

the completion of the Project, conditioned upon the Owner's execution of an agreement to cure the Design/Builder's default in payment to the Architect for services previously performed and to indemnify the Architect with regard to claims arising from such reuse without the Architect's professional involvement.

1.3.4 Submission or distribution of the Design/Builder's documents to meet official regulatory requirements or for similar purposes in connection with the Project is not to be construed as publication in derogation of the rights reserved in Subparagraph 1.3.1.

## ARTICLE 2

## OWNER

2.1    The Owner shall designate a representative authorized to act on the Owner's behalf with respect to the Project. The Owner or such authorized representative shall examine documents submitted by the Design/Builder and shall render decisions in a timely manner and in accordance with the schedule accepted by the Owner. The Owner may obtain independent review of the Contract Documents by a separate architect, engineer, contractor or cost estimator under contract to or employed by the Owner. Such independent review shall be undertaken at the Owner's expense in a timely manner and shall not delay the orderly progress of the Work.

2.2    The Owner may appoint an on-site project representative to observe the Work and to have such other responsibilities as the Owner and the Design/Builder agree in writing.

2.3    The Owner shall cooperate with the Design/Builder in securing building and other permits, licenses and inspections. The Design/Builder shall be required to pay the fees for such permits, licenses and inspections.

2.4    The Owner shall disclose, to the extent known to the Owner, the results and reports of prior tests, inspections or investigations conducted for the Project involving: structural or mechanical systems; chemical, air and water pollution; hazardous materials; or other environmental and subsurface conditions. The Owner shall disclose all information known to the Owner regarding the presence of pollutants at the Project's site.

2.5    The Owner shall furnish all legal, accounting and insurance counseling services as may be necessary at any time for the Project, including such auditing services as the Owner may require to verify the Design/Builder's Applications for Payment.

2.6    Those services, information, surveys and reports required by Paragraphs 2.4 through 2.6 which are within the Owner's control shall be furnished at the Owner's expense, and the Design/Builder shall be entitled to rely upon the accuracy and completeness thereof, except to the extent the Owner advises the Design/Builder to the contrary in writing.

2.7    If the Owner requires the Design/Builder to maintain any special insurance coverage, policy, amendment, or rider, the Owner shall pay the additional cost thereof, except as otherwise stipulated in this Agreement.

2.8    If the Owner has actual knowledge of a fault or defect in the Work or nonconformity with the Design/Builder's Proposal or the Construction Documents, the Owner shall give prompt written notice thereof to the Design/Builder.

2.9    The Owner shall, at the request of the Design/Builder, prior to execution of this Agreement and promptly upon request thereafter, furnish to the Design/Builder reasonable evidence that financial arrangements have been made to fulfill the Owner's obligations under the Contract.

2.10    The Owner shall communicate with persons or entities employed or retained by the Design/Builder through the Design/Builder, unless otherwise directed by the Design/Builder.  However, breach of contract by the Design/Builder shall allow direct communication with persons or entities employed or retained by the Design/Builder.

## ARTICLE 3

## DESIGN/BUILDER

### 3.1    SERVICES AND RESPONSIBILITIES

3.1.1    Design services required by this Agreement shall be performed by qualified architects and other design professionals.    The contractual obligations of such professional persons or entities are undertaken and performed in the interest of the Design/Builder.

3.1.2    The agreements between the Design/Builder and the persons or entities identified in this Agreement, and any subsequent modifications, shall be in writing.    These agreements, including financial arrangements with respect to this Project, shall be promptly and fully disclosed to the Owner upon request.

3.1.3    The Design/Builder shall be responsible to the Owner for acts and omissions of the Design/Builder's employees, subcontractors and their agents and employees, and other persons, including the Architect and other design professionals, performing any portion of the Design/Builder's obligations under this Agreement.

### 3.2    BASIC SERVICES

3.2.1    The Design/Builder's Basic Services are described below and in Article 14.

3.2.2    The Design/Builder shall designate a representative authorized to act on the Design/Builder's behalf with respect to the Project.

3.2.3    The Design/Builder shall submit Construction Documents for review and approval by the Owner.  Construction Documents may include drawings, specifications, and other documents and electronic data setting forth in detail the requirements for construction of the Work, and shall:

.1    be consistent with the intent of the Design/Builder's Proposal;

.2      provide information for the use of those in the building trades; and

.3      include documents customarily required for regulatory agency approvals.

3.2.4   The Design/Builder, at the expense of the Design/Builder, with the assistance of the Owner, shall file documents required to obtain necessary approvals of governmental authorities having jurisdiction over the Project.

3.2.5   Unless otherwise provided in the Contract Documents, the Design/Builder shall provide or cause to be provided and shall pay for design services, labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation and other facilities and services necessary for proper execution and completion of the Work, whether temporary or permanent and whether or not incorporated or to be incorporated in the Work.

3.2.6   The Design/Builder shall be responsible for all construction means, methods, techniques, sequences and procedures, and for coordinating all portions of the Work under this Agreement.

3.2.7   The Design/Builder shall keep the Owner and Trustee informed of the progress and quality of the Work on a monthly basis.

3.2.8   The Design/Builder shall be responsible for correcting Work which does not conform to the Contract Documents.

3.2.9   The Design/Builder warrants to the Owner that materials and equipment furnished under the Contract will be of good quality and new unless otherwise required or permitted by the Contract Documents, that the construction will be free from faults and defects, and that the construction will conform with the requirements of the Contract Documents. Construction not conforming to these requirements, including substitutions not properly approved by the Owner, shall be corrected in accordance with Article 9.

3.2.10  The Design/Builder shall pay all sales, consumer, use and similar taxes which had been legally enacted at the time the Design/Builder's Proposal was first submitted to the Owner, and shall secure and pay for building and other permits and governmental fees, licenses and inspections necessary for the proper execution and completion of the Work which are either customarily secured after execution of a contract for construction or are legally required at the time the Design/Builder's Proposal was first submitted to the Owner. It being clearly understood that this is a Separated Contract and the Owner shall cause to be provided to the Design/Builder, by the County Jail Public Facility Corporation of Willacy County, Texas, a Tax Exemption Certificate, which will allow the material and equipment purchased for this project to be purchased without any State Taxes being owed or paid. In order to comply with the sales tax law of the State of Texas, this Agreement shall be considered a separated contract with the costs of Materials and Equipment to be $2,741,364.00 and the costs of Services to be $2,335,236.00, when combined the total contract amount is $5,076,600.00.

3.2.11 The Design/Builder shall comply with and give notices required by laws, ordinances, rules, regulations and lawful orders of public authorities relating to the Project.

3.2.12 The Design/Builder shall pay royalties and license fees for patented designs, processes or products. The Design/Builder shall defend suits or claims for infringement of patent rights and shall hold the Owner harmless from loss on account thereof, but shall not be responsible for such defense or loss when a particular design, process or product of a particular manufacturer is required by the Owner. However, if the Design/Builder has reason to believe the use of a required design, process or product is an infringement of a patent, the Design/Builder shall be responsible for such loss unless such information is promptly furnished to the Owner.

3.2.13 The Design/Builder shall keep the premises and surrounding area free from accumulation of waste materials or rubbish caused by operations under this Agreement. At the completion of the Work, the Design/Builder shall remove from the site waste materials, rubbish, the Design/Builder's tools, construction equipment, machinery, and surplus materials.

3.2.14 The Design/Builder shall notify the Owner when the Design/Builder believes that the Work or an agreed upon portion thereof is substantially completed. If the Owner concurs, the Design/Builder shall issue a Certificate of Substantial Completion which shall establish the Date of Substantial Completion, shall state the responsibility of each party for security, maintenance, heat, utilities, damage to the Work and insurance, shall include a list of items to be completed or corrected and shall fix the time within which the Design/Builder shall complete items listed therein. Disputes between the Owner and Design/Builder regarding the Certificate of Substantial Completion shall be resolved in accordance with provisions of Article 10.

3.2.15 The Design/Builder shall maintain at the site for the Owner one record copy of the drawings, specifications, product data, samples, shop drawings, Change Orders and other modifications, in good order and regularly updated to record the completed construction. These shall be delivered to the Owner upon completion of construction and prior to final payment.

3.2.16 The Design/Builder shall facilitate, at the Owner's request the acquisition of the land and furnish services of land surveyors, geotechnical engineers and other consultants for subsoil, air and water conditions when such services are deemed necessary by the Design/Builder to properly carry out the design services required by this Agreement.

3.2.17 The Design/Builder shall use his best efforts to develop subcontractor interest in the Project and shall furnish to the Owner and Architect for their information a list of possible subcontractors, including suppliers who are to furnish materials or equipment fabricated to a special design, from whom proposals will be requested for each principal portion of the Work. The Architect will promptly reply in writing to the Design/Builder if the Architect or Owner knows of any objection to such subcontractor or supplier. The receipt of such list shall not require the Owner or Architect to investigate the qualifications of proposed subcontractors or suppliers, nor shall it waive the right of the Owner or Architect later to object to or reject any proposed subcontractor or supplier.

The Design/Builder shall seek to solicit bids from these qualified subcontractors and suppliers to furnish services for all construction aspects of the Project covered by this Agreement.

## 3.3   ADDITIONAL SERVICES

3.3.1   The services described in this Paragraph 3.3 are not included in Basic Services unless so identified in Article 14, and they shall be paid for by the Owner as provided in this Agreement, in addition to the compensation for Basic Services.   The services described in this Paragraph 3.3 shall be provided only if authorized or confirmed in writing by the Owner.

3.3.2   Making revisions in drawings, specifications, and other documents or electronic data when such revisions are required by the enactment or revision of codes, laws or regulations subsequent to the preparation of such documents or electronic data.

3.3.3   Providing consultation concerning replacement of Work damaged by fire or other cause during construction, and furnishing services required in connection with the replacement of such Work.   However, replacement of Work damaged by acts of the Design/Builder or his sub-contractors shall not be considered additional services.

3.3.4   Providing services in connection with a public hearing, arbitration proceeding or legal proceeding, except where the Design/Builder is a party thereto.

3.3.5   Providing coordination of construction performed by the Owner's own forces or separate contractors employed by the Owner, and coordination of services required in connection with construction performed and equipment supplied by the Owner.

3.3.6   Preparing a set of reproducible record documents or electronic data showing significant changes in the Work made during construction shall not be an additional charge.

3.3.7   Providing assistance in the utilization of equipment or systems such as preparation of operation and maintenance manuals, training personnel for operation and maintenance, and consultation during operation.

## ARTICLE 4

### TIME

4.1   Unless otherwise indicated, the Owner and the Design/Builder shall perform their respective obligations as expeditiously as is consistent with reasonable skill and care and the orderly progress of the Project.

4.2   Time limits stated in the Contract Documents are of the essence.  The Work to be performed under this Agreement shall commence upon receipt of a notice to proceed unless otherwise agreed and, subject to authorized Modifications, Substantial Completion shall be achieved on or before the date established in Article 14.

4.3     Substantial Completion is the stage in the progress of the Work when the Work or designated portion thereof is sufficiently complete in accordance with the Contract Documents so the Owner can occupy or utilize the Work for its intended use.

4.4     Based on the Design/Builder's Proposal, a construction schedule shall be provided consistent with Paragraph 4.2 above.

4.5     If the Design/Builder is delayed at any time in the progress of the Work by an act or neglect of the Owner, Owner's employees, or separate contractors employed by the Owner, or by material changes ordered in the Work, or by labor disputes, fire, unusual delay in deliveries, adverse weather conditions not reasonably anticipatable, unavoidable casualties or other causes beyond the Design/Builder's control, or by delay authorized by the Owner pending arbitration, or by other causes which the Owner and Design/Builder agree may justify delay, then the Contract Time shall be reasonably extended by Change Order.

## ARTICLE 5

## PAYMENTS

### 5.1  PROGRESS PAYMENTS

.1      5.1.1 The Design/Builder shall deliver to the Owner itemized Applications for Payment in such detail as indicated in Article 14.

5.1.2   Within ten (10) days of the Owner's receipt of a properly submitted and correct Application for Payment, the Owner shall make payment to the Design/Builder less retainage of 5% of the amount otherwise payable.

5.1.3   The Application for Payment shall constitute a representation by the Design/Builder to the Owner that the design and construction have progressed to the point indicated, the quality of the Work covered by the application is in accordance with the Contract Documents, and the Design/Builder is entitled to payment in the amount requested.

5.1.4   Upon receipt of payment from the Owner, the Design/Builder shall promptly pay the Architect, other design professionals and each contractor the amount to which each is entitled in accordance with the terms of their respective contracts.

5.1.5   The Owner shall have no obligation under this Agreement to pay or to be responsible in any way for payment to the Architect, another design professional or a contractor performing portions of the Work.

5.1.6   Neither progress payment nor partial or entire use or occupancy of the Project by the Owner shall constitute an acceptance of Work not in accordance with the Contract Documents.

5.1.7 The Design/Builder warrants that title to all construction covered by an Application for Payment will pass to the Owner no later than the time of payment. The Design/Builder further warrants that upon submittal of an Application for Payment all construction for which payments have been received from the Owner shall be free and clear of liens, claims, security interests or encumbrances in favor of the Design/Builder or any other person or entity performing construction at the site or furnishing materials or equipment relating to the construction.

5.1.8 At the time of Substantial Completion, the Owner shall pay the Design/Builder the retainage less the reasonable cost to correct or complete incorrect or incomplete Work. Final payment of such withheld sum shall be made upon correction or completion of such Work.

## 5.2 FINAL PAYMENT

5.2.1 Neither final payment nor amounts retained, if any, shall become due until the Design/Builder submits to the Owner: (1) final application for payment; (2) an affidavit that payrolls, bills for materials and equipment, and other indebtedness connected with the Work for which the Owner or Owner's property might be responsible or encumbered (less amounts withheld by the Owner) have been paid or otherwise satisfied; (3) a certificate evidencing that insurance required by the Contract Documents to remain in force after final payment is currently in effect and will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Owner; (4) a written statement that the Design/Builder knows of no substantial reason that the insurance will not be renewable to cover the period required by the Contract Documents; (4) consent of surety, if any, to final payment. If a contractor or other person or entity entitled to assert a lien against the Owner's property refuses to furnish a release or waiver required by the Owner, the Design/Builder may furnish a bond satisfactory to the Owner to indemnify the Owner against such lien. If such lien remains unsatisfied after payments are made, the Design/Builder shall indemnify the Owner for all loss and cost, including reasonable attorneys' fees incurred as a result of such lien.

5.2.2 When the Work has been completed and the contract fully performed, the Design/Builder shall submit a final application for payment to the Owner, who shall make final payment within 30 days of receipt.

5.2.3 The making of final payment shall constitute a waiver of claims by the Owner except those arising from:

.1 liens, claims, security interests or encumbrances arising out of the Contract and unsettled;

.2 failure of the Work to comply with the requirements of the Contract Documents; or

.3 terms of special warranties required by the Contract Documents.

5.2.4 Acceptance of final payment shall constitute a waiver of all claims by the Design/Builder except those previously made in writing and identified by the Design/Builder as unsettled at the time of final Application for Payment.

## 5.3 INTEREST PAYMENTS

5.3.1 Payments due the Design/Builder under this Agreement which are not paid when due shall bear interest from the date due at the rate specified in Article 13, or in the absence of a specified rate, at the legal rate prevailing where the Project is located.

5.3.2 Payments due the Owner under this Agreement which are not paid when due shall bear interest from the date due at the rate specified in Article 13, or in the absence of a specified rate, at the legal rate prevailing where the Project is located.

## ARTICLE 6

## PROTECTION OF PERSONS AND PROPERTY

6.1 The Design/Builder shall be responsible for initiating, maintaining and providing supervision of all safety precautions and programs in connection with the performance of this Agreement.

6.2 The Design/Builder shall take reasonable precautions for the safety of, and shall provide reasonable protection to prevent damage, injury or loss to: (1) employees on the Work and other persons who may be affected thereby; (2) the Work and materials and equipment to be incorporated therein, whether in storage on or off the site, under care, custody, or control of the Design/Builder or the Design/Builder's contractors; and (3) other property at or adjacent thereto, such as trees, shrubs, lawns, walks, pavements, roadways, structures and utilities not designated for removal, relocation or replacement in the course of construction.

6.3 The Design/Builder shall give notices and comply with applicable laws, ordinances, rules, regulations and lawful orders of public authorities bearing on the safety of persons or property or their protection from damage, injury or loss.

6.4 The Design/Builder shall promptly remedy damage and loss (other than damage or loss insured under property insurance provided or required by the Contract Documents) to property at the site caused in whole or in part by the Design/Builder, a contractor of the Design/Builder or anyone directly or indirectly employed by any of them, or by anyone for whose acts they may be liable.

## ARTICLE 7

## INSURANCE AND BONDS

## 7.1 DESIGN/BUILDER'S LIABILITY INSURANCE

7.1.1   The Design/Builder shall purchase from and maintain, in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located and approved by Owner, such insurance as will protect the Design/Builder from claims set forth below which may arise out of or result from operations under this Agreement by the Design/Builder or by a contractor of the Design/Builder, or by anyone directly or indirectly employed by any of them, or by anyone for whose acts any of them may be liable:

.1      claims under workers' compensation, disability benefit and other similar employee benefit laws that are applicable to the Work to be performed;

.2      claims for damages because of bodily injury, sickness or disease, or death;

.3      claims for damages because of bodily injury, sickness or disease, or death of persons other than the Design/Builder's employees;

.4      claims for damages for personal injury liability coverage which are sustained (1) by a person as a result of an offense directly or indirectly related to employment of such person by the Design/Builder or (2) by another person;

.5      claims for damages, other than to the Work itself, because of injury to or destruction of tangible property, including loss of use resulting therefrom;

.6      claims for damages because of bodily injury, death of a person or property damage arising out of ownership, maintenance or use of a motor vehicle; and

.7      claims involving contractual liability insurance applicable to the Design/Builder's obligations under Paragraph 11.5.

7.1.2   The insurance required by Subparagraph 7.1.1 shall be written for not less than limits of liability specified in this Agreement or required by law, whichever coverage is greater.   Coverages, whether written on an occurrence or claims-made basis, shall be maintained without interruption from date of commencement of the Work until date of final payment and termination of any coverage required to be maintained after final payment. Schedule of coverage is attached herewith as Exhibit 1.

7.1.3   Certificates of insurance acceptable to the Owner shall be delivered to the Owner immediately after execution of this Agreement.   These certificates and the insurance policies required by this Paragraph 7.1 shall contain a provision that coverages afforded under the policies will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Owner.  If any of the foregoing insurance coverages are required to remain in force after final payment, an additional certificate evidencing continuation of such coverage shall be submitted with the application for final payment.

**7.2     OWNER'S LIABILITY INSURANCE**

7.2.1   The Design/Builder shall be responsible to provide "Additionally Insured" coverage for the Owner to satisfy the usual liability exposures of the Owner for work performed by the Design/Builder.   Optionally, the Owner may purchase and maintain

other insurance for self-protection against claims which may arise from operations under this Agreement. The Design/Builder shall not be responsible for purchasing and maintaining this optional Owner's liability insurance unless specifically required by the Contract Documents.

## 7.3 PROPERTY INSURANCE

7.3.1 Unless otherwise provided under this Agreement, the Design/Builder shall purchase and maintain, in a company or companies authorized to do business in the jurisdiction, and acceptable to the Owner, in which the principal improvements are to be located, property insurance upon the Work to the full insurable value thereof on a replacement cost basis without optional deductibles. Such property insurance shall be maintained, unless otherwise provided in the Contract Documents or otherwise agreed in writing by all persons and entities who are beneficiaries of such insurance, until substantial completion. This insurance shall include interests of the Owner, the Design/Builder, and their respective contractors and subcontractors in the Work.

7.3.2 Property insurance shall be on an all-risk policy form and shall insure against the perils of fire and extended coverage and physical loss or damage including, without duplication of coverage, theft, vandalism, malicious mischief, collapse, falsework, temporary buildings and debris removal including demolition occasioned by enforcement of any applicable legal requirements, and shall cover reasonable compensation for the services and expenses of the Design/Builder's Architect and other professionals required as a result of such insured loss. Coverage for other perils shall not be required unless otherwise provided in the Contract Documents.

7.3.3 Reserved.

7.3.4 Unless otherwise provided, the Design/Builder shall purchase and maintain such boiler and machinery insurance required by this Agreement or by law, which shall specifically cover such insured objects during installation and until final acceptance by the Owner. This insurance shall include interests of the Owner, the Design/Builder, the Design/Builder's contractors and subcontractors in the Work, and the Design/Builder's Architect and other design professionals. The Owner and the Design/Builder shall be named insureds.

7.3.5 A loss insured under the property insurance purchased by the Design/Builder described above in 7.3.2 shall be adjusted by the Owner and made payable to the Owner for the insureds, as their interests may appear, subject to requirements of any applicable mortgagee clause and of Subparagraph 7.3.10. The Design/Builder shall pay contractors their shares of insurance proceeds received by the Design/Builder, and by appropriate agreement, written where legally required for validity, shall require contractors to make payments to their subcontractors in similar manner.

7.3.6 If the Design/Builder requests in writing that insurance for risks other than those described herein or for other special hazards be included in the property insurance policy, the Owner shall, if possible, obtain such insurance, and the cost thereof shall be charged to the Design/Builder by appropriate Change Order.

7.3.7 Before an exposure to loss may occur, the Owner shall file with the Design/Builder a copy of each policy that includes insurance coverages required by this Paragraph 7.3 .Each policy shall contain all generally applicable conditions, definitions, exclusions and endorsements related to this Project. Each policy shall contain a provision that the policy will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Design/Builder.

7.3.8 The Owner and the Design/Builder waive all rights against each other and the Architect and other design professionals, contractors, subcontractors, agents and employees, each of the other, for damages caused by fire or other perils to the extent covered by property insurance obtained pursuant to this Paragraph 7.3 or other property insurance applicable to the Work, except such rights as they may have to proceeds of such insurance held by the Owner. The Owner or Design/Builder, as appropriate, shall require from contractors and subcontractors by appropriate agreements, written where legally required for validity, similar waivers each in favor of other parties enumerated in this Paragraph 7.3. The policies shall provide such waivers of subrogation by endorsement or otherwise. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

7.3.9 If required in writing by a party in interest, the Owner shall, upon occurrence of an insured loss, give bond for proper performance of the Owner's duties. The cost of required bonds shall be charged against proceeds received. The Owner shall deposit in a separate account proceeds so received, which the Owner shall distribute in accordance with such agreement as the parties in interest may reach, or in accordance with an arbitration award in which case the procedure shall be as provided in Article 10. If after such loss no other special agreement is made, replacement of damaged Work shall be covered by appropriate Change Order.

7.3.10 The Owner shall have power to adjust and settle a loss with insurers unless one of the parties in interest shall object in writing, within five (5) days after occurrence of loss to the Owner's exercise of this power; if such objection be made, the parties shall enter into dispute resolution under procedures provided in Article 10. If distribution of insurance proceeds by arbitration is required, the arbitrators will direct such distribution.

7.3.11 Partial occupancy or use prior to Substantial Completion shall not commence until the insurance company or companies providing property insurance have consented to such partial occupancy or use by endorsement or otherwise. The Owner and the Design/Builder shall take reasonable steps to obtain consent of the insurance company or companies and shall not, without mutual written consent, take any action with respect to partial occupancy or use that would cause cancellation, lapse or reduction of coverage.

7.4    PERFORMANCE AND PAYMENT BOND

7.4.1 The Design/Builder shall furnish bonds covering faithful performance of the Agreement and payment obligations arising thereunder. Bonds may be obtained through the Design/Builder's usual source, with Owner's approval, and the cost thereof shall be

included in the Guaranteed Maximum Price stipulated in Section 13.1.1. The amount of each bond shall be equal to one hundred percent (100%) of the GMP.

## 7.5  LOSS OF USE INSURANCE

7.5.1  The Design/Builder will add coverage to their Builders Risk policy and maintain such insurance as will insure the Owner against loss of use of the Owner's property, for a period not-to-exceed 12-months, due to fire or other hazards, however caused. Such coverage is limited to an insurable loss, as defined in the property insurance provisions, and an amount of $ 1,977.00 per day.

## ARTICLE 8

## CHANGES IN THE WORK

## 8.1  CHANGES

8.1.1  Changes in the Work may be accomplished after execution of this Agreement, without invalidating this Agreement, by Change Order, Construction Change Directive, or order for a minor change in the Work.

8.1.2  A Change Order shall be based upon agreement between the Owner and the Design/Builder; a Construction Change Directive may be issued by the Owner without the agreement of the Design/Builder; an order for a minor change in the Work may be issued by the Design/Builder alone.

8.1.3  Changes in the Work shall be performed under applicable provisions of the Contract Documents, and the Design/Builder shall proceed promptly, unless otherwise provided in the Change Order, Construction Change Directive, or order for a minor change in the Work.

8.1.4  If unit prices are stated in the Contract Documents or subsequently agreed upon, and if quantities originally contemplated are so changed in a proposed Change Order or Construction Change Directive that application of such unit prices to quantities of Work proposed will cause substantial inequity to the Owner or the Design/Builder, the applicable unit prices shall be equitably adjusted.

## 8.2  CHANGE ORDERS

8.2.1  A Change Order is a written instrument prepared by the Design/Builder and signed by the Owner and the Design/Builder, stating their agreement upon all of the following:

.1      a change in the Work;

.2      the amount of the adjustment, if any, in the Contract Sum; and

.3      the extent of the adjustment, if any, in the Contract Time.

8.2.2 If the Owner requests a proposal for a change in the Work from the Design/Builder and subsequently elects not to proceed with the change, a Change Order shall be issued to reimburse the Design/Builder for any costs incurred for estimating services, design services or preparation of proposed revisions to the Contract Documents.

## 8.3 CONSTRUCTION CHANGE DIRECTIVES

8.3.1 A Construction Change Directive is a written order prepared and signed by the Owner, directing a change in the Work prior to agreement on adjustment, if any, in the Contract Sum or Contract Time, or both. Both parties to this Agreement agree to make every effort to not issue or use any Construction Change Directives in this work.

8.3.2 Except as otherwise agreed by the Owner and the Design/Builder, the adjustment to the Contract Sum shall be determined on the basis of reasonable expenditures and savings of those performing the Work attributable to the change, including the expenditures for design services and revisions to the Contract Documents. In case of an increase in the Contract Sum, the cost shall include a reasonable allowance for overhead and profit. In such case, the Design/Builder shall keep and present an itemized accounting together with appropriate supporting data for inclusion in a Construction Change Directive. Unless otherwise provided in the Contract Documents, costs for these purposes shall be limited to the following:

.1 costs of labor, including social security, old age and unemployment insurance, fringe benefits required by agreement or custom, and workers' compensation insurance;

.2 costs of materials, supplies and equipment, including cost of transportation, whether incorporated or consumed;

.3 rental costs of machinery and equipment exclusive of hand tools, whether rented from the Design/Builder or others;

.4 costs of premiums for all bonds and insurance permit fees, and sales, use or similar taxes;

.5 additional costs of supervision and field office personnel directly attributable to the change; and fees paid to the Architect, engineers and other professionals.

8.3.3 Pending final determination of cost to the Owner, amounts not in dispute may be included in Applications for Payment. The amount of credit to be allowed by the Design/Builder to the Owner for deletion or change which results in a net decrease in the Contract Sum will be actual net cost. When both additions and credits covering related Work or substitutions are involved in a change, the allowance for overhead and profit shall be figured on the basis of the net increase, if any, with respect to that change.

8.3.4 When the Owner and the Design/Builder agree upon the adjustments in the Contract Sum and Contract Time, such agreement shall be effective immediately and

shall be recorded by preparation and execution of an appropriate Construction Change Directive.

## 8.4 MINOR CHANGES IN THE WORK

8.4.1 The Design/Builder shall have authority to make minor changes in the Construction Documents and construction consistent with the intent of the Contract Documents when such minor changes do not involve adjustment in the Contract Sum or extension of the Contract Time. The Design/Builder shall promptly inform the Owner, in writing, of minor changes in the Construction Documents and construction.

## 8.5 CONCEALED CONDITIONS

8.5.1 If conditions are encountered at the site which are (1) subsurface or otherwise concealed physical conditions which differ materially from those indicated in the Contract Documents, or (2) unknown physical conditions of an unusual nature which differ materially from those ordinarily found to exist and generally recognized as inherent in construction activities of the character provided for in the Contract Documents, then notice by the observing party shall be given to the other party promptly before conditions are disturbed and in no event later than 21 days after first observance of the conditions. The Contract Sum shall be equitably adjusted for such concealed or unknown conditions by Change Order upon claim by either party made within 21 days after the claimant becomes aware of the conditions.

## 8.6 REGULATORY CHANGES

8.6.1 The Design/Builder shall be compensated for changes in the construction necessitated by the enactment or revision of codes, laws or regulations subsequent to the submission of the Design/Builder's Proposal.

## ARTICLE 9

## CORRECTION OF WORK

9.1 The Design/Builder shall promptly correct Work rejected by the Owner, or his designee, or known by the Design/Builder to be defective or failing to conform to the requirements of the Contract Documents, whether observed before or after Substantial Completion and whether or not fabricated, installed or completed. The Design/Builder shall bear costs of correcting such rejected Work, including additional testing and inspections.

9.2 If, within one (1) year after the date of Substantial Completion of the Work or, after the date for commencement of warranties established in a written agreement between the Owner and the Design/Builder, or by terms of an applicable special warranty required by the Contract Documents, any of the Work is found to be not in accordance with the requirements of the Contract Documents, the Design/Builder shall correct it promptly after receipt of a written notice from the Owner to do so unless the Owner has previously given the Design/Builder a written acceptance of such condition.

Page 17 of 26

9.3    Nothing contained in this Article 9 shall be construed to establish a period of limitation with respect to other obligations which the Design/Builder might have under the Contract Documents. Establishment of the time period of one (1) year as described in Subparagraph 9.2 relates only to the specific obligation of the Design/Builder to correct the Work, and has no relationship to the time within which the obligation to comply with the Contract Documents may be sought to be enforced, nor to the time within which proceedings may be commenced to establish the Design/Builder's liability with respect to the Design/Builder's obligations other than specifically to correct the Work.

9.4    If the Design/Builder fails to correct nonconforming Work as required or fails to carry out Work in accordance with the Contract Documents, the Owner, by written order signed personally or by an agent specifically so empowered by the Owner in writing, may order the Design/Builder to stop the Work, or any portion thereof, until the cause for such order has been eliminated; however, the Owner's right to stop the Work shall not give rise to a duty on the part of the Owner to exercise the right for benefit of the Design/Builder or other persons or entities.

9.5    If the Design/Builder defaults or neglects to carryout the Work in accordance with the Contract Documents and fails within seven (7) days after receipt of written notice from the Owner to commence and continue correction of such default or neglect with diligence and promptness, the Owner may give a second written notice to the Design/Builder and, seven (7) days following receipt by the Design/Builder of that second written notice and without prejudice to other remedies the Owner may have, correct such deficiencies. In such case an appropriate Change Order shall be issued deducting from payments then or thereafter due the Design/Builder, the costs of correcting such deficiencies including Owner costs and expenses related thereto. If the payments then or thereafter due the Design/Builder are not sufficient to cover the amount of the deduction, the Design/Builder shall pay the difference to the Owner. Such action by the Owner shall be subject to dispute resolution procedures as provided in Article 10.

## ARTICLE 10

### DISPUTE RESOLUTION, MEDIATION AND ARBITRATION

10.1    Claims, disputes or other matters in question between the parties to this Agreement arising out of or relating to this Agreement or breach thereof shall be subject to and decided by mediation or arbitration. Such mediation or arbitration shall be conducted in accordance with the Construction Industry Mediation or Arbitration Rules of the American Arbitration Association currently in effect.

10.2    In addition to and prior to arbitration, the parties shall endeavor to settle disputes by mediation. Demand for mediation shall be filed in writing with the other party to this Agreement and with the American Arbitration Association. A demand for mediation shall be made within a reasonable time after the claim, dispute or other matter in question has arisen. In no event shall the demand for mediation be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statutes of repose or limitations.

10.3    Demand for arbitration shall be filed in writing with the other party to this Agreement and with the American Arbitration Association. A demand for arbitration shall be made within a reasonable time after the claim, dispute or other matter in question has arisen. In no event shall the demand for arbitration be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statutes of repose or limitations.

10.4    An arbitration pursuant to this Article may be joined with an arbitration involving common issues of law or fact between the Design/Builder and any person or entity with whom the Design/Builder has a contractual obligation to arbitrate disputes. No other arbitration arising out of or relating to this Agreement shall include, by consolidation, joiner or in any other manner, an additional person or entity not a party to this Agreement or not a party to an agreement with the Design/Builder, except by written consent containing a specific reference to this Agreement signed by the Owner, the Design/Builder and any other person or entities sought to be joined. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of any claim, dispute or other matter in question not described in the written consent or with a person or entity not named or described therein. The foregoing agreement to arbitrate and other agreements to arbitrate with an additional person or entity duly consented to by the parties to this Agreement shall be specifically enforceable in accordance with applicable law in any court having jurisdiction thereof.

10.5    The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

## ARTICLE 11

## MISCELLANEOUS PROVISIONS

11.1    Unless otherwise provided, this Agreement shall be governed by the law of the place where the Project is located.

## 11.2  SUBCONTRACTS

11.2.1 The Design/Builder, as soon as practicable after execution of this Agreement, shall furnish to the Owner in writing the names, address, telephone numbers, fax numbers and representatives names of the persons or entities the Design/Builder will engage as contractors for the Project.

## 11.3  WORK BY OWNER OR OWNER'S CONTRACTORS

11.3.1 The Owner reserves the right to perform construction or operations related to the Project with the Owner's own forces, and to award separate contracts in connection with other portions of the Project or other construction or operations on the site under conditions of insurance and waiver of subrogation identical to the provisions of this Agreement. If the Design/Builder claims that delay or additional cost is involved because of such action by the Owner, the Design/Builder shall assert such claims as provided in Subparagraph 11.4.

11.3.2 The Design/Builder shall afford the Owner's separate contractors reasonable opportunity for introduction and storage of their materials and equipment and performance of their activities and shall connect and coordinate the Design/Builder's construction and operations with theirs as required by the Contract Documents.

11.3.3 Costs caused by delays or by improperly timed activities or defective construction shall be borne by the party responsible therefor.

## 11.4 CLAIMS FOR DAMAGES

11.4.1 If either party to this Agreement suffers injury or damage to person or property because of an act or omission of the other party, of any of the other party's employees or agents, or of others for whose acts such party is legally liable, written notice of such injury or damage, whether or not insured, shall be given to the other party within a reasonable time not exceeding 21 days after first observance. The notice shall provide sufficient detail to enable the other party to investigate the matter. If a claim of additional cost or time related to this claim is to be asserted, it shall be filed in writing.

## 11.5 INDEMNIFICATION

11.5.1 To the fullest extent permitted by law, the Design/Builder shall indemnify and hold harmless the Owner, Owner's consultants, and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) including loss of use resulting therefrom, but only to the extent caused in whole or in part by negligent acts or omissions of the Design/Builder, anyone directly or indirectly employed by the Design/Builder or anyone for whose acts the Design/Builder may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder. Such obligation shall not be construed to negate, abridge, or reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Paragraph 11.5.

11.5.2 In claims against any person or entity indemnified under this Paragraph 11.5 by an employee of the Design/Builder, anyone directly or indirectly employed by the Design/Builder or anyone for whose acts the Design/Builder may be liable, the indemnification obligation under this Paragraph 11.5 shall not be limited by a limitation on amount or type of damages, compensation or benefits payable by or for the Design/Builder under workers' compensation acts, disability benefit acts or other employee benefit acts.

## 11.6 SUCCESSORS AND ASSIGNS

11.6.1 The Owner and Design/Builder, respectively, bind themselves, their partners, successors, assigns and legal representatives to the other party to this Agreement and to the partners, successors and assigns of such other party with respect to all covenants of this Agreement. Neither the Owner nor the Design/Builder shall assign this Agreement

without the written consent of the other. The Owner may assign this Agreement to any institutional lender providing construction financing, and the Design/Builder agrees to execute all consents reasonably required to facilitate such an assignment. If either party makes such an assignment, that party shall nevertheless remain legally responsible for all obligations under this Agreement, unless otherwise agreed by the other party.

## 11.7 TERMINATION OF PROFESSIONAL DESIGN SERVICES

11.7.1 Prior to termination of the services of the Architect or any other design professional designated in this Agreement, the Design/Builder shall identify to the Owner in writing another architect or other design professional with respect to whom the Owner has no reasonable objection, who will provide the services
originally to have been provided by the Architect or other design professional whose services are being terminated.

## 11.8 EXTENT OF AGREEMENT

11.8.1 This Agreement represents the entire agreement between the Owner and the Design/Builder and supersedes prior negotiations, representations or agreements, either written or oral. This Agreement may be amended only by written instrument and signed by both the Owner and the Design/Builder.

## ARTICLE 12

## TERMINATION OF THE AGREEMENT

## 12.1 TERMINATION BY THE OWNER

12.1.1 This Agreement may be terminated by the Owner upon 14 days' written notice to the Design/Builder in the event that the Project is abandoned. If such termination occurs, the Owner shall pay the Design/Builder for Work completed and for proven loss sustained upon materials, equipment, tools, and construction equipment and machinery, including reasonable profit and applicable damages.

12.1.2 If the Design/Builder defaults or persistently fails or neglects to carry out the Work in accordance with the Contract Documents or fails to perform the provisions of this Agreement, the Owner may give written notice that the Owner intends to terminate this Agreement. If the Design/Builder fails to correct the defaults, failure or neglect within seven (7) days after being given notice, the Owner may then give a second written notice and, after an additional seven (7) days, the Owner may without prejudice to any other remedy terminate the employment of the Design/Builder and take possession of the site and of all materials, equipment, tools and construction equipment and machinery thereon owned by the Design/Builder and finish the Work by whatever method the Owner may deem expedient. If the unpaid balance of the Contract Sum exceeds the expense of finishing the Work and all damages incurred by the Owner, such excess shall be paid to the Design/Builder. If the expense of completing the Work and all damages incurred by the Owner exceeds the unpaid balance, the Design/Builder shall pay the difference to the Owner. This obligation for payment shall survive termination of this Agreement.

## 12.2 TERMINATION BY THE DESIGN/BUILDER

12.2.1 If the Owner fails to make payment when due, or the work is stopped for 30 days by causes outside of the control of the Design/Builder, the Design/Builder may give written notice of the Design/Builder's intention to terminate this Agreement or seek adjustment in price and time. If the Design/Builder fails to receive payment within seven (7) days after receipt of such notice by the Owner, the Design/Builder may give a second written notice and, seven (7) days after receipt of such second written notice by the Owner, may terminate this Agreement, or the Design/Builder will receive an adjustment for price and time, and recover from the Owner payment for Work executed and for proven losses sustained or increases anticipated upon materials, equipment, tools, and construction equipment and machinery, including reasonable profit and applicable damages.

The owner shall compensate the Design/Builder in accordance with Article 5, Payments, and the other provisions of this Agreement as described below.

## ARTICLE 13

## BASIS OF COMPENSATION

### 13.1 COMPENSATION

13.1.1 For the Design/Builder's performance of the Work, as described in Paragraph 3.2 and including any other services listed in Article 14 as part of Basic Services, the Owner shall pay the Design/Builder in current funds the Contract Sum as follows:

The sum of the cost of the Work, including the Design/Builder's fee are guaranteed by the Design/Builder as a Stipulated Sum, subject to additions and deductions by changes in Work as provided in the Agreement, the Stipulated Sum of Five Million, Seventy-Six Thousand, Six Hundred and No cents ($5,076,600.00). In order to comply with the sales tax law of the State of Texas, this Agreement shall be considered a separated contract, with the Cost of Materials and Equipment to be $2,741,364.00 and the Cost of Services to be $2,335,236.00, when combined, the total contract amount is $5,076,600.00. The Stipulated Sum includes $100,00.00 for furniture, fixtures and equipment.

13.1.2 Notwithstanding any provision herein to the contrary, any obligations or liabilities of any kind of Owner or any of its officers, employees, agents or representatives under this Agreement shall be payable solely from the proceeds of the County Jail Public Facility Corporation of Willacy County, Texas Project Revenue Bonds, Series 2004, and the Construction Account established pursuant to a Trust Indenture, dated as of the 1st day of July, 2003 (the "Indenture"), by and between Owner and U.S. Bank, National Association, (the "Trustee"). This Agreement is not intended to create nor does it create any liability on the part of the persons or entity referenced in the previous sentenance except to the extent such liabilities are paid and can be paid from funds in the above referenced constust account.

## ARTICLE 14

### OTHER CONDITIONS AND SERVICES

14.1     The Basic Services to be performed shall be commenced on June 29, 2004 and, subject to authorized adjustments and to delays not caused by the Design/Builder, Substantial Completion shall be achieved in the contract time of three hundred and sixty-five (365) calendar days (Contract Time).

Should the Design/Builder fail to substantially complete the Project within the Contract Time, subject to extensions pursuant to this Agreement, the Design/Builder agrees to pay the Owner as liquidated damages for each and everyday of delay beyond the Contract Time the sum of One Thousand Nine Hundred Seventy Seven Dollars and No Cents ($1,977.00) per day, which sum is hereby, in view of the difficulty of estimating such damages, agreed upon, fixed, and determined by the parties hereto, as the liquidated damages that the Owner will suffer by such default and not by way of penalty, and shall be deducted as such from the "Balance Due Design Builder."

14.2     The Basic Services beyond those described in Article 3 are as follows:

NONE

14.3     Additional Services beyond those described in Article 3 are as follows:

NONE

14.4     The Design/Builder shall submit an Application for Payment on the First (1st) day of each month.

14.5     The Design/Builder shall provide monthly progress reports with current photographic documentation with each pay request.

NONE

14.6     The Design/Builder shall provide documentation of acceptable roofing preparation and installation from roofing manufacturer prior to substantial completion, and during installation, inspection of roofing continuously to insure compliance.

14.7     The Design/Builder will provide updated graphic monthly schedule.

14.8     To the extent that any Owner covenants contained in this Agreement or the performance thereof conflict with the provisions(or performance thereof) of the Indenture Agreement, dated as of_____, by and between the Owner and Hudspeth County, Texas, the provisions of the Indenture Agreement shall control.

This Agreement entered into as of the day and year first written above.

OWNER                                        DESIGN/BUILDER

County Jail Public Facility Corporation of   Kendall Phinney, President of KGP
Willacy County, Texas                        Management, LLC
                                             Hale-Mills Construction, Ltd.

EXHIBIT 1

# ACORD. CERTIFICATE OF LIABILITY INSURANCE

OP ID BK
3-HALEM

DATE (MM/DD/YYYY)
06/24/04

| PRODUCER | |
|---|---|
| The Transportation Group, Ltd.<br>11111 Wilcrest Green, #325<br>Houston TX 77042<br>Phone: 713-785-6785  Fax:713-785-8785 | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. |

| INSURED | INSURERS AFFORDING COVERAGE | NAIC # |
|---|---|---|
| Hale-Mills Construction, Ltd.;<br>Hale-Mills Construction, Inc.<br>Attn: Phil Packer<br>4130 Bellaire Blvd., #210<br>Houston TX 77025 | Scottsdale Ins. Co.<br>Capital Specialty Ins Corp.<br>Colonial County Mutual<br>Texas Mutual Ins. Co. | |

## COVERAGES

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS |
|---|---|---|---|---|---|---|
| A | X | GENERAL LIABILITY | BCS0006745 | 09/30/03 | 09/30/04 | 1,000,000.<br>50,000<br>5,000.<br>1,000,000.<br>2,000,000.<br>1,000,000. |
| C | | AUTOMOBILE LIABILITY | CAG0012375 | 09/30/03 | 09/30/04 | 1,000,000. |
| | | GARAGE LIABILITY | | | | |
| B | X | EXCESS/UMBRELLA LIABILITY | MHA022504 | 09/30/03 | 09/30/04 | 5,000,000.<br>5,000,000. |
| D | | WORKERS COMPENSATION AND EMPLOYERS LIABILITY | SB90001041044 | 10/28/03 | 10/28/04 | 1,000,000.<br>1,000,000.<br>1,000,000. |
| E | | OTHER<br>Builders' Risk | D3594414A | 02/30/04 | 03/20/05 | Per Occr. $15,000,000 |

DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES/EXCLUSIONS ADDED BY ENDORSEMENT/SPECIAL PROVISIONS
Reference--County Jail. Certificate Holder is included as an Additional
Insured as respects General Liability and Waiver of Subrogation applies.
Workers' Compensation Policy provides coverage for class code 8809 -
Executive Officers.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| WILCRAY<br><br>Willacy County Public Facility<br>Corporation<br>546 West Hidalgo Street<br>Raymondville TX 78580 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL 30 DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES.<br><br>AUTHORIZED REPRESENTATIVE<br>Jodi Neal |

ACORD 25 (2001/08)  © ACORD CORPORATION 1988

# ACORD. CERTIFICATE OF LIABILITY INSURANCE

OP ID SX
3-HALEM

DATE (MM/DD/YYYY)
06/24/04

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.

**PRODUCER**

The Transportation Group, Ltd.
11111 Wilcrest Green, #325
Houston TX 77042
Phone: 713-785-6785   Fax: 713-785-8785

**INSURED**

Hale-Mills Construction, Ltd.;
Hale-Mills Construction, Inc.
Attn:  Phil Packer
4130 Bellaire Blvd., #210
Houston TX 77025

**INSURERS AFFORDING COVERAGE**    NAIC #

INSURER A: Scottsdale Ins. Co.*
INSURER B: Capitol Specialty Ins. Corp.
INSURER C: Colonial County Mutual
INSURER D: Texas Mutual Ins. Co.
INSURER E: Westchester Surplus Lines Ins.

## COVERAGES

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| A | X | GENERAL LIABILITY | BCS0006745 | 09/30/03 | 09/30/04 | EACH OCCURRENCE | $1,000,000. |
| | | | | | | DAMAGE TO RENTED PREMISES | $50,000 |
| | X | | | | | MED EXP | $5,000. |
| | | | | | | PERSONAL & ADV INJURY | $1,000,000. |
| | | | | | | GENERAL AGGREGATE | $2,000,000. |
| | | | | | | PRODUCTS-COMP/OP AGG | $1,000,000. |
| | X | | | | | | |
| C | | AUTOMOBILE LIABILITY | CA00012375 | 09/30/03 | 09/30/04 | COMBINED SINGLE LIMIT | $1,000,005. |
| | X | | | | | BODILY INJURY (Per person) | |
| | X | | | | | BODILY INJURY (Per accident) | |
| | X | | | | | PROPERTY DAMAGE | |
| | | GARAGE LIABILITY | | | | | |
| | | | | | | | |
| B | X | EXCESS/UMBRELLA LIABILITY | MUA022504 | 09/30/03 | 09/30/04 | EACH OCCURRENCE | $5,000,000. |
| | | | | | | AGGREGATE | $5,000,000. |
| | | | | | | | |
| D | | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY | SBP0001041044 | 10/28/03 | 10/28/04 | X WC STATU-TORY LIMITS | |
| | | | | | | E.L. EACH ACCIDENT | $1,000,000. |
| | | | | | | E.L. DISEASE-EA EMPLOYEE | $1,000,000. |
| | | | | | | E.L. DISEASE-POLICY LIMIT | $1,000,000. |
| E | | OTHER Builders' Risk | D35944414A | 03/30/04 | 03/30/05 | Per Occr. | $15,000,000 |

DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES/EXCLUSIONS ADDED BY ENDORSEMENT/SPECIAL PROVISIONS
Reference--County Jail.  Certificate Holder is included as an Additional
Insured as respects General Liability and Waiver of Subrogation applies.
Workers' Compensation Policy provides coverage for class code 8809 -
Executive Officers.

## CERTIFICATE HOLDER

USBNDE2

U.S. Bank National Association
950 17th Street, Suite #650
Mail Stop DN-CO-T6
Denver CO 80202

## CANCELLATION

SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL  30  DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES.

AUTHORIZED REPRESENTATIVE
Jodi Neal

ACORD 25 (2001/08)    © ACORD CORPORATION 1988

# ⚜AIA® Document G704™ – 2000

## Certificate of Substantial Completion

| | | |
|---|---|---|
| **PROJECT:** | **PROJECT NUMBER:** /04-01 | OWNER: ☒ |
| *(Name and address):* | **CONTRACT FOR:** General Construction | |
| Willacy County Sheriff's Office | **CONTRACT DATE:** June 29, 2004 | ARCHITECT: ☒ |
| 1371 Industrial Park Drive | | CONTRACTOR: ☒ |
| Raymondville, Texas 78580 | | FIELD: ☒ |
| **TO OWNER:** | **TO CONTRACTOR:** | |
| *(Name and address):* | *(Name and address):* | OTHER: ☐ |
| County Jail Public Facility Corporation | Hale-Mills Construction, Ltd. | |
| of Willacy County, Texas | 4130 Bellaire Boulevard, Suite 210 | |
| 546 West Hildalgo | Houston, Texas 77025 | |
| Raymondville, Texas 78580 | | |

**PROJECT OR PORTION OF THE PROJECT DESIGNATED FOR PARTIAL OCCUPANCY OR USE SHALL INCLUDE:**

Entire Project

The Work performed under this Contract has been reviewed and found, to the Architect's best knowledge, information and belief, to be substantially complete. Substantial Completion is the stage in the progress of the Work when the Work or designated portion is sufficiently complete in accordance with the Contract Documents so that the Owner can occupy or utilize the Work for its intended use. The date of Substantial Completion of the Project or portion designated above is the date of issuance established by this Certificate, which is also the date of commencement of applicable warranties required by the Contract Documents, except as stated below:

**Warranty**
March 30, 2005

**Date of Commencement**
March 30, 2005

FC Cuny Corporation
**ARCHITECT** BY 4/5/05 DATE OF ISSUANCE

A list of items to be completed or corrected is attached hereto. The failure to include any items on such list does not alter the responsibility of the Contractor to complete all Work in accordance with the Contract Documents. Unless otherwise agreed to in writing, the date of commencement of warranties for items on the attached list will be the date of issuance of the final Certificate of Payment or the date of final payment.

**Cost estimate of Work that is incomplete or defective: $ 0.00**

The Contractor will complete or correct the Work on the list of items attached hereto within Thirty ( 30 ) days from the above date of Substantial Completion.

Hale-Mills Construction, Ltd.
**CONTRACTOR** BY 4/4/05 DATE

The Owner accepts the Work or designated portion as substantially complete and will assume full possession at 10:00 a.m. (time) on March 30, 2005 (date).

County Jail Public Facility
Corporation of Willacy County,
Texas
**OWNER** BY DATE

AIA Document G704™ – 2000. Copyright © 1963, 1978, 1992 and 2000 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:51:19 on 04/01/2005 under Order No.1000120966_1 which expires on 5/28/2005, and is not for resale.
User Notes: (885531343)

1

**158**

# EXHIBIT C

# Standard Form of Agreement Between
# Owner and Design-Builder - Lump Sum

This document has been amended and revised from its standard form.

This AGREEMENT is made as of the _19th_ day of _July_ in the year of 2006, by and between the following parties, for services in connection with the Project identified below.

OWNER:

The Willacy County Local Government Corporation
190 North 3rd Street
Courthouse Annex
Raymondville, Texas 78580

DESIGN-BUILDER:

HMC Contracting South Texas, L.L.C.
4130 Bellaire Boulevard, Suite 210
Houston, Texas 77025-1044

PROJECT:

Willacy County 2000 Bed ICE Facility
Willacy County, Texas

In consideration of the mutual covenants and obligations contained herein, Owner and Design-Builder agree as set forth herein.

## Article 1
### Scope of Work

1.1 Design-Builder shall perform all design and construction services, and provide all material, equipment, tools and labor, necessary to complete the Work described in and reasonably inferable from the Contract Documents.

154912 2068.1



**EXHIBIT**

**3**

**160**

1.2 A description of the Project is attached as part of Exhibit A. This description is for general purposes only – the Project may have different technical attributes not described in this Exhibit or described differently in this Exhibit.

## Article 2
## Contract Documents

2.1 The Contract Documents are comprised of the following:

.1 All written modifications, amendments and change orders to this Agreement issued in accordance with DBIA Document No 535 Standard Form of General Conditions of Contract Between Owner and Design-Builder (1998 Edition) as amended ("General Conditions of Contract");

.2 This Agreement, including all exhibits and attachments, executed by Owner and Design-Builder;

.3 The General Conditions of Contract;

.4 Construction Documents prepared in accordance with Section 2.4 of the General Conditions of Contract along with a description of the Project, attached as Exhibit A;

.5 Attached as Exhibit B, Design-Builder's Applications for Payment.

.6 Attached Exhibit C, Design-Builder's Certificate of Insurance.

.7 Attached Exhibit D, Payment and Performance Bonds.

.8 Attached as Exhibit E, the list of drawings as of the effective date of this Agreement, which may be modified.

## Article 3
## Interpretation and Intent

3.1 The Contract Documents are intended to permit the parties to complete the Work and all obligations required by the Contract Documents within the Contract Time(s) for the Contract Price. The Contract Documents are intended to be complementary and interpreted in harmony so as to avoid conflict, with words and phrases interpreted in a manner consistent with construction and design industry standards. In the event of any inconsistency, conflict, or ambiguity between or among the Contract Documents, the Contract Documents shall take precedence in the order in which they are listed in Section 2.1 hereof.

3.2 Terms, words and phrases used in the Contract Documents, including this Agreement, shall have the meanings given them in the General Conditions of Contract.

3.3 The Contract Documents form the entire agreement between Owner and Design-Builder and by incorporation herein are as fully binding on the parties as if repeated herein. No oral representations or other agreements regarding the Work have been made by the parties except as specifically stated in the Contract Documents.

## Article 4
### Ownership of Work Product

4.1 Work Product. All drawings, specifications and other documents and electronic data furnished by Design-Builder to Owner under this Agreement ("Work Product") are deemed to be instruments of service and Design-Builder shall retain the ownership and property interests therein, including the copyrights thereto.

4.2 Upon Owner's payment in full for all Work performed under the Contract Documents, the drawings, specifications, models, renderings, work product, instruments of service and other documents shall become the property of the Owner. Owner may utilize such drawings, specifications, models, renderings, work product, instruments of service and other documents only for the repair, maintenance, modification, expansion or renovation of the Project. Nevertheless, it is understood by Owner that all such Drawings, Specifications, models, renderings, work product, instruments of service and other documents may be inappropriate for use in the construction of any other project. Therefore, Design-Builder shall not be responsible for the use or workability of such drawings, specifications, models, renderings, work product, instruments of service and other documents in connection with any project other than the Project for which they were specifically prepared. OWNER SHALL INDEMNIFY, DEFEND AND HOLD DESIGN-BUILDER HARMLESS OF AND FROM ANY AND ALL CLAIMS, DEMANDS AND CAUSES OF ACTION, INCLUDING ATTORNEY'S FEES AND LITIGATION COSTS, ARISING OUT OR RELATING TO OWNER'S USE OF DRAWINGS, SPECIFICATIONS, MODELS, RENDERINGS, WORK PRODUCT, INSTRUMENTS OF SERVICE AND OTHER DOCUMENT FOR THIS PROJECT ON ANY OTHER PROJECT.

## Article 5
### Contract Time

5.1 Date of Commencement. The Date of Commencement shall be June 21, 2006 ("Date of Commencement").

5.2 Substantial Completion and Final Completion

5.2.1 The Project will be completed in two phases. The First Phase ("Phase 1") shall be the substantial completion of facilities (excluding the support building) to be able house 500 inmates and shall be substantially completed within 40 days of the Date of Commencement. The Second Phase ("Phase 2") will be the substantial completion of facilities to be able to house an additional 1500 inmates (for a total of 2000 inmates), as well as substantial completion of the support building, within 90 days of the Date of

Commencement. The substantial completion of Phase 2 shall be referred to in the Contract Documents as the "Scheduled Substantial Completion Date."

5.2.2 Intentionally left blank.

5.2.3 Final Completion of the Work, including the support building, shall be achieved 120 days after the Date of Commencement.

5.2.4 All of the dates set forth in this Article 5 ("Contract Time(s)") shall be subject to adjustment in accordance with the General Conditions of Contract. The Contract Time shall be extended if ICE grants time extensions to Owner and/or Willacy County, Texas, for the same amount of time granted by ICE, unless agreed otherwise.

5.3 Time is of the Essence. Owner and Design-Builder mutually agree that time is of the essence with respect to the dates and times set forth in the Contract Documents.

5.4 Liquidated Damages. Design-Builder understands that if Substantial Completion is not attained by the Scheduled Substantial Completion Date, Owner will suffer damages which are difficult to determine and accurately specify. Design-Builder agrees that if Substantial Completion is not attained by thirty (30) days after the Scheduled Substantial Completion Date (the "LD Date"), Designer-Builder shall pay Owner Twenty Five Thousand Dollars ($25,000) as liquidated damages for each day that Substantial Completion extends beyond the LD Date. The liquidated damages provided herein shall be in lieu of all liability for any and all extra costs, losses, expenses, claims, penalties and any other damages, whether special or consequential, and of whatsoever nature incurred by Owner which are occasioned by any delay in achieving Substantial Completion.

## Article 6
### Contract Price

6.1 Contract Price. Owner shall direct the Trustee to pay Design-Builder's Applications for Payment attached to this Agreement in the total sum of Fifty Million Dollars ($50,000,000) ("Contract Price"), subject to adjustments made in accordance with the General Conditions of Contract.

6.2 Materials incorporated into this project are exempt from State Sales tax according to provisions of the Texas Tax Code, Chapter 151, Subsection H. The Owner shall provide to Design-Builder a limited sales, excise and use tax permit or exemption certificate which shall enable Design-Builder to buy the materials to be incorporated into the Work without paying tax due at time of purchase. This is a separated contract as that term is used the Texas Tax Code and applicable Texas law and the Owner agrees and acknowledges that it is purchasing the material for the Work separately from the labor for the Work. Material for the Work totals $19,997,000 and labor for the Work totals $30,003,000. This paragraph is meant to meet the separated contract definition under the Texas Tax Code and the laws of Texas.

6.3. Upon Substantial Completion of the Project, Design Builder will provide Owner a certification that the Project has been substantially completed. Design-Builder will also provide a final release for all payments made by Owner and a consent of surety. Upon Final Completion, Design-Builder shall supply a list of all subcontractors utilized by Design-Builder and all applicable warranties.

6.4 Design-Builder guarantees to complete the Project for the Contract Price, which cannot be modified by either party except by a Change Order signed by both parties pursuant to Article 9 of the General Conditions.

## Article 7
## Procedure for Payment

7.1 Progress Payments

7.1.1 Design-Builder's Applications for Payment are attached to this Agreement as Exhibit B. By the execution of this Agreement, Owner hereby approves the Applications for Payment and agrees to take all actions necessary to fund such Applications for Payment.

7.1.2 Owner agrees that the Trustee can pay the Applications for Payment upon submission by Design-Builder of the Applications for Payment to the Trustee.

7.2 Source of Funds. Design-Builder and Owner acknowledge and agree that the funding for payments due under this Agreement shall come from the Construction Fund established pursuant to the Trust Indenture by the Trustee, U.S. Bank, N.A. (the "Trustee").

7.3 (Intentionally Left Blank)

7.4 Record Keeping and Finance Controls. In light of the fact that this is a stipulated sum contract, Design-Builder shall have no obligation to keep records, books, correspondence, receipts, subcontracts, purchase orders, vouchers, memoranda or other data relating to the Work and no records shall be open for inspection by any party. Design-Builder agrees to cooperate with Owner in conjunction with any reporting required of Owner by ICE or the Federal Government in connection with the Project.

## Article 8
## (Intentionally Left Blank)

## Article 9
## Representatives of the Parties

154912 2068.1                                    5

9.1 Owner's Representatives

9.1.1 Owner designates the individuals listed below as its Senior Representatives ("Owner's Senior Representatives"), which such individuals have the authority and responsibility for avoiding and resolving disputes under Section 10.2.3 of the General Conditions of Contract:

Emilio Vera, President
Abiel Cantu, Vice-President
Aurelio Guerra, Secretary/Treasurer
Noe Loya
Simon Salinas

9.1.2 Owner designates the individual listed below as its Owner's Representative, which individual has the authority and responsibility set forth in Section 3.4 of the General Conditions of Contract: (Identify individual's name, title, address and telephone numbers)

Mr. Emilio Vera, President
The Willacy County Local Government Corporation
190 North 3rd Street
Courthouse Annex
Raymondville, Texas 78580

9.1.3. Owner may designate another representative by providing written notice to Design-Builder (the "Assigned Representative"). Design-Builder shall reimburse Owner for Assigned Representative's costs, not to exceed $30,000.

9.2 Design-Builder's Representatives

9.2.1 Design-Builder designates the individual listed below as its Senior Representative ("Design-Builder's Senior Representative"), which individual has the authority and responsibility for avoiding and resolving disputes under Section 10.2.3 of the General Conditions of Contract:

Mr. Philip K. Packer
President of HMC Contracting South Texas, L.L.C.
4130 Bellaire Blvd., Suite 210
Houston, Texas 77025-1044
(713) 665-1100

9.2.2 Design-Builder designates the individual listed below as its Design-Builder's Representative, which individual has the authority and responsibility set forth in Section 2.1.1 of the General Conditions of Contract:

Mr. Philip K. Packer
President of HMC Contracting South Texas, L.L.C.
4130 Bellaire Blvd., Suite 210

Houston, Texas 77025-1044
(713) 665-1100

## Article 10
### Bonds and Insurance

10.1 Insurance. Design-Builder shall procure in accordance with Article 5 of the General Conditions of Contract the insurance coverages set forth in Exhibit C.

10.2 Bonds and Other Performance Security. Design-Builder shall provide the following performance bond and labor and material payment bond or other performance security:

See Exhibit D.

## Article 11
### Other Provisions

11.1 Other provisions, if any, are as follows: (Insert any additional provisions)

    11.1.1      Willacy County, Texas shall be a direct, third party beneficiary of this Agreement and shall be bound by the dispute resolution procedures contained in Article 10 of the General Conditions of the Contract.

In executing this Agreement, Owner and Design-Builder each individually represents that it has the necessary financial resources to fulfill its obligations under this Agreement, and each has the necessary corporate approvals to execute this Agreement, and perform the services described herein.

**OWNER:**
THE WILLACY COUNTY LOCAL
GOVERNMENT CORPORATION

**DESIGN-BUILDER:**
HMC CONTRACTING
SOUTH TEXAS, L.L.C.

154912 2068.1         7

_____       _____
**President**                                                      **President**

**Witness:** _____
County Clerk, Willacy
County, Texas

# EXHIBIT "A"
## LIST OF DRAWINGS

### Willacy 2000 Bed Federal Temporary Detention Facility
### 1800 Industrial Drive
### Raymondville, Texas 78580

| Sheet | Title | Date | Addendum |
|---|---|---|---|
| C1 of 8 | Sheet Title | 06/14/06 | |
| C2 of 8 | Grading Plan | 06/14/06 | |
| C3 of 8 | Dimension Control Plan | 06/14/06 | |
| C4 of 8 | SWPPP | 06/14/06 | |
| C5 of 8 | Water and Sanitary Sewer Plan | 06/14/06 | |
| C6 of 8 | S.H. 186 R.O. Water and Sanitary Sewer Aerial | 06/14/06 | |
| C7 of 8 | Off-Site Water and Sanitary Sewer Plan | 06/14/06 | |
| C8 of 8 | Sanitary Sewer Forced Main from S.H. 186 | 06/14/06 | |
| A0.1 | General Information | 06/14/06 | |
| A1.0 | Phasing Site Plan | 06/14/06 | |
| A1.1 | Site Plans and Details | 06/14/06 | |
| A2.1 | Overall Admin Floor Plan | 06/14/06 | |
| A2.1A-B | Admin Floor Plan Areas "A" and "B" | 06/14/06 | |
| A2.2 | Housing Floor Plan | 06/14/06 | |
| A2.3 | Overall Admin Reflected Ceiling Plan | 06/14/06 | |
| A2.4 | Admin Reflected Ceiling Plan Areas "A" and "B" | 06/14/06 | |
| A3.1 | Admin Exterior Elevations | 06/14/06 | |
| A8.1 | Wall types/Millwork elevations/Millwork details | 06/14/06 | |
| S1.0 | General Notes | 06/14/06 | |
| S2.0 | Foundation Plan and Sections | 06/14/06 | |
| S2.1 | Foundation Plan | 06/14/06 | |
| S2.2 | Foundation Sections | 06/14/06 | |
| P06126.0 | 70.0' x 205.0' Corrections Facility | 06/13/06 | |
| P06126.1 | Column Base Layout | 06/13/06 | |
| P06126.2 | 70.0' x 205.0' Concrete Details | 06/13/06 | |
| S-1 | 70.0' Structures Section and Base Details | 06/14/06 | |
| S-2 | 70.0' Structure Purlin and Splice Details | 06/14/06 | |
| S-3 | 70.0' Hemispherical End Details | 06/14/06 | |

# HMC Contracting South Texas, L.L.C.

SOLD TO:    The Willacy County Local Government Corporation
            546 W. Hidalgo
            Raymondville, Texas 78580


Project    Willacy County 2000 Bed ICE Facility    Invoice Date: June 22, 2006
           Pay Application No. 1

| Description | Amount |
|---|---|
| Trustee to fund @ Financial Closing | $25,000,000.00 |
| SUB-TOTAL | $25,000,000.00 |
| TOTAL | $25,000,000.00 |

## WIRING INSTRUCTIONS

FROST NATIONAL BANK
HOUSTON, TEXAS 77040

ROUTING NO.: 114000093

HMC CONTRACTING SOUTH TEXAS, L.L.C.
ACCOUNT NO.: 5099-46349


Submitted to the Trustee pursuant to Article 7.1.2, for the payment due from the Trustee.


4130 Bellaire Boulevard, Suite 210
Houston, Texas 77027
Telephone 713.665.1100 Facsimile 713.665.4944

# HMC Contracting South Texas, L.L.C.

SOLD TO:    The Willacy County Local Government Corporation
546 W. Hidalgo
Raymondville, Texas 78580

Project:    Willacy County 2000 Bed ICE Facility    Invoice Date: June 22, 2006
Pay Application No. 2

| Description | Amount |
|---|---|
| Trustee to fund 30 days after payment of Pay Application No. 1 | $12,500,000.00 |
| SUB-TOTAL | $12,500,000.00 |
| TOTAL | $12,500,000.00 |

WIRING INSTRUCTIONS

FROST NATIONAL BANK
HOUSTON, TEXAS 77040

ROUTING NO.: 114000093

HMC CONTRACTING SOUTH TEXAS, L.L.C.
ACCOUNT NO.: 5099-46349

Submitted to the Trustee pursuant to Article 7.1.2, for the payment due from the Trustee.

4130 Bellaire Boulevard, Suite 210
Houston, Texas 77027
Telephone 713.665.1100 Facsimile 713.665.4944

**170**

# HMC Contracting South Texas, L.L.C.

SOLD TO:  The Willacy County Local Government Corporation
546 W. Hidalgo
Raymondville, Texas 78580

Project:  Willacy County 2000 Bed ICE Facility      Invoice Date: June 22, 2006
Pay Application No. 3

| Description | Amount |
|---|---|
| Trustee to fund 30 days after payment of Pay Application No. 2 | $12,500,000.00 |
| SUB-TOTAL | $12,500,000.00 |
| TOTAL | $12,500,000.00 |

WIRING INSTRUCTIONS

FROST NATIONAL BANK
HOUSTON, TEXAS 77040

ROUTING NO.: 114000093

HMC CONTRACTING SOUTH TEXAS, L.L.C.
ACCOUNT NO.: 5099-46349

Submitted to the Trustee pursuant to Article 7.1.2, for the payment due from the Trustee.

4130 Bellaire Boulevard, Suite 210
Houston, Texas 77027
Telephone 713.665.1100 Facsimile 713.665.4944

171

# ACORD. CERTIFICATE OF LIABILITY INSURANCE

CSR JN
3-HALEM

DATE (MM/DD/YYYY)
07/07/06

| PRODUCER | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. | | |
|---|---|---|---|
| ie Transportation Group, Ltd. 11111 Wilcrest Green, #325 Houston TX 77042 Phone: 713-785-6785 Fax: 713-785-8785 | | | |
| | **INSURERS AFFORDING COVERAGE** | | **NAIC #** |
| **INSURED** HMC Contracting South Texas, LLC 4130 Bellaire Blvd. #210 Houston TX 77025 | INSURER A: Westchester Surplus Lines Ins. | | |
| | INSURER B: | | |
| | INSURER C: | | |
| | INSURER D: | | |
| | INSURER E: | | |

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| | | **GENERAL LIABILITY** | | | | EACH OCCURRENCE | $ |
| | | COMMERCIAL GENERAL LIABILITY | | | | DAMAGE TO RENTED PREMISES (Ea occurence) | $ |
| | | CLAIMS MADE ☐ OCCUR | | | | MED EXP (Any one person) | $ |
| | | | | | | PERSONAL & ADV INJURY | $ |
| | | | | | | GENERAL AGGREGATE | $ |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | PRODUCTS - COMP/OP AGG | $ |
| | | POLICY ☐ PROJECT ☐ LOC | | | | | |
| | | **AUTOMOBILE LIABILITY** | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | | ANY AUTO | | | | | |
| | | ALL OWNED AUTOS | | | | BODILY INJURY (Per person) | $ |
| | | SCHEDULED AUTOS | | | | | |
| | | HIRED AUTOS | | | | BODILY INJURY (Per accident) | $ |
| | | NON-OWNED AUTOS | | | | | |
| | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | **GARAGE LIABILITY** | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | ANY AUTO | | | | OTHER THAN EA ACC | $ |
| | | | | | | AUTO ONLY: AGG | $ |
| | | **EXCESS/UMBRELLA LIABILITY** | | | | EACH OCCURRENCE | $ |
| | | OCCUR ☐ CLAIMS MADE | | | | AGGREGATE | $ |
| | | | | | | | $ |
| | | DEDUCTIBLE | | | | | $ |
| | | RETENTION $ | | | | | $ |
| | | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? If yes, describe under SPECIAL PROVISIONS below | | | | WC STATUTORY LIMITS ☐ OTHER ☐ | |
| | | | | | | E L. EACH ACCIDENT | $ |
| | | | | | | E L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | E L. DISEASE - POLICY LIMIT | $ |
| A | | **OTHER** Builders Risk | IMC I20667643 001 | 07/07/06 | 11/07/06 | Per Occ. Wind Occ. | $50,000,000 $10,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS
Re: Willacy County 2000 Bed ICE Facility.
Deductibles: $50,000 per occurrence; $250,000 or 5% of the Total Values Installed of the project(s) suffering loss at the time of loss whichever is greater.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| WILCRAY Willacy County Public Facility Corporation 546 W. Hidalgo Street Raymondville, TX 78580 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL __30__ DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES. AUTHORIZED REPRESENTATIVE *Jodi Neal* |

ACORD 25 (2001/08) © ACORD CORPORATION 1988

172

# ACORD. CERTIFICATE OF LIABILITY INSURANCE

| | CSR JN 3-HALEM | DATE (MM/DD/YYYY) 07/07/06 |

| PRODUCER | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. |

PRODUCER
.e Transportation Group, Ltd.
11111 Wilcrest Green, #325
Houston TX 77042
Phone: 713-785-6785  Fax: 713-785-8785

| INSURERS AFFORDING COVERAGE | NAIC # |
|---|---|
| INSURER A: Westchester Surplus Lines Ins. | |
| INSURER B | |
| INSURER C: | |
| INSURER D: | |
| INSURER E: | |

INSURED

HMC Contracting South
Texas. LLC
4130 Bellaire Blvd. #210
Houston TX 77025

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| | | **GENERAL LIABILITY** | | | | EACH OCCURRENCE | $ |
| | | COMMERCIAL GENERAL LIABILITY | | | | DAMAGE TO RENTED PREMISES (Ea occurence) | $ |
| | | CLAIMS MADE ☐ OCCUR | | | | MED EXP (Any one person) | $ |
| | | | | | | PERSONAL & ADV INJURY | $ |
| | | | | | | GENERAL AGGREGATE | $ |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | PRODUCTS - COMP/OP AGG | $ |
| | | POLICY ☐ PRO-JECT ☐ LOC | | | | | |
| | | **AUTOMOBILE LIABILITY** | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | | ANY AUTO | | | | | |
| | | ALL OWNED AUTOS | | | | BODILY INJURY (Per person) | $ |
| | | SCHEDULED AUTOS | | | | | |
| | | HIRED AUTOS | | | | BODILY INJURY (Per accident) | $ |
| | | NON-OWNED AUTOS | | | | | |
| | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | **GARAGE LIABILITY** | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | ANY AUTO | | | | OTHER THAN EA ACC | $ |
| | | | | | | AUTO ONLY: AGG | $ |
| | | **EXCESS/UMBRELLA LIABILITY** | | | | EACH OCCURRENCE | $ |
| | | OCCUR ☐ CLAIMS MADE | | | | AGGREGATE | $ |
| | | | | | | | $ |
| | | DEDUCTIBLE | | | | | $ |
| | | RETENTION $ | | | | | $ |
| | | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** | | | | WC STATU-TORY LIMITS ☐ OTH-ER | |
| | | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? | | | | E L EACH ACCIDENT | $ |
| | | If yes, describe under | | | | E L DISEASE - EA EMPLOYEE | $ |
| | | SPECIAL PROVISIONS below | | | | E L DISEASE - POLICY LIMIT | $ |
| A | | **OTHER** Builders Risk | IMC I20667643 001 | 07/07/06 | 11/07/06 | Per Occ. Wind Occ. | $50,000,000 $10,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS

Re:  Willacy County 2000 Bed ICE Facility.
Deductibles:  $50,000 per occurrence; $250,000 or 5% of the Total Values
Installed of the project(s) suffering loss at the time of loss whichever is greater.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| USBADEN U.S. Bank National Association As Trustee 950 17th Street, Suite 650 Mail Stop CNDT 0665 Denver, CO 80202 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL __30__ DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES. AUTHORIZED REPRESENTATIVE _Lori Neal_ |

ACORD 25 (2001/08)                                                    © ACORD CORPORATION 1988

173

The Willacy County Local Government Corporation

**PAYMENT BOND**

**PAYMENT BOND**

**Bond #61BCSEB5978**

| STATE OF TEXAS | § |
| | § |
| COUNTY OF WILLACY | § |

KNOWN ALL MEN BY THESE PRESENTS: That HMC Contracting South Texas, L.L.C., as principal, and Hartford Fire Insurance Company authorized under the laws of the State of Texas to act as surety on bonds for principals, are held and firmly bound unto The Willacy County Local Government Corporation as Obligee (Owner), in the penal sum of Fifty Million Dollars ($50,000,000.00) for the payment whereof, the said Principal and Surety bind themselves, and their heirs, administrators, executors, successors arid assigns, jointly and severally, by these presents:

WHEREAS, the Principal has entered into a certain written contract with the Owner, effective as of the 29th day of June, 2006, (the "Contract") to commence and complete the construction of certain improvements described as follows:

Willacy County 2000 Bed ICE Facility
Willacy County, Texas

which Contract, including the Contract Documents as defined therein, is hereby referred to and made a part hereof as fully and to the same extent as if copied at length herein.

NOW THEREFORE, THE CONDITION OF THIS OBLIGATION IS SUCH, that if the said Principal shall pay all claimants supplying labor or material to it or a subcontractor in the prosecution of the Work provided for in said Contract, then, this obligation shall be void; otherwise to remain in full force and effect;

PROVIDED, HOWEVER, that this bond is executed pursuant to the provisions of Chapter 2253 of the Texas Government Code as amended and all liabilities on this bond shall be determined in accordance with the provisions of said Statute to the same extent as if it were copied at length herein.

Surety, for value received, stipulates and agrees that no change, extension of time, alteration or addition to the terms of the Contract, or to the Work performed thereunder, or the plans, specifications, or drawings accompanying the same, shall in any way affect its obligation on this bond, and it does hereby waive notice of any such change, extension of time, alteration or addition to the terms of the Contract, or to the Work to be performed thereunder.

154173 1562.0

**174**

The Willacy County Local Government Corporation

IN WITNESS WHEREOF, the said Principal and Surety have signed and sealed this instrument this 28th day of June, 2006.

Principal, HMC Contracting South Texas, L.L.C.

By: _____

Title: _President_

Address: _4th future Blvd., Hou, TX_

Telephone: (713) 665-1100

Fax: (713) 665-1944

Surety, Hartford Fire Insurance Company

By: _____

Title: Attorney-in-Fact

Address: Houston, TX

Telephone: (713) 785-6785

Fax: (713) 785-8785

**NOTICE: THE ADDRESS OF THE SURETY COMPANY TO WHICH ANY NOTICE OF CLAIM SHOULD BE SENT MAY BE OBTAINED FROM THE TEXAS DEPARTMENT OF INSURANCE BY CALLING ITS TOLL-FREE TELEPHONE NUMBER: 1-800-252-3439.**

154173 1562.0

The Willacy County Local Government Corporation | **PERFORMANCE BOND**

**Bond #61BCSEB5978**

## PERFORMANCE BOND

STATE OF TEXAS          §
                        §
COUNTY OF WILLACY   §

KNOWN ALL MEN BY THESE PRESENTS: That HMC Contracting South Texas, L.L.C., as principal, and Hartford Fire Insurance Company authorized under the laws of the State of Texas to act as surety on bonds for principals, are held and firmly bound unto The Willacy County Local Government Corporation as Obligee (Owner), in the penal sum of Fifty Million Dollars ($50,000,000) for the payment whereof, the said Principal and Surety bind themselves, and their heirs, administrators, executors, successors and assigns, jointly and severally, by these presents:

WHEREAS, the Principal has entered into a certain written contract with the Owner, effective as of the 29th day of June 2006, (the "Contract") to commence and complete the construction of certain improvements described as follows:

Willacy County 2000 Bed ICE Facility
Willacy County, Texas

which Contract, including the Contract Documents as defined therein, is hereby referred to and made a part hereof as fully and to the same extent as if copied at length herein.

NOW THEREFORE, THE CONDITION OF THIS OBLIGATION IS SUCH, that if the said Principal shall faithfully perform said Contract Work, then this obligation shall be void; otherwise to remain in full force and effect;

Whenever, Contractor shall be, and be declared by Owner in a written notice to Surety, to be in default under the Contract, the Owner having performed Owner's obligations thereunder, the Surety may promptly remedy the default, or shall promptly:

1.    Complete the Contract in accordance with its terms and conditions, or

2.    Obtain a bid or bids for completing the Contract in accordance with its terms and conditions, and upon determination by Surety of the lowest responsible bidder, or, if the Owner elects, upon determination by the Owner and the Surety jointly of the lowest responsible bidder, arrange for a contract between such bidder and Owner, and make available as Work progresses (even though there should be a default or succession of defaults under the contract or contracts of completion arranged under this paragraph) sufficient funds to pay the cost of completion less the balance of the Contract Price; but not exceeding, including other costs and damages for which

154172 1562.0

**176**

the Surety may be liable hereunder, the amount set forth in this first paragraph hereof. The term "balance of the Contract Price," as used in this paragraph, shall mean the total amount payable by Owner to Contractor under the Contract and any amendments thereto, less the amount properly paid by Owner to Contractor.

Surety shall have no further or other obligations other than those set forth above.

As a condition precedent to coverage under this Bond, Owner must give Surety its written notice of Contractor's default no later than ninety one (91) days from the earliest to occur of the following: (i) the date of any abandonment or termination of the Contract; (ii) the date final payment is made to the Contractor under the Contract; or (iii) the date Contractor last performed Work under the Contract, excluding any warranty work. Any default declared by Owner or demand made against the Surety by Owner outside of this time frame is not covered by this Bond and Surety shall have no liability therefore.

Any suit under this bond must be instituted before the expiration of twenty-five (25) months from the date on which the right of action accrues, but if this provision is prohibited by law or if any law provides for a lesser period of time then it shall be deemed to be amended as so to be equal to the minimum period of limitation allowed by such law.

No right of action shall accrue on this Bond to or for the use of any person or entity other than the Owner and its successors or assigns. The terms and conditions of this Bond shall be binding upon Contractor, Surety, Owner and their respective successors or assigns.

Surety, for value received, stipulates and agrees that no change, extension of time, alteration or addition to the terms of the Contract, or to the Work performed thereunder, or the plans, specifications, or drawings accompanying the same, shall in any way affect its obligation on this Bond, and it does hereby waive notice of any such change, extension of time, alteration or addition to the terms of the Contract, or to the Work to be performed thereunder.

IN WITNESS WHEREOF, the said Principal and Surety have signed and sealed this instrument this 28th day of June 2006.

154172 1562.0

The Willacy County Local Government Corporation

Principal, HMC Contracting South Texas, L.L.C.

By: _____
Title: _President_____
Address: 41.. l..lla.. l.l. .l. .l.. l.. ...
Telephone: (713) 665-1100
Fax: (713) 665-4944

Surety, Hartford Fire Insurance Company

By: _____
Title: Attorney-in-Fact
Address: Houston, TX
Telephone: (713) 785-6785
Fax: (713) 785-8785

# HARTFORD FIRE INSURANCE COMPANY

## Hartford, Connecticut

### POWER OF ATTORNEY

Know all men by these Presents, That HARTFORD FIRE INSURANCE COMPANY, a corporation duly organized under the laws of the State of Connecticut, and having its principal office in the City of Hartford, County of Hartford, State of Connecticut, does hereby make, constitute and appoint

### JIM HOWSE and/or JODI NEAL
### of HOUSTON, TEXAS

its true and lawful Attorney(s)-in-Fact, with full power and authority to each of said Attorney(s)-in-Fact, in their separate capacity if more than one is named above, to sign, execute and acknowledge any and all bonds and undertakings and other writings obligatory in the nature thereof on behalf of the Company in its business of guaranteeing the fidelity of persons holding places of public or private trust; guaranteeing the performance of contracts other than insurance policies; guaranteeing the performance of insurance contracts where surety bonds are accepted by states and municipalities, and executing or guaranteeing bonds and undertakings required or permitted in all actions or proceedings or by law allowed, and to bind HARTFORD FIRE INSURANCE COMPANY thereby as fully and to the same extent as if such bonds and undertakings and other writings obligatory in the nature thereof were signed by an Executive Officer of HARTFORD FIRE INSURANCE COMPANY and sealed and attested by one other of such Officers, and hereby ratifies and confirms all that its said Attorney(s)-in-Fact may do in pursuance hereof.

This Power of Attorney is granted under and by authority of the By-Laws of HARTFORD FIRE INSURANCE COMPANY, ("the Company") as amended by the Board of Directors at a meeting duly called and held on July 9, 1997, as follows:

### ARTICLE IV

**SECTION 7.** The President or any Vice President or Assistant Vice-President, acting with any Secretary or Assistant Secretary shall have power and authority to sign and execute and attach the seal of the Company to bonds and undertakings, recongnizances, contracts of indemnity and other writings obligatory in the nature thereof, and such instruments so signed and executed, with or without the common seal, shall be valid and binding upon the Company

**SECTION 8.** The President or any Vice-President or any Assistant Vice President acting with any Secretary or Assistant Secretary, shall have power and authority to appoint, for purposes only of executing and attesting bonds and undertakings and other writings obligatory in the nature thereof, one or more resident Vice Presidents, resident Assistant Secretaries and Attorneys-in-Fact and at any time to remove any such resident Vice-President, resident Assistant Secretary, or Attorney-in-Fact, and revoke the power and authority given to him.

Resolved, that the signatures of such Officers and the seal of the Company may be affixed to any such power of attorney or to any certificate relating thereto by facsimile, and any such power of attorney or certificate bearing such facsimile signatures or facsimile seal shall be valid and binding upon the Company and any such power so executed and certified by facsimile signatures and facsimile seal shall be valid and binding upon the Company in the future with respect to any bond or undertaking to which it is attached.

In Witness Whereof, HARTFORD FIRE INSURANCE COMPANY has caused these presents to be signed by its Assistant Vice President, and its corporate seal to be hereto affixed, duly attested by its Secretary, this 15th day of September, 1997.

Attest:                                                                HARTFORD FIRE INSURANCE COMPANY

Richard A. Hermanson, Secretary                    John F. Burke, Assistant Vice President

STATE OF CONNECTICUT ⎱
                                                  ⎰ SS.
COUNTY OF HARTFORD ⎰

On this 15th day of September, A.D. 1997, before me personally came John F. Burke, to me known, who being by me duly sworn, did depose and say: that he resides in the County of Hartford, State of Connecticut; that he is the Assistant Vice-President of HARTFORD FIRE INSURANCE COMPANY, the corporation described in and which executed the above instrument; that he knows the seal of the said corporation; that the seal affixed to the said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation and that he signed his name thereto by like order.

STATE OF CONNECTICUT ⎱
                                                  ⎰ SS.
COUNTY OF HARTFORD ⎰

Jean H. Wozniak
Notary Public
My Commission Expires June 30, 1999

### CERTIFICATE

I, the undersigned, Secretary of HARTFORD FIRE INSURANCE COMPANY, a Connecticut Corporation, DO HEREBY CERTIFY that the foregoing and attached POWER OF ATTORNEY remains in full force and has not been revoked; and furthermore, that Article IV, Sections 7 and 8 of the By-Laws of HARTFORD FIRE INSURANCE COMPANY, set forth in the Power of Attorney, are now in force.

Signed and sealed at the City of Hartford.                    Dated the 28th day of June, 2006   xxx

Robert L. Post, Secretary

Form S-3507-9 (HF) Printed in U.S.A.

**179**



**DESIGN-BUILD**
**INSTITUTE OF AMERICA**

# STANDARD FORM OF GENERAL CONDITIONS OF CONTRACT BETWEEN OWNER AND DESIGN-BUILDER



# D B I A

**DESIGN-BUILD**
**INSTITUTE OF AMERICA**

# Standard Form of General Conditions
# of Contract Between Owner and Design-Builder

*This document has been amended and revised from its standard form.*

## Table of Contents

Article 1:    General ...........................................................................................................................3

Article 2:    Design-Builder's Services and Responsibilities .........................................................3

Article 3:    Owner's Services and Responsibilities .......................................................................6

Article 4:    Hazardous Conditions and Differing Site Conditions ...............................................7

Article 5:    Insurance and Bonds ..................................................................................................7

Article 6:    Payment ......................................................................................................................8

Article 7:    Indemnification .........................................................................................................10

Article 8:    Time ...........................................................................................................................11

Article 9:    Changes to the Contract Price and Time...................................................................11

Article 10:   Contract Adjustments and Disputes..........................................................................12

Article 11:   Stop Work and Termination for Cause ......................................................................13

Article 12:   Miscellaneous ...........................................................................................................15

# Article 1

# General

## 1.1 Mutual Obligations

**1.1.1** Owner and Design-Builder commit at all times to cooperate fully with each other, and proceed on the basis of trust and good faith, to permit each party to realize the benefits afforded under the Contract Documents.

## 1.2 Basic Definitions

**1.2.1** *Agreement* refers to the executed contract between Owner and Design-Builder ,DBIA Document No. 525, *Standard Form of Agreement Between Owner and Design-Builder C Lump Sum* (1998 Edition) as amended by the parties.

**1.2.2** *Day* or *Days* shall mean calendar days unless otherwise specifically noted in the Contract Documents.

**1.2.3** *Design Consultant* is a qualified, licensed design professional who is not an employee of Design-Builder, but is retained by Design-Builder, or employed or retained by anyone under contract with Design-Builder or Subcontractor, to furnish design services required under the Contract Documents.

**1.2.4** *Hazardous Conditions* are any materials, wastes, substances and chemicals deemed to be hazardous under applicable Legal Requirements, or the handling, storage, remediation, or disposal of which are regulated by applicable Legal Requirements.

**1.2.5** *General Conditions of Contract* refer to this DBIA Document No. 535, *Standard Form of General Conditions of Contract Between Owner and Design-Builder* (1998 Edition) as amended by the parties.

**1.2.6** *Legal Requirements* are all applicable federal, state and local laws, codes, ordinances, rules, regulations, orders and decrees of any government or quasi-government entity having jurisdiction over the Project or Site, the practices involved in the Project or Site, or any Work.

**1.2.7** (Intentionally Left Blank)

**1.2.8** *Site* is the land or premises on which the Project is located.

**1.2.9** *Subcontractor* is any person or entity retained by Design-Builder as an independent contractor to perform a portion of the Work and shall include materialmen and suppliers.

**1.2.10** *Sub-Subcontractor* is any person or entity retained by a Subcontractor as an independent contractor to perform any portion of a Subcontractor's Work and shall include materialmen and suppliers.

**1.2.11** *Substantial Completion* is the date on which the Work, or an agreed upon portion of the Work, is sufficiently complete so that Owner can occupy and use the Project.

**1.2.12** *Work* is comprised of all Design-Builder's design, construction and other services required by the Contract Documents, including procuring and furnishing all materials, equipment, services and labor reasonably inferable from the Contract Documents.

# Article 2

# Design-Builder's Services and Responsibilities

## 2.1 General Services

**2.1.1** Design-Builder's Representative shall be reasonably available to Owner and shall have the necessary expertise and experience required to supervise the Work. Design-Builder's Representative shall communicate regularly with Owner and shall be vested with the authority to act on behalf of Design-Builder. Design-Builder's Representative may be replaced only with the mutual agreement of Owner and Design-Builder.

**2.1.2** Design-Builder shall provide Owner with a monthly status report detailing the progress of the Work.

## 2.2 Design Professional Services

**2.2.1** Design-Builder shall, consistent with applicable state licensing laws, provide through qualified, licensed design professionals employed by Design-Builder, procured from qualified, independent licensed Design Consultants or from subcontractors/vendors fabricating materials and/or equipment for the Project, the necessary design services, including architectural, engineering and other design professional services, for the preparation of the required drawings, specifications and other design

submittals to permit Design-Builder to complete the Work consistent with the Contract Documents. Nothing in the Contract Documents is intended or deemed to create any legal or contractual relationship between Owner and any Design Consultant.

## 2.3 Standard of Care for Design Professional Services

2.3.1 The standard of care for all design professional services performed to execute the Work shall be the care and skill ordinarily used by members of the design profession practicing under similar conditions at the same time and locality of the Project.

## 2.4 Design Development Services

2.4.1 Design-Builder has provided Owner design/conceptual submissions that have been approved by Owner and are attached as Exhibit A to the Agreement.

2.4.2 Design-Builder may submit to Owner Construction Documents setting forth in greater detail drawings and specifications describing the requirements for construction of the Work. The Construction Documents shall be consistent with the intent defined in the previously approved design submissions identified in the Agreement. Owner acknowledges that the Project will not be designed to meet or comply with any type of State, Federal or voluntary jail or prison design standards that may or may not be applicable to the Project. Design-Builder shall proceed with construction in accordance with the Construction Documents, if any are created.

## 2.5 Legal Requirements

2.5.1 Design-Builder shall perform the Work in accordance with all Legal Requirements and shall provide all notices applicable to the Work as required by the Legal Requirements.

2.5.2 The Contract Price and/or Contract Time(s) shall be adjusted to compensate Design-Builder for the effects of any changes in the Legal Requirements enacted after the date of the Agreement affecting the performance of the Work. Such effects may include, without limitation, revisions Design-Builder is required to make to the Construction Documents because of changes in Legal Requirements.

## 2.6 Government Approvals and Permits

2.6.1 Except as identified in an Owner's Permit List which may be attached as an exhibit to the Agreement, Design-Builder shall obtain and pay for all necessary permits, approvals, licenses, government charges and inspection fees required for the prosecution of the Work by any government or quasi-government entity having jurisdiction over the Project.

2.6.2 Owner shall provide reasonable assistance to Design-Builder in obtaining those permits, approvals and licenses that are necessary for the design and construction of the Project.

## 2.7 Design-Builder's Construction Phase Services

2.7.1 Design-Builder shall provide through itself or Subcontractors the necessary supervision, labor, inspection, testing, start-up, material, equipment, machinery, temporary utilities and other temporary facilities to permit Design-Builder to complete construction of the Project consistent with the Contract Documents.

2.7.2 Design-Builder shall perform all construction activities efficiently and with the requisite expertise, skill and competence to satisfy the requirements of the Contract Documents. Design-Builder shall at all times exercise complete and exclusive control over the means, methods, sequences and techniques of construction.

2.7.3 Design-Builder shall employ only Subcontractors who are duly licensed and qualified to perform the Work consistent with the Contract Documents.

2.7.4 Design-Builder assumes responsibility to Owner for the proper performance of the Work of Subcontractors and any acts and omissions in connection with such performance. Nothing in the Contract Documents is intended or deemed to create any legal or contractual relationship between Owner and any Subcontractor or Sub-Subcontractor, including but not limited to any third-party beneficiary rights.

2.7.5 Design-Builder shall coordinate the activities of all Subcontractors. If Owner performs other work on the Project or at the Site with separate contractors under Owner's control, Design-Builder agrees to reasonably cooperate and coordinate its activities with those of such separate contractors so that the Project can be completed in an orderly and coordinated manner without unreasonable disruption.

**2.7.6** Design-Builder shall keep the Site reasonably free from debris, trash and construction wastes to permit Design-Builder to perform its construction services efficiently, safely and without interfering with the use of adjacent land areas. Upon Substantial Completion of the Work, or a portion of the Work, Design-Builder shall remove all debris, trash, construction wastes, materials, equipment, machinery and tools arising from the Work or applicable portions thereof to permit Owner to occupy the Project or a portion of the Project for its intended use.

**2.8    Design-Builder's Responsibility for Project Safety**

**2.8.1** Design-Builder recognizes the importance of performing the Work in a safe manner so as to prevent damage, injury or loss to (i) all individuals at the Site, whether working or visiting, (ii) the Work, including materials and equipment incorporated into the Work or stored on-Site or off-Site, and (iii) all other property at the Site or adjacent thereto. Design-Builder assumes responsibility for implementing and monitoring all safety precautions and programs related to the performance of the Work.

**2.8.2** Design-Builder and Subcontractors shall comply with all Legal Requirements relating to safety, as well as any Owner-specific safety requirements set forth in the Contract Documents, provided that such Owner-specific requirements do not violate any applicable Legal Requirement. Design-Builder will immediately report in writing any safety-related injury, loss, damage or accident arising from the Work to Owner's Representative and, to the extent mandated by Legal Requirements, to all government or quasi-government authorities having jurisdiction over safety-related matters involving the Project or the Work.

**2.8.3** Design-Builder's responsibility for safety under this Section 2.8 is not intended in any way to relieve Subcontractors and Sub-Subcontractors of their own contractual and legal obligations and responsibility for (i) complying with all Legal Requirements, including those related to health and safety matters, and (ii) taking all necessary measures to implement and monitor all safety precautions and programs to guard against injury, losses, damages or accidents resulting from their performance of the Work.

**2.9    Design-Builder's Warranty**

**2.9.1** Design-Builder warrants to Owner that the construction, including all materials and equipment furnished as part of the construction, shall be new unless otherwise specified in the Contract Documents, of good quality, in conformance with the Contract Documents and free of defects in materials and workmanship. Design-Builder's warranty obligation excludes defects caused by abuse, alterations, or failure to maintain the Work by persons other than Design-Builder or anyone for whose acts Design-Builder may be liable. Nothing in this warranty is intended to limit any manufacturer's warranty which provides Owner with greater warranty rights than set forth in this Section 2.9 or the Contract Documents. Design-Builder will provide Owner with all manufacturers' warranties upon either Substantial or Final Completion. Where a manufacturer's or third party warranty has been provided to Owner, Owner agrees that Design-Builder will have no further liability with respect to the subject of the manufacturer's or third party warranty and Owner agrees to look solely to such manufacturer or third party for any warranty claim with respect to such items and hereby specifically releases Design-Builder of and from any such claims.

**2.10    Correction of Defective Work**

**2.10.1** Design-Builder agrees to correct any Work that is found to not be in conformance with the Contract Documents, including that part of the Work subject to Section 2.9 hereof, within a period of one year from the date of Substantial Completion of the Work or any portion of the Work, or within such longer period to the extent required by the Contract Documents, provided such work is not the subject of a manufacturers warranty as described in Article 2.9.1 above.

**2.10.2** Design-Builder shall, within seven (7) days of receipt of written notice from Owner that the Work is not in conformance with the Contract Documents, take steps to commence correction of such nonconforming Work, including the correction, removal or replacement of the nonconforming Work and any damage caused to other parts of the Work affected by the nonconforming Work, provided such work is not the subject of a manufacturer's or third party warranty as described in Article 2.9.1 above. If Design-Builder fails to commence the necessary steps within such seven (7) day period, Owner, in addition to any other remedies provided under the Contract Documents, may provide Design-Builder with written notice that Owner will commence correction of such nonconforming Work with its own forces. If Owner does perform such corrective Work, Design-Builder shall be responsible for all reasonable costs incurred by Owner

in performing such correction. If the nonconforming Work creates an emergency requiring an immediate response, the seven (7) day periods identified herein shall be deemed inapplicable.

**2.10.3** The one year period referenced in Section 2.10.1 above applies only to Design-Builder's obligation to correct nonconforming Work not the subject of a manufacturer's or third party warranty and is not intended to constitute a period of limitations for any other rights or remedies Owner may have regarding Design-Builder's other obligations under the Contract Documents.

# Article 3

# Owner's Services and Responsibilities

## 3.1 Duty to Cooperate

**3.1.1** Owner shall, throughout the performance of the Work, cooperate with Design-Builder and perform its responsibilities, obligations and services in a timely manner to facilitate Design-Builder's timely and efficient performance of the Work and so as not to delay or interfere with Design-Builder's performance of its obligations under the Contract Documents.

**3.1.2** If required by this Agreement, Owner shall provide timely reviews and approvals of submissions consistent with the turnaround times set forth in Design-Builder's schedule.

## 3.2 Furnishing of Services and Information

**3.2.1** Owner is responsible for securing and executing all necessary agreements with adjacent land or property owners and any easements that are necessary to enable Design-Builder to perform the Work. Owner is further responsible for all costs, including attorneys' fees, incurred in securing these necessary agreements.

## 3.3 Financial Information

**3.3.1** Design-Builder shall cooperate with the reasonable requirements of Owner's lenders or other financial sources. Notwithstanding the preceding sentence, after execution of the Agreement, Design-Builder shall have no obligation to execute for Owner or Owner's lenders or other financial sources any documents or agreements that require Design-Builder to assume obligations or responsibilities greater than those existing obligations Design-Builder that may exist under the Contract Documents.

## 3.4 Owner's Representative

**3.4.1** Owner's Representative shall be responsible for providing Owner-supplied information and in a timely manner to permit Design-Builder to fulfill its obligations under the Contract Documents. Owner's Representative shall also provide Design-Builder with prompt notice if it observes any failure on the part of Design-Builder to fulfill its contractual obligations, including any errors, omissions or defects in the performance of the Work. Failure to provide such notice to Design-Builder shall constitute a complete waiver of any claims by Owner relating to such matters.

## 3.5 Government Approvals and Permits

**3.5.1** Owner shall provide reasonable assistance to Design-Builder in obtaining those permits, approvals and licenses that are Design-Builder's responsibility.

## 3.6 Owner's Separate Contractors

**3.6.1** Owner is responsible for all work performed on the Project or at the Site by separate contractors under Owner's control. Owner shall contractually require its separate contractors to cooperate with, and coordinate their activities so as not to interfere with, Design-Builder in order to enable Design-Builder to timely complete the Work consistent with the Contract Documents.

## 3.7 Owner's Responsibility for Maintenance

**3.7.1** Owner shall be responsible for maintaining the Work after Final Completion by Design-Builder. Owner warrants and represents to Design-Builder that it will provide all necessary maintenance and upkeep of the structure, systems, equipment and appurtenances furnished and installed by Design-Builder hereunder.

## Article 4

## Hazardous Conditions and Differing Site Conditions

### 4.1 Hazardous Conditions

**4.1.1** Unless otherwise expressly provided in the Contract Documents to be part of the Work, Design-Builder is not responsible for any Hazardous Conditions encountered at the Site. Upon encountering any Hazardous Conditions, Design-Builder will stop Work immediately in the affected area and duly notify Owner and, if required by Legal Requirements, all government or quasi-government entities with jurisdiction over the Project or Site.

**4.1.2** Upon receiving notice of the presence of suspected Hazardous Conditions, Owner shall take the necessary measures required to ensure that the Hazardous Conditions are remediated or rendered harmless. Such necessary measures shall include Owner retaining qualified independent experts to (i) ascertain whether Hazardous Conditions have actually been encountered, and, if they have been encountered, (ii) prescribe the remedial measures that Owner must take either to remove the Hazardous Conditions or render the Hazardous Conditions harmless.

**4.1.3** Design-Builder shall be obligated to resume Work at the affected area of the Project only after Owner's expert provides it with written certification that (i) the Hazardous Conditions have been removed or rendered harmless and (ii) all necessary approvals have been obtained from all government and quasi-government entities having jurisdiction over the Project or Site.

**4.1.4** Design-Builder will be entitled, in accordance with these General Conditions of Contract, to an adjustment in its Contract Price and/or Contract Time(s) to the extent Design-Builder's cost and/or time of performance have been adversely impacted by the presence of Hazardous Conditions.

**4.1.5** TO THE FULLEST EXTENT PERMITTED BY LAW, OWNER SHALL INDEMNIFY, DEFEND AND HOLD HARMLESS DESIGN-BUILDER, DESIGN CONSULTANTS, SUBCONTRACTORS, ANYONE EMPLOYED DIRECTLY OR INDIRECTLY FOR ANY OF THEM, AND THEIR OFFICERS, DIRECTORS, EMPLOYEES AND AGENTS, FROM AND AGAINST ANY AND ALL CLAIMS, LOSSES, DAMAGES, LIABILITIES AND EXPENSES, INCLUDING ATTORNEYS' FEES AND EXPENSES, ARISING OUT OF OR RESULTING FROM THE PRESENCE, REMOVAL OR REMEDIATION OF HAZARDOUS CONDITIONS AT THE SITE.

**4.1.6** Notwithstanding the preceding provisions of this Section 4.1, Owner is not responsible for Hazardous Conditions introduced to the Site by Design-Builder, Subcontractors or anyone for whose acts they may be liable. DESIGN-BUILDER SHALL INDEMNIFY, DEFEND AND HOLD HARMLESS OWNER AND OWNER'S OFFICERS, DIRECTORS, EMPLOYEES AND AGENTS FROM AND AGAINST ALL CLAIMS, LOSSES, DAMAGES, LIABILITIES AND EXPENSES, INCLUDING ATTORNEYS' FEES AND EXPENSES, ARISING OUT OF OR RESULTING FROM THOSE HAZARDOUS CONDITIONS INTRODUCED TO THE SITE BY DESIGN-BUILDER, SUBCONTRACTORS OR ANYONE FOR WHOSE ACTS THEY MAY BE LIABLE.

### 4.2 Differing Site Conditions

**4.2.1** Concealed or latent physical conditions or subsurface conditions at the Site that (i) materially differ from the conditions indicated in the Contract Documents or (ii) are of an unusual nature, differing materially from the conditions ordinarily encountered and generally recognized as inherent in the Work are collectively referred to herein as "Differing Site Conditions." If Design-Builder encounters a Differing Site Condition, Design-Builder will be entitled to an adjustment in the Contract Price and/or Contract Time(s) to the extent Design-Builder's cost and/or time of performance are adversely impacted by the Differing Site Condition.

**4.2.2** Upon encountering a Differing Site Condition, Design-Builder shall provide prompt written notice to Owner of such condition, which notice shall not be later than fourteen (14) days after such condition has been encountered. Design-Builder shall, to the extent reasonably possible, provide such notice before the Differing Site Condition has been substantially disturbed or altered.

## Article 5

## Insurance and Bonds

### 5.1 Design-Builder's Insurance Requirements

**5.1.1** Design-Builder is responsible for procuring and maintaining from insurance companies authorized to do

business in the state in which the Project is located, the insurance coverages set forth in the attached Exhibit C.

**5.1.2** Design-Builder's liability insurance set forth in Exhibit C shall specifically delete any design-build or similar exclusions that could compromise coverages because of the design-build delivery of the Project.

**5.1.4** To the extent Owner requires Design-Builder or any Design Consultant to provide professional liability insurance for claims arising from the negligent performance of design services by Design-Builder or the Design Consultant, the coverage limits, duration and other specifics of such insurance shall be as set forth in the Agreement. Any professional liability policy shall specifically delete any design-build or similar exclusions that could compromise coverages because of the design-build delivery of the Project. Such policies shall be provided prior to the commencement of any design services hereunder.

**5.1.5** Prior to commencing any construction services hereunder, Design-Builder shall provide Owner with certificates evidencing that (i) all insurance obligations required by the Contract Documents are in full force and in effect and will remain in effect for the duration required by the Contract Documents and (ii) no insurance coverage will be canceled, renewal refused, or materially changed unless at least thirty (30) days prior written notice is given to Owner.

**5.2 Owner's Liability Insurance**

**5.2.1** Owner shall procure and maintain from insurance companies authorized to do business in the state in which the Project is located such liability insurance to protect Owner from claims which may arise from the performance of Owner's obligations under the Contract Documents or Owner's conduct during the course of the Project.

**5.3 Property Insurance**

**5.3.1** Unless otherwise provided in the Contract Documents, Design-Builder shall procure and maintain from insurance companies authorized to do business in the state in which the Project is located property insurance upon the entire Project to the full insurable value of the Project, including professional fees, overtime premiums and all other expenses incurred to replace or repair the insured property. The property insurance obtained by Design-Builder shall include as additional insureds the interests of Owner, Design Consultants,

Subcontractors and Sub-Subcontractors, and shall insure against the perils of fire and extended coverage, theft, vandalism, malicious mischief, collapse, flood, earthquake, debris removal and other perils or causes of loss as called for in the Contract Documents. The property insurance shall include physical loss or damage to the Work, including materials and equipment in transit, at the Site or at another location as may be indicated in Design-Builder's Application for Payment and approved by Owner.

**5.3.2** Owner and Design-Builder waive against each other and Owner's separate contractors, Design Consultants, Subcontractors, agents and employees of each and all of them, all damages covered by property insurance provided herein, except such rights as they may have to the proceeds of such insurance. Design-Builder and Owner shall, where appropriate, require similar waivers of subrogation from Owner's separate contractors, Design Consultants and Subcontractors and shall require each of them to include similar waivers in their contracts.

**5.4 Bonds and Other Performance Security**

**5.4.1** Copies of the performance and payment bonds for the Project are attached as Exhibit D to the Standard Form of Agreement Between Owner and Design-Builder – Lump Sum. The owner acknowledges that the surety on such bonds (and the Design-Builder) shall not be liable or responsible in any way for the items, or the reimbursement of items, set forth in the Initial Application for Payment as described in Article 6.2.4 below.

# Article 6

# Payment

**6.1 Applications for Payment**

**6.1.1** The proposed Application for Payments are attached to the Agreement. Design-Builder shall submit for Owner's review its Application for Payment. The Applications shall be paid in accordance with the terms of the Agreement.

**6.2 Initial Application for Payment**

**6.2.1** Design-Builder's Initial Application for Payment will include funds for disbursements to third parties for land acquisition, all pre-construction development costs and fees, insurance, bond fees, travel and legal expense

reimbursement, design consultant and pre-development fees. Design-Builder is performing this function at the request of Owner and has not participated in the negotiation or creation of these obligations and, therefore, does not assume, and express disclaims, any liability or warranty obligations with respect to such activities. This Initial Application for Payment will be paid at the financial closing of the transaction for the Project.

## 6.3    Disputes over Payments

**6.3.1**    On or before the date established in the Agreement, Owner shall pay Design-Builder all amounts properly due. If Owner determines that Design-Builder is not entitled to all or part of an Application for Payment, it will notify Design-Builder in writing at least five (5) days prior to the date payment is due. The notice shall indicate the specific amounts Owner disputes, the reasons and contractual basis for such disputes, and the specific measures Design-Builder may take to rectify Owner's concerns. Design-Builder and Owner will attempt to resolve Owner's concerns prior to the date payment is due. If the parties cannot resolve such concerns, Owner must pay Design-Builder and Owner may pursue its rights under the Contract Documents, including those under Article 10 hereof.

## 6.4    Right to Stop Work and Interest

**6.4.1**    If Owner fails to pay Design-Builder any amount that becomes due, Design-Builder, in addition to all other remedies provided in the Contract Documents, may stop Work pursuant to Section 11.3 hereof. All payments due and unpaid shall bear interest at the rate set forth in the Agreement.

## 6.5    Design-Builder's Payment Obligations

**6.5.1**    Design-Builder will pay Design Consultants and Subcontractors in accordance with its contractual obligations to such parties. Design-Builder will impose similar requirements on Design Consultants and Subcontractors to pay those parties with whom they have contracted. Design-Builder will indemnify and defend Owner against any claims for payment and mechanic's liens as set forth in Section 7.3 hereof.

## 6.6    Substantial Completion

**6.6.1**    Design-Builder shall notify Owner when it believes the Work, or to the extent permitted in the Contract Documents, a portion of the Work, is substantially complete. Within five (5) days of Owner's receipt of Design-Builder's notice, Owner and Design-Builder will jointly review such Work. Design-Builder shall prepare and issue a Certificate of Substantial Completion that will set forth (i) the date of Substantial Completion of the Work or portion thereof, (ii) the remaining items of Work that have to be completed before final payment, (iii) provisions (to the extent not already provided in the Contract Documents) establishing Owner's and Design-Builder's responsibility for the Project's security, maintenance, utilities and insurance pending final payment and (iv) an acknowledgment that warranties commence to run on the date of Substantial Completion, except as may otherwise be noted in the Certificate of Substantial Completion.

**6.6.2**    Owner, at its option, may use a portion of the Work which has been determined to be substantially complete, provided, however, that (i) a Certificate of Substantial Completion has been issued for the portion of Work addressing the items set forth in Section 6.6.1 above, (ii) Design-Builder and Owner have obtained the consent of their sureties and insurers, and to the extent applicable, the appropriate government authorities having jurisdiction over the Project, and (iii) Owner and Design-Builder agree that Owner's use or occupancy will not interfere with Design-Builder's completion of the remaining Work.

## 6.7    Final Payment

**6.7.1**    After receipt of a Final Application for Payment from Design-Builder, Owner shall make final payment by the time required in the Agreement, provided that Design-Builder has completed all of the Work in conformance with the Contract Documents.

**6.7.2**    At the time of submission of its Final Application for Payment, Design-Builder shall provide the following information:

.1    (intentionally left blank);

.2    a general release executed by Design-Builder waiving, upon receipt of final payment by Design-Builder, all claims, except those claims previously made in

**188**

writing to Owner and remaining unsettled at the time of final payment;

.3 consent of Design-Builder's surety, if any, to final payment;

.4 all operating manuals, warranties and other deliverables required by the Contract Documents; and

.5 certificates of insurance confirming that required coverages will remain in effect consistent with the requirements of the Contract Documents.

**6.7.3** Upon making final payment, Owner waives all claims against Design-Builder except claims relating to (i) Design-Builder's failure to satisfy its payment obligations, if such failure affects Owner's interests, (ii) Design-Builder's failure to complete the Work consistent with the Contract Documents, including defects appearing after Substantial Completion and (iii) the terms of any special warranties required by the Contract Documents, specifically excluding manufacturers' warranties.

## Article 7

## Indemnification

### 7.1 Patent and Copyright Infringement

**7.1.1** Design-Builder shall defend any action or proceeding brought against Owner based on any claim that the Work, or any part thereof, or the operation or use of the Work or any part thereof, constitutes infringement of any United States patent or copyright, now or hereafter issued. Owner shall give prompt written notice to Design-Builder of any such action or proceeding and will reasonably provide authority, information and assistance in the defense of same. Design-Builder shall indemnify and hold harmless Owner from and against all damages and costs, including but not limited to attorneys' fees and expenses awarded against Owner or Design-Builder in any such action or proceeding. Design-Builder agrees to keep Owner informed of all developments in the defense of such actions.

**7.1.2** If Owner is enjoined from the operation or use of the Work, or any part thereof, as the result of any patent or copyright suit, claim, or proceeding, Design-Builder shall at its sole expense take reasonable steps to procure the right to operate or use the Work. If Design-Builder cannot so procure such right within a reasonable

time, Design-Builder shall promptly, at Design-Builder's option and at Design-Builder's expense, (i) modify the Work so as to avoid infringement of any such patent or copyright or (ii) replace said Work with Work that does not infringe or violate any such patent or copyright.

**7.1.3** Sections 7.1.1 and 7.1.2 above shall not be applicable to any suit, claim or proceeding based on infringement or violation of a patent or copyright (i) relating solely to a particular process or product of a particular manufacturer specified by Owner and not offered or recommended by Design-Builder to Owner or (ii) arising from modifications to the Work by Owner or its agents after acceptance of the Work. If the suit, claim or proceeding is based upon events set forth in the preceding sentence, Owner shall defend, indemnify and hold harmless Design-Builder to the same extent Design-Builder is obligated to defend, indemnify and hold harmless Owner in Section 7.1.1 above.

**7.1.4** The obligations set forth in this Section 7.1 shall constitute the sole agreement between the parties relating to liability for infringement of violation of any patent or copyright.

### 7.2 Tax Claim Indemnification

**7.2.1** If, in accordance with Owner's direction, an exemption for all or part of the Work is claimed for taxes, Owner shall indemnify, defend and hold harmless Design-Builder from and against any liability, penalty, interest, fine, tax assessment, attorneys' fees or other expenses or costs incurred by Design-Builder as a result of any action taken by Design-Builder in accordance with Owner's directive.

### 7.3 Payment Claim Indemnification

**7.3.1** Providing that Owner is not in breach of its contractual obligation to make payments to Design-Builder for the Work, Design-Builder shall indemnify, defend and hold harmless Owner from any claims or mechanic's liens brought against Owner or against the Project as a result of the failure of Design-Builder, or those for whose acts it is responsible, to pay for any services, materials, labor, equipment, taxes or other items or obligations furnished or incurred for or in connection with the Work. Within three (3) days of receiving written notice from Owner that such a claim or mechanic's lien has been filed, Design-Builder shall commence to take the steps necessary to discharge said claim or lien, including, if necessary, the furnishing of a mechanic's lien bond.

## 7.4 Design-Builder's General Indemnification

**7.4.1** Design-Builder, to the fullest extent permitted by law, shall indemnify, hold harmless and defend Owner, its officers, directors, employees and agents from and against claims, losses, damages, liabilities, including attorneys' fees and expenses, for bodily injury, sickness or death, and property damage or destruction (other than to the Work itself) to the extent resulting from the negligent acts or omissions of Design-Builder, Design Consultants, Subcontractors, anyone employed directly or indirectly by any of them or anyone for whose acts any of them may be liable.

**7.4.2** If an employee of Design-Builder, Design Consultants, Subcontractors, anyone employed directly or indirectly by any of them or anyone for whose acts any of them may be liable has a claim against Owner, its officers, directors, employees, or agents, Design-Builder's indemnity obligation set forth in Section 7.4.1 above shall not be limited by any limitation on the amount of damages, compensation or benefits payable by or for Design-Builder, Design Consultants, Subcontractors, or other entity under any employee benefit acts, including workers' compensation or disability acts.

## 7.5 Owner's General Indemnification

**7.5.1** Owner, to the fullest extent permitted by law, shall indemnify, hold harmless and defend Design-Builder and any of Design-Builder's officers, directors, employees, or agents from and against claims, losses, damages, liabilities, including attorneys' fees and expenses, for bodily injury, sickness or death, and property damage or destruction (other than to the Work itself) to the extent resulting from the negligent acts or omissions of Owner, Owner's separate contractors or anyone for whose acts any of them may be liable.

## Article 8

## Time

### 8.1 Obligation to Achieve the Contract Times

**8.1.1** Design-Builder agrees that it will commence performance of the Work and achieve the Contract Time(s) in accordance with Article 5 of the Agreement.

### 8.2 Delays to the Work

**8.2.1** If Design-Builder is delayed in the performance of the Work due to acts, omissions, conditions, events, or circumstances beyond its control and due to no fault of its own or those for whom Design-Builder is responsible, the Contract Time(s) for performance shall be reasonably extended by Change Order. By way of example, events that will entitle Design-Builder to an extension of the Contract Time(s) include acts or omissions of Owner or anyone under Owner's control (including separate contractors), changes in the Work, unavailability of materials/equipment at the price contemplated by Design-Builder when establishing the Contract Price, Differing Site Conditions, Hazardous Conditions, wars, floods, labor disputes, unusual delay in transportation, epidemics abroad, earthquakes, adverse weather conditions not reasonably anticipated, and other acts of God.

**8.2.2** In addition to Design-Builder's right to a time extension for those events set forth in Section 8.2.1 above, Design-Builder shall also be entitled to an appropriate adjustment of the Contract Price.

## Article 9

## Changes to the Contract Price and Time

### 9.1 Change Orders

**9.1.1** A Change Order is a written instrument issued after execution of the Agreement signed by Owner and Design-Builder, stating their agreement upon all of the following:

.1 The scope of the change in the Work;

.2 The amount of the adjustment to the Contract Price; and

.3 The extent of the adjustment to the Contract Time(s).

**9.1.2** All changes in the Work authorized by applicable Change Order shall be performed under the applicable conditions of the Contract Documents, provided that Owner covenants to Design-Builder that it has sufficient funds to pay for any changes in the Work. Owner and Design-Builder shall negotiate in good faith and as expeditiously as possible the appropriate adjustments for such changes.

**9.1.3** If Owner requests a proposal for a change in the Work from Design-Builder and subsequently elects not to

proceed with the change, a Change Order shall be issued to reimburse Design-Builder for reasonable costs incurred for estimating services, design services and services involved in the preparation of proposed revisions to the Contract Documents.

**9.2 (intentionally left blank)**

**9.3 Minor Changes in the Work**

**9.3.1** Minor changes in the Work do not involve an adjustment in the Contract Price and/or Contract Time(s) and do not materially and adversely affect the Work, including the design, quality, performance and workmanship required by the Contract Documents. Design-Builder may make minor changes in the Work consistent with the intent of the Contract Documents, provided, however that Design-Builder shall record such changes on the documents maintained by Design-Builder.

**9.4 Contract Price Adjustments**

**9.4.1** The increase or decrease in Contract Price resulting from a change in the Work shall be determined by the agreement between Owner and Design-Builder.

**9.5 Emergencies**

**9.5.1** In any emergency affecting the safety of persons and/or property, Design-Builder shall act, at its discretion, to prevent threatened damage, injury or loss. Any change in the Contract Price and/or Contract Time(s) on account of emergency work shall be determined as provided in this Article 9.

# Article 10

## Contract Adjustments and Disputes

**10.1 Requests for Contract Adjustments and Relief**

**10.1.1** If either Design-Builder or Owner believes that it is entitled to relief against the other for any event arising out of or related to the Work or Project, such party shall provide written notice to the other party of the basis for its claim for relief. Such notice shall, if possible, be made prior to incurring any cost or expense and in accordance with any specific notice requirements contained in applicable sections of these General Conditions of Contract. In the absence of any specific notice requirement, written notice shall be given within a

reasonable time, not to exceed twenty-one (21) days, after the occurrence giving rise to the claim for relief or after the claiming party reasonably should have recognized the event or condition giving rise to the request, whichever is later. Such notice shall include sufficient information to advise the other party of the circumstances giving rise to the claim for relief, the specific contractual adjustment or relief requested and the basis of such request.

**10.2 Dispute Avoidance and Resolution**

**10.2.1** The parties are fully committed to working with each other throughout the Project and agree to communicate regularly with each other at all times so as to avoid or minimize disputes or disagreements. If disputes or disagreements do arise, Design-Builder and Owner each commit to resolving such disputes or disagreements in an amicable, professional and expeditious manner so as to avoid unnecessary losses, delays and disruptions to the Work.

**10.2.2** Design-Builder and Owner will first attempt to resolve disputes or disagreements at the field level through discussions between Design-Builder's Representative and Owner's Representative.

**10.2.3** If a dispute or disagreement cannot be resolved through Design-Builder's Representative and Owner's Representative, Design-Builder's Senior Representative and Owner's Senior Representative, upon the request of either party, shall meet as soon as conveniently possible, but in no case later than thirty (30) days after such a request is made, to attempt to resolve such dispute or disagreement. Prior to any meetings between the Senior Representatives, the parties will exchange relevant information that will assist the parties in resolving their dispute or disagreement.

**10.2.4** If after meeting the Senior Representatives determine that the dispute or disagreement cannot be resolved on terms satisfactory to both parties, the parties shall submit the dispute or disagreement to non-binding mediation. The mediation shall be conducted by a mutually agreeable impartial mediator, or if the parties cannot so agree, a mediator designated by the American Arbitration Association ("AAA") pursuant to its Construction Industry Mediation Rules. The mediation will be governed by and conducted pursuant to a mediation agreement negotiated by the parties or, if the parties cannot so agree, by procedures established by the mediator. The local of the mediation shall be conducted in Houston, Texas.

## 10.3 Arbitration

**10.3.1** Any claims, disputes or controversies between the parties arising out of or relating to the Agreement, or the breach thereof, the Project or any transaction or occurrence arising out of or relating to the Project which have not been resolved in accordance with the procedures set forth in Section 10.2 above shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the AAA then in effect, unless the parties mutually agree otherwise.. The hearing locale shall be in Houston, Texas.

**10.3.2** The award of the arbitrator(s) shall be final and binding upon the parties without the right of appeal to the courts. Judgment may be entered upon it in accordance with applicable law by any court having jurisdiction thereof.

**10.3.3** Design-Builder and Owner expressly agree that any arbitration pursuant to this Section 10.3 may be joined or consolidated with any arbitration involving any other person or entity (i) necessary to resolve the claim, dispute or controversy, or (ii) substantially involved in or affected by such claim, dispute or controversy. Both Design-Builder and Owner will include appropriate provisions in all contracts they execute with other parties in connection with the Project to require such joinder or consolidation.

**10.3.4** The prevailing party in any arbitration, or any other final, binding dispute proceeding upon which the parties may agree, shall be entitled to recover from the other party reasonable attorneys' fees and expenses incurred by the prevailing party.

## 10.4 Duty to Continue Performance

**10.4.1** Unless provided to the contrary in the Contract Documents, Design-Builder shall continue to perform the Work and Owner shall continue to satisfy its payment obligations to Design-Builder, pending the final resolution of any dispute or disagreement between Design-Builder and Owner.

## 10.5 CONSEQUENTIAL DAMAGES

**10.5.1** NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY (EXCEPT AS SET FORTH IN SECTION 10.5.2 BELOW), NEITHER DESIGN-BUILDER NOR OWNER SHALL BE LIABLE TO THE OTHER FOR ANY CONSEQUENTIAL LOSSES OR DAMAGES, WHETHER ARISING IN CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR OTHERWISE, INCLUDING BUT NOT LIMITED TO LOSSES OF USE, PROFITS, BUSINESS, REPUTATION OR FINANCING.

**10.5.2** The consequential damages limitation set forth in Section 10.5.1 above is not intended to affect the payment of liquidated damages, if any, set forth in Article 5 of the Agreement, which both parties recognize has been established, in part, to reimburse Owner for some damages that might otherwise be deemed to be consequential.

## Article 11

## Stop Work and Termination for Cause

### 11.1 Owner's Right to Stop Work

**11.1.1** Owner may, without cause and for its convenience, order Design-Builder in writing to stop and suspend the Work. Such suspension shall not exceed sixty (60) consecutive days or aggregate more than ninety (90) days during the duration of the Project.

**11.1.2** Design-Builder is entitled to seek an adjustment of the Contract Price and/or Contract Time(s) if its cost or time to perform the Work has been adversely impacted by any suspension of stoppage of work by Owner.

### 11.2 Owner's Right to Perform and Terminate for Cause

**11.2.1** If Design-Builder persistently fails to (i) provide a sufficient number of skilled workers, (ii) supply the materials required by the Contract Documents, (iii) comply with applicable Legal Requirements, (iv) timely pay, without cause, Design Consultants or Subcontractors, (v) prosecute the Work with promptness and diligence to ensure that the Work is completed by the Contract Time(s), as such times may be adjusted, or (vi) perform material obligations under the Contract Documents during the performance of the Work, then Owner, in addition to any other rights and remedies provided in the Contract Documents, shall have the rights set forth in Sections 11.2.2 and 11.2.3 below.

**11.2.2** Upon the occurrence of an event set forth in Section 11.2.1 above, Owner may provide written notice to Design-Builder that it intends to terminate the Agreement unless the problem cited is cured, or commenced to be cured, within seven (7) days of Design-Builder's receipt of such notice. If Design-Builder fails

to cure, or reasonably commence to cure, such problem, then Owner may give a second written notice to Design-Builder of its intent to terminate within an additional seven (7) day period. If Design-Builder, within such second seven (7) day period, fails to cure, or reasonably commence to cure, such problem, then Owner may declare the Agreement terminated for default by providing written notice to Design-Builder of such declaration and after obtaining written approval from the Trustee of the same, which shall be an express condition precedent to terminating this agreement for default.

**11.2.3** Upon declaring the Agreement terminated pursuant to Section 11.2.2 above, Owner may enter upon the premises and take possession, for the purpose of completing the Work, of all materials, equipment, scaffolds, tools, appliances and other items thereon, which have been purchased or provided for the performance of the Work and paid for by Owner, all of which Design-Builder hereby transfers, assigns and sets over to Owner for such purpose, and to employ any person or persons to complete the Work and provide all of the required labor, services, materials, equipment and other items. In the event of such termination, Design-Builder shall not be entitled to receive any further payments under the Contract Documents until the Work shall be finally completed in accordance with the Contract Documents. At such time, if the unpaid balance of the Contract Price exceeds the cost and expense incurred by Owner in completing the Work, such excess shall be paid by Owner to Design-Builder. If Owner's cost and expense of completing the Work exceeds the unpaid balance of the Contract Price, then Design-Builder shall be obligated to pay the difference to Owner. Such costs and expense shall include not only the cost of completing the Work, but also losses, damages, costs and expense, including attorneys' fees and expenses, incurred by Owner in connection with the reprocurement and defense of claims arising from Design-Builder's default, subject to the waiver of consequential damages set forth in Section 10.5 hereof.

**11.3    Design-Builder's Right to Stop Work**

**11.3.1**   Design-Builder may, in addition to any other rights afforded under the Contract Documents or at law, stop work for the following reasons:

.1   Owner's failure to provide financial assurances as required under Section 3.3 hereof; or

.2   Owner's failure to pay amounts properly due under Design-Builder's Application for Payment.

**11.3.2**   Should any of the events set forth in Section 11.3.1 above occur, Design-Builder has the right to provide Owner with written notice that Design-Builder will stop work unless said event is cured within seven (7) days from Owner's receipt of Design-Builder's notice. If Owner does not cure the problem within such seven (7) day period, Design-Builder may stop work. In such case, Design-Builder shall be entitled to make a claim for adjustment to the Contract Price and Contract Time(s) to the extent it has been adversely impacted by such stoppage.

**11.4    Design-Builder's Right to Terminate for Cause**

**11.4.1**   Design-Builder, in addition to any other rights and remedies provided in the Contract Documents or by law, may terminate the Agreement for cause for the following reasons:

.1   The Work has been stopped for sixty (60) consecutive days, or more than ninety (90) days during the duration of the Project, because of court order, any government authority having jurisdiction over the Work, or orders by Owner under Section 11.1.1 hereof, provided that such stoppages are not due to the acts or omissions of Design-Builder or anyone for whose acts Design-Builder may be responsible.

.2   Owner's failure to provide Design-Builder with any information, permits or approvals that are Owner's responsibility under the Contract Documents which result in the Work being stopped for sixty (60) consecutive days, or more than ninety (90) days during the duration of the Project, even though Owner has not ordered Design-Builder in writing to stop and suspend the Work pursuant to Section 11.1.1 hereof.

.3   Owner's failure to cure the problems set forth in Section 11.3.1 above after Design-Builder has stopped the Work.

**11.4.2** Upon the occurrence of an event set forth in Section 11.4.1 above, Design-Builder may provide written notice to Owner that it intends to terminate the Agreement unless the problem cited is cured, or commenced to be cured, within seven (7) days of Owner's receipt of such notice. If Owner fails to cure, or reasonably commence to cure, such problem, then Design-Builder may give a second written notice to Owner of its intent to terminate within an additional seven (7) day period. If Owner, within such second seven (7) day period, fails to cure, or reasonably commence to cure, such problem, then Design-Builder may declare the Agreement terminated for default by providing written notice to Owner of such declaration. In such case, Design-Builder shall be entitled to recover in the same manner as if Owner had terminated the Agreement for its convenience under Article 8 of the Agreement.

**11.5    Bankruptcy of Owner or Design-Builder**

**11.5.1** If either Owner or Design-Builder institutes or has instituted against it a case under the United States Bankruptcy Code (such party being referred to as the "Bankrupt Party"), such event may impair or frustrate the Bankrupt Party's ability to perform its obligations under the Contract Documents. Accordingly, should such event occur:

.1    The Bankrupt Party, its trustee or other successor, shall furnish, upon request of the non-Bankrupt Party, adequate assurance of the ability of the Bankrupt Party to perform all future material obligations under the Contract Documents, which assurances shall be provided within ten (10) days after receiving notice of the request; and

.2    The Bankrupt Party shall file an appropriate action within the bankruptcy court to seek assumption or rejection of the Agreement within sixty (60) days of the institution of the bankruptcy filing and shall diligently prosecute such action.

If the Bankrupt Party fails to comply with its foregoing obligations, the non-Bankrupt Party shall be entitled to request the bankruptcy court to reject the Agreement, declare the Agreement terminated and pursue any other recourse available to the non-Bankrupt Party under this Article 11.

**11.5.2** The rights and remedies under Section 11.5.1 above shall not be deemed to limit the ability of the non-Bankrupt Party to seek any other rights and remedies provided by the Contract Documents or by law, including its ability to seek relief from any automatic stays under the United States Bankruptcy Code or the right of Design-Builder to stop Work under any applicable provision of these General Conditions of Contract.

## Article 12

## Miscellaneous

**12.1    Assignment**

**12.1.1** Neither Design-Builder nor Owner shall, without the written consent of the other assign, transfer or sublet any portion or part of the Work or the obligations required by the Contract Documents.

**12.2    Successorship**

**12.2.1** Design-Builder and Owner intend that the provisions of the Contract Documents are binding upon the parties, their employees, agents, heirs, successors and assigns.

**12.3    Governing Law**

**12.3.1** The Agreement and all Contract Documents shall be governed by the laws of the place of the Project, without giving effect to its conflict of law principles.

**12.4    Severability**

**12.4.1** If any provision or any part of a provision of the Contract Documents shall be finally determined to be superseded, invalid, illegal, or otherwise unenforceable pursuant to any applicable Legal Requirements, such determination shall not impair or otherwise affect the validity, legality, or enforceability of the remaining provision or parts of the provision of the Contract Documents, which shall remain in full force and effect as if the unenforceable provision or part were deleted.

**12.5    No Waiver**

**12.5.1** The failure of either Design-Builder or Owner to insist, in any one or more instances, on the performance of any of the obligations required by the other under the Contract Documents shall not be construed as a waiver or relinquishment of such obligation or right with respect to future performance.

**12.6    Headings**

**12.6.1**    The headings used in these General Conditions of Contract, or any other Contract Document, are for ease of reference only and shall not in any way be construed to limit or alter the meaning of any provision.

**12.7    Notice**

**12.7.1**    Whenever the Contract Documents require that notice be provided to the other party, notice will be deemed to have been validly given (i) if delivered in person to the individual intended to receive such notice, (ii) four (4) days after being sent by registered or certified mail, postage prepaid to the address indicated in the Agreement or (iii) if transmitted by facsimile, by the time stated in a machine generated confirmation that notice was received at the facsimile number of the intended recipient.

**12.8    Amendments**

**12.8.1**    The Contract Documents may not be changed, altered, or amended in any way except in writing signed by a duly authorized representative of each party.

# AIA Document G704™ – 2000

## Certificate of Substantial Completion

PROJECT:                              PROJECT NUMBER:
(Name and address):                   CONTRACT FOR: 2000 Bed ICE Facility        Operator  ☒
Willacy County 2000 Bed ICE           CONTRACT DATE: July 19, 2006      July 19  ARCHITECT: ☒
Facility                                                                         CONTRACTOR: ☒
1800 Industrial Drive, Raymondville, TX  78580
TO OWNER:                             TO CONTRACTOR: HMC Contracting South Texas, LLC FIELD: ☒
(Name and address):                   (Name and address): 4130 Bellaire Blvd, Ste. 210    OTHER: ☐
The Willacy County Local Gov. Corp                        Houston, Texas  77025
190 North 3rd Street
Raymondville, Texas  78580

### PROJECT OR PORTION OF THE PROJECT DESIGNATED FOR PARTIAL OCCUPANCY OR USE SHALL INCLUDE:

The Occupancy Certificate was issued by the City of Raymondville on September 8, 2006

The Work performed under this Contract has been reviewed and found, to the Architect's best knowledge, information and belief, to be substantially complete. Substantial Completion is the stage in the progress of the Work when the Work or designated portion is sufficiently complete in accordance with the Contract Documents so that the Owner can occupy or utilize the Work for its intended use. The date of Substantial Completion of the Project or portion designated above is the date of issuance established by this Certificate, which is also the date of commencement of applicable warranties required by the Contract Documents, except as stated below:

Warranty                                    Date of Commencement
September 8, 2006                            September 8, 2006

Deborah L. Williams Architecture LP                                September 8, 2006
ARCHITECT                 BY                        DATE OF ISSUANCE

A list of items to be completed or corrected is attached hereto. The failure to include any items on such list does not alter the responsibility of the Contractor to complete all Work in accordance with the Contract Documents. Unless otherwise agreed to in writing, the date of commencement of warranties for items on the attached list will be the date of issuance of the final Certificate of Payment or the date of final payment.

Cost estimate of Work that is incomplete or defective:

The Contractor will complete or correct the Work on the list of items attached hereto within Thirty (45) days from the above date of Substantial Completion.

HMC Contracting South Texas, LLC                                   9/9/06
CONTRACTOR               BY                          DATE

The Owner accepts the Work or designated portion as substantially complete and will assume full possession at          a.m. (time)
on                   :date).

Management Training Corporation
Operator                 BY                          DATE

Owner assumes all responsibility for security, maintenance, utilities and insurance.

AIA Document G704™ – 2000. Copyright © 1963, 1978, 1992 and 2000 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:51:19 on 04/01/2006 under Order No.1000120866_1 which expires on 8/28/2005, and is not for resale.
User Notes:                                                                                      (885531343)

1

**196**

# EXHIBIT D

# Standard Form of Agreement Between
## Owner and Design-Builder - Lump Sum
This document has been amended and revised from its standard form.

This AGREEMENT is made as of the 20th day of August in the year of 2007, by and between the following parties, for services in connection with the Project identified below.

OWNER:

The Willacy County Local Government Corporation
190 North 3rd Street
Courthouse Annex
Raymondville, Texas 78580

DESIGN-BUILDER:

HMC Contracting South Texas, L.L.C.
2900 Weslayan, Suite 375
Houston, Texas 77027

PROJECT:

1000 Bed Addition to the Willacy County ICE Detention Facility
Willacy County, Texas

In consideration of the mutual covenants and obligations contained herein, Owner and Design-Builder agree as set forth herein.

## Article 1
### Scope of Work

1.1 Design-Builder shall perform all design and construction services, and provide all material, equipment, tools and labor, necessary to complete the Work described in and reasonably inferable from the Contract Documents.



**EXHIBIT**

4

198

1.2 A description of the Project is attached as part of Exhibit A. This description is for general purposes only – the Project may have different technical attributes not described in this Exhibit or described differently in this Exhibit.

## Article 2
## Contract Documents

2.1 The Contract Documents are comprised of the following:

.1      All written modifications, amendments and change orders to this Agreement issued in accordance with DBIA Document No. 535, Standard Form of General Conditions of Contract Between Owner and Design-Builder (1998 Edition) as amended ("General Conditions of Contract");

.2      This Agreement, including all exhibits and attachments, executed by Owner and Design-Builder;

.3      The General Conditions of Contract;

.4      Construction Documents prepared in accordance with Section 2.4 of the General Conditions of Contract along with a description of the Project, attached as Exhibit A;

.5      Attached as Exhibit B, Design-Builder's Applications for Payment and Requisitions for Payment to Trustee.

.6      Attached Exhibit C, Design-Builder's Certificate of Insurance.

.7      Attached Exhibit D, Payment and Performance Bonds.

.8      Attached as Exhibit E, the list of drawings as of the effective date of this Agreement, which may be modified.

## Article 3
## Interpretation and Intent

3.1 The Contract Documents are intended to permit the parties to complete the Work and all obligations required by the Contract Documents within the Contract Time(s) for the Contract Price. The Contract Documents are intended to be complementary and interpreted in harmony so as to avoid conflict, with words and phrases interpreted in a manner consistent with construction and design industry standards. In the event of any inconsistency, conflict, or ambiguity between or among the Contract Documents, the Contract Documents shall take precedence in the order in which they are listed in Section 2.1 hereof.

171620 2068 1              2

**199**

3.2 Terms, words and phrases used in the Contract Documents, including this Agreement, shall have the meanings given them in the General Conditions of Contract.

3.3 The Contract Documents form the entire agreement between Owner and Design-Builder and by incorporation herein are as fully binding on the parties as if repeated herein. No oral representations or other agreements regarding the Work have been made by the parties except as specifically stated in the Contract Documents.

## Article 4
### Ownership of Work Product

4.1 Work Product. All drawings, specifications and other documents and electronic data furnished by Design-Builder to Owner under this Agreement ("Work Product") are deemed to be instruments of service and Design-Builder shall retain the ownership and property interests therein, including the copyrights thereto.

4.2 Upon Owner's payment in full for all Work performed under the Contract Documents, the drawings, specifications, models, renderings, work product, instruments of service and other documents shall become the property of the Owner. Owner may utilize such drawings, specifications, models, renderings, work product, instruments of service and other documents only for the repair, maintenance, modification, expansion or renovation of the Project. Nevertheless, it is understood by Owner that all such Drawings, Specifications, models, renderings, work product, instruments of service and other documents may be inappropriate for use in the construction of any other project. Therefore, Design-Builder shall not be responsible for the use or workability of such drawings, specifications, models, renderings, work product, instruments of service and other documents in connection with any project other than the Project for which they were specifically prepared. OWNER SHALL INDEMNIFY, DEFEND AND HOLD DESIGN-BUILDER HARMLESS OF AND FROM ANY AND ALL CLAIMS, DEMANDS AND CAUSES OF ACTION, INCLUDING ATTORNEY'S FEES AND LITIGATION COSTS, ARISING OUT OR RELATING TO OWNER'S USE OF DRAWINGS, SPECIFICATIONS, MODELS, RENDERINGS, WORK PRODUCT, INSTRUMENTS OF SERVICE AND OTHER DOCUMENT FOR THIS PROJECT ON ANY OTHER PROJECT.

## Article 5
### Contract Time

5.1 Date of Commencement. The Work shall commence within five (5) days of Contractor's receipt of 1) Owner's Notice to Proceed 2) the execution of this Agreement by both parties and the receipt of same by Contractor, and 3) payment of Contractor's initial Application for Payment payable at the financial closing of the transaction for the Project ("Date of Commencement") unless the parties mutually agree otherwise in writing.

5.2 Substantial Completion and Final Completion

171620 2068.1          3

**200**

5.2.1 Substantial Completion of the entire Work shall be achieved no later than 180 calendar days after the Date of Commencement ("Scheduled Substantial Completion Date").

5.2.2 Intentionally left blank.

5.2.3 Final Completion of the Work, including the support building, shall be achieved 120 days after the Date of Commencement.

5.2.4 All of the dates set forth in this Article 5 ("Contract Time(s)") shall be subject to adjustment in accordance with the General Conditions of Contract. The Contract Time shall be extended if ICE grants time extensions to Owner and/or Willacy County, Texas, for the same amount of time granted by ICE, unless agreed otherwise.

5.3 Time is of the Essence. Owner and Design-Builder mutually agree that time is of the essence with respect to the dates and times set forth in the Contract Documents.

5.4 Liquidated Damages. Design-Builder understands that if Substantial Completion is not attained by the Scheduled Substantial Completion Date, Owner will suffer damages which are difficult to determine and accurately specify. Design-Builder agrees that if Substantial Completion is not attained by thirty (30) days after the Scheduled Substantial Completion Date (the "LD Date"), Designer-Builder shall pay Owner Thirteen Thousand Seven Hundred Twenty Five Dollars ($13,725.00) as liquidated damages for each day that Substantial Completion extends beyond the LD Date. The liquidated damages provided herein shall be in lieu of all liability for any and all extra costs, losses, expenses, claims, penalties and any other damages, whether special or consequential, and of whatsoever nature incurred by Owner which are occasioned by any delay in achieving Substantial Completion.

## Article 6
### Contract Price

6.1 Contract Price. Owner shall direct the Trustee to pay Design-Builder's Applications for Payment attached to this Agreement in the total sum of Forty-three Million One Hundred Seventy-two Thousand Three Hundred Twenty Seven Dollars ($43,172,327) ("Contract Price"), subject to adjustments made in accordance with the General Conditions of Contract.

6.2 Materials incorporated into this project are exempt from State Sales tax according to provisions of the Texas Tax Code, Chapter 151, Subsection H. The Owner shall provide to Design-Builder a limited sales, excise and use tax permit or exemption certificate which shall enable Design-Builder to buy the materials to be incorporated into the Work without paying tax due at time of purchase. This is a separated contract as that term is used the Texas Tax Code and applicable Texas law and the Owner agrees and acknowledges that it is purchasing the material for the Work separately from the labor for the Work. Material for the Work totals $24,176,503 and labor for the Work totals

171620 2068 1                                            4

$18,995,824. This paragraph is meant to meet the separated contract definition under the Texas Tax Code and the laws of Texas.

6.3. Upon Substantial Completion of the Project, Design Builder will provide Owner a certification that the Project has been substantially completed. Design-Builder will also provide a final release for all payments made by Owner and a consent of surety. Upon Final Completion, Design-Builder shall supply a list of all subcontractors utilized by Design-Builder and all applicable warranties.

6.4 Design-Builder guarantees to complete the Project for the Contract Price, which cannot be modified by either party except by a Change Order signed by both parties pursuant to Article 9 of the General Conditions.

## Article 7
### Procedure for Payment

7.1 Progress Payments

7.1.1 Design-Builder's Applications for Payment are attached to this Agreement as Exhibit B. By the execution of this Agreement, Owner hereby approves the Applications for Payment and agrees to take all actions necessary to fund such Applications for Payment, including the execution of the Requisitions attached as Exhibit B at closing.

7.1.2 Owner agrees that the Trustee can pay the Applications for Payment upon submission by Design-Builder of the executed Requisitions for Payment to the Trustee, without the need for any additional information or consent from the Owner.

7.2 Source of Funds. Design-Builder and Owner acknowledge and agree that the funding for payments due under this Agreement shall come from the Construction Fund established pursuant to the Trust Indenture by the Trustee, U.S. Bank, N.A. (the "Trustee").

7.3 (Intentionally Left Blank)

7.4 Record Keeping and Finance Controls. In light of the fact that this is a stipulated sum contract, Design-Builder shall have no obligation to keep records, books, correspondence, receipts, subcontracts, purchase orders, vouchers, memoranda or other data relating to the Work and no records shall be open for inspection by any party. Design-Builder agrees to cooperate with Owner in conjunction with any reporting required of Owner by ICE or the Federal Government in connection with the Project.

## Article 8
### (Intentionally Left Blank)

171620 2068.1

5

## Article 9
### Representatives of the Parties

9.1 Owner's Representatives

9.1.1 Owner designates the individuals listed below as its Senior Representatives ("Owner's Senior Representatives"), which such individuals have the authority and responsibility for avoiding and resolving disputes under Section 10.2.3 of the General Conditions of Contract:

_____

_____

_____

_____

9.1.2 Owner designates the individual listed below as its Owner's Representative, which individual has the authority and responsibility set forth in Section 3.4 of the General Conditions of Contract: (Identify individual's name, title, address and telephone numbers)

_____
The Willacy County Local Government Corporation
190 North 3rd Street
Courthouse Annex
Raymondville, Texas 78580

9.2 Design-Builder's Representatives

9.2.1 Design-Builder designates the individual listed below as its Senior Representative ("Design-Builder's Senior Representative"), which individual has the authority and responsibility for avoiding and resolving disputes under Section 10.2.3 of the General Conditions of Contract:

Mr. Philip K. Packer
President of HMC Contracting South Texas, L.L.C.
2900 Weslayan, Suite 375
Houston, Texas 77027
(713) 665-1100

9.2.2 Design-Builder designates the individual listed below as its Design-Builder's Representative, which individual has the authority and responsibility set forth in Section 2.1.1 of the General Conditions of Contract:

Mr. Philip K. Packer
President of HMC Contracting South Texas, L.L.C.
2900 Weslayan, Suite 375
Houston, Texas 77027
(713) 665-1100

171620 2068.1                                6

**203**

## Article 10
### Bonds and Insurance

10.1 Insurance. Design-Builder shall procure in accordance with Article 5 of the General Conditions of Contract the insurance coverages set forth in Exhibit C.

10.2 Bonds and Other Performance Security. Design-Builder shall provide the following performance bond and labor and material payment bond or other performance security:

See Exhibit D.

## Article 11
### Other Provisions

11.1 Other provisions, if any, are as follows: (Insert any additional provisions)

    11.1.1    Willacy County, Texas shall be a direct, third party beneficiary of this Agreement and shall be bound by the dispute resolution procedures contained in Article 10 of the General Conditions of the Contract.

In executing this Agreement, Owner and Design-Builder each individually represents that it has the necessary financial resources to fulfill its obligations under this Agreement, and each has the necessary corporate approvals to execute this Agreement, and perform the services described herein.

**OWNER:**
THE WILLACY COUNTY LOCAL
GOVERNMENT CORPORATION

President

Witness:
County Clerk, Willacy
County, Texas

171620 2088.1

**DESIGN-BUILDER:**
HMC CONTRACTING
SOUTH TEXAS, L.L.C.

President





**DBIA**

**DESIGN-BUILD**
**INSTITUTE OF AMERICA**

# STANDARD FORM OF GENERAL CONDITIONS OF CONTRACT BETWEEN OWNER AND DESIGN-BUILDER





# D B I A

**DESIGN-BUILD
INSTITUTE OF AMERICA**

# Standard Form of General Conditions
# of Contract Between Owner and Design-Builder

*This document has been amended and revised from its standard form.*

## Table of Contents

Article 1: General ..........................................................................................................................3

Article 2: Design-Builder's Services and Responsibilities.............................................................3

Article 3: Owner's Services and Responsibilities..........................................................................6

Article 4: Hazardous Conditions and Differing Site Conditions....................................................7

Article 5: Insurance and Bonds.....................................................................................................7

Article 6: Payment.........................................................................................................................8

Article 7: Indemnification.............................................................................................................10

Article 8: Time.............................................................................................................................11

Article 9: Changes to the Contract Price and Time.....................................................................11

Article 10: Contract Adjustments and Disputes . ........................................................................12

Article 11: Stop Work and Termination for Cause ......................................................................13

Article 12: Miscellaneous ...........................................................................................................15

# Article 1

## General

### 1.1 Mutual Obligations

**1.1.1** Owner and Design-Builder commit at all times to cooperate fully with each other, and proceed on the basis of trust and good faith, to permit each party to realize the benefits afforded under the Contract Documents.

### 1.2 Basic Definitions

**1.2.1** *Agreement* refers to the executed contract between Owner and Design-Builder ,DBIA Document No. 525, *Standard Form of Agreement Between Owner and Design-Builder — Lump Sum* (1998 Edition) as amended by the parties.

**1.2.2** *Day* or *Days* shall mean calendar days unless otherwise specifically noted in the Contract Documents.

**1.2.3** *Design Consultant* is a qualified, licensed design professional who is not an employee of Design-Builder, but is retained by Design-Builder, or employed or retained by anyone under contract with Design-Builder or Subcontractor, to furnish design services required under the Contract Documents.

**1.2.4** *Hazardous Conditions* are any materials, wastes, substances and chemicals deemed to be hazardous under applicable Legal Requirements, or the handling, storage, remediation, or disposal of which are regulated by applicable Legal Requirements.

**1.2.5** *General Conditions of Contract* refer to this DBIA Document No. 535, *Standard Form of General Conditions of Contract Between Owner and Design-Builder* (1998 Edition) as amended by the parties.

**1.2.6** *Legal Requirements* are all applicable federal, state and local laws, codes, ordinances, rules, regulations, orders and decrees of any government or quasi-government entity having jurisdiction over the Project or Site, the practices involved in the Project or Site, or any Work.

**1.2.7** (Intentionally Left Blank)

**1.2.8** *Site* is the land or premises on which the Project is located.

**1.2.9** *Subcontractor* is any person or entity retained by Design-Builder as an independent contractor to perform a portion of the Work and shall include materialmen and suppliers.

**1.2.10** *Sub-Subcontractor* is any person or entity retained by a Subcontractor as an independent contractor to perform any portion of a Subcontractor's Work and shall include materialmen and suppliers.

**1.2.11** *Substantial Completion* is the date on which the Work, or an agreed upon portion of the Work, is sufficiently complete so that Owner and/or Operator would be able to use the Project for training and/or operations.

**1.2.12** *Work* is comprised of all Design-Builder's design, construction and other services required by the Contract Documents, including procuring and furnishing all materials, equipment, services and labor reasonably inferable from the Contract Documents.

# Article 2

## Design-Builder's Services and Responsibilities

### 2.1 General Services

**2.1.1** Design-Builder's Representative shall be reasonably available to Owner and shall have the necessary expertise and experience required to supervise the Work. Design-Builder's Representative shall communicate regularly with Owner and shall be vested with the authority to act on behalf of Design-Builder. Design-Builder's Representative may be replaced only with the mutual agreement of Owner and Design-Builder.

**2.1.2** Design-Builder shall provide Owner with a monthly status report detailing the progress of the Work.

### 2.2 Design Professional Services

**2.2.1** Design-Builder shall, consistent with applicable state licensing laws, provide through qualified, licensed design professionals employed by Design-Builder, procured from qualified, independent licensed Design Consultants or from subcontractors/vendors fabricating materials and/or equipment for the Project, the necessary design services, including architectural, engineering and other design professional services, for the preparation of

the required drawings, specifications and other design submittals to permit Design-Builder to complete the Work consistent with the Contract Documents. Nothing in the Contract Documents is intended or deemed to create any legal or contractual relationship between Owner and any Design Consultant.

### 2.3 Standard of Care for Design Professional Services

**2.3.1** The standard of care for all design professional services performed to execute the Work shall be the care and skill ordinarily used by members of the design profession practicing under similar conditions at the same time and locality of the Project.

### 2.4 Design Development Services

**2.4.1** Design-Builder has provided Owner design/conceptual submissions that have been approved by Owner and are attached as Exhibit A to the Agreement.

**2.4.2** Design-Builder may submit to Owner Construction Documents setting forth in greater detail drawings and specifications describing the requirements for construction of the Work. The Construction Documents shall be consistent with the intent defined in the previously approved design submissions identified in the Agreement. Owner acknowledges that the Project will not be designed to meet or comply with any type of State, Federal or voluntary jail or prison design standards that may or may not be applicable to the Project. Design-Builder shall proceed with construction in accordance with the Construction Documents, if any are created.

### 2.5 Legal Requirements

**2.5.1** Design-Builder shall perform the Work in accordance with all Legal Requirements and shall provide all notices applicable to the Work as required by the Legal Requirements.

**2.5.2** The Contract Price and/or Contract Time(s) shall be adjusted to compensate Design-Builder for the effects of any changes in the Legal Requirements enacted after the date of the Agreement affecting the performance of the Work. Such effects may include, without limitation, revisions Design-Builder is required to make to the Construction Documents because of changes in Legal Requirements.

### 2.6 Government Approvals and Permits

**2.6.1** Except as identified in an Owner's Permit List which may be attached as an exhibit to the Agreement, Design-Builder shall obtain and pay for all necessary permits, approvals, licenses, government charges and inspection fees required for the prosecution of the Work by any government or quasi-government entity having jurisdiction over the Project.

**2.6.2** Owner shall provide reasonable assistance to Design-Builder in obtaining those permits, approvals and licenses that are necessary for the design and construction of the Project.

### 2.7 Design-Builder's Construction Phase Services

**2.7.1** Design-Builder shall provide through itself or Subcontractors the necessary supervision, labor, inspection, testing, start-up, material, equipment, machinery, temporary utilities and other temporary facilities to permit Design-Builder to complete construction of the Project consistent with the Contract Documents.

**2.7.2** Design-Builder shall perform all construction activities efficiently and with the requisite expertise, skill and competence to satisfy the requirements of the Contract Documents. Design-Builder shall at all times exercise complete and exclusive control over the means, methods, sequences and techniques of construction.

**2.7.3** Design-Builder shall employ only Subcontractors who are duly licensed and qualified to perform the Work consistent with the Contract Documents.

**2.7.4** Design-Builder assumes responsibility to Owner for the proper performance of the Work of Subcontractors and any acts and omissions in connection with such performance. Nothing in the Contract Documents is intended or deemed to create any legal or contractual relationship between Owner and any Subcontractor or Sub-Subcontractor, including but not limited to any third-party beneficiary rights.

**2.7.5** Design-Builder shall coordinate the activities of all Subcontractors. If Owner performs other work on the Project or at the Site with separate contractors under Owner's control, Design-Builder agrees to reasonably cooperate and coordinate its activities with those of such separate contractors so that the Project can be completed

in an orderly and coordinated manner without unreasonable disruption.

**2.7.6** Design-Builder shall keep the Site reasonably free from debris, trash and construction wastes to permit Design-Builder to perform its construction services efficiently, safely and without interfering with the use of adjacent land areas. Upon Substantial Completion of the Work, or a portion of the Work, Design-Builder shall remove all debris, trash, construction wastes, materials, equipment, machinery and tools arising from the Work or applicable portions thereof to permit Owner to occupy the Project or a portion of the Project for its intended use.

**2.8     Design-Builder's Responsibility for Project Safety**

**2.8.1** Design-Builder recognizes the importance of performing the Work in a safe manner so as to prevent damage, injury or loss to (i) all individuals at the Site, whether working or visiting, (ii) the Work, including materials and equipment incorporated into the Work or stored on-Site or off-Site, and (iii) all other property at the Site or adjacent thereto. Design-Builder assumes responsibility for implementing and monitoring all safety precautions and programs related to the performance of the Work.

**2.8.2** Design-Builder and Subcontractors shall comply with all Legal Requirements relating to safety, as well as any Owner-specific safety requirements set forth in the Contract Documents, provided that such Owner-specific requirements do not violate any applicable Legal Requirement. Design-Builder will immediately report in writing any safety-related injury, loss, damage or accident arising from the Work to Owner's Representative and, to the extent mandated by Legal Requirements, to all government or quasi-government authorities having jurisdiction over safety-related matters involving the Project or the Work.

**2.8.3** Design-Builder's responsibility for safety under this Section 2.8 is not intended in any way to relieve Subcontractors and Sub-Subcontractors of their own contractual and legal obligations and responsibility for (i) complying with all Legal Requirements, including those related to health and safety matters, and (ii) taking all necessary measures to implement and monitor all safety precautions and programs to guard against injury, losses, damages or accidents resulting from their performance of the Work.

**2.9     Design-Builder's Warranty**

**2.9.1** Design-Builder warrants to Owner that the construction, including all materials and equipment furnished as part of the construction, shall be new unless otherwise specified in the Contract Documents, of good quality, in conformance with the Contract Documents and free of defects in materials and workmanship. Design-Builder's warranty obligation excludes defects caused by abuse, alterations, or failure to maintain the Work by persons other than Design-Builder or anyone for whose acts Design-Builder may be liable. Nothing in this warranty is intended to limit any manufacturer's warranty which provides Owner with greater warranty rights than set forth in this Section 2.9 or the Contract Documents. Design-Builder will provide Owner with all manufacturers' warranties upon either Substantial or Final Completion. Where a manufacturer's or third party warranty has been provided to Owner, Owner agrees that Design-Builder will have no further liability with respect to the subject of the manufacturer's or third party warranty and Owner agrees to look solely to such manufacturer or third party for any warranty claim with respect to such items and hereby specifically releases Design-Builder of and from any such claims.

**2.10     Correction of Defective Work**

**2.10.1** Design-Builder agrees to correct any Work that is found to not be in conformance with the Contract Documents, including that part of the Work subject to Section 2.9 hereof, within a period of one year from the date of Substantial Completion of the Work or any portion of the Work, or within such longer period to the extent required by the Contract Documents, provided such work is not the subject of a manufacturers warranty as described in Article 2.9.1 above.

**2.10.2** Design-Builder shall, within seven (7) days of receipt of written notice from Owner that the Work is not in conformance with the Contract Documents, take steps to commence correction of such nonconforming Work, including the correction, removal or replacement of the nonconforming Work and any damage caused to other parts of the Work affected by the nonconforming Work, provided such work is not the subject of a manufacturer's or third party warranty as described in Article 2.9.1 above. If Design-Builder fails to commence the necessary steps within such seven (7) day period, Owner, in addition to any other remedies provided under the Contract Documents, may provide Design-Builder with written notice that Owner will commence correction of such nonconforming Work with its own forces. If Owner does perform such corrective Work, Design-Builder shall

be responsible for all reasonable costs incurred by Owner in performing such correction. If the nonconforming Work creates an emergency requiring an immediate response, the seven (7) day periods identified herein shall be deemed inapplicable.

**2.10.3** The one year period referenced in Section 2.10.1 above applies only to Design-Builder's obligation to correct nonconforming Work not the subject of a manufacturer's or third party warranty and is not intended to constitute a period of limitations for any other rights or remedies Owner may have regarding Design-Builder's other obligations under the Contract Documents.

## Article 3

## Owner's Services and Responsibilities

### 3.1 Duty to Cooperate

**3.1.1** Owner shall, throughout the performance of the Work, cooperate with Design-Builder and perform its responsibilities, obligations and services in a timely manner to facilitate Design-Builder's timely and efficient performance of the Work and so as not to delay or interfere with Design-Builder's performance of its obligations under the Contract Documents.

**3.1.2** If required by this Agreement, Owner shall provide timely reviews and approvals of submissions consistent with the turnaround times set forth in Design-Builder's schedule.

### 3.2 Furnishing of Services and Information

**3.2.1** Owner is responsible for securing and executing all necessary agreements with adjacent land or property owners and any easements that are necessary to enable Design-Builder to perform the Work. Owner is further responsible for all costs, including attorneys' fees, incurred in securing these necessary agreements.

### 3.3 Financial Information

**3.3.1** Design-Builder shall cooperate with the reasonable requirements of Owner's lenders or other financial sources. Notwithstanding the preceding sentence, after execution of the Agreement, Design-Builder shall have no obligation to execute for Owner or Owner's lenders or other financial sources any documents or agreements that require Design-Builder to assume obligations or responsibilities greater than those existing obligations Design-Builder that may exist under the Contract Documents.

### 3.4 Owner's Representative

**3.4.1** Owner's Representative shall be responsible for providing Owner-supplied information and in a timely manner to permit Design-Builder to fulfill its obligations under the Contract Documents. Owner's Representative shall also provide Design-Builder with prompt notice if it observes any failure on the part of Design-Builder to fulfill its contractual obligations, including any errors, omissions or defects in the performance of the Work. Failure to provide such notice to Design-Builder shall constitute a complete waiver of any claims by Owner relating to such matters.

### 3.5 Government Approvals and Permits

**3.5.1** Owner shall provide reasonable assistance to Design-Builder in obtaining those permits, approvals and licenses that are Design-Builder's responsibility.

### 3.6 Owner's Separate Contractors

**3.6.1** Owner is responsible for all work performed on the Project or at the Site by separate contractors under Owner's control. Owner shall contractually require its separate contractors to cooperate with, and coordinate their activities so as not to interfere with, Design-Builder in order to enable Design-Builder to timely complete the Work consistent with the Contract Documents.

### 3.7 Owner's Responsibility for Maintenance

**3.7.1** Owner shall be responsible for maintaining the Work after Final Completion by Design-Builder. Owner warrants and represents to Design-Builder that it will provide all necessary maintenance and upkeep of the structure, systems, equipment and appurtenances furnished and installed by Design-Builder hereunder.

## Article 4

## Hazardous Conditions and Differing Site Conditions

**4.1    Hazardous Conditions**

**4.1.1**    Unless otherwise expressly provided in the Contract Documents to be part of the Work, Design-Builder is not responsible for any Hazardous Conditions encountered at the Site.    Upon encountering any Hazardous Conditions, Design-Builder will stop Work immediately in the affected area and duly notify Owner and, if required by Legal Requirements, all government or quasi-government entities with jurisdiction over the Project or Site.

**4.1.2**    Upon receiving notice of the presence of suspected Hazardous Conditions, Owner shall take the necessary measures required to ensure that the Hazardous Conditions are remediated or rendered harmless. Such necessary measures shall include Owner retaining qualified independent experts to (i) ascertain whether Hazardous Conditions have actually been encountered, and, if they have been encountered, (ii) prescribe the remedial measures that Owner must take either to remove the Hazardous Conditions or render the Hazardous Conditions harmless.

**4.1.3**    Design-Builder shall be obligated to resume Work at the affected area of the Project only after Owner's expert provides it with written certification that (i) the Hazardous Conditions have been removed or rendered harmless and (ii) all necessary approvals have been obtained from all government and quasi-government entities having jurisdiction over the Project or Site.

**4.1.4**    Design-Builder will be entitled, in accordance with these General Conditions of Contract, to an adjustment in its Contract Price and/or Contract Time(s) to the extent Design-Builder's cost and/or time of performance have been adversely impacted by the presence of Hazardous Conditions.

**4.1.5**    TO THE FULLEST EXTENT PERMITTED BY LAW, OWNER SHALL INDEMNIFY, DEFEND AND HOLD HARMLESS DESIGN-BUILDER, DESIGN CONSULTANTS, SUBCONTRACTORS, ANYONE EMPLOYED DIRECTLY OR INDIRECTLY FOR ANY OF THEM, AND THEIR OFFICERS, DIRECTORS, EMPLOYEES AND AGENTS, FROM AND AGAINST ANY AND ALL CLAIMS, LOSSES, DAMAGES, LIABILITIES AND EXPENSES, INCLUDING ATTORNEYS' FEES AND EXPENSES, ARISING OUT OF OR RESULTING FROM THE PRESENCE, REMOVAL OR REMEDIATION OF HAZARDOUS CONDITIONS AT THE SITE.

**4.1.6**    Notwithstanding the preceding provisions of this Section 4.1, Owner is not responsible for Hazardous Conditions introduced to the Site by Design-Builder, Subcontractors or anyone for whose acts they may be liable.    DESIGN-BUILDER SHALL INDEMNIFY, DEFEND AND HOLD HARMLESS OWNER AND OWNER'S OFFICERS, DIRECTORS, EMPLOYEES AND AGENTS FROM AND AGAINST ALL CLAIMS, LOSSES, DAMAGES, LIABILITIES AND EXPENSES, INCLUDING ATTORNEYS' FEES AND EXPENSES, ARISING OUT OF OR RESULTING FROM THOSE HAZARDOUS CONDITIONS INTRODUCED TO THE SITE BY DESIGN-BUILDER, SUBCONTRACTORS OR ANYONE FOR WHOSE ACTS THEY MAY BE LIABLE.

**4.2    Differing Site Conditions**

**4.2.1**    Concealed or latent physical conditions or subsurface conditions at the Site that (i) materially differ from the conditions indicated in the Contract Documents or (ii) are of an unusual nature, differing materially from the conditions ordinarily encountered and generally recognized as inherent in the Work are collectively referred to herein as "Differing Site Conditions." If Design-Builder encounters a Differing Site Condition, Design-Builder will be entitled to an adjustment in the Contract Price and/or Contract Time(s) to the extent Design-Builder's cost and/or time of performance are adversely impacted by the Differing Site Condition.

**4.2.2**    Upon encountering a Differing Site Condition, Design-Builder shall provide prompt written notice to Owner of such condition, which notice shall not be later than fourteen (14) days after such condition has been encountered.    Design-Builder shall, to the extent reasonably possible, provide such notice before the Differing Site Condition has been substantially disturbed or altered.

## Article 5

## Insurance and Bonds

**5.1    Design-Builder's Insurance Requirements**

**5.1.1**    Design-Builder is responsible for procuring and maintaining from insurance companies authorized to do

business in the state in which the Project is located, the insurance coverages set forth in the attached Exhibit C.

**5.1.2** Design-Builder's liability insurance set forth in Exhibit C shall specifically delete any design-build or similar exclusions that could compromise coverages because of the design-build delivery of the Project.

**5.1.4** To the extent Owner requires Design-Builder or any Design Consultant to provide professional liability insurance for claims arising from the negligent performance of design services by Design-Builder or the Design Consultant, the coverage limits, duration and other specifics of such insurance shall be as set forth in the Agreement. Any professional liability policy shall specifically delete any design-build or similar exclusions that could compromise coverages because of the design-build delivery of the Project. Such policies shall be provided prior to the commencement of any design services hereunder.

**5.1.5** Prior to commencing any construction services hereunder, Design-Builder shall provide Owner with certificates evidencing that (i) all insurance obligations required by the Contract Documents are in full force and in effect and will remain in effect for the duration required by the Contract Documents and (ii) no insurance coverage will be canceled, renewal refused, or materially changed unless at least thirty (30) days prior written notice is given to Owner.

**5.2 Owner's Liability Insurance**

**5.2.1** Owner shall procure and maintain from insurance companies authorized to do business in the state in which the Project is located such liability insurance to protect Owner from claims which may arise from the performance of Owner's obligations under the Contract Documents or Owner's conduct during the course of the Project.

**5.3 Property Insurance**

**5.3.1** Unless otherwise provided in the Contract Documents, Design-Builder shall procure and maintain from insurance companies authorized to do business in the state in which the Project is located property insurance upon the entire Project to the full insurable value of the Project, including professional fees, overtime premiums and all other expenses incurred to replace or repair the insured property. The property insurance obtained by Design-Builder shall include as additional insureds the interests of Owner, Design Consultants,

Subcontractors and Sub-Subcontractors, and shall insure against the perils of fire and extended coverage, theft, vandalism, malicious mischief, collapse, flood, earthquake, debris removal and other perils or causes of loss as called for in the Contract Documents. The property insurance shall include physical loss or damage to the Work, including materials and equipment in transit, at the Site or at another location as may be indicated in Design-Builder's Application for Payment and approved by Owner.

**5.3.2** Owner and Design-Builder waive against each other and Owner's separate contractors, Design Consultants, Subcontractors, agents and employees of each and all of them, all damages covered by property insurance provided herein, except such rights as they may have to the proceeds of such insurance. Design-Builder and Owner shall, where appropriate, require similar waivers of subrogation from Owner's separate contractors, Design Consultants and Subcontractors and shall require each of them to include similar waivers in their contracts.

**5.4 Bonds and Other Performance Security**

**5.4.1** Copies of the performance and payment bonds for the Project are attached as Exhibit D to the Standard Form of Agreement Between Owner and Design-Builder – Lump Sum. The owner acknowledges that the surety on such bonds (and the Design-Builder) shall not be liable or responsible in any way for the items, or the reimbursement of items, set forth in the Initial Application for Payment as described in Article 6.2.1 below.

# Article 6

# Payment

**6.1 Applications for Payment**

**6.1.1** The proposed Application for Payments are attached to the Agreement. Design-Builder shall submit for Owner's review its Application for Payment. The Applications shall be paid in accordance with the terms of the Agreement.

**6.2 Initial Application for Payment**

**6.2.1** Design-Builder's Initial Application for Payment will include funds for disbursements to third parties for land acquisition, all pre-construction development costs and fees, insurance, bond fees, travel and legal expense

reimbursement, design consultant and pre-development fees. Design-Builder is performing this function at the request of Owner and has not participated in the negotiation or creation of these obligations and, therefore, does not assume, and express disclaims, any liability or warranty obligations with respect to such activities. This Initial Application for Payment will be paid at the financial closing of the transaction for the Project.

### 6.3 Disputes over Payments

**6.3.1** On or before the date established in the Agreement, Owner shall pay Design-Builder all amounts properly due. If Owner determines that Design-Builder is not entitled to all or part of an Application for Payment, it will notify Design-Builder in writing at least five (5) days prior to the date payment is due. The notice shall indicate the specific amounts Owner disputes, the reasons and contractual basis for such disputes, and the specific measures Design-Builder may take to rectify Owner's concerns. Design-Builder and Owner will attempt to resolve Owner's concerns prior to the date payment is due. If the parties cannot resolve such concerns, Owner must pay Design-Builder and Owner may pursue its rights under the Contract Documents, including those under Article 10 hereof.

### 6.4 Right to Stop Work and Interest

**6.4.1** If Owner fails to pay Design-Builder any amount that becomes due, Design-Builder, in addition to all other remedies provided in the Contract Documents, may stop Work pursuant to Section 11.3 hereof. All payments due and unpaid shall bear interest at the rate set forth in the Agreement.

### 6.5 Design-Builder's Payment Obligations

**6.5.1** Design-Builder will pay Design Consultants and Subcontractors in accordance with its contractual obligations to such parties. Design-Builder will impose similar requirements on Design Consultants and Subcontractors to pay those parties with whom they have contracted. Design-Builder will indemnify and defend Owner against any claims for payment and mechanic's liens as set forth in Section 7.3 hereof.

### 6.6 Substantial Completion

**6.6.1** Design-Builder shall notify Owner when it believes the Work, or to the extent permitted in the Contract Documents, a portion of the Work, is substantially complete. Within five (5) days of Owner's receipt of Design-Builder's notice, Design-Builder shall prepare and issue a Certificate of Substantial Completion that will set forth (i) the date of Substantial Completion of the Work or portion thereof, (ii) provisions (to the extent not already provided in the Contract Documents) establishing Owner's and Design-Builder's responsibility for the Project's security, maintenance, utilities and insurance pending final payment and (iii) an acknowledgment that warranties commence to run on the date of Substantial Completion, except as may otherwise be noted in the Certificate of Substantial Completion.

**6.6.2** Owner, at its option, may use a portion of the Work which has been determined to be substantially complete, provided, however, that (i) a Certificate of Substantial Completion has been issued for the portion of Work addressing the items set forth in Section 6.6.1 above, (ii) Design-Builder and Owner have obtained the consent of their sureties and insurers, and to the extent applicable, the appropriate government authorities having jurisdiction over the Project, and (iii) Owner and Design-Builder agree that Owner's use or occupancy will not interfere with Design-Builder's completion of the remaining Work.

### 6.7 Final Payment

**6.7.1** At the time of submission of its Final Application for Payment, Design-Builder shall provide the following information:

.1 (intentionally left blank);

.2 a general release executed by Design-Builder waiving, upon receipt of final payment by Design-Builder, all claims, except those claims previously made in writing to Owner and remaining unsettled at the time of final payment;

.3 consent of Design-Builder's surety, if any, to final payment;

.4 all operating manuals, warranties and other deliverables required by the Contract Documents; and

.5 certificates of insurance confirming that required coverages will remain in effect consistent with the requirements of the Contract Documents.

6.7.2 Upon making final payment, Owner waives all claims against Design-Builder except claims relating to (i) Design-Builder's failure to satisfy its payment obligations, if such failure affects Owner's interests, (ii) Design-Builder's failure to complete the Work consistent with the Contract Documents, including defects appearing after Substantial Completion and (iii) the terms of any special warranties required by the Contract Documents, specifically excluding manufacturers' warranties.

# Article 7

## Indemnification

### 7.1    Patent and Copyright Infringement

7.1.1    Design-Builder shall defend any action or proceeding brought against Owner based on any claim that the Work, or any part thereof, or the operation or use of the Work or any part thereof, constitutes infringement of any United States patent or copyright, now or hereafter issued.    Owner shall give prompt written notice to Design-Builder of any such action or proceeding and will reasonably provide authority, information and assistance in the defense of same.    Design-Builder shall indemnify and hold harmless Owner from and against all damages and costs, including but not limited to attorneys' fees and expenses awarded against Owner or Design-Builder in any such action or proceeding.    Design-Builder agrees to keep Owner informed of all developments in the defense of such actions.

7.1.2    If Owner is enjoined from the operation or use of the Work, or any part thereof, as the result of any patent or copyright suit, claim, or proceeding, Design-Builder shall at its sole expense take reasonable steps to procure the right to operate or use the Work.  If Design-Builder cannot so procure such right within a reasonable time, Design-Builder shall promptly, at Design-Builder's option and at Design-Builder's expense, (i) modify the Work so as to avoid infringement of any such patent or copyright or (ii) replace said Work with Work that does not infringe or violate any such patent or copyright.

7.1.3    Sections 7.1.1 and 7.1.2 above shall not be applicable to any suit, claim or proceeding based on infringement or violation of a patent or copyright (i)

relating solely to a particular process or product of a particular manufacturer specified by Owner and not offered or recommended by Design-Builder to Owner or (ii) arising from modifications to the Work by Owner or its agents after acceptance of the Work. If the suit, claim or proceeding is based upon events set forth in the preceding sentence, Owner shall defend, indemnify and hold harmless Design-Builder to the same extent Design-Builder is obligated to defend, indemnify and hold harmless Owner in Section 7.1.1 above.

7.1.4    The obligations set forth in this Section 7.1 shall constitute the sole agreement between the parties relating to liability for infringement of violation of any patent or copyright.

### 7.2    Tax Claim Indemnification

7.2.1    If, in accordance with Owner's direction, an exemption for all or part of the Work is claimed for taxes, Owner shall indemnify, defend and hold harmless Design-Builder from and against any liability, penalty, interest, fine, tax assessment, attorneys' fees or other expenses or costs incurred by Design-Builder as a result of any action taken by Design-Builder in accordance with Owner's directive.

### 7.3    Payment Claim Indemnification

7.3.1    Providing that Owner is not in breach of its contractual obligation to make payments to Design-Builder for the Work, Design-Builder shall indemnify, defend and hold harmless Owner from any claims or mechanic's liens brought against Owner or against the Project as a result of the failure of Design-Builder, or those for whose acts it is responsible, to pay for any services, materials, labor, equipment, taxes or other items or obligations furnished or incurred for or in connection with the Work. Within three (3) days of receiving written notice from Owner that such a claim or mechanic's lien has been filed, Design-Builder shall commence to take the steps necessary to discharge said claim or lien, including, if necessary, the furnishing of a mechanic's lien bond.

### 7.4    Design-Builder's General Indemnification

7.4.1    Design-Builder, to the fullest extent permitted by law, shall indemnify, hold harmless and defend Owner, its officers, directors, employees and agents from and against claims, losses, damages, liabilities, including attorneys' fees and expenses, for bodily injury, sickness or death, and property damage or destruction (other than

to the Work itself) to the extent resulting from the negligent acts or omissions of Design-Builder, Design Consultants, Subcontractors, anyone employed directly or indirectly by any of them or anyone for whose acts any of them may be liable.

**7.4.2** If an employee of Design-Builder, Design Consultants, Subcontractors, anyone employed directly or indirectly by any of them or anyone for whose acts any of them may be liable has a claim against Owner, its officers, directors, employees, or agents, Design-Builder's indemnity obligation set forth in Section 7.4.1 above shall not be limited by any limitation on the amount of damages, compensation or benefits payable by or for Design-Builder, Design Consultants, Subcontractors, or other entity under any employee benefit acts, including workers' compensation or disability acts.

**7.5** **Owner's General Indemnification**

**7.5.1** Owner, to the fullest extent permitted by law, shall indemnify, hold harmless and defend Design-Builder and any of Design-Builder's officers, directors, employees, or agents from and against claims, losses, damages, liabilities, including attorneys' fees and expenses, for bodily injury, sickness or death, and property damage or destruction (other than to the Work itself) to the extent resulting from the negligent acts or omissions of Owner, Owner's separate contractors or anyone for whose acts any of them may be liable.

## Article 8

## Time

**8.1** **Obligation to Achieve the Contract Times**

**8.1.1** Design-Builder agrees that it will commence performance of the Work and achieve the Contract Time(s) in accordance with Article 5 of the Agreement.

**8.2** **Delays to the Work**

**8.2.1** If Design-Builder is delayed in the performance of the Work due to acts, omissions, conditions, events, or circumstances beyond its control and due to no fault of its own or those for whom Design-Builder is responsible, the Contract Time(s) for performance shall be reasonably extended by Change Order. By way of example, events that will entitle Design-Builder to an extension of the Contract Time(s) include acts or omissions of Owner or anyone under Owner's control (including separate

contractors), changes in the Work, unavailability of materials/equipment at the price contemplated by Design-Builder when establishing the Contract Price, Differing Site Conditions, Hazardous Conditions, wars, floods, labor disputes, unusual delay in transportation, epidemics abroad, earthquakes, adverse weather conditions not reasonably anticipated, and other acts of God.

**8.2.2** In addition to Design-Builder's right to a time extension for those events set forth in Section 8.2.1 above, Design-Builder shall also be entitled to an appropriate adjustment of the Contract Price.

## Article 9

## Changes to the Contract Price and Time

**9.1** **Change Orders**

**9.1.1** A Change Order is a written instrument issued after execution of the Agreement signed by Owner and Design-Builder, stating their agreement upon all of the following:

　.1　The scope of the change in the Work;

　.2　The amount of the adjustment to the Contract Price; and

　.3　The extent of the adjustment to the Contract Time(s).

**9.1.2** All changes in the Work authorized by applicable Change Order shall be performed under the applicable conditions of the Contract Documents, provided that Owner covenants to Design-Builder that it has sufficient funds to pay for any changes in the Work. Owner and Design-Builder shall negotiate in good faith and as expeditiously as possible the appropriate adjustments for such changes.

**9.1.3** If Owner requests a proposal for a change in the Work from Design-Builder and subsequently elects not to proceed with the change, a Change Order shall be issued to reimburse Design-Builder for reasonable costs incurred for estimating services, design services and services involved in the preparation of proposed revisions to the Contract Documents.

**9.2** **(Intentionally left blank)**

### 9.3 Minor Changes in the Work

**9.3.1** Minor changes in the Work do not involve an adjustment in the Contract Price and/or Contract Time(s) and do not materially and adversely affect the Work, including the design, quality, performance and workmanship required by the Contract Documents. Design-Builder may make minor changes in the Work consistent with the intent of the Contract Documents, provided, however that Design-Builder shall record such changes on the documents maintained by Design-Builder.

### 9.4 Contract Price Adjustments

**9.4.1** The increase or decrease in Contract Price resulting from a change in the Work shall be determined by the agreement between Owner and Design-Builder.

### 9.5 Emergencies

**9.5.1** In any emergency affecting the safety of persons and/or property, Design-Builder shall act, at its discretion, to prevent threatened damage, injury or loss. Any change in the Contract Price and/or Contract Time(s) on account of emergency work shall be determined as provided in this Article 9.

# Article 10
# Contract Adjustments and Disputes

### 10.1 Requests for Contract Adjustments and Relief

**10.1.1** If either Design-Builder or Owner believes that it is entitled to relief against the other for any event arising out of or related to the Work or Project, such party shall provide written notice to the other party of the basis for its claim for relief. Such notice shall, if possible, be made prior to incurring any cost or expense and in accordance with any specific notice requirements contained in applicable sections of these General Conditions of Contract. In the absence of any specific notice requirement, written notice shall be given within a reasonable time, not to exceed twenty-one (21) days, after the occurrence giving rise to the claim for relief or after the claiming party reasonably should have recognized the event or condition giving rise to the request, whichever is later. Such notice shall include sufficient information to advise the other party of the circumstances giving rise to the claim for relief, the specific contractual adjustment or relief requested and the basis of such request.

### 10.2 Dispute Avoidance and Resolution

**10.2.1** The parties are fully committed to working with each other throughout the Project and agree to communicate regularly with each other at all times so as to avoid or minimize disputes or disagreements. If disputes or disagreements do arise, Design-Builder and Owner each commit to resolving such disputes or disagreements in an amicable, professional and expeditious manner so as to avoid unnecessary losses, delays and disruptions to the Work.

**10.2.2** Design-Builder and Owner will first attempt to resolve disputes or disagreements at the field level through discussions between Design-Builder's Representative and Owner's Representative.

**10.2.3** If a dispute or disagreement cannot be resolved through Design-Builder's Representative and Owner's Representative, Design-Builder's Senior Representative and Owner's Senior Representative, upon the request of either party, shall meet as soon as conveniently possible, but in no case later than thirty (30) days after such a request is made, to attempt to resolve such dispute or disagreement. Prior to any meetings between the Senior Representatives, the parties will exchange relevant information that will assist the parties in resolving their dispute or disagreement.

**10.2.4** If after meeting the Senior Representatives determine that the dispute or disagreement cannot be resolved on terms satisfactory to both parties, the parties shall submit the dispute or disagreement to non-binding mediation. The mediation shall be conducted by a mutually agreeable impartial mediator, or if the parties cannot so agree, a mediator designated by the American Arbitration Association ("AAA") pursuant to its Construction Industry Mediation Rules. The mediation will be governed by and conducted pursuant to a mediation agreement negotiated by the parties or, if the parties cannot so agree, by procedures established by the mediator. The local of the mediation shall be conducted in Houston, Texas.

### 10.3 Arbitration

**10.3.1** Any claims, disputes or controversies between the parties arising out of or relating to the Agreement, or the breach thereof, the Project or any transaction or occurrence arising out of or relating to the Agreement and/or the Project which have not been resolved in accordance with the procedures set forth in Section 10.2 above shall be decided by arbitration in accordance with

the Construction Industry Arbitration Rules of the AAA then in effect, unless the parties mutually agree otherwise.. The hearing locale shall be in Houston, Texas.

**10.3.2** The award of the arbitrator(s) shall be final and binding upon the parties without the right of appeal to the courts. Judgment may be entered upon it in accordance with applicable law by any court having jurisdiction thereof. The parties stipulate and agree that the Project involves interstate commerce and this Agreement shall be governed by the Federal Arbitration Act.

**10.3.3** Design-Builder and Owner expressly agree that any arbitration pursuant to this Section 10.3 may be joined or consolidated with any arbitration involving any other person or entity (i) necessary to resolve the claim, dispute or controversy, or (ii) substantially involved in or affected by such claim, dispute or controversy. Both Design-Builder and Owner will include appropriate provisions in all contracts they execute with other parties in connection with the Project to require such joinder or consolidation.

**10.3.4** The prevailing party in any arbitration, or any other final, binding dispute proceeding upon which the parties may agree, shall be entitled to recover from the other party reasonable attorneys' fees and expenses incurred by the prevailing party.

**10.4    Duty to Continue Performance**

**10.4.1** Unless provided to the contrary in the Contract Documents, Design-Builder shall continue to perform the Work and Owner shall continue to satisfy its payment obligations to Design-Builder, pending the final resolution of any dispute or disagreement between Design-Builder and Owner.

**10.5    CONSEQUENTIAL DAMAGES**

**10.5.1** NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY (EXCEPT AS SET FORTH IN SECTION 10.5.2 BELOW), NEITHER DESIGN-BUILDER NOR OWNER SHALL BE LIABLE TO THE OTHER FOR ANY CONSEQUENTIAL LOSSES OR DAMAGES, WHETHER ARISING IN CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR OTHERWISE, INCLUDING BUT NOT LIMITED TO LOSSES OF USE, PROFITS, BUSINESS, REPUTATION OR FINANCING.

**10.5.2** The consequential damages limitation set forth in Section 10.5.1 above is not intended to affect the payment of liquidated damages, if any, set forth in Article 5 of the Agreement, which both parties recognize has been established, in part, to reimburse Owner for some damages that might otherwise be deemed to be consequential.

## Article 11

## Stop Work and Termination for Cause

**11.1    Owner's Right to Stop Work**

**11.1.1** Owner may, without cause and for its convenience, order Design-Builder in writing to stop and suspend the Work. Such suspension shall not exceed sixty (60) consecutive days or aggregate more than ninety (90) days during the duration of the Project.

**11.1.2** Design-Builder is entitled to seek an adjustment of the Contract Price and/or Contract Time(s) if its cost or time to perform the Work has been adversely impacted by any suspension of stoppage of work by Owner.

**11.2    Owner's Right to Perform and Terminate for Cause**

**11.2.1** If Design-Builder persistently fails to (i) provide a sufficient number of skilled workers, (ii) supply the materials required by the Contract Documents, (iii) comply with applicable Legal Requirements, (iv) timely pay, without cause, Design Consultants or Subcontractors, (v) prosecute the Work with promptness and diligence to ensure that the Work is completed by the Contract Time(s), as such times may be adjusted, or (vi) perform material obligations under the Contract Documents during the performance of the Work, then Owner, in addition to any other rights and remedies provided in the Contract Documents, shall have the rights set forth in Sections 11.2.2 and 11.2.3 below.

**11.2.2** Upon the occurrence of an event set forth in Section 11.2.1 above, Owner may provide written notice to Design-Builder that it intends to terminate the Agreement unless the problem cited is cured, or commenced to be cured, within seven (7) days of Design-Builder's receipt of such notice. If Design-Builder fails to cure, or reasonably commence to cure, such problem, then Owner may give a second written notice to Design-Builder of its intent to terminate within an additional seven (7) day period. If Design-Builder, within such second seven (7) day period, fails to cure, or reasonably

commence to cure, such problem, then Owner may declare the Agreement terminated for default by providing written notice to Design-Builder of such declaration and after obtaining written approval from the Trustee of the same, which shall be an express condition precedent to terminating this agreement for default.

**11.2.3** Upon declaring the Agreement terminated pursuant to Section 11.2.2 above, Owner may enter upon the premises and take possession, for the purpose of completing the Work, of all materials, equipment, scaffolds, tools, appliances and other items thereon, which have been purchased or provided for the performance of the Work and paid for by Owner, all of which Design-Builder hereby transfers, assigns and sets over to Owner for such purpose, and to employ any person or persons to complete the Work and provide all of the required labor, services, materials, equipment and other items. In the event of such termination, Design-Builder shall not be entitled to receive any further payments under the Contract Documents until the Work shall be finally completed in accordance with the Contract Documents. At such time, if the unpaid balance of the Contract Price exceeds the cost and expense incurred by Owner in completing the Work, such excess shall be paid by Owner to Design-Builder. If Owner's cost and expense of completing the Work exceeds the unpaid balance of the Contract Price, then Design-Builder shall be obligated to pay the difference to Owner. Such costs and expense shall include not only the cost of completing the Work, but also losses, damages, costs and expense, including attorneys' fees and expenses, incurred by Owner in connection with the reprocurement and defense of claims arising from Design-Builder's default, subject to the waiver of consequential damages set forth in Section 10.5 hereof.

## 11.3    Design-Builder's    Right    to    Stop Work/Terminate

**11.3.1** Design-Builder may, in addition to any other rights afforded under the Contract Documents or at law, stop work for the following reasons:

.1    Owner's failure to provide financial assurances as required under Section 3.3 hereof; or

.2    Failure to pay Design-Builder's Application(s) for Payment.

**11.3.2** Should any of the events set forth in Section 11.3.1 above occur, Design-Builder has the right to

provide Owner with written notice that Design-Builder will stop work and terminate the Agreement unless said event is cured within seven (7) days from Owner's receipt of Design-Builder's notice. If Owner does not cure the problem within such seven (7) day period, Design-Builder may stop work and/or terminate the Agreement for cause pursuant to 11.4 below. If Design-Builder only stops work, Design-Builder shall be entitled to make a claim for adjustment to the Contract Price and Contract Time(s) to the extent it has been adversely impacted by such stoppage.

## 11.4    Design-Builder's Right to Terminate for Cause

**11.4.1** Design-Builder, in addition to any other rights and remedies provided in the Contract Documents or by law, may terminate the Agreement for cause for the following reasons:

.1    The Work has been stopped for sixty (60) consecutive days, or more than ninety (90) days during the duration of the Project, because of court order, any government authority having jurisdiction over the Work, or orders by Owner under Section 11.1.1 hereof, provided that such stoppages are not due to the acts or omissions of Design-Builder or anyone for whose acts Design-Builder may be responsible.

.2    Owner's failure to provide Design-Builder with any information, permits or approvals that are Owner's responsibility under the Contract Documents which result in the Work being stopped for sixty (60) consecutive days, or more than ninety (90) days during the duration of the Project, even though Owner has not ordered Design-Builder in writing to stop and suspend the Work pursuant to Section 11.1.1 hereof.

.3    Owner's failure to cure the problems set forth in Section 11.3.1 above after Design-Builder has stopped the Work.

**11.4.2** Upon the occurrence of an event set forth in Section 11.4.1 above, Design-Builder may provide written notice to Owner that it intends to terminate the Agreement unless the problem cited is cured, or commenced to be cured, within seven (7) days of

Owner's receipt of such notice, or notice has already been provided to Owner under Article 11.3. If Owner fails to cure, or reasonably commence to cure, such problem, then Design-Builder may declare the Agreement terminated for default by providing written notice to Owner of such declaration. In such case, Design-Builder shall be entitled to recover all damages arising out of or resulting from such termination.

**11.5    Bankruptcy of Owner or Design-Builder**

11.5.1    If either Owner or Design-Builder institutes or has instituted against it a case under the United States Bankruptcy Code (such party being referred to as the "Bankrupt Party"), such event may impair or frustrate the Bankrupt Party's ability to perform its obligations under the Contract Documents. Accordingly, should such event occur:

.1    The Bankrupt Party, its trustee or other successor, shall furnish, upon request of the non-Bankrupt Party, adequate assurance of the ability of the Bankrupt Party to perform all future material obligations under the Contract Documents, which assurances shall be provided within ten (10) days after receiving notice of the request; and

.2    The Bankrupt Party shall file an appropriate action within the bankruptcy court to seek assumption or rejection of the Agreement within sixty (60) days of the institution of the bankruptcy filing and shall diligently prosecute such action.

If the Bankrupt Party fails to comply with its foregoing obligations, the non-Bankrupt Party shall be entitled to request the bankruptcy court to reject the Agreement, declare the Agreement terminated and pursue any other recourse available to the non-Bankrupt Party under this Article 11.

11.5.2    The rights and remedies under Section 11.5.1 above shall not be deemed to limit the ability of the non-Bankrupt Party to seek any other rights and remedies provided by the Contract Documents or by law, including its ability to seek relief from any automatic stays under the United States Bankruptcy Code or the right of Design-Builder to stop Work under any applicable provision of these General Conditions of Contract.

## Article 12

### Miscellaneous

**12.1    Assignment**

12.1.1    Neither Design-Builder nor Owner shall, without the written consent of the other assign, transfer or sublet any portion or part of the Work or the obligations required by the Contract Documents.

**12.2    Successorship**

12.2.1    Design-Builder and Owner intend that the provisions of the Contract Documents are binding upon the parties, their employees, agents, heirs, successors and assigns.

**12.3    Governing Law**

12.3.1    The Agreement and all Contract Documents shall be governed by the laws of the place of the Project, without giving effect to its conflict of law principles.

**12.4    Severability**

12.4.1    If any provision or any part of a provision of the Contract Documents shall be finally determined to be superseded, invalid, illegal, or otherwise unenforceable pursuant to any applicable Legal Requirements, such determination shall not impair or otherwise affect the validity, legality, or enforceability of the remaining provision or parts of the provision of the Contract Documents, which shall remain in full force and effect as if the unenforceable provision or part were deleted.

**12.5    No Waiver**

12.5.1    The failure of either Design-Builder or Owner to insist, in any one or more instances, on the performance of any of the obligations required by the other under the Contract Documents shall not be construed as a waiver or relinquishment of such obligation or right with respect to future performance.

**12.6    Headings**

12.6.1    The headings used in these General Conditions of Contract, or any other Contract Document, are for ease of reference only and shall not in any way be construed to limit or alter the meaning of any provision.

**12.7    Notice**

**12.7.1** Whenever the Contract Documents require that notice be provided to the other party, notice will be deemed to have been validly given (i) if delivered in person to the individual intended to receive such notice, (ii) four (4) days after being sent by registered or certified mail, postage prepaid to the address indicated in the Agreement or (iii) if transmitted by facsimile, by the time stated in a machine generated confirmation that notice was received at the facsimile number of the intended recipient.

**12.8    Amendments**

**12.8.1** The Contract Documents may not be changed, altered, or amended in any way except in writing signed by a duly authorized representative of each party.

EXHIBIT A
PROJECT DESCRIPTION

The original 2006 Project consists of a 2000-bed, low security adult detention facility, constructed in two phases, including ten housing structures and a support building. The work under this Agreement consists of an addition to and remodel of the existing Administration Building, a new 1,086 Detainee Housing Building, a new Administration/Maintenance Building and a new enclosed Recreation Building. The expansion of the existing facility is located on the original 54 acres. The entire facility is surrounded by a double security fence and perimeter patrol road. Additional vehicle parking has been provided to accommodate the additional staff. The facility is designed to comply with applicable local, state and national codes. Public utilities are available and of the appropriate capacities to accommodate the detainees and facility staff.

The existing Administration Building is approximately 41,000 square feet and will be expanded by 21,286 square feet. The Facility Operator's offices will be relocated from the existing Administration Building to the new Administration/Maintenance Building. This building will be extensively remodeled to accommodate expanded general office space needs that will initially be utilized by the ICE Office of Detention and Removal (DRO), the Office of Principle Legal Advisor (OPLA), the Executive Office for Immigration Review (EOIR), which is the judicial portion of the facility, and Public Health Services (PHS), which is the health care portion of the facility. Each of these areas contains offices, office cubicles, storage, support spaces, conference rooms, multi-purpose rooms, courtrooms, restrooms, etc. Detainee intake and processing, detainee visitation and the vehicular sally port are part of the original Administration Building. The ceiling in the Administration Building is acoustical ceiling tile or gypsum board; the partitions are either gypsum board or concrete masonry units. The floors in the Administration Building are carpet, vinyl composition tile or sealed concrete. Plumbing fixtures, hardware, doors, windows and finishes are commercial grade. The Administration Building is an engineered steel structure with a pre-engineered metal roof.

The new Detainee Housing Building is approximately 130,960 square feet and contains (43) 2-bed separation cells, and (20) 50-person dormitories. The kitchen and laundry are also located in this building. The kitchen and laundry are fully equipped with the appropriate equipment and food storage areas to accommodate food preparation and laundry processing for 3,300 detainees/staff. Inmate dining, law library, urgent care, tele-health, tele-medicine, exam room, ICE offices, operator offices, multipurpose rooms, staff restrooms, mechanical, electrical, unit storage and exterior inmate recreation are all included in the Detainee Housing Building. The control room located in this building controls all the electro/mechanical security hardware, CCTV and monitors in this building. The ceilings in the separation cells are concrete, the Dormitories are exposed to structure and the corridors and support areas are acoustical ceiling tile. The floors are either vinyl composition tile or sealed concrete. The walls in the detainee areas are structurally grouted, reinforced concrete masonry units with gypsum wall board from 12' AFF to underside of structure or concrete panels. The plumbing fixtures in the separation cells are security stainless steel fixtures. The plumbing fixtures in the dormitories and support areas are vitreous china. The doors in the secure area are security hollow metal and the door hardware is detention grade hardware. The doors in the support areas are commercial hollow

171620 2068.1



**221**

metal with commercial hardware. The Detainee Housing Building exterior walls are concrete tilt up panels and the roof is standing seam metal.

The new Administration/Maintenance Building is approximately 27,350 square feet. The Administration portion contains the necessary offices, office cubicles, storage, support spaces, conference rooms, multi-purpose rooms, workout room, property storage, locker rooms, restrooms, etc. for the Facility Operator. The ceiling in the Administration portion is acoustical ceiling tile, gypsum board or exposed to structure, the partitions are either gypsum board or concrete masonry units. The floors in the Administration portion are carpet, vinyl composition tile or sealed concrete. Plumbing fixtures, hardware, doors, windows and finishes are commercial grade.

The Maintenance portion of the Administration/Maintenance Building contains an office, tool storage, property storage, restrooms, and armories. The ceiling in the Maintenance portion is either exposed to structure, acoustical ceiling tile or security gypsum board, the partitions are either gypsum wall board or concrete masonry units. The floors are carpet, vinyl composition tile or sealed concrete. Plumbing fixtures, hardware and finishes are typical commercial grade in the office areas and security type in the armories. The Administration/Maintenance Building is an engineered steel structure with a pre-engineered metal roof.

The new enclosed Recreation Building is approximately 18,750 square feet. It contains (2) recreation areas, restrooms, library, offices and supply storage. The ceiling is exposed to structure in the recreation area and acoustical ceiling tile in the other areas. The partitions are either metal panel or gypsum board. The floors are either vinyl composition tile or sealed concrete. The enclosed Recreation Building is an engineered steel structure with pre-engineered metal roof.

## EXHIBIT B
## PAY APPLICATIONS AND REQUISITIONS

171620 2068.1



EXHIBIT C
CERTIFICATES OF LIABILITY INSURANCE

171620 2068.1

224

# ACORD. CERTIFICATE OF LIABILITY INSURANCE

**OP ID CH**
**3-HAZEM**

**DATE (MM/DD/YY)**
08/24/07

| PRODUCER | |
|---|---|
| The Transportation Group, Ltd.<br>11111 Wilcrest Green, #325<br>Houston TX 77042<br>Phone: 713-785-6785  Fax: 713-785-8785 | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW |

| INSURERS AFFORDING COVERAGE | NAIC # |
|---|---|
| INSURER A  Interstate Fire & Casualty | |
| INSURER B  Westchester Surplus Lines Ins | |
| INSURER C  Zurich American Insurance Co. | |
| INSURER D | |
| INSURER E | |

**INSURED**
HMC Contracting South
Texas, L.L.C.
Attn:  Phil Packer
2900 Weslayan, Suite 375
Houston TX 77027

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| A | X | **GENERAL LIABILITY**<br>X COMMERCIAL GENERAL LIABILITY<br>CLAIMS MADE  X OCCUR | DGL1000044 | 08/01/07 | 08/01/08 | EACH OCCURRENCE | $1,000,000. |
| | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $50,000. |
| | | | | | | MED EXP (Any one person) | $5,000 |
| | | | | | | PERSONAL & ADV INJURY | $1,000,000. |
| | | GEN'L AGGREGATE LIMIT APPLIES PER<br>POLICY X PROJECT  LOC | | | | GENERAL AGGREGATE | $2,000,000. |
| | | | | | | PRODUCTS - COMP/OP AGG | $2,000,000. |
| C | | **AUTOMOBILE LIABILITY**<br>ANY AUTO<br>ALL OWNED AUTOS<br>X SCHEDULED AUTOS<br>X HIRED AUTOS<br>X NON-OWNED AUTOS | SCI0023907731 | 06/01/07 | 06/01/08 | COMBINED SINGLE LIMIT (Ea accident) | $1,000,000 |
| | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | **GARAGE LIABILITY**<br>ANY AUTO | | | | AUTO ONLY - EA ACCIDENT<br>OTHER THAN  EA ACC<br>AUTO ONLY:  AGG | $<br>$<br>$ |
| B | | **EXCESS/UMBRELLA LIABILITY**<br>X OCCUR  CLAIMS MADE<br>DEDUCTIBLE<br>X RETENTION  $10,000 | G220499020012 | 08/01/07 | 08/01/08 | EACH OCCURRENCE<br>AGGREGATE | $25,000,000<br>$25,000,000<br>$<br>$<br>$ |
| | | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY**<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?<br>If yes, describe under SPECIAL PROVISIONS below | | | | WC STATU-TORY LIMITS  OTH-ER<br>E.L. EACH ACCIDENT<br>E.L. DISEASE - EA EMPLOYEE<br>E.L. DISEASE - POLICY LIMIT | $<br>$<br>$ |
| B | | **OTHER**<br>Builders' Risk | FSD3594414A004 | 03/30/07 | 03/30/08 | Per Occr. | $50,000,000 |

**DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS**
Certificate Holder is included as an Additional Insured as respects General
Liability and Waiver of Subrogation applies as required by contract.
Certificate Holder is included as Mortgagee on the Builders Risk Policy as
respects Willacy County Local Government Corporation.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| **USBADEN**<br>U.S. Bank National Association<br>As Trustee<br>950 17th Street, Suite 650<br>Mail Stop CNDT 0665<br>Denver, CO 80202 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL __30__ DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES<br>**AUTHORIZED REPRESENTATIVE** |

ACORD 25 (2001/08)

© ACORD CORPORATION 1988

225

# IMPORTANT

If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s)

If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

## DISCLAIMER

The Certificate of Insurance on the reverse side of this form does not constitute a contract between the issuing insurer(s), authorized representative or producer, and the certificate holder, nor does it affirmatively or negatively amend, extend or alter the coverage afforded by the policies listed thereon.

ACORD 25 (2001/08)

226

# ACORD. CERTIFICATE OF LIABILITY INSURANCE

OP ID CH 3-KALEM

DATE (MM/DD/YYYY) 08/24/07

**PRODUCER**

The Transportation Group, Ltd.
11111 Wilcrest Green, #325
Houston TX 77042
Phone: 713-785-6785  Fax: 713-785-8785

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.

**INSURED**

HMC Contracting South
Texas, L.L.C.
Attn: Phil Packer
2900 Weslayan, Suite 375
Houston TX 77027

| INSURERS AFFORDING COVERAGE | NAIC # |
|---|---|
| INSURER A  Interstate Fire & Casualty | |
| INSURER B  Westchester Surplus Lines Ins. | |
| INSURER C  Zurich American Insurance Co. | |
| INSURER D | |
| INSURER E | |

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| A | X | **GENERAL LIABILITY** X COMMERCIAL GENERAL LIABILITY ☐ CLAIMS MADE X OCCUR | DGL1000044 | 08/01/07 | 08/01/08 | EACH OCCURRENCE | $1,000,000. |
| | | | | | | DAMAGE TO RENTED PREMISES (Ea occurence) | $50,000. |
| | | | | | | MED EXP (Any one person) | $5,000 |
| | | | | | | PERSONAL & ADV INJURY | $1,000,000. |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: POLICY X PROJECT ☐ LOC | | | | GENERAL AGGREGATE | $2,000,000. |
| | | | | | | PRODUCTS - COMP/OP AGG | $2,000,000. |
| C | | **AUTOMOBILE LIABILITY** ☐ ANY AUTO ☐ ALL OWNED AUTOS X SCHEDULED AUTOS X HIRED AUTOS X NON-OWNED AUTOS | SCI0023907731 | 06/01/07 | 06/01/08 | COMBINED SINGLE LIMIT (Ea accident) | $1,000,000 |
| | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | **GARAGE LIABILITY** ☐ ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | | OTHER THAN EA ACC AUTO ONLY: AGG | $ |
| B | | **EXCESS/UMBRELLA LIABILITY** X OCCUR ☐ CLAIMS MADE ☐ DEDUCTIBLE X RETENTION  $10,000 | G220499020012 | 08/01/07 | 08/01/08 | EACH OCCURRENCE | $25,000,000 |
| | | | | | | AGGREGATE | $25,000,000 |
| | | | | | | | $ |
| | | | | | | | $ |
| | | | | | | | $ |
| | | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? If yes, describe under SPECIAL PROVISIONS below | | | | ☐ WC STATUTORY LIMITS ☐ OTHER | |
| | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| B | | **OTHER** Builders' Risk | FSD3594414A004 | 03/30/07 | 03/30/08 | Per Occr. | $50,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS

Certificate Holder is included as an Additional Insured as respects General
Liability and Waiver of Subrogation applies.

## CERTIFICATE HOLDER

WILCRAY

Willacy County Local
Government Corporation
546 W. Hidalgo Street
Raymondville, TX 78580

## CANCELLATION

SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL  30  DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES

AUTHORIZED REPRESENTATIVE

ACORD 25 (2001/08)

© ACORD CORPORATION 1988

227

# IMPORTANT

If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s)

If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s)

## DISCLAIMER

The Certificate of Insurance on the reverse side of this form does not constitute a contract between the issuing insurer(s), authorized representative or producer, and the certificate holder, nor does it affirmatively or negatively amend, extend or alter the coverage afforded by the policies listed thereon.

ACORD 25 (2001/08)

228

EXHIBIT D
PAYMENT AND PERFORMANCE BONDS

171620 2068.1



**229**

# TEXAS STATUTORY PAYMENT BOND

STATE OF TEXAS      §
                       §
COUNTY OF WILLACY   §

KNOW ALL MEN BY THESE PRESENTS that HMC Contracting South Texas, L.L.C. (hereinafter called the "Principal") as Principal, and Hartford Fire Insurance Company (hereinafter called the "Surety") as Surety, are held and firmly bound unto the Willacy County Local Government Corporation, the Owner of the subject property (hereinafter called the "Obligee") in the amount of Forty-three Million One Hundred Seventy-two Thousand Three Hundred Twenty Seven Dollars ($43,172,327), said amount being a sum at least equal to the total of the original contract amount, for the payment whereof the said Principal and Surety bind themselves and their respective heirs, administrators, executors, successors and assigns, jointly and severally, firmly by these presents.

WHEREAS, the Principal has entered into a certain written contract with the Obligee on the 19th day of July, 2006, (the "Contract") for the construction of a 1000 bed addition to the ICE Detention Facility located in Willacy County, Texas, which Contract is hereby referred to and made a part hereof as fully and to the same extent as if copied at length herein.

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION IS SUCH, that if the Principal shall promptly pay Claimants for all labor, subcontracts, materials, equipment and specially fabricated materials performed or furnished under or by virtue of said Contract and duly authorized normal and usual extras thereto not exceeding fifteen percent (15%) of the contract price, then this obligation shall be void, otherwise to remain in full force and effect. "Labor, subcontracts, materials, equipment and specially fabricated materials" shall be construed in accordance with Chapter 53 of the Texas Property Code and Chapter 2253 of the Texas Government Code.

This Bond has been furnished to comply with Subchapter I of Chapter 53 of the Texas Property Code and Subchapter B of the Texas Government Code. Any provisions in this Bond conflicting with Subchapter I of Chapter 53 of the Texas Property Code or Subchapter B of the Texas Government Code shall be disregarded, and provisions conforming to such statutory or legal requirements of Subchapter I of Chapter 53 of the Texas Property Code or Subchapter B of the Texas Government Code shall be deemed incorporated herein. The intent is that this Bond shall be construed as a Statutory Bond in compliance with both Subchapter I of the Texas Property Code and Subchapter B of the Texas Government Code.

**The address of Surety to which any notice of claim should be sent may be obtained from the Texas Department of Insurance by calling its toll-free number: 1-800-252-3439 (Consumer Information) or 1-800-578-4677 (Main).**

171820 2068.1

230

IN WITNESS WHEREOF, the said Principal and Surety have signed and sealed this instrument this _____ day of _____, 2007.

Principal, HMC Contracting South Texas, L.L.C.

By: _____
Title: _____
Address: _____
Telephone: (713) 665-1100
Fax: (713) 665-4944

Surety, Hartford Fire Insurance Company

By: _____
Title: _____
Address: _____
Telephone: (   ) _____
Fax: (   ) _____

THE FOREGOING BOND IS HEREBY APPROVED BY OWNER:

Willacy County Local Government Corporation

By: _____
Its: _____

Address: _____

Date: _____

171620 2068.1

# PERFORMANCE BOND

STATE OF TEXAS      §
                        §

COUNTY OF WILLACY    §

KNOWN ALL MEN BY THESE PRESENTS: That HMC Contracting South Texas, L.L.C., as principal, and Hartford Fire Insurance Company authorized under the laws of the State of Texas to act as surety on bonds for principals, are held and firmly bound unto The Willacy County Local Government Corporation as Obligee (Owner), in the penal sum of Forty-three Million One Hundred Seventy-two Thousand Three Hundred Twenty Seven Dollars ($43,172,327) for the payment whereof, the said Principal and Surety bind themselves, and their heirs, administrators, executors, successors and assigns, jointly and severally, by these presents:

WHEREAS, the Principal has entered into a certain written contract with the Owner, effective as of the _____ day of _____, 2007, (the "Contract") to commence and complete the construction of certain improvements described as follows:

A 1000 bed expansion of ICE Facility
Willacy County, Texas

which Contract, including the Contract Documents as defined therein, is hereby referred to and made a part hereof as fully and to the same extent as if copied at length herein.

NOW THEREFORE, THE CONDITION OF THIS OBLIGATION IS SUCH, that if the said Principal shall faithfully perform said Contract Work, then this obligation shall be void; otherwise to remain in full force and effect;

Whenever, Contractor shall be, and be declared by Owner in a written notice to Surety, to be in default under the Contract, the Owner having performed Owner's obligations thereunder, the Surety may promptly remedy the default, or shall promptly:

       1.     Complete the Contract in accordance with its terms and conditions, or

       2.     Obtain a bid or bids for completing the Contract in accordance with its terms and conditions, and upon determination by Surety of the lowest responsible bidder, or, if the Owner elects, upon determination by the Owner and the Surety jointly of the lowest responsible bidder, arrange for a contract between such bidder and Owner, and make available as Work progresses (even though there should be a default or succession of defaults under the contract or contracts of completion arranged under this paragraph) sufficient funds to pay the cost of completion less the balance of the Contract Price; but not exceeding, including other costs and damages for which the Surety may be liable hereunder, the amount set forth in this first paragraph hereof. The term "balance of the Contract Price," as used in this paragraph, shall mean the total amount payable by Owner to Contractor under the Contract and any amendments thereto, less the amount properly paid by Owner to Contractor.

171620 2068.1

Surety shall have no further or other obligations other than those set forth above.

As a condition precedent to coverage under this Bond, Owner must give Surety its written notice of Contractor's default no later than ninety one (91) days from the earliest to occur of the following: (i) the date of any abandonment or termination of the Contract; (ii) the date final payment is made to the Contractor under the Contract; or (iii) the date Contractor last performed Work under the Contract, excluding any warranty work. Any default declared by Owner or demand made against the Surety by Owner outside of this time frame is not covered by this Bond and Surety shall have no liability therefore.

Any suit under this bond must be instituted before the expiration of twenty-five (25) months from the date on which the right of action accrues, but if this provision is prohibited by law or if any law provides for a lesser period of time then it shall be deemed to be amended as so to be equal to the minimum period of limitation allowed by such law.

No right of action shall accrue on this Bond to or for the use of any person or entity other than the Owner and its successors or assigns. The terms and conditions of this Bond shall be binding upon Contractor, Surety, Owner and their respective successors or assigns.

Surety, for value received, stipulates and agrees that no change, extension of time, alteration or addition to the terms of the Contract, or to the Work performed thereunder, or the plans, specifications, or drawings accompanying the same, shall in any way affect its obligation on this Bond, and it does hereby waive notice of any such change, extension of time, alteration or addition to the terms of the Contract, or to the Work to be performed thereunder.

IN WITNESS WHEREOF, the said Principal and Surety have signed and sealed this instrument this _____ day of _____,2007.

Principal, HMC Contracting South Texas, L.L.C.          Surety, Hartford Fire Insurance Company

By: _____               By: _____
Title: _____            Title: _____
Address: _____          Address: _____
Telephone: (713) 665-1100                  Telephone: ( ) _____
Fax: (713) 665-4944                        Fax: ( ) _____

171620 2068 1

**233**

EXHIBIT E
LIST OF DRAWINGS

171820 2088.1

Ex. E

**Willacy County Processing Facility Expansion**

| Sheet | Title | Date | Rev 1 |
|---|---|---|---|
| C1 | Dimension Control Plan | 8/10/07 | |
| C2 | Grading/Paving Plan | 8/10/07 | |
| C3 | Drainage Area Map | 8/10/07 | |
| C4 | Drainage Plan | 8/10/07 | |
| C5 | Water & Sanitary Sewer Plan | 8/10/07 | |
| S1.1 | General Notes | 8/10/07 | |
| S2.1 | Housing Building Foundation Plan | 8/10/07 | |
| S2.2 | Housing Building Foundation Plan | 8/10/07 | |
| S2.3 | Housing Building Foundation Plan | 8/10/07 | |
| S2.4 | Housing Building Foundation Plan | 8/10/07 | |
| S2.5 | Admin Expansion Foundation Plan | 8/10/07 | |
| S2.6 | Admin Expansion Foundation Plan | 8/10/07 | |
| S2.7 | Maintenance Bldg Foundation Plan | 8/10/07 | |
| S2.8 | Rec Building Foundation Plan | 8/10/07 | |
| S3.1 | Housing Building Security Plan | 8/10/07 | |
| S3.2 | Housing Building Security Plan | 8/10/07 | |
| S3.3 | Housing Building Security Plan | 8/10/07 | |
| S3.4 | Housing Building Security Plan | 8/10/07 | |
| S4.1 | Housing Building Roof Framing Plan | 8/10/07 | |
| S4.2 | Housing Building Roof Framing Plan | 8/10/07 | |
| S4.3 | Housing Building Roof Framing Plan | 8/10/07 | |
| S4.4 | Housing Building Roof Framing Plan | 8/10/07 | |
| S5.1 | Main Facility Foundation Sections | 8/10/07 | |
| S5.2 | Main Facility Foundation Sections | 8/10/07 | |
| S5.3 | Maint Building Foundation Plan | 8/10/07 | |
| S6.1 | Main Facility Framing Sections | 8/10/07 | |
| S6.2 | Main Facility Framing Sections | 8/10/07 | |
| S7.1 | Panel Elevations and Details | 8/10/07 | |
| S7.2 | Panel Elevations and Details | 8/10/07 | |
| S8.1 | Panel Joint Elevations | 8/10/07 | |
| S8.2 | Panel Joint Elevations | 8/10/07 | |
| S8.3 | Panel Joint Elevations | 8/10/07 | |
| S8.4 | Panel Joint Elevations | 8/10/07 | |
| S8.5 | Panel Joint Elevations | 8/10/07 | |
| S8.6 | Panel Joint Elevations | 8/10/07 | |
| S8.7 | Panel Joint Elevations | 8/10/07 | |
| A1.1 | Site Plan | 8/10/07 | |
| A2.0 | Floor Plans | 8/10/07 | |
| A2.1 | Demo Plan/Floor Plan | 8/10/07 | |
| A2.1A | Floor Plan-Area A | 8/10/07 | |
| A2.1B | Floor Plan-Area B | 8/10/07 | |
| A2.2 | Housing Floor Plan | 8/10/07 | 8/14/07 |
| A2.2A | Housing Floor Plan - Area A | 8/10/07 | 8/14/07 |
| A2.2B | Housing Floor Plan - Area B | 8/10/07 | 8/14/07 |
| A2.2C | Housing Floor Plan - Area C | 8/10/07 | 8/14/07 |
| A2.2D | Housing Floor Plan - Area D | 8/10/07 | 8/14/07 |
| A2.3 | MTC Admin Floor Plan | 8/10/07 | |
| A2.4 | Admin Reflective Ceiling Plan | 8/10/07 | |
| A2.5 | Housing Reflective Ceiling Plan | 8/10/07 | |
| A3.1 | Exterior Elevations | 8/10/07 | |
| A3.2 | Exterior Elevations | 8/10/07 | |
| A8.1 | Partition Types/Interior Elevations | 8/10/07 | |
| A8.2 | Millwork Elevations | 8/10/07 | |
| DE5.00 | Overall Door Schedule | 8/10/07 | |
| DE5.01 | Overall Door Schedule | 8/10/07 | |
| DE6.00 | Door and Window Frame Elevations | 8/10/07 | |
| M-1 | MTC - Maintenance Bldg Mechanical Plan | 8/10/07 | |
| M-2 | Indoor Rec Bldgs Mechanical Plan | 8/10/07 | |
| M-3 | Bunks/Kitchen Bldg Mechanical Plan | 8/10/07 | |
| M-4 | Bunks/Kitchen Bldg Mechanical Plan | 8/10/07 | |
| M-5 | Bunks/Kitchen Bldg Mechanical Plan | 8/10/07 | |
| M-6 | Bunks/Kitchen Bldg Mechanical Plan | 8/10/07 | |
| M-7 | Existing Admin Bldg Mechanical Plan | 8/10/07 | |
| M-8 | Existing Admin Bldg Mechanical Plan | 8/10/07 | |
| M-9 | Existing Admin Bdg Mechanical Plan | 8/10/07 | |
| M-10 | Existing Admin Bldg Mechanical Plan | 8/10/07 | |
| M-11 | Mechanical Schedules | 8/10/07 | |
| DE2.1 | Overall Lighting Demo Plan | 8/10/07 | |
| DE2.1A | Lighting Demo Plan Area A | 8/10/07 | |
| DE2.1B | Lighting Demo Plan Area B | 8/10/07 | |
| DE3.1 | Overall Power Demo Plan | 8/10/07 | |
| DE3.1A | Power Demo Plan Area A | 8/10/07 | |
| DE3.1B | Power Demo Plan Area B | 8/10/07 | |
| E1.2 | Site Tel, Data & Primary Conduit Runs | 8/10/07 | |

| Sheet | Title | Date | Rev 1 |
|---|---|---|---|
| E2.1 | Overall Lighting Plan | 8/10/07 | |
| E2.1A | Lighting Plan Area A | 8/10/07 | |
| E2.1B | Lighting Plan Area B | 8/10/07 | |
| E2.2 | Overall Housing Lighting Plan | 8/10/07 | |
| E2.2A | Housing Lighting Plan Area A | 8/10/07 | |
| E2.2B | Housing Lighting Plan Area B | 8/10/07 | |
| E2.2C | Housing Lighting Plan Area C | 8/10/07 | |
| E2.2D | Housing Lighting Plan Area D | 8/10/07 | |
| E2.3 | New Admin Lighting Plan | 8/10/07 | |
| E2.4 | Indoor Recreation Lighting Plan | 8/10/07 | |
| E3.1 | Overall Power Plan | 8/10/07 | |
| E3.1A | Power Plan Area A | 8/10/07 | |
| E3.1B | Power Plan Area B | 8/10/07 | |
| E3.2 | Overall Housing Power Plan | 8/10/07 | |
| E3.2A | Housing Power Plan Area A | 8/10/07 | |
| E3.2B | Housing Power Plan Area B | 8/10/07 | |
| E3.2C | Housing Power Plan Area C | 8/10/07 | |
| E3.2D | Housing Power Plan Area D | 8/10/07 | |
| E3.3 | New Admin Power Plan | 8/10/07 | |
| E3.4 | Indoor Recreation HVAC & Power Plan | 8/10/07 | |
| E4.1 | Overall HVAC Power Plan | 8/10/07 | |
| E4.1A | HVAC Power Plan Area A | 8/10/07 | |
| E4.1B | HVAC Power Plan Area B | 8/10/07 | |
| E4.2 | Overall Housing HVAC Power Plan | 8/10/07 | |
| E4.2A | Housing HVAC Power Plan Area A | 8/10/07 | |
| E4.2B | Housing HVAC Power Plan Area B | 8/10/07 | |
| E4.2C | Housing HVAC Power Plan Area C | 8/10/07 | |
| E4.2D | Housing HVAC Power Plan Area D | 8/10/07 | |
| E4.3 | New Admin HVAC Power Plan | 8/10/07 | |
| E5.1 | Schedules & Riser | 8/10/07 | |
| E5.2 | Schedules & Riser | 8/10/07 | |
| P.1.1 | Demolition Plan Sewer Expansion Plan | 8/10/07 | |
| P.2.1 | Housing Sewer Plan Area A | 8/10/07 | |
| P.2.2 | Housing Sewer Plan Area B | 8/10/07 | |
| P.2.3 | Housing Sewer Plan Area C | 8/10/07 | |
| P.2.4 | Housing Sewer Plan Area D | 8/10/07 | |
| P.2.5 | Recreation Building Plumbing Plan | 8/10/07 | |
| P.3.1 | Housing Water Plan Area A | 8/10/07 | |
| P.3.2 | Housing Water Plan Area B | 8/10/07 | |
| P.3.3 | Housing Water Plan Area C | 8/10/07 | |
| P.3.4 | Housing Water Plan Area D | 8/10/07 | |
| P.4.1 | Plumbing Kitchen Detail | 8/10/07 | |
| P.4.2 | Sewer Plan Admin Building | 8/10/07 | |
| P.4.3 | Water Plan Admin Building | 8/10/07 | |
| P.5.1 | ISO Riser Details | 8/10/07 | |
| Se0.00 | General Notes and Symbol Legend | 8/10/07 | |
| Se1.00 | Security Electronics Overall Site Plan | 8/10/07 | |
| Se2.00 | Security Electronics Overall Floor Plan | 8/10/07 | |
| Se2.01 | Security Electronics Partial Floor Plan | 8/10/07 | |
| Se2.02 | Security Electronics Partial Floor Plan | 8/10/07 | |
| Se3.00 | Security Electronics Partial Floor Plan | 8/10/07 | |
| Se4.00 | Security Electronics Overall Floor Plan | 8/10/07 | |
| Se 4.01 | Security Electronics Partial Floor Plan | 8/10/07 | |
| Se4.02 | Security Electronics Partial Floor Plan | 8/10/07 | |
| Se4.03 | Security Electronics Partial Floor Plan | 8/10/07 | |
| Se4.04 | Security Electronics Partial Floor Plan | 8/10/07 | |
| Se5.00 | Security Electronics Overall Floor Plan | 8/10/07 | |
| 199-FS01 | Kitchen/Laundry Plan View | 8/10/07 | |
| 199-FS02 | Kitchen/Laundry Plan View | 8/10/07 | |
| 199-FS03 | Kitchen/Laundry Plan View | 8/10/07 | |
| 199-FS04 | Equipment Schedule | 8/10/07 | |

**Willacy County Processing Facility Expansion**

| Sheet | Title | Date | Rev 1 |
|---|---|---|---|
| C1 | Dimension Control Plan | 8/10/07 | |
| C2 | Grading/Paving Plan | 8/10/07 | |
| C3 | Drainage Area Map | 8/10/07 | |
| C4 | Drainage Plan | 8/10/07 | |
| C5 | Water & Sanitary Sewer Plan | 8/10/07 | |
| S1.1 | General Notes | 8/10/07 | |
| S2.1 | Housing Building Foundation Plan | 8/10/07 | |
| S2.2 | Housing Building Foundation Plan | 8/10/07 | |
| S2.3 | Housing Building Foundation Plan | 8/10/07 | |
| S2.4 | Housing Building Foundation Plan | 8/10/07 | |
| S2.5 | Admin Expansion Foundation Plan | 8/10/07 | |
| S2.6 | Admin Expansion Foundation Plan | 8/10/07 | |
| S2.7 | Maintenance Bldg Foundation Plan | 8/10/07 | |
| S2.8 | Rec Building Foundation Plan | 8/10/07 | |
| S3.1 | Housing Building Security Plan | 8/10/07 | |
| S3.2 | Housing Building Security Plan | 8/10/07 | |
| S3.3 | Housing Building Security Plan | 8/10/07 | |
| S3.4 | Housing Building Security Plan | 8/10/07 | |
| S4.1 | Housing Building Roof Framing Plan | 8/10/07 | |
| S4.2 | Housing Building Roof Framing Plan | 8/10/07 | |
| S4.3 | Housing Building Roof Framing Plan | 8/10/07 | |
| S4.4 | Housing Building Roof Framing Plan | 8/10/07 | |
| S5.1 | Main Facility Foundation Sections | 8/10/07 | |
| S5.2 | Main Facility Foundation Sections | 8/10/07 | |
| S5.3 | Maint Building Foundation Plan | 8/10/07 | |
| S6.1 | Main Facility Framing Sections | 8/10/07 | |
| S6.2 | Main Facility Framing Sections | 8/10/07 | |
| S7.1 | Panel Elevations and Details | 8/10/07 | |
| S7.2 | Panel Elevations and Details | 8/10/07 | |
| S8.1 | Panel Joint Elevations | 8/10/07 | |
| S8.2 | Panel Joint Elevations | 8/10/07 | |
| S8.3 | Panel Joint Elevations | 8/10/07 | |
| S8.4 | Panel Joint Elevations | 8/10/07 | |
| S8.5 | Panel Joint Elevations | 8/10/07 | |
| S8.6 | Panel Joint Elevations | 8/10/07 | |
| S8.7 | Panel Joint Elevations | 8/10/07 | |
| A1.1 | Site Plan | 8/10/07 | |
| A2.0 | Floor Plans | 8/10/07 | |
| A2.1 | Demo Plan/Floor Plan | 8/10/07 | |
| A2.1A | Floor Plan-Area A | 8/10/07 | |
| A2.1B | Floor Plan-Area B | 8/10/07 | |
| A2.2 | Housing Floor Plan | 8/10/07 | 8/14/07 |
| A2.2A | Housing Floor Plan - Area A | 8/10/07 | 8/14/07 |
| A2.2B | Housing Floor Plan - Area B | 8/10/07 | 8/14/07 |
| A2.2C | Housing Floor Plan - Area C | 8/10/07 | 8/14/07 |
| A2.2D | Housing Floor Plan - Area D | 8/10/07 | 8/14/07 |
| A2.3 | MTC Admin Floor Plan | 8/10/07 | |
| A2.4 | Admin Reflective Ceiling Plan | 8/10/07 | |
| A2.5 | Housing Reflective Ceiling Plan | 8/10/07 | |
| A3.1 | Exterior Elevations | 8/10/07 | |
| A3.2 | Exterior Elevations | 8/10/07 | |
| A8.1 | Partition Types/Interior Elevations | 8/10/07 | |
| A8.2 | Millwork Elevations | 8/10/07 | |
| DE5.00 | Overall Door Schedule | 8/10/07 | |
| DE5.01 | Overall Door Schedule | 8/10/07 | |
| DE6.00 | Door and Window Frame Elevations | 8/10/07 | |
| M-1 | MTC - Maintenance Bldg Mechanical Plan | 8/10/07 | |
| M-2 | Indoor Rec Bldgs Mechanical Plan | 8/10/07 | |
| M-3 | Bunks/Kitchen Bldg Mechanical Plan | 8/10/07 | |
| M-4 | Bunks/Kitchen Bldg Mechanical Plan | 8/10/07 | |
| M-5 | Bunks/Kitchen Bldg Mechanical Plan | 8/10/07 | |
| M-6 | Bunks/Kitchen Bldg Mechanical Plan | 8/10/07 | |
| M-7 | Existing Admin Bldg Mechanical Plan | 8/10/07 | |
| M-8 | Existing Admin Bldg Mechanical Plan | 8/10/07 | |
| M-9 | Existing Admin Bldg Mechanical Plan | 8/10/07 | |
| M-10 | Existing Admin Bldg Mechanical Plan | 8/10/07 | |
| M-11 | Mechanical Schedules | 8/10/07 | |
| DE2.1 | Overall Lighting Demo Plan | 8/10/07 | |
| DE2.1A | Lighting Demo Plan Area A | 8/10/07 | |
| DE2.1B | Lighting Demo Plan Area B | 8/10/07 | |
| DE3.1 | Overall Power Demo Plan | 8/10/07 | |
| DE3.1A | Power Demo Plan Area A | 8/10/07 | |
| DE3.1B | Power Demo Plan Area B | 8/10/07 | |
| E1.2 | Site Tel, Data & Primary Conduit Runs | 8/10/07 | |

## Willacy County Processing Facility Expansion

| Sheet | Title | Date | Rev 1 |
|-------|-------|------|-------|
| E2.1 | Overall Lighting Plan | 8/10/07 | |
| E2.1A | Lighting Plan Area A | 8/10/07 | |
| E2.1B | Lighting Plan Area B | 8/10/07 | |
| E2.2 | Overall Housing Lighting Plan | 8/10/07 | |
| E2.2A | Housing Lighting Plan Area A | 8/10/07 | |
| E2.2B | Housing Lighting Plan Area B | 8/10/07 | |
| E2.2C | Housing Lighting Plan Area C | 8/10/07 | |
| E2.2D | Housing Lighting Plan Area D | 8/10/07 | |
| E2.3 | New Admin Lighting Plan | 8/10/07 | |
| E2.4 | Indoor Recreation Lighting Plan | 8/10/07 | |
| E3.1 | Overall Power Plan | 8/10/07 | |
| E3.1A | Power Plan Area A | 8/10/07 | |
| E3.1B | Power Plan Area B | 8/10/07 | |
| E3.2 | Overall Housing Power Plan | 8/10/07 | |
| E3.2A | Housing Power Plan Area A | 8/10/07 | |
| E3.2B | Housing Power Plan Area B | 8/10/07 | |
| E3.2C | Housing Power Plan Area C | 8/10/07 | |
| E3.2D | Housing Power Plan Area D | 8/10/07 | |
| E3.3 | New Admin Power Plan | 8/10/07 | |
| E3.4 | Indoor Recreation HVAC & Power Plan | 8/10/07 | |
| E4.1 | Overall HVAC Power Plan | 8/10/07 | |
| E4.1A | HVAC Power Plan Area A | 8/10/07 | |
| E4.1B | HVAC Power Plan Area B | 8/10/07 | |
| E4.2 | Overall Housing HVAC Power Plan | 8/10/07 | |
| E4.2A | Housing HVAC Power Plan Area A | 8/10/07 | |
| E4.2B | Housing HVAC Power Plan Area B | 8/10/07 | |
| E4.2C | Housing HVAC Power Plan Area C | 8/10/07 | |
| E4.2D | Housing HVAC Power Plan Area D | 8/10/07 | |
| E4.3 | New Admin HVAC Power Plan | 8/10/07 | |
| E5.1 | Schedules & Riser | 8/10/07 | |
| E5.2 | Schedules & Riser | 8/10/07 | |
| P.1.1 | Demolition Plan Sewer Expansion Plan | 8/10/07 | |
| P.2.1 | Housing Sewer Plan Area A | 8/10/07 | |
| P.2.2 | Housing Sewer Plan Area B | 8/10/07 | |
| P.2.3 | Housing Sewer Plan Area C | 8/10/07 | |
| P.2.4 | Housing Sewer Plan Area D | 8/10/07 | |
| P.2.5 | Recreation Building Plumbing Plan | 8/10/07 | |
| P.3.1 | Housing Water Plan Area A | 8/10/07 | |
| P.3.2 | Housing Water Plan Area B | 8/10/07 | |
| P.3.3 | Housing Water Plan Area C | 8/10/07 | |
| P.3.4 | Housing Water Plan Area D | 8/10/07 | |
| P.4.1 | Plumbing Kitchen Detail | 8/10/07 | |
| P.4.2 | Sewer Plan Admin Building | 8/10/07 | |
| P.4.3 | Water Plan Admin Building | 8/10/07 | |
| P.5.1 | ISO Riser Details | 8/10/07 | |
| Se0.00 | General Notes and Symbol Legend | 8/10/07 | |
| Se1.00 | Security Electronics Overall Site Plan | 8/10/07 | |
| Se2.00 | Security Electronics Overall Floor Plan | 8/10/07 | |
| Se2.01 | Security Electronics Partial Floor Plan | 8/10/07 | |
| Se2.02 | Security Electronics Partial Floor Plan | 8/10/07 | |
| Se3.00 | Security Electronics Partial Floor Plan | 8/10/07 | |
| Se4.00 | Security Electronics Overall Floor Plan | 8/10/07 | |
| Se 4.01 | Security Electronics Partial Floor Plan | 8/10/07 | |
| Se4.02 | Security Electronics Partial Floor Plan | 8/10/07 | |
| Se4.03 | Security Electronics Partial Floor Plan | 8/10/07 | |
| Se4.04 | Security Electronics Partial Floor Plan | 8/10/07 | |
| Se5.00 | Security Electronics Overall Floor Plan | 8/10/07 | |
| 199-FS01 | Kitchen/Laundry Plan View | 8/10/07 | |
| 199-FS02 | Kitchen/Laundry Plan View | 8/10/07 | |
| 199-FS03 | Kitchen/Laundry Plan View | 8/10/07 | |
| 199-FS04 | Equipment Schedule | 8/10/07 | |



**D B I A**

DESIGN-BUILD
INSTITUTE OF AMERICA

# Certificate of Substantial Completion

| | |
|---|---|
| | Date of Substantial Completion: **January 31, 2008** |
| **Project:** 1,086 Bed Addition to the Willacy County ICE Detention Facility Willacy County, Texas | Design-Builder's Project No: **07-06** |
| | Date Of Agreement: August 30, 2007 |
| **Owner:** The Willacy County Local Government Corporation 190 North 3rd Street Courthouse Annex Raymondville, Texas 78580 | **Design-Builder:** HMC Contracting South Texas, LLC 2900 Weslayan, Suite 375 Houston, Texas 77027 |

This Certificate of Substantial Completion applies to all Work as defined in DBIA Contract Dated August 30, 2007, General Conditions of Contract, or to the following portion of the Work only:

:tantial Completion for: 1,086 Bed Housing Building Expansion, Administration Expansion and Remodel, Recreation Building, and MTC Administration Building.

Owner and Design-Builder have jointly inspected the Work and have verified that the Work identified above was substantially complete in accordance with the requirements of the Contract Documents on the above-stated Date of Substantial Completion. The following items of Work remain to be completed prior to final payment (if necessary, attach list):

**Attached Punch List**

Except as noted below, warranties related to the Work identified above to which this Certificate of Substantial Completion applies, commence to run on the date of Substantial Completion:

Owner assumes all responsibility for security, maintenance, heat, utilities, damage to work and insurance

**OWNER:**

By: _____

Printed Name and Title: Emilio Vera, Commissioner

Date: _____

**OPERATOR:**

By: _____

P     I Name and Title: Stephen McADMS - Director - MTC

Date: 1-31-2008

**DESIGN-BUILDER:**

By: _____

Printed Name and Title: Kendall Phinney, President

Date: _____

**DESIGNER:**

By: _____

Printed Name and Title: Deborah Williams, Architect

Date: January 31, 2008

# EXHIBIT E

CAUSE NO. 2014-CV-0103A

| | | |
|---|---|---|
| WILLACY COUNTY,<br>Plaintiff | § § § § § | IN THE TEXAS DISTRICT COURT |
| vs. | § § | |
| HALE-MILLS CONSTRUCTION, LTD.;<br>HALE-MILLS CONSTRUCTION, INC.;<br>HMC CONTRACTING SOUTH TEXAS, LLC;<br>and MANAGEMENT & TRAINING<br>CORPORATION d/b/a MTC/GSA-TEXAS,<br>Defendants | § § § § § § | 197TH JUDICIAL DISTRICT<br><br><br><br><br>WILLACY COUNTY, TEXAS |

## ORDER

**THE COURT**, after reviewing Defendants' Motion to Abate and Compel Arbitration, and Plaintiff's Response, and after hearing held on January 21, 2015, finds that Defendant's Motion should be **DENIED**.

Plaintiff, Willacy County, retains sovereign immunity against any attempt to enforce the contractual terms—including those allowing for arbitration. *See Highland Park v. Iron Crow Constr., Inc.*, 168 S.W.3d 313, 319 (Tex. App. Dallas 2005). Moreover, Willacy County was not even a signatory to the agreements, and as such, has not consented to arbitration. The fact that the parties to the Agreements designated Willacy as a third party beneficiary does not rise to the level of making it a signatory or giving its assent to waive its right to a judicial forum. None of the cases cited by the Defendants hold otherwise. The Court further agrees with the reasons set forth in Plaintiffs' Response to Defendants' Motion as to why arbitration cannot be compelled under these circumstances.

IT IS SO ORDERED.

*[handwritten: 1:42 pm]* *[handwritten: KC: 03/27/15]*

**FILED**

*[handwritten: R. Garcia]*
*[handwritten: m. Mills]*

MAR 27 2015 *[handwritten: D. Rios]*
*[handwritten: m. Solis]*

Gilbert Lozano, Dist. Clerk, Willacy Co.
By_____Deputy *[handwritten: B. Steckler]*
*[handwritten: W. Westcott]*

_____
Presiding Judge

*[handwritten: March 26, 2015]*

418

# EXHIBIT F

| | | |
|---|---|---|
| WILLACY COUNTY, | § | IN THE TEXAS DISTRICT COURT |
| **Plaintiff** | § | |
| | § | |
| vs. | § | |
| | § | |
| HALE-MILLS CONSTRUCTION, LTD.; | § | 197TH JUDICIAL DISTRICT |
| HALE-MILLS CONSTRUCTION, INC.; | § | |
| HMC CONTRACTING SOUTH TEXAS, | § | |
| LLC; | § | |
| and MANAGEMENT & TRAINING | § | |
| CORPORATION d/b/a MTC/GSA-TEXAS, | § | |
| **Defendants** | § | WILLACY COUNTY, TEXAS |

---

## WILLACY COUNTY'S PLEA TO THE JURISDICTION AND RESPONSE TO PLEA IN ABATEMENT AND OPPOSITION TO ARBITRATION BEFORE AAA

---

**TO THE HONORABLE JUDGE OF THIS COURT:**

**COME NOW,** the Plaintiff County of Willacy, Texas, by and through their respective attorneys of record, and files this its Response To Plea In Abatement And Opposition To Arbitration Before AAA, and as grounds therefore would show unto the Court as follows:

### I.

### <u>INTRODUCTION</u>

Plaintiff County of Willacy, Texas, respectfully submits this Response to Defendants' Plea in Abatement and Motion to Compel Arbitration, set for hearing in this Court on January 21, 2015, and by undersigned counsel would respectfully show the Court:

Defendants make much hay out of the fact that they claim to have four different agreements, with four different arbitration clauses, covering (at least) four different transactions that are alleged by Defendants to be implicated in this case. But Defendants' miss the point and cannot prevail because:



FILED

3:37 p.m.

'JAN 2 0 2015



Gilbert Lozano, Dist. Clerk, Willacy Co.
By_____ Deputy

84

- Under the case *Town of Highland Park*, Defendant's Motion to Compel is tantamount to an action to enforce the contract against Willacy County, an action against which Willacy County has unwaivable sovereign immunity—this Court thus lacks jurisdiction to enforce such a contractual right against the County;

- Willacy County is not a party to the Arbitration agreements, and cannot be made a party by implication or supposition;

- Defendants have not attached the alleged contracts, nor authenticated them— therefore, there is no evidence for this Court to conduct a "trial" as is required under the statute;

- Even if sovereign rights had not been waived, Willacy County's claims are incident to the contract and Willacy is not attempting to enforce the contract— therefore, there is no basis to enforce the agreement on estoppel grounds; and

- The arbitration clauses are unconscionable and therefore, unenforceable under the Texas Arbitration Act.

Any of one of these reasons is sufficient to deny the motion. Together, they are a bulwark against Defendants' impotent attempt to enforce an unenforceable and unconscionable agreement that the County never signed and never agreed to be bound by.

Accordingly, this Court should deny the Plea in Abatement and Motion to Compel Arbitration.

## II.

## ARGUMENTS AND AUTHORITIES

### A. WILLACY COUNTY'S PLEA TO THE JURISDICTION: The Agreement to Arbitrate is Invalid and Unenforceable Against Willacy County Because there Was Lack of Capacity to Bind Willacy County to an Arbitration Agreement

None of the agreements purports to bind Willacy County. Nor do any of the Signatories have the authority to bind Willacy County to waive its sovereign rights. It is well-established now that forcing a County into arbitration implicates the county's sovereign rights. *See Town of Highland Park v. Iron Crow Constr., Inc.*, 168 S.W.3d 313, 319 (Tex. App. Dallas 2005) ("Because its contract with Highland Park provided for binding arbitration in the event of a

dispute between the parties, Iron Crow was seeking to enforce Highland Park's performance under that contract. Therefore, sovereign immunity was indeed implicated here.").

In *Town of Highland Park*, the town was a signatory to the contract and the Court still refused to allow it to compel arbitration. 168 S.W.3d at 319. The Court held that a motion or action to enforce an Arbitration clause is essentially a suit to enforce the terms of a contract, a suit against which the County has sovereign immunity. *Id.* The Court noted that only the legislature can waive immunity which it did not in this case. *Id.* The court of appeals also held that the Federal Arbitration Act did not apply because both the plaintiff and the defendant were Texas residents (as is the case here: Willacy and Hale-Mills are Texas residents); and even if the FAA did apply, it could not preempt the sovereign rights of the County. *Id.* at 317-318. Therefore, this Court *lacks jurisdiction* to enforce the Arbitration Agreement against Willacy County.

The Agreements' arbitration clauses are completely unenforceable against Willacy County absent an express and unambiguous agreement by *Willacy County* to waive its right to be a party in a court of law. In another case analogous to this one, in *Texas Natural Resource Conservation Commission v. IT-Davy*, 74 S.W.3d 849 (Tex. 2002), the Texas Supreme Court rejected the argument that a contractual provision providing that disputes could be decided by arbitration could be enforced against the County. *Id.* at 857-58. The court held that since only the Legislature could waive sovereign immunity, "administrative agents," even those with authority to enter into contracts such as the County Judge, had no authority to bind the County. *Id.*

Likewise, in *Fluor Daniel, Inc. v. Travis County*, 2003 U.S. App. LEXIS 8138, *4 (5th Cir. Tex. Apr. 30, 2003), the Fifth Circuit held that Travis County had not waived its rights as a sovereign in a contract with Fluor, despite the fact that the County Judge had signed the contract.

The Court held that only "the legislative body of the county—the commissioner's court—can waive sovereign immunity." *Id.* at *5. And moreover, even then it must be "clear and unambiguous." *Id.* In that case, the Court held that Travis County—even though it arguably invoked the jurisdiction of the court by filing counterclaims—had not waived any of its sovereign rights not to be brought into court without its express consent. It is also well-established that these rights cannot be waived through the conduct of the county. *See Webb County v. Khaledi Props.*, 2013 Tex. App. LEXIS 9063, 3 (Tex. App. San Antonio July 24, 2013).

Here, the contractual provision hailing Willacy County into arbitration is a violation of the above case law and rules. The various corporate entities lacked capacity to bind the County to those agreements in any way, fashion or form. And Defendants cannot prove otherwise. Therefore, the Motion must fail.

## B. There is No Valid Agreement to Arbitrate Between Defendants and Willacy County— In Fact the Agreements *Preclude* Arbitration in this Instance

To compel arbitration, a party must show that there is a valid arbitration agreement and that the claims raised fall within the agreement's scope. *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 737 (Tex. 2005) (*orig. proceeding*); *see also* Tex. Civ. Prac. Rem. Code § 171.001(a). Without an agreement to arbitrate, arbitration cannot be compelled. *J.M. Davidson*, 128 S.W.3d at 227 (citing *Freis v. Canales*, 877 S.W.2d 283, 284 (Tex. 1994) (orig. proceeding)).

A court determines the validity of an arbitration agreement by applying state contract law principles. *See J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003). Any presumption in favor of arbitration only arises after a valid agreement to arbitrate is established

to exist—the presumption does not apply to construing the existence of the agreement itself. *See In re Kellogg Brown & Root, Inc.*, 166 S.W.3d at 737.

## 1. The Arbitration Agreements Are Not With the County of Willacy And Therefore Cannot be Enforced Against the County

The four putative arbitration agreements are between Hale Mills et al. and Willacy County Public Facility Corporation (Exhibit A), between Hale-Mills Construction Ltd. and County Jail Public Facility Corporation of Willacy County (Exhibit B), HMC Contracting South Texas LLC and the Willacy County Local Government Corporation (Exhibit C), and HMC Contracting South Texas LLC and Willacy County Local Government Corporation (Exhibit D).

Willacy County is not a signatory to any of the agreements. Moreover, none of the above-identified corporate signatories is a plaintiff in this lawsuit. Therefore, there is no contractual basis to enforce the agreements against Willacy County.

Willacy County's claims for breach of implied warranty, negligence/unjust enrichment and for fraud in the inducement "relate" to the contracts, but do not actually depend upon them. As one Court of Appeals explained, "a non-signatory cannot be compelled to arbitrate when claims merely 'touch matters' covered by a contract or 'are dependent upon' a contract; instead, the claims must *rely* on the terms of the contract." *Carr v. Main Carr Dev., LLC,* 337 S.W.3d 489, 498 (Tex. App. Dallas 2011) (citing *Hill v. G.E. Power Sys., Inc.,* 282 F.3d 343, 348-49 (5th Cir. 2002). "Where the obligations arise under general law"—e.g., here, the law of negligence, anti-fraud and implied warranty—then a non-signatory to the agreement cannot be compelled to arbitrate. *Id.* As the *Weekley* court observed, "claims must be brought on the contract (and arbitrated) if liability arises <u>solely</u> from the contract or must be determined by reference to it." *Weekley,* 180 S.W.3d at 132 (emphasis added). Conversely, ". . . claims can be brought in tort (and in court) if liability arises from obligations imposed by law." *Id.*

*Here*, Defendants' motion is completely silent as to what of the contractual language themselves Willacy's claims would rely upon. Willacy's claim for breach of contract/warranty, is not an attempt to enforce any of the specific terms of the agreements. It is well-established that a warranty and defect claims can be brought by third parties to the contract without enforcing any specific terms of the contract. *See Landmark Org., L.P. v. Tremco Inc.*, 2010 Tex. App. LEXIS 5052, *29 (Tex. App. Austin 2010). Likewise, seeking restitution for negligence or unjust enrichment and fraud in the inducement does not invoke any terms of the agreement.

Defendant cite the case *In re NEXT Fin. Group Inc.*, 271 S.W.3d 263, 267 (Tex. 2008) for the proposition that "[a] third-party beneficiary to a contract can be compelled to arbitrate under an arbitration provision in the contract." But this is not what the court in *In re NEXT* held at all. There, the Court held that a non-signatory third-party beneficiary could *enforce* an arbitration clause against one of the signatories. The case here is the opposite—a signatory (Hale Mills or HMC) is trying to force a non-signatory (Willacy County) into arbitration. Defendant cites no other case or statute that specifically allows for arbitration clauses to be enforced against a non-signatory, even if that non-signatory is a putative third-party beneficiary.

Furthermore, Defendants admit that Willacy County is not a party to any of the agreements, and is only designated as a third-party beneficiary in three of the four agreements. Thus, that agreement and its claims fall outside of Hale-Mills' own contractual argument that a third-party beneficiary may be compelled to arbitration under all the agreements.

However, because Willacy is named as a Third-Party beneficiary is not enough to compel it to arbitration if it is not invoking the contract specifically—its claims are merely incident to the contract.

### 2. Defendants Cannot Establish That the Non-Parties Can be Bound to the Arbitration Clause

Defendants are attempting to bring parties to the arbitration table that cannot be seated there under Defendants' own arbitration clauses. For instance, the Arbitration agreements expressly exclude arbitration with non-signatories to the Agreement. Specifically, the agreements provide, for example, that:

> No other arbitration arising out of or relating to this Part 2 Agreement shall include by consolidation, joinder, or in any other manner, an additional person or entity not a party to this Part 2 Agreement or not a party to an Agreement with [Hale-Mills], except by written consent[.][1]

Thus, by the plain language, Willacy County cannot be compelled to arbitration under this provision since Willacy County is not a signatory to any of the arbitration agreements either, nor are four two of the three co-defendant entities. Thus, this lawsuit brought by Willacy as against the non-signatory defendants must continue.

### 3. Defendants Cannot Established That a Valid Arbitration Agreement Exists, Therefore, This Court Need Not Try the Matter

The Texas Civil Practice & Remedies Code states that "If there is a substantial bona fide dispute as to whether an agreement to arbitrate exists, the court shall *try* the issue promptly and summarily."). *See* Tex. Civ. Prac. Rem. Code § 171.023(b) (emphasis added). Here, there is a substantial dispute as to whether an agreement to arbitrate exists between the County and the Defendants. Thus, this Court is to try the issue summarily—but how can the Court try this issue when there is not proper evidence before the Court? It cannot.

Defendants only attach snippets of what they claim to be agreements to arbitrate. However, it is prima facie accepted law that to be valid, an arbitration clause must be part of an otherwise enforceable written agreement. *See Bennett v. Leas*, 2008 Tex. App. LEXIS 4817, *8-9 (Tex. App. Corpus Christi June 26, 2008); Tex. Civ. Prac. Rem. Code § 171.021(b).

---

[1] *See* Exhibit A to Amended Motion.

Defendants ask this court to *assume* without evidence—not even an affidavit—that their snippets are part of enforceable contracts. Yet, the contracts have not been presented in full to the Court with signatures, dates or other matters governing the scope of the claims or issues covered by the Agreements. They have not been properly authenticated or otherwise presented properly to the Court as certified copies or genuine facsimiles. This is grounds for striking the evidence and not considering it—it constitutes hearsay. *Wortham v. Otis Elevator Co.*, 2000 Tex. App. LEXIS 3443, *8 (Tex. App. Dallas May 25, 2000) (sustaining trial court striking of summary evidence where "documents constituted hearsay and were not properly authenticated").

Therefore, before this court is *no evidence* of an enforceable agreement containing an enforceable arbitration clause. Defendants' say-so is not enough. Defendants mere attachment of pieces of paper constitute *hearsay* and is plenary grounds for striking the evidence. *Wortham*, 2000 Tex. App. LEXIS 3443, *8. Because there is no evidence in favor of the Defendants, there need be no summary trial. And for that reason alone, the Motion fails on its face.

## C. The Claims Do Not Fall Within the Scope of Any of the Submitted Agreements

Defendants have not presented the agreements, and therefore, there is no basis for this Court to say that the claims fall within the scope of the agreements or their arbitration clauses. It is fundamental law that a court cannot compel arbitration of claims that are not covered by the arbitration clause. *See In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 737 (Tex. 2005) (orig. proceeding); *see also* Tex. Civ. Prac. Rem. Code § 171.001(a).

Therefore, because Defendants have not made even the most fundamental showing of how the allegations or the claims actually arise under the Agreements bearing the arbitration clauses, they cannot hope to establish that arbitration is necessary.

## D. The Purported Arbitration Agreements are Unconscionable

Section 171.022 of the Texas Civil Practices and Remedies Code states that "[a] court may not enforce an agreement to arbitrate if the court finds the agreement was unconscionable at the time the agreement was made." "An unconscionable contract provision is defined as one that 'is grossly unreasonable or unconscionable in light of the mores and business practices of the time and place as to be unenforceable according to its literal terms.'" *BDO Seidman, LLP v. J.A. Green Dev. Corp.*, 327 S.W.3d 852, 859 (Tex. App. Dallas 2010) (quoting *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1 (N.Y. 1988)). Unconscionability has a procedural dimension as well as a substantive one. *Id.*

Here, the Agreements were procedurally unconscionable. They were standard form agreements that were compelled on the County. Moreover, they were procedure through a process that included two officials who accepted bribes and ultimately pled guilty to criminal charges of bribery.[2] The agreements are substantively unconscionable because they select the American Arbitration Association, which requires high up-front fees and arbitrator costs—all of which the Willacy County taxpayers would have to bare. The taxpayers should not be the victims of a bribery scandal and shoddy workmanship on a prison that is at the root of this issue.

For these reasons, the arbitration clause should not be enforced.

## III.

## CONCLUSION

For the foregoing reason, this Court should deny Defendants' Plea in Abatement and Motion to Compel Arbitration, and set this matter for trial on the merits.

---

[2] *See* www.myplainview.com/article_439ed742-bbc0-51de-8368-26bf030b4c35.html (last visited January 20, 2015).

**92**

Respectfully submitted,

**LAW OFFICE OF RAMON GARCIA, P.C.**
222 West University Drive
Edinburg, Texas 78539
(956) 383-7441 / (956) 381-0825-Facsimile
e-mail address(s): *EArellano@ramongarcia-law.com*
or *rsalinas@ramongarcia-law.com*

By: _____
HON. RAMON GARCIA
State Bar No.: 07641800
HON. EMERSON E. ARELLANO
State Bar No.: 24067490

&

Hon. BRUCE STECKLER
State Bar No.: 00785039
THE STECKLER LAW GROUP, LLP
12720 Hillcrest Road, Suite 1045
Dallas, Texas 75230
(972) 387-4040
(972) 387-4041

&

HON. MANUEL SOLIS
State Bar No.: 18826790
6657 Navigation
Houston. TX 77011
(713) 844-2700
(281) 754-4681

&

HON. DAN RIOS
State Bar No.: 00784844
323 Nolana Loop
McAllen, TX 78504
(956) 630-9401
(956) 682-0566
*Counselor(s) for Willacy County*

## CERTIFICATE OF SERVICE

I, **EMERSON E. ARELLANO,** do hereby certify that on the **20th** day of **January, 2015**, a true and correct copy of the foregoing *WILLACY COUNTY'S PLEA TO THE JURISDICTION AND RESPONSE TO PLEA IN ABATEMENT AND OPPOSITION TO ARBITRATION BEFORE AAA* filed and a true and a correct copy of the foregoing was issued via e-mail addresses and facsimile transmission to:

**William B. Westcott**
**Kristi Belt**
**ANDREWS MYERS, P.C.**
3900 Essex Lane, suite #800
Houston, TX 77027
(713) 850-4200 / (713)850-4211 - Facsimile
e-mail address(s): *Ben.ewestcott@andrewsmyers.com or kblet@andrewsmyers.com*
*Counsel for Defendants Hale-Mills Construction, LTD, Hale-Mills Construction, Inc.*
*and HMC Contracting South Texas, LLC*


_____
**EMERSON E. ARELLANO**

**94**

LAW OFFICE OF

# RAMON GARCIA

## A PROFESSIONAL CORPORATION

— ❖ —

222 W. UNIVERSITY DRIVE
EDINBURG, TEXAS 78539
rgarcia@ramongarcia-law.com

RAMON GARCIA

TELEPHONE : (956) 383-7441
FACSIMILE :  (956) 381-0825

January 20, 2015

Hon. Gilbert Lozano
**WILLACY COUNTY DISTRICT CLERK**
Willacy County Courthouse
546 West Hidalgo Avenue
Raymondville, Texas 78580

*ISSUED VIA:* <u>*Hand-Delivery (only)*</u>

*Re: Cause No. 2014-cv-0103-A; Willacy County vs. Hale-Mills Construction, Ltd.; Hale-Mills Construction, Inc.; HMC Contracting South Texas, LLC; and Management & Training Corporation d/b/a MTC/GSA-TEXAS; situated before the 197th Judicial District Court, the Honorable Judge Migdalia Lopez, presiding.*

Dear Mr. Lozano:

Regarding the above referenced cause and style, please for filing an original & five copies of the following:

1)  *Willacy County's Plea To The Jurisdiction And Response To Plea In Abatement And Opposition To Arbitration Before AAA;*

Please stamp file our copy and return said stamped copy for our files in the enclosed metered envelope.

Should you have any questions, please do not hesitate to contact me, Rosie Salinas at (956) 383-7441.  Lastly, thank you for your assistance and cooperation in this matter.

Respectfully submitted,

**LAW OFFICE OF RAMON GARCIA, P.C.**

**Rosie Salinas,**
Assistant to Judge Ramon Garcia & Attorney Emerson E. Arellano

EEA/rms
xc:  Our file 013-13R / Willacy County Detention Centers

**RECEIVED**
*8:37 p.m.*
JAN 20 2015

95

Gilbert Lozano, Dist. Clerk, Willacy Co.
By_____ Deputy